UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------x
                                                                          :

COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO,    :

                 :

             Plaintiff,                    :

                 :

      - against -                  :

                 :

VERIZON NEW YORK, INC. TELESECTOR RESOURCES    :    08 Civ. 0467 (HB)
GROUP, INC., EMPIRE CITY SUBWAY COMPANY         :
(LIMITED), VERIZON AVENUE, INC., VERIZON         :
ADVANCED DATA INC., AND VERIZON CORPORATE        :
SERVICES CORP.,                                                              :

                 :

             Defendants.               :

                 :
------------------------------------------------------------------------------x

---------------------------------------------------------------------------------------------------
PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS
MOTION TO COMPEL ARBITRATION (FOR SUMMARY JUDGMENT)
---------------------------------------------------------------------------------------------------

CWA Legal Department
275 Seventh Avenue, Ste. 2300
New York, New York 10001

Table of Contents

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    THE UNION'S GRIEVANCE FALLS WITHIN THE PARTIES' AGREEMENT
    TO ARBITRATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Table of Authorities

<u>Case</u>                                                                                          <u>Page</u>

<u>Associated Brick Contractors, Inc. v. Harrington</u>, 820 F.2d 31 (2d Cir. 1987) . . . . . . . . . . . . . . 5

<u>AT&T Tech., Inc., v. Communications Workers of America</u>, 475 U.S. 643 (1986) . . . . . . . . 4, 5

<u>Collyer Insulated Wire</u>, 192 NLRB 837 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

<u>Communications Workers of America v. Verizon</u>, 2003 WL 22471830 (S.D.N.Y.) . . . . . . . . . 11

<u>Emery Air Freight Corp. v. Local Union 295</u>, 786 F.2d 93 (2d Cir. 1986) . . . . . . . . . . . . . . . . 10

<u>Gateway Coal Co. v. United Mine Workers</u>, 414 U.S. 368 (1974) . . . . . . . . . . . . . . . . . . . . . . . 5

<u>NABET v. ABC</u>, 140 F.3d 459 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

<u>United Steelworkers of America v. American Mfg Co.</u>, 363 U.S. 564 (1960) . . . . . . . . . . . . . 10

<u>United Steelworkers of America v. Warrior & Gulf Nav. Co.</u>, 363 U.S. 574 (1960) . . . . . . . 4, 5

<u>Worldcrisa Corp. v. Armstrong</u>, 129 F.3d 71 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## PRELIMINARY STATEMENT

Plaintiff, Communications Workers of America, AFL-CIO ("CWA" or "Union"), is a labor union and the certified collective bargaining agent for certain employees of the employer, Defendants Verizon New York, Inc., Telesector Resources Group, Inc., Empire City Subway Company (Limited), Verizon Avenue, Inc., and Verizon Corporate Services Corp. (collectively, "Verizon" or "Company").  CWA and Verizon are parties to a group of collective bargaining agreements, among which is the Plant Agreement, covering employees employed by Verizon in titles that are categorized as craft, building and supplies, clerical, and miscellaneous.  Verizon and CWA have been parties to such agreements for decades.  The current Plant Agreement, which is at issue here, is effective between August 3, 2003 and August 2, 2008.[1]

The Plant Agreement has a broad arbitration provision encompassing contractual disputes.  It enables either party to "arbitrate a grievance regarding the true intent and meaning of a provision of this Agreement . . . "  On or about November 30, 2006, one of CWA's affiliated local unions, Local 1109, filed a grievance alleging that the 2006 changes Verizon made to the Absence Control Plan violated the Plant Agreement.  The grievance was processed through the contractual grievance procedure.  Verizon subsequently refused to proceed to arbitration as required by the Plant Agreement.

The Union brings this Motion to Compel Arbitration[2] to compel Verizon to arbitrate the Union's grievance as required under the Plant Agreement.

---

[1] The relevant provisions of the Plant Agreement are attached as Exhibit B to the Declaration of Dennis Trainor.

[2] Provided there are no material facts in dispute, this motion is dispositive of the action before the Court.

STATEMENT OF FACTS

From approximately 1964 until 2006, Verizon or one of its predecessor corporations[3] maintained the Absence Control Plan or Program ("ACP").  The ACP set forth how the Company would address employee absenteeism.  (Trainor Decl., Ex. A.)  Over decades, the ACP became embedded in the parties' collective bargaining agreement.  (Trainor Decl., Ex. B.)  The ACP has been the subject of many arbitrations between the parties.  (Semel Decl. ¶ 11.)

Under the ACP, the Company's managers are directed to look for patterns in an employee's absence, process an employee with an absence problem through a six step program, with Step 6 being termination.  The ACP provides for repeating steps, retrogressing after periods of no absence, and not stepping when an absence is unrelated to the absence pattern identified. The parties bargained specific alterations to the ACP, such as not placing an employee on a step of the ACP when s/he has had a year without absences and that an employee with twenty-five (25) or more years of service would have an additional step in the ACP.  (Trainor Decl., Ex. B, p. 172.)

In 2003, Verizon and CWA negotiated successor collective bargaining agreements.  In its initial presentation, Verizon brought to the table the issue of reducing absenteeism.  The parties created the Joint Committee on Absence Control ("JCAC") "for the purpose of discussing a plan or program for absence reduction for the companies' operations within the operating territory of [Verizon-New York]."  (Trainor Decl., Ex. C, Article XI.)

---

[3]In 2000, Verizon was created by a merger of Bell Atlantic and GTE.  Prior to this merger, the employer of the employees represented by CWA in what is now the Verizon Plant bargaining unit were known as New York Telephone, NYNEX, and Bell Atlantic.  All were parties to the collective bargaining agreements that preceded the Plant Agreement.

2

On March 22, 2006, Verizon Labor Relations Executive Director Jackie Latham informed CWA District One Assistant to the President Dennis Trainor that Verizon intended to unilaterally impose a modified Absence Control Plan ("mACP") that significantly changed the decades-old ACP, even altering portions that were specifically laid out in the Plant Agreement.  (Trainor Decl., ¶ 9, Ex. D.)  The mACP was never presented to the JCAC or its subcommittee for discussion.  (Trainor Decl., ¶ 10.)

CWA objected to the implementation of the mACP.  (Trainor Decl. ¶ 12.)  In a May 19, 2006 letter agreement, the parties set forth their positions on the mACP and the framework through which the parties would attempt to negotiate a resolution to their disagreements over the mACP.  (Trainor Decl. ¶ 13, Exhibit F.)  Among other things, the parties agreed to have the JCAC consider whether the parties should bargain about the mACP.

The parties failed to resolve their differences concerning the mACP.  (Trainor Decl. ¶ 14.)

On October 6, 2006, Verizon notified CWA that it would implement the mACP on November 5, 2006.  (Trainor Decl. ¶ 15.)

Since November 5, 2006, CWA-represented employees employed by Verizon have been stepped, suspended, and discharged under the mACP.  Those employees would have been treated differently under the ACP.  (Trainor Decl. ¶ 16.)

On November 26, 2006, CWA filed an unfair labor practice with the National Labor Relations Board ("NLRB") alleging that Verizon violated the National Labor Relations Act ("NLRA") by unilaterally changing the terms and conditions of the employment of employees represented by CWA when it implemented the mACP without the agreement of CWA.  (Semel

Decl. ¶ 3, Exhibit A.)  On January 29, 2007, the NLRB deferred CWA's charge to arbitration

pursuant to its policy as set out in <u>Collyer Insulated Wire</u>, 192 NLRB 837 (1971).

On or about December 8, 2006, CWA's affiliate local, Local 1109, filed a grievance

objecting to the changes made to the ACP and unilaterally implemented by Verizon.  (Lawson

Decl. ¶ 5.)  The grievance was processed through the parties' three-step grievance procedure.

(Lawson Decl. ¶¶ 6, 7; Finnigan Decl. ¶¶ 4, 5, 6.)

On June 14, 2007, CWA District One Counsel Gabrielle Semel began the process of

moving the grievance to an arbitration hearing.  (Semel Decl. ¶ 5, Exhibit C.)  On October 22,

2007, Verizon Counsel Richard Shaw informed Semel that Verizon's position was that the

grievance was not substantively arbitrable and the Company would not proceed to arbitration.

(Semel Decl. ¶ 10.)

The instant Complaint was filed on January 18, 2008.  (Semel Decl. ¶ 12, Exhibit D.)


<u>ARGUMENT</u>

THE UNION'S GRIEVANCE FALLS WITHIN
THE PARTIES' AGREEMENT TO ARBITRATE

The Court's inquiry in a motion to compel arbitration is limited to substantive

arbitrability -- the question of whether the parties have agreed to arbitrate and, if so, whether the

grievance at hand falls within that agreement.  <u>AT&T Tech., Inc., v. Communications Workers of</u>

<u>America</u>, 475 U.S. 643, 648-649 (1986); <u>United Steelworkers of America v. Warrior & Gulf</u>

<u>Nav. Co.</u>, 363 U.S. 574, 582 (1960).

These parties have clearly agreed to arbitrate:

> Either the Union or the Company may arbitrate a grievance regarding the true intent and meaning of a provision of this Agreement, or a grievance involving a claim referable to arbitration as provided in Articles 8, 9, 10 and 15 . . .

(Trainor Decl., Exhibit B, Article 12.01.)  Under Article 12.01, any provision of the Plant Agreement is arbitrable.  Grievances concerning Articles 8, 9, 10 and 15 are arbitrable except to the extent that such arbitrability is limited by language in those specific provisions.

It is well settled that, when parties have agreed to an arbitration clause such as the one in Article 12.01 of the Plant Agreement, "[a] grievance is arbitrable 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'"  NABET v. ABC, 140 F.3d 459, 461 (2d Cir. 1998), citing AT&T Tech., Inc. v. Communications Workers of America, 475 U.S. 643, 650 (1986).  The federal courts maintain a strong presumption in favor of arbitrability.  The Supreme Court has stated and restated that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.  Doubts should be resolved in favor of coverage."  AT&T Tech., 475 U.S. at 650; Gateway Coal Co. v. United Mine Workers, 414 U.S. 368, 377-378 (1974); Warrior & Gulf, 363 U.S. at 582-583.  See also Associated Brick Contractors, Inc. v. Harrington, 820 F.2d 31, 35 (2d Cir. 1987).

The Union's grievance regarding the unilateral implementation of the mACP clearly falls within the parties' agreement to arbitrate because the Company's action has violated at least eight separate provisions of the Plant Agreement:  Article 1; the ACP, an implicit provision of the Plant Agreement; Article 10.01; page 218 of the Plant Agreement; Article XI of the 2003

5

Memorandum of Understanding; page 168 of the Plant Agreement; Article 15.02; and page 172 of the Plant Agreement.

The ACP, in effect since 1964, has become a binding past practice. Thus, the implementation of the mACP violated Article 1. Article 1 establishes that CWA is "the sole and exclusive representative for the purpose of collective bargaining with respect to rates of pay wages, hours and other terms and conditions of employment." (Trainor Decl., Exhibit B, p. 2.) The Union's grievance concerns the Company unilaterally changing the conditions of employment of the employees represented by Verizon by implementing a more oppressive absence policy, the mACP, without the agreement of CWA. Whether the unilateral implementation of the mACP violates the true intent and meaning of Article 1 is explicitly arbitrable under Article 12.01.

Further, the ACP became a provision of the Plant Agreement, as that term is understood in Article 12.01, when the parties began using it as a basis upon which they rested other provisions of the Plant Agreement. In 1972, the parties agreed that the Company was required to notify CWA before any warning or other discipline was meted out to employees under the ACP. (Trainor Decl., Exhibit B, p. 163.) In 1977, the parties agreed that, if an employee was absent due to an on-the-job accident, the Company would "give consideration to not stepping the employee on the [ACP]." (Trainor Decl., Exhibit B, 168.) In 1983, the parties agreed that (i) the first step of the ACP would not be applied to the absence of an employee who had just had a year without any absences; and (ii) that any employee with twenty-five (25) or more years of service would receive a seventh step in addition to the six steps of the ACP. (Trainor Decl., Exhibit B, p. 172.) Other sections of the Plant Agreement, such as 44.02(e), refer to "satisfactory

6

attendance." (Trainor Decl., Exhibit B, p. 107.) "Satisfactory attendance" under these provisions, negotiated based upon a common understanding of the ACP, is defined by whether the employee is on a step of the ACP and what step s/he is on. Since the parties have been using the ACP as a basis for bargaining provisions of the Plant Agreement, and it is referenced in the Plant Agreement, it has become a provision of the Plant Agreement. A grievance regarding the true intent and meaning of a provision of the Plant Agreement is arbitrable under Article 12.01.

Additionally, implementing the mACP also violates the just cause requirement of the Plant Agreement. Article 10.01 and 12.01 permit the union to grieve and arbitrate an allegation that an employee has been disciplined or discharged without just cause. Since the implementation of the mACP, employees have been suspended without pay and discharged when they would not have been under the ACP. (Trainor Decl., ¶ 17.) Through Articles 10.01 and 12.01, the collective bargaining agreement guarantees CWA the right to grieve and arbitrate whether the mACP meets the just cause requirement.

Also, in light of more than forty years of arbitration awards defining just cause for discharge due to absence under the ACP, CWA's grievance also presents the question of whether the ACP's methodology for disciplining employees for absence has become the definition of "just cause" for discipline for absenteeism. The requirement that an employee be disciplined only for just cause is found in Article 10.01, a provision of the Plant Agreement. As such, the Union's grievance falls within the parties' agreement to arbitrate.

Verizon has violated other provisions of the Plant Agreement with its unilateral implementation of the mACP. In 2000, the parties agreed that the Joint Attendance Committee would "explore issues relating to . . . the absence control program . . ." (Trainor Decl., Exhibit B,

7

p. 218.)  In 2003, the parties agreed that the Joint Committee on Absence Control would "discuss[] a plan or program for absence reduction for the companies' operations within the operating territory of Verizon New York."  (Trainor Decl., Exhibit C, p. 26.)  By developing the mACP unilaterally instead of going through these labor/management committees, Verizon violated two provisions of the Plant Agreement.  Article 12.01 obligates the Company to arbitrate a grievance regarding whether the "true intent and meaning" of these provisions[4] required the Company to develop a new absence control policy only through the established labor/management committees.

The mACP violates the agreement between the parties that the Company give consideration to absences due to on-the-job accidents:

> This is to advise you that whenever an accident on the job occurs and results in absence, the Company will give consideration to not stepping the employee on the Absence Control Program.

(Trainor Decl., Exhibit B, p. 168.)  The Company's unilateral implementation of the mACP violated this provision by requiring the Company to give consideration only to the initial absence due to an on-the-job accident but not to any subsequent absences due to the same accident, adds a caveat to the requirement, and makes the consideration optional instead of mandatory:

> In those cases where the on-the-job accident appears separate from a pattern of absence, consideration may be given to not stepping the employee on the ACP for the initial period of absence.  However, any subsequent absences for the same on the job accident will result in stepping the employee under the ACP.

---

[4]The parties' 2003 Memorandum of Understanding leaves no doubt that Article XI of the 2003 MOU was to be considered "provisions" of the 2003 Plant Agreement:

> Provisions of this 2003 MOU . . . will be incorporated, by reference or otherwise, into the appropriate collective bargaining agreements between the parties.

(Trainor Decl., Exhibit E, p. 7.)  By removing the contractual protections guaranteed to an employee who has been the victim of an accident in the course of his employment at Verizon, the Company has violated the provision of the Plant Agreement found on page 168.  A grievance challenging this violation concerns the "true intent and meaning" of a provision of the Plant Agreement and is therefore arbitrable.

The mACP's on-the-job accident language also violates another provision of the Plant Agreement.  Article 15.02 guarantees that the benefits provided to employees under the "Sickness and Accident Disability Benefit Plan" will not be diminished during the term of the Plant Agreement without the consent of the Union.  Article 15.03 specifies that "[a]ny dispute involving the true intent and meaning of Section 15.02 of this Article may be submitted to the grievance and arbitration provisions of this Agreement."  (Trainor Decl., Exhibit B, p. 37.)  By changing the requirement to consider an on-the-job accident as a reason not to step an employee under the mACP, by not exercising such consideration for subsequent absences due to the same accident, and by reducing the number of steps on the plan before discharge or suspension without pay, and by increasing the rapidity of an employee's progress through the steps to discharge, Verizon is diminishing the Accident Disability benefits that an employee, injured by an on-the-job accident, can receive.  The Plant Agreement, through Article 15.03, makes a grievance with this allegation arbitrable.

The mACP also violated the contractual guarantee given to employees with twenty-five (25) or more years of service that they not be discharged until a "seventh step" is applied to their absences.  (Trainor Decl., Exhibit B, p. 172.)  The mACP states that an employee will terminated

when he reaches Step 5; no special consideration is given to employees with twenty-five (25) or more years of service.  (Trainor Decl., Exhibit E, p. 5.)

The Second Circuit has made clear that "[e]ven if it appears to the court that the claim is frivolous, a union's assertion that an employer has violated the labor agreement should be decided by the arbitrator, not by the court, because '[t]he agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious." Emery Air Freight Corp. v. Local Union 295, 786 F.2d 93, 96-97 (2d Cir. 1986) citing United Steelworkers of America v. American Mfg Co., 363 U.S. 564, 568 (1960).  Here, Article 12 requires the Company to arbitrate any "grievance regarding the true intent and meaning of a provision of this Agreement" -- an arbitration clause considered more broad than narrow.  See, e.g., Worldcrisa Corp. v. Armstrong, 129 F.3d 71, 74-75 (2d Cir. 1997).  CWA has pointed to eight provisions that the Company's unilateral implementation of the mACP violates.

Further, the Plant Agreement contains no language that expressly excludes any of these provisions from arbitration.  This Court, in analyzing the arbitrability of a grievance under Article 12.01 of the 2000 Plant Agreement,[5] observed that to find a grievance excluded from arbitration, the collective bargaining agreement must contain clear and unambiguous exclusionary language placing the grievance at issue outside the scope of the arbitration clause. Communications Workers of America v. Verizon, 2003 WL 22471830*1 (S.D.N.Y.).  The Plant Agreement contains no provisions that excludes a grievance, claiming that the mACP violates Articles 1, 10.01, 15.02, the letters of agreement on pages 168, 172, and 218, as well as Article

---

[5]The language of Article 12.01 in the 2003 Plant Agreement, at issue here, as it was in 2000.

10

XI of the 2003 Memorandum of Understanding and an implied provision of the Plant Agreement or a grievance claiming a violation of any one of those provisions.

When determining whether a grievance regarding whether the Company could declare a surplus under Article 55 was arbitrable, this Court found "the absence of such [exclusionary] language . . . particularly striking because much express exclusionary language appears elsewhere in the Plant Agreement itself." Id. at *2.  Since the Plant Agreement contains no language excluding the instant grievance from arbitration and it falls within the parties' agreement to arbitrate through eight different avenues, Verizon must be compelled to arbitrate.

CONCLUSION

For all of the reasons explained above, the Union respectfully requests that the Court compel the arbitration of the Union's grievance concerning the unilateral implementation of the modified Absence Control Plan and award the costs of this action and any other appropriate remedy to the Union.

Dated:  New York, New York
        May 5, 2008

                                        Respectfully submitted,


                                        By:_____
                                            Amy S. Young (AY 5547)
                                        Attorney for CWA
                                        CWA District One Legal Department
                                        275 Seventh Avenue, Ste. 2300
                                        New York, NY  10001
                                        (212) 419-1550 (voice)
                                        (212) 419-1555 (facsimile)

12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
                                                    :
COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO,    :
                                                    :
         Plaintiff,                                 :
                                                    :
     - against -                                    :
                                                    :
VERIZON NEW YORK, INC. TELESECTOR RESOURCES    :  08 Civ. 0467 (HB)
GROUP, INC., EMPIRE CITY SUBWAY COMPANY        :
(LIMITED), VERIZON AVENUE, INC., VERIZON        :  DECLARATION IN
ADVANCED DATA INC., AND VERIZON CORPORATE      :  SUPPORT OF CWA'S
SERVICES CORP.,                                 :  MOTION TO COMPEL
                                                :  ARBITRATION
         Defendants.                            :
                                                :
-------------------------------------------------------------------------x

GLADYS FINNIGAN hereby declares under penalty of perjury:

1.    I am a Staff Representative for the Communications Workers of America

("CWA"). I have held this position since May 2004. With regard to my representation of

employees employed by Verizon, my duties include advising locals affiliated with CWA, sitting

the third step of the contractual grievance procedure, collective negotiations, representing CWA

on various labor/management committees, and handling any other duties assigned by the District

One Vice President.

2.    In January 2007, I accepted an appeal from Local 1109 regarding Grievance

number G06-018317.

3.    On January 11, 2007, I notified Verizon Labor Relations Director Patrick

Prindeville, who replaced Jackie Latham in that position, that CWA would be moving the

grievance to Step 3. (My letter to Prindeville is attached as Exhibit A.)

1

4.    Pursuant to Article 11 of the Plant Agreement, the parties sat the grievance on February 16, 2007.

5.    On April 11, 2007, Verizon denied the grievance.  (Prindeville's letter is attached as Exhibit B.)

6.    On April 18, 2007, CWA informed Verizon that it intended to proceed to arbitration.  (The letter is attached as Exhibit C.)

7.    Verizon has not informed CWA that it has any claim that the grievance is procedurally deficit.

Dated:  New York, New York
        April 28, 2008

_Gladys Finnigan_
GLADYS FINNIGAN

2



**Communications**
**Workers of America**
AFL-CIO, DISTRICT 1

80 Pine Street, 37th Floor
New York, New York 10005
212-344-7332
Fax: 212-363-7010

Lawrence R. Cohen
President

Christopher M. Shelton
Vice President
District 1

ELISA RIORDAN
Downstate NY-CT Area Director

January 11, 2007

Patrick Prindeville, Director
Verizon Labor Relations
140 West Street, 10th Floor
New York, New York 10007

Re:    **Local 1109 – Grievance #G06-018317 – Improper Changes to ACP**
       **_Everett Lawson_**

Dear Mr. Prindeville:

We have accepted an appeal from _Local 1109_ in the above captioned grievance.

This office will contact you pursuant to Article 11.

Very truly yours,

Gladys Finnigan
CWA Representative

OPEIU-AFL-CIO
GF/mb

cc:    **William J. Gallagher, Jr., _Vice President & Grievance Coordinator - CWA Local 1109_**

**Patrick J. Prindeville**
Director
Labor Relations





140 West Street, Room 1011
New York, NY 10007

Phone 212 321-8590
Fax 212 528-1542

04/11/2007

Gladys Finnigan, CWA Staff Representative
Communications Workers of America
80 Pine Street, 37th Floor
New York, NY 10005

Re:
     G06-018317     Improper Changes to the ACP - E. Lawson

Mrs. Finnigan:

The above referenced grievance was reviewed at 3rd Step on 02/16/2007 for CWA Local 1109.

As discussed, the Company notified the Union of the proposed changes to the ACP and gave them an opportunity to bargain over the matter, which they declined. There was no violation of the Collective Bargaining Agreement. Therefore, this grievance is denied.

Sincerely yours,

cc:    NY Labor Relations Office
       G. Gordon

**Communications
Workers of America**
AFL-CIO, DISTRICT 1

80 Pine Street, 37th Floor
New York, New York 10005
212-344-7332
Fax: 212-363-7010

Lawrence R. Cohen
President

Christopher M. Shelton
Vice President
District 1

........................................................................................................................................................



ELISA RIORDAN
Downstate NY-CT Area Director

April 18, 2007

Jackie Latham, Executive Director
Verizon – Labor Relations
140 West Street, 10th Floor
New York, New York 10007

Re:    <u>Local 1109–Grievance #G06-018317 – Improper Changes to ACP – *Everett Lawson*</u>

Dear Ms. Latham:

This is to advise you that the Union intends to proceed to arbitration in the above captioned grievance.

Very truly yours,

*Elisa Riordan*
Elisa Riordan
Downstate NY Area Director
District 1

ER/mb
Opeiu/153, afl-cio

cc:    Gladys Finnigan, *CWA Staff Representative*
       John Dempsey, *President – CWA Local 1109*
       William J. Gallagher, Jr., *Vice President & Grievance Coordinator – CWA Local 1109*
       Joe D'Angelo, *Senior Staff Consultant – Verizon – Labor Relations*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x

COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO,

      Plaintiff,

  - against -

VERIZON NEW YORK, INC. TELESECTOR RESOURCES
GROUP, INC., EMPIRE CITY SUBWAY COMPANY
(LIMITED), VERIZON AVENUE, INC., VERIZON
ADVANCED DATA INC., AND VERIZON CORPORATE
SERVICES CORP.,

      Defendants.

----------------------------------------------------------------------x

08 Civ. 0467 (HB)

DECLARATION IN
SUPPORT OF CWA'S
MOTION TO COMPEL
ARBITRATION

EVERETT LAWSON hereby declares under penalty of perjury:

1.     I am familiar with the facts and circumstances stated herein and make this declaration in support of the Communications Workers of America's ("CWA" or "National Union") Motion to Compel Arbitration.

2.     I am employed as a field technician at Verizon New York, Inc. ("Verizon" or "Company"). I have been a Verizon employee and a member of the bargaining unit represented by CWA since November 15, 1993.

3.     I have held the position of steward with CWA's affiliated local, Local 1109, since February 2005. Among other of my duties as a Local 1109 steward, I file grievances under the Plant Agreement and I sit grievances on behalf of Local 1109.

4.     Pursuant to Article 11 of the Plant Agreement, local unions are responsible for filing grievances and processing those grievances through the second step of the grievance procedure.

5.     On or about December 8, 2006, upon instruction from then-President John Dempsey of Local 1109, I filed a grievance with Verizon Foreman Dennis Brybag. I informed Brybag that Local 1109 was filing a grievance alleging that the changes made to the Absence Control Plan by Verizon, imposed on the bargaining unit in November 2006, violated the Plant Agreement. Brybag assigned grievance number G06-018317 to this grievance.

6.     I and fellow steward Aubrey Primus sat this grievance on behalf of Local 1109. Area Operations Manager John McHugh and Foreman Brybag represented Verizon. Verizon denied the grievance at first step. Consistent with Article 11.02, the first step of the grievance and its answer are verbal.

7.     Local 1109 appealed the denial of grievance G06-018317 at first step. I sat the second step on behalf of Local 1109 with then-Business Agent Rod Gallo. The Company was represented by McHugh and Foreman Mike Pinnock. Verizon denied the grievance at the second step

8.     Pursuant to Article 11, the National Union is responsible for the grievance after the second step. Local 1109 requested that the National Union appeal the grievance to the third step of the grievance procedure.

Dated: New York, New York
       May 2, 2008

Everett Lawson

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------x
                                                            :
COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO,    :
                                                            :
                    Plaintiff,                              :
                                                            :
        - against -                                         :
                                                            :
VERIZON NEW YORK, INC. TELESECTOR RESOURCES    :   08 Civ. 0467 (HB)
GROUP, INC., EMPIRE CITY SUBWAY COMPANY         :
(LIMITED), VERIZON AVENUE, INC., VERIZON         :   DECLARATION IN
ADVANCED DATA INC., AND VERIZON CORPORATE       :   SUPPORT OF CWA'S
SERVICES CORP.,                                     :   MOTION TO COMPEL
                                                            :   ARBITRATION
                    Defendants.                             :
                                                            :
-------------------------------------------------------------------------------x

        GABRIELLE SEMEL hereby declares under penalty of perjury:

        1.      I am an attorney representing Communications Workers of America ("CWA").  I

have represented CWA since August 1986.   Among my duties is representing CWA in

arbitration of grievances to enforce its collective bargaining agreement with Verizon and in

administrative proceedings before the National Labor Relations Board.

        2.      I represented CWA regarding Verizon's unilateral implementation of the modified

Absence Control Plan ("mACP") in November 2006.

        3.      On November 26, 2006, I filed an unfair labor practice charge alleging that

Verizon had violated § 8(a)(1) and 8(a)(5) of the National Labor Relations Act (29 U.S.C. §

158(a)(1) and (5)) by unilaterally implementing the mACP without the agreement of CWA.  (The

charge is attached as Exhibit A.)

1

4.      By letter dated January 29, 2007, the National Labor Relations Board deferred the charge to arbitration.  (The referenced letter is attached as Exhibit B.)

5.      I also represented CWA regarding Grievance G06-018317, the grievance filed by CWA's affiliated Local 1109 regarding Verizon's unilateral implementation of the mACP.  On June 14, 2007, pursuant to Article 12 of the Plant Agreement, I wrote to Verizon Assistant General Counsel Steven Martin to move the grievance to arbitration.  (The letter is attached as Exhibit C.)

6.      In late July 2007, Martin's office informed me that Verizon would be represented by Richard Shaw of Jones Day with regard to the grievance.

7.      On August 6, 2007, I suggested the names of three arbitrators to hear Grievance G06-018317.

8.      During August 2007, I discussed with Shaw whether the grievance was substantively arbitrable.

9.      Throughout September and October 2007, Shaw informed me that he was discussing with his client whether Verizon would agree that the grievance was substantively arbitrable.

10.     On October 22, 2007, Shaw informed me that Verizon's position was that Grievance G06-018317 is not arbitrable.

11.     Prior to the November 2006 implementation of the mACP, many arbitrators issued awards under Article 10.01 regarding the ACP.  When Verizon discharged a bargaining unit employee for absenteeism and CWA grieved that discharge to mandatory arbitration under Article 12.01, arbitrators have analyzed the grievance by determining whether the Company

2

complied with the ACP as part of the "just cause" analysis required by Article 10 of the Plant

Agreement.

      12.     Attached as Exhibit D hereto is the Complaint filed by CWA in the instant matter.

      13.     Attached as Exhibit E hereto is the Answer filed by Verizon in the instant matter.


Dated:  New York, New York
      May 5, 2008


                           \s\
                    GABRIELLE SEMEL

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
## CHARGE AGAINST EMPLOYER

FORM EXEMPT UNDER 44 U.S.C. 3512

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case 2–CA–37997 | Date Filed 11/27/06 |

**INSTRUCTIONS:**
File an original and 4 copies of this charge with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

### 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer | | b. Number of Workers Employed |
|---|---|---|
| Verizon | | 100,000 + |

| c. Address (street, city, State, ZIP Code) | d. Employer Representative | e. Telephone No. (212) 321-8600 |
|---|---|---|
| 140 West Street New York, New York 10007 | Jackie Latham, Executive Director LR | Fax No. |

| f. Type of Establishment (factory, mine, wholesaler, etc.) | g. Identify Principal Product or Service |
|---|---|
| Utility | Telecommunications |

h. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of Section 8(a), subsections (1) and *(list subsection(s))* (5) _____ of the National Labor Relations Act, and these unfair labor practices are unfair practices affecting commerce within the meaning of the Act.

### 2. Basis of the Charge (set forth a clear and concise statement of the facts constituting the alleged unfair labor practices.)

In or about November 2006, the above-named Employer by its agents, officers and representatives has unilaterally changed the terms and conditions of employees represented by the Communications Workers of America ("CWA") by changing its Absence Control Plan mid-term without the agreement of the Union.



By the above and other acts, the above-named employer has interfered with, restrained, and coerced employees in the exercise of the rights guaranteed in Section 7 of the Act.

3. Full name of party filing charge (if labor organization, give full name, including local name and number)

Communications Workers of America

| 4a. Address (street and number, city, State, and ZIP code) | 4b. Telephone No. (212) 344-2515 |
|---|---|
| 80 Pine Street, 37th Floor New York, NY 10005 | Fax No. (212) 419-1555 |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit (to be filled in when charge is filed by a labor organization)

Communications Workers of America, AFL-CIO

### 6. DECLARATION

I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

| By _(signature)_ | District Counsel _(Title, if any)_ |
|---|---|
| (Signature of representative or person making charge) | |
| Address  225 Seventh Avenue, Suite 2300, New York, New York 10001 | Fax No. (212) 419-1555   Telephone No. (212) 419-1530   Date November 27, 2006 |

WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)

RECEIVED
NOV 27 2006
SECOND REGION
NEW YORK, N.Y.
NLRB



**United States Government**

**NATIONAL LABOR RELATIONS BOARD**

Region 2

26 Federal Plaza – Room 3614

New York, New York 10278-0104

Telephone: (212) 264-0300

Facsimile: (212) 264-2450

January 29, 2007

Communications Workers of America
Attn: Christopher Shelton,
Vice President of District One
80 Pine Street 37th Floor
New York, NY 10005

**JAN 3 0**

Re: Verizon
Case No. 2-CA-37997

Dear Mr. Shelton:

The Region has carefully considered the charge filed by the Union against Verizon alleging violations of Section 8(a)(1) and (5) of the National Labor Relations Act. As explained below, I have decided that further proceedings on the charge should be handled in accordance with the Board's deferral policy.

*Deferral Policy:* Under the Board's deferral policy as set forth in *Collyer Insulated Wire*, 192 NLRB 837 (1971) and *United Technologies Corp.*, 268 NLRB 557 (1984), this Agency will withhold making a final determination on certain arguably meritorious unfair labor practice charges when a grievance involving the same issue can be processed under the grievance/arbitration provisions of the applicable contract. This policy is based, in part, on the preference that the parties should resolve certain issues through their contractual grievance procedure in order to achieve a prompt, fair and effective settlement of their dispute. Therefore, if an employer agrees to waive contractual time limits and process the related grievance through arbitration if necessary, the Regional office will defer the charge. However, this policy requires that a charge be dismissed if the charging party thereafter fails to promptly file and attempt to process a grievance on the subject matter of the charge.

*Decision to Defer:* Based on our investigation, I am deferring further proceedings of this charge to the grievance/arbitration process for the following reasons.

1.   The charge alleges that the above-named Employer violated Section 8(a)(1) and (5) of the Act by unilaterally changing the Absence Control Plan mid-term without the agreement of the Union.

2. The Employer and the Union have a collective bargaining agreement currently in effect that provides for final and binding arbitration procedure.

3. A grievance has been filed concerning this issue and the Employer is currently processing the grievance.

4. Since the above allegations in the charges appear to be covered by certain provisions of the collective bargaining agreement, it is likely that the allegations may be resolved through the grievance and arbitration procedures.

*Further Processing of the Charge:* As explained below, while the charge is deferred, the Region will monitor the processing of the grievance and under certain circumstances will resume processing the charge.

*Charging Party's Obligation:* Under the Board's *Collyer* deferral policy, the Charging Party has an affirmative obligation to file a grievance, if a grievance has not already been filed. If the Charging Party fails either to promptly file or submit the grievance to the grievance/arbitration process, or declines to have the grievance arbitrated if it is not resolved, I will dismiss the charge.

*Charged Party's Conduct:* If the Charged Party prevents or impedes resolution of the grievance, raises a defense that the grievance is untimely filed or refuses to arbitrate the grievance, I will revoke deferral and resume processing of the charge.

*Inquiries and Requests for Further Processing:* Approximately every 90 days, the Regional Office will ask the parties about the status of this dispute to determine if the dispute has been resolved and whether continued deferral is appropriate. However, I will accept and consider at any time requests and supporting evidence submitted by any party to this matter for dismissal of the charge, for continued deferral of the charge, or for issuance of a complaint.

*Notice to Arbitrator Form:* If the grievance is submitted to an arbitrator, please sign and submit to the arbitrator the enclosed "Notice to Arbitrator" form to ensure that the Region receives a copy of an arbitration award when the award is sent to the parties.

*Review of Arbitrator's Award:* If the grievance is arbitrated, the Charging Party may request this office to review the arbitrator's award. The request must be in writing and addressed to me. The request should analyze whether the arbitration process was fair and regular, whether the unfair labor practice allegations in the charge were considered by the arbitrator, and whether the award is consistent with the Act. Further guidance on the nature of this review is provided in *Spielberg Manufacturing Company*, 112 NLRB 1080 (1955), and *Olin Corp.*, 268 NLRB 573 (1984).

2

*Your Right to Appeal:* The National Labor Relations Board Rules and Regulations permit you to obtain a review of this action by filing an appeal with the General Counsel of the National Labor Relations Board. Use of the Appeal Form (Form NLRB-4767) will satisfy this requirement. However, you are encouraged to submit a complete statement setting forth the facts and reasons why you believe that the decision to dismiss your charge was incorrect. The appeal may be filed by regular mail addressed to the General Counsel at the National Labor Relations Board, Attn: Office of Appeals, 1099 14th Street, N.W., Washington D.C. 20570-0001. A copy of the appeal should also be mailed to the Regional Director.

An appeal also may be filed electronically by using the e-filing system on the Agency's Website. In order to file an appeal electronically, please go to the Agency's Website at www.nlrb.gov, under "**E-GOV.**" Select "**E-filing**" and then click on "**File an Appeal or Other Document**" under the heading "**General Counsel's Office of Appeals.**" The Website will contain detailed instructions on how to file an appeal electronically.

The appeal MAY NOT be filed by facsimile transmission.

*Appeal Due Date:* The appeal must be received by the General Counsel in Washington, D.C. by the close of business at 5:00 p.m. EST on February 12, 2007. If you mail the appeal, it will be considered timely filed if it is postmarked no later than one day before the due date set forth above. If you file the appeal electronically, it also must be received by the General Counsel by the close of business at 5:00 p.m. (EDT) on February 12, 2007. A failure to timely file an appeal electronically will not be excused on the basis of a claim that transmission could not be accomplished because the receiving machine was off-line or unavailable, the sending machine malfunctioned, or for any other electronic-related reason. The appeal may not be filed by facsimile transmission or by using the Internet.

*Extension of Time to File Appeal:* Upon good cause shown, the General Counsel may grant you an extension of time to file the appeal. You may file a request for an extension of time to file by mail, facsimile transmission, or through the Internet. The fax number is (202) 273-4283. Special instructions for requesting an extension of time over the Internet are set forth in the attached Address Code Certificate. While an appeal will be accepted as timely filed if it is postmarked no later than one day prior to the appeal due date, this rule does not apply to requests for extensions of time. A request for an extension of time to file an appeal **must be received** on or before the original due date. A request that is postmarked prior to the appeal due date but received after the appeal due date will be rejected as untimely. Unless filed through the Internet, a copy of any request for an extension of time should be sent to me.

*Confidentiality Privilege:* Please be advised that we cannot accept any limitation upon the use of any appeal statement or evidence in support thereof provided to the Agency. Thus, any claim of confidentiality or privilege cannot be honored except as provided by the FOIA, 5 U. S. C. 552, and any appeal statement may be subject to

discretionary disclosure to a party upon request during the processing of the appeal. In the event the appeal is sustained, any statement or material submitted may be subject to introduction as evidence at any hearing that may be held before an administrative law judge. Further, we are required by the Federal Records Act to keep copies of documents used in our case handling for some period of years after a case closes. Accordingly, we may be required by the FOIA to disclose such records upon request, absent some applicable exemption such as those that protect confidential source, commercial/financial information or personal privacy interests (e.g., FOIA Exemptions 4,6,7 © and 7 (D)). Accordingly, we will not honor any requests to place limitations on our use of appeal statements or supporting evidence beyond those prescribed by the foregoing laws, regulations and policies.

*Notice to Other Parties of Appeal:* You should notify the other party(ies) to the case that an appeal has been filed. Therefore, at the time the appeal is sent to the General Counsel, please complete the enclosed Appeal Form and send one copy of the form to all parties and representatives whose names and addresses are set forth in this letter. If you have submitted a statement regarding your appeal, a copy of your statement need not be sent to other parties to your case. Mailing the Appeal Form to the parties does not relieve you from filing the Appeal Form itself with the General Counsel and sending a copy of the Appeal Form to me by the due date.

Very truly yours,

Celeste J. Mattina,
Regional Director

Enclosures
cc:
National Labor Relations Board
Attn.: General Counsel
Office of Appeals
1099 14th Street NW
Washington, DC 20571

Verizon
Attn: Jackie Latham, Esq.
Executive Director of Labor Relations
140 West Street
New York, NY 10007

4

Steven M. Martin, Esq.
Verizon Communications
140 West Street Room 2710
New York, NY 10007

Gabrielle Semel, Esq.
Semel, Young & Norum
275 Seventh Avenue, Suite 2300
New York, NY 10001

Lawrence Cohen
Pres.t\Dir. of Organization
CWA Legal Dept.
501 Third Street, N.W.
Washington, DC 20001

Mary O'Melveny, Esq.
Communication Workers of America
501 Third Street, NW
Washington, DC 20001

**Communications**
**Workers of America**
AFL-CIO

275 Seventh Avenue, 23rd Floor
New York, New York 10001
212 419 1550
212-419-1555 (facsimile)

Christopher M. Shelton
Vice President
District 1

Gabrielle Semel *
Amy S. Young *
M. Christina Nolum *
Anul Tatwar *



DISTRICT 1
LEGAL DEPARTMENT

June 14, 2007


Steve Martin, Esq.
Verizon
140 West Street, Room 2709
New York, NY


       Re:  CWA & Verizon
           (Improper Change to ACP)
           CWA Case No. 1-07-061
           <u>VZ Case No. A-07-086</u>

Dear Steve:

      I will be representing CWA in the above-referenced matter.  Please have the attorney assigned to the case contact me to select an arbitrator and schedule dates for the hearing.  Thanks.


                               Very truly yours,

                               Gabrielle Semel

GS/dad

cc:  Lisa Riordan, Area Director (by fax)
     Gladys Finnegan, Staff Representative (by fax)

Amy S. Young
CWA LEGAL DEPARTMENT
275 Seventh Avenue, Suite 2300
New York, NY 10001
(212) 419-1550

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

COMMUNICATIONS WORKERS OF AMERICA,        :
AFL-CIO,                                                            :
                                                                           :
                        Plaintiff,                                  :
                                                                           :
            - and -                                                 :
                                                                           :
VERIZON NEW YORK, INC., TELESECTOR    :
RESOURCES GROUP, INC., EMPIRE CITY SUBWAY  :
COMPANY (LIMITED), VERIZON AVENUE, INC.,   :
VERIZON ADVANCED DATA INC., and VERIZON   :
CORPORATE SERVICES CORP.,                      :
                                                                           :
                        Defendants.                             :
                                                                           :
------------------------------------------------------------x

**JUDGE CROTTY**

# 08 CV 0467

08 Civ.

## COMPLAINT

1.      Plaintiff Communications Workers of America, AFL-CIO ("CWA" or "Union"),

brings this action pursuant to Section 301 of the Labor Management Relations Act of 1947, as

amended, 29 U.S.C. § 185, to require defendants Verizon New York Inc., Telesector Resources

Group, Inc., Empire City Subway Company (Limited), Verizon Avenue, Inc., Verizon Advanced

Data Inc., and Verizon Corporate Services Corp. (collectively "Verizon") to proceed to

arbitration with the grievance G06-018317 ("ACP grievance").

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action pursuant to

29 U.S.C. § 185(a) in that this is a suit for violations of contracts between an employer and a

labor organization representing employees in an industry affecting commerce.  Jurisdiction is

also conferred pursuant to 28 U.S.C. §§ 1331 and 1337.

3.      Venue lies in this district pursuant to 29 U.S.C. § 185(c) because the duly

authorized officers and agents of CWA are engaged in representing and acting for the Union's

employee members within the Southern District of New York and because Verizon maintains its

principal place of business within the Southern District of New York.

## PARTIES

4.      Plaintiff CWA is a labor organization as that term is defined by § 2(5) of the

Labor Management Relations Act, 29 U.S.C. § 152(5) and maintains a district office at 80 Pine

Street in the City, County, and State of New York.  CWA represents approximately 700,000

employees throughout the United States and in Canada, the majority of whom are employed in

the telecommunications industry, which is an industry affecting commerce.

5.      Defendant Verizon New York, Inc., is an employer in an industry affecting

commerce within the meaning of § 2(2) of the Labor Management Relations Act, 29 U.S.C. §

152(2), and maintains its principal place of business at 140 West Street in the City, County and

State of New York.  Defendants Telesector Resources Group, Inc.,  Empire City Subway

Company (Limited), Verizon Avenue, Inc., Verizon Advanced Data Inc., and Verizon Corporate

Services Corp. are wholly owned subsidiaries of Verizon New York, Inc.

2

## CAUSE OF ACTION

6.      CWA is the exclusive collective bargaining representative of approximately

67,000 employees employed by Verizon.  More than 30,000 of these employees are covered by

ten collective bargaining agreements between CWA and Verizon ("Agreements") and work in

New York State and New England.  These Agreements took effect on August 3, 2003 and will

remain in effect through August 2, 2008.  The Agreements govern the terms and conditions of

employment of employees of Verizon represented by CWA.  The Agreements are contracts

within the meaning of § 301 of the LMRA, 29 U.S.C. § 185.

7.      One of the Agreements between Verizon and CWA covers all employees of

Empire City Subway Company (Limited) and employees of Verizon New York and Telesector

Resources Group Inc. in New York State in listed occupational classifications categorized as

craft, building and supplies, clerical and miscellaneous.  This agreement is referred to as the

"Plant Agreement."

8.      The Plant Agreement contains a grievance and arbitration provision under which

the parties agreed to submit to arbitration any "grievance regarding the true intent and meaning of

a provision of this Agreement . . ."

9.      From 1964 until 2006, Verizon (and its predecessor corporations) maintained the

Absence Control Plan ("ACP") which established attendance standards, methods for keeping

records of employee attendance, appropriate disciplinary action for poor attendance, and other

policies regarding attendance.

3

10.    The ACP is a provision of the Plant Agreement, as well as the other collective bargaining agreements maintained by CWA and Verizon covering employees in New York State, because it is referenced in the agreements.

11.    On March 22, 2006, Verizon notified CWA that it intended to implement a modified ACP ("mACP"); the notification set forth the changes in the ACP that Verizon had determined it would make.

12.    Prior to developing the mACP, Verizon did not request that the Joint Attendance Committee ("JAC") and/or the Joint Committe on Absence Control ("JCAC") explore the question of whether to and/or how best to modify ACP as required by the Plant Agreement.

13.    By letter agreement dated May 19, 2006, the parties agreed that the JAC would be convened to "discuss and review absence data and information related to the issues that contributed to the Company's decision to modify its ACP." Verizon did not submit to JAC the issue of whether the ACP should be modified at all and if so in what way.

14.    On November 5, 2006, Verizon implemented the mACP.

15.    On December 8, 2006, pursuant to Article 11 of the Plant Agreement, Local 1109 of the Communications Workers of America filed grievance number G06-018317 alleging that the implementation of the mACP violated the Plant Agreement.

16.    Verizon denied the grievance at first step, Local 1109 appealed to second step, and Verizon denied the grievance again at second step.

17.    The grievance was appealed to third step, the final step before mandatory binding arbitration. Verizon denied the grievance at third step on April 11, 2007.

4

18.    CWA performed all of the necessary procedural steps to process the grievance to arbitration in a timely manner.

19.    On August 6, 2007, CWA Attorney Gabrielle Semel proposed to Verizon Attorney Richard Shaw the names of three arbitrators to hear the grievance.

20.    By telephone on August 29, 2007, Semel and Shaw discussed whether the Union's grievance was substantively arbitrable.

21.    On October 22, 2007, Verizon informed CWA that it was refusing to arbitrate the Union's grievance because Verizon maintains that the grievance is not substantively arbitrable.

22.    To date, Verizon maintains its refusal to arbitrate the ACP grievance.

23.    The ACP grievance is substantively arbitrable because it concerns whether Verizon, through the implementation of the mACP, violated various provisions of the Plant Agreement. Specifically: (i) Verizon violated the recognition clause (Article 1) by unilaterally imposing the mACP during the term of the Plant Agreement; (ii) the ACP is itself a provision of the Plant Agreement and the implementation of any alternative policy or program to address employee absence violates the ACP; (iii) using a policy or program other than the ACP to discipline employees for absence violates the just cause provision (Article 10) of the Plant Agreement; (iv) Verizon violated the Letter of Agreement on page 218 and Article XI of the 2003 Memorandum of Understanding when it developed the mACP without submitting the issue of whether to modify the ACP and, if so, how to modify the ACP to the Joint Absence Committee and/or the Joint Committee on Absence Control; and (v) the implementation of the mACP also specifically violates Article 44.02(e); the 1972 Letter of Agreement signed by Verizon's R.E. Williams and CWA's M. Don Sanchez (p. 163 of the Plant Agreement); the 1977

5

Letter of Agreement signed by Verizon's Bernard C. Sissler and Sanchez (p. 168 of the Plant

Agreement); and the 1983 Letter of Agreement signed by Verizon's A.M. Freije and CWA's

Lawarence Mancino (p. 172 of the Plant Agreement), among other provisions.

WHEREFORE, plaintiff CWA respectfully requests that Verizon be ordered to proceed

to arbitration in accordance with the terms of the Agreements, for attorneys' fees and costs to be

awarded to plaintiff, and for such other relief as this Court deems just and proper.

Dated: New York, New York
       January 17, 2008

CWA Legal Department

By:

Amy S. Young (AY5547)
275 Seventh Avenue, Suite. 2300
New York, New York 10001
(212) 419-1550 (voice)
(212) 419-1555 (facsimile)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO,<br><br>                    Plaintiff,<br><br>      -against-<br><br>VERIZON NEW YORK, INC., TELESECTOR RESOURCES GROUP, INC., EMPIRE CITY SUBWAY COMPANY (LIMITED), VERIZON AVENUE, INC., VERIZON ADVANCED DATA INC., AND VERIZON CORPORATE SERVICES CORP.,<br><br>                  Defendants. | Case No.: 08-CV-0467(HB) |

## ANSWER AND AFFIRMATIVE DEFENSES

Defendants Verizon New York Inc. ("Verizon New York"), Telesector Resources Group, Inc. ("TRG"), Empire City Subway Company (Limited) ("ECS"), Verizon Avenue Inc. ("Verizon Ave."), Verizon Advanced Data Inc. ("VADI")[1], and Verizon Corporate Services Corp. ("Verizon Corp. Services") (collectively "Defendants"), respond as follows to the Complaint filed by Plaintiff, Communications Workers of America, AFL-CIO (hereinafter "CWA"):

1.  Defendants admit only that CWA purports to bring this action under Section 301 of the Labor Management Relations Act of 1947 ("LMRA"), as amended, 29 U.S.C. § 185, to compel arbitration of grievance number G06-018317 ("ACP grievance").  Defendants deny the remaining allegations contained in paragraph 1.

---

[1] VADI is not a proper party because it is no longer in existence, and was merged into Verizon New York on September 28, 2007.

JURISDICTION AND VENUE

2.      Defendants state that whether this Court has original jurisdiction and/or supplemental jurisdiction involves a legal determination that is not subject to admission or denial.  Defendants deny the remaining allegations contained in paragraph 2.

3.      Defendants admit that venue lies in this district, and that Verizon New York and ECS maintain their principal places of business within the Southern District of New York.  Defendants deny the remaining allegations contained in paragraph 3.

PARTIES

4.      Defendants admit only that CWA is a labor organization with an office at 80 Pine Street, New York, New York, representing employees throughout the United States and Canada, and that the telecommunications industry is an industry affecting commerce.  Defendants neither admit nor deny the allegations contained in paragraph 4 regarding the number of employees CWA represents and the industry in which a majority of these employees work for the reason that Defendants lack knowledge or information sufficient to form an opinion as to the truth of such allegations.  Defendants deny the remaining allegations contained in paragraph 4.

5.      Defendants admit that Verizon New York is an employer within the meaning of § 2(2) of the LMRA, that Verizon New York maintains its principal place of business at 140 West Street, New York, New York 10007, that ECS is a direct wholly owned subsidiary of Verizon New York and that VADI no longer exists and was merged into Verizon New York on September 28, 2007.  Defendants deny the remaining allegations contained in paragraph 5.

CAUSE OF ACTION

6.      Defendants admit only that CWA is the exclusive collective bargaining representative of certain employees employed by Defendants, that Verizon New York is party to

- 2 -

NYI-4062647v1

six CBAs with CWA, the most recent of which took effect on August 3, 2003 and will remain in effect through August 2, 2008, that these CBAs govern the terms and conditions of employment of certain employees represented by CWA, and that these CBAs are contracts within the meaning of § 301 of the LMRA, 29 U.S.C. § 185. Defendants deny the remaining allegations contained in paragraph 6.

7. Defendants admit the allegations contained in paragraph 7.

8. Defendants admit the allegations contained in paragraph 8.

9. Defendants admit only that in 1964 Defendants unilaterally implemented the Absence Control Plan ("ACP") and that the ACP, in a form different than originally implemented, is still in existence. Defendants aver that the ACP speaks for itself. Defendants deny the remaining allegations contained in paragraph 9.

10. Defendants deny the allegations contained in paragraph 10.

11. Defendants admit only that by letter dated March 22, 2006, Defendants informed CWA that they were planning to modify the ACP, and further state that this letter speaks for itself. Defendants deny the remaining allegations contained in paragraph 11.

12. Defendants deny the allegations contained in paragraph 12.

13. Defendants admit only that Defendants entered a letter agreement with CWA, dated May 19, 2006, which speaks for itself, and that, at CWA's request, Defendants did not submit the issue of modification of the ACP to the JAC. Defendants deny the remaining allegations contained in paragraph 13.

14. Defendants admit the allegations contained in paragraph 14.

15. Defendants admit that on or about November 30, 2006, Local 1109 filed grievance number G06-018317 regarding implementation of the modified ACP.

16.     Defendants admit that Verizon New York denied the ACP grievance at the first step, that Local 1109 appealed to the second step, and that Verizon New York denied the grievance again at the second step.

17.     Defendants admit only that Local 1109 appealed the ACP grievance to the third step, and that Verizon New York denied the grievance on or about April 11, 2007.  Defendants deny the remaining allegations contained in paragraph 17.

18.     Defendants admit only that Local 1109 grieved the ACP grievance through the procedural grievance steps under Article 11 of the Plant Agreement.  Defendants deny the remaining allegations contained in paragraph 18.

19.     Defendants admit that on or about August 6, 2007, CWA Attorney Gabrielle Semel proposed to Defendants' outside counsel Richard Shaw the names of three arbitrators.

20.     Defendants admit the allegations contained in paragraph 20.

21.     Defendants admit that on or around October 22, 2007, Verizon New York notified Local 1109 that it would not arbitrate the ACP grievance because Defendants maintain that the ACP grievance is not substantively arbitrable.

22.     Defendants admit the allegations contained in paragraph 22.

23.     Defendants deny the allegations contained in paragraph 23, including subparts (i) through (v).

24.     By way of further response to the Complaint, to the extent that any allegations have not been admitted or denied, they are hereby denied.

**PRAYER FOR RELIEF**

25.     In response to CWA's prayer for relief, Defendants deny that CWA is entitled to the requested relief, or any relief whatsoever.

NYI-4062647v1

## AFFIRMATIVE DEFENSES[2]

### First Defense

26.     CWA's Complaint fails, in whole or in part, to state claims upon which relief can be granted.

### Second Defense

27.     CWA's ACP grievance is not substantively arbitrable because the ACP is not a provision of the Plant Agreement, or any other CBA between Defendants and CWA, and the ACP grievance does not involve interpretation or application of a term of the Plant Agreement, or any other CBA between Defendants and CWA.

### Third Defense

28.     CWA's ACP grievance is not substantively arbitrable because it is not covered by Article XII, Section 1 of the Plant Agreement, which provides an exhaustive list of matters that are subject to arbitration.

### Fourth Defense

29.     CWA's ACP grievance is not substantively arbitrable because mere reference to the ACP in the Plant Agreement does not serve to incorporate the ACP into the Plant Agreement, or any other CBA between Defendants and CWA.

### Fifth Defense

30.     CWA's claims are barred, in whole or in part, by the doctrines of waiver, laches, unclean hands and/or estoppel.

### Sixth Defense

31.     CWA's claims are barred, in whole or in part, by the doctrine of collateral estoppel.

---

[2] In asserting these "affirmative defenses," Defendants do not assume the burden of proof on any such defenses except as required by applicable law with respect to the particular defense asserted.

NYI-4062647v1

**Seventh Defense**

32.     VADI is not a proper party.

**Eighth Defense**

33.     Defendants expressly reserve the right to raise any additional defenses that may

arise or be developed as this litigation proceeds.

WHEREFORE, Defendants request that the Complaint be dismissed, that CWA be

denied any remedy or relief, and that Defendants be awarded their attorneys' fees, costs and any

other relief that the Court deems appropriate.

Dated:  February 25, 2008                              Jones Day


                                        By:  /s/ Shari M. Goldsmith

                                            Shari M. Goldsmith  (SG 0909)
                                            JONES DAY
                                            222 East 41st Street
                                            New York, NY  10017
                                            Telephone: (212) 326-3939
                                            Facsimile: (212) 755-7306

                                            Thomas Beck  (*pro hac vice pending*)
                                            JONES DAY
                                            51 Louisiana Avenue, NW
                                            Washington, D.C. 20001-2113
                                            Telephone: (202) 879-3939
                                            Facsimile: (202) 626-1700

                                            *Attorneys for Defendant*

- 6 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 25, 2008, the foregoing Answer and Affirmative

Defenses was filed with the Clerk of the Court and served in accordance with the Federal Rules

of Civil Procedure, and/or the Southern District's Local Rules, and/or the Southern District's

Rules on Electronic Service upon the following parties:

> Amy S. Young
> 275 Seventh Avenue, Suite 2300
> New York, New York  10001

> /s/ Shari M. Goldsmith
> Shari M. Goldsmith (SG-0909)
> Jones Day
> 222 East 41st Street
> New York, NY 10017-6702
> smgoldsmith@jonesday.com
> (212) 326-3939

NYI-4062647v1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------x
                                                        :
COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO,             :
                                                        :
                    Plaintiff,                          :
                                                        :
            - against -                                 :
                                                        :
VERIZON NEW YORK, INC. TELESECTOR RESOURCES             :   08 Civ. 0467 (HB)
GROUP, INC., EMPIRE CITY SUBWAY COMPANY                 :
(LIMITED), VERIZON AVENUE, INC., VERIZON                :   DECLARATION IN
ADVANCED DATA INC., AND VERIZON CORPORATE               :   SUPPORT OF CWA'S
SERVICES CORP.,                                         :   MOTION TO COMPEL
                                                        :   ARBITRATION
                    Defendants.                         :
                                                        :
------------------------------------------------------------------------------x

    DENNIS TRAINOR hereby declares under penalty of perjury:

    1.      I am the Assistant to the Vice President of District One of the Communications

Workers of America ("CWA"). I have held this position since May 2005. My duties include

overseeing all collective bargaining in District One, including bargaining with Verizon-New

York.

    2.      Prior to that, I held the position of Downstate New York Area Director from July

2003 to May 2005. My duties included collective bargaining with Verizon, supervising the

CWA downstate New York staff representatives, determining which grievances should proceed

to arbitration and other duties as assigned.

    3.      Prior to that, I held the position of CWA Staff Representative from March 1989 to

July 2003. Prior to working for CWA, I held positions with Local 1101, including Assistant to

1

the President, chief steward and steward from 1971 until 1989.  During this time I was involved with grievances between CWA locals and Verizon.

4.      In addition to my positions with CWA and Local 1101, I have been an employee of Verizon and its predecessor corporations, in the Plant bargaining unit, since 1969.

5.      Attached as Exhibit A is the Absence Control Plan or Program ("ACP").  The ACP has been maintained by Verizon and its predecessor corporations in this or a form substantially similar to Exhibit A since approximately 1964.

6.      Attached as Exhibit B is the collective bargaining agreement between Verizon and CWA that is effective between August 3, 2003 and August 2, 2008 ("Plant Agreement") from which the instant grievance arose.

7.      Attached as Exhibit C is the signature page and Section XI of the 2003 Memorandum of Understanding between CWA and Verizon.  The Memorandum of Understanding is the document actually signed by the parties at the successful completion of collective bargaining.  The provisions of the Memorandum of Understanding are provisions of the Plant Agreement and the of other collective bargaining agreements covering employees in the bargaining units listed on its first page.

8.      I was CWA's chairperson on the Joint Committee on Absence Control ("JCAC"), a committee that was created during collective bargaining between CWA and Verizon in 2003. At 2003 bargaining, the parties created the JCAC "for the purpose of discussing a plan or program for absence reduction for the companies' operations within the operating territory of VZ-NY."  (Exhibit C, Section XI.)

2

9.      On March 22, 2006, Verizon Labor Relations Executive Director Jackie Latham informed me that Verizon intended to unilaterally impose a modified Absence Control Plan ("mACP")  (Latham's letter is attached as Exhibit D.)

10.      At no time did Verizon present the mACP to the JCAC for discussion.

11.      The mACP is more punitive than the ACP was.  Both plans use a system of "steps" to address employee absenteeism.  The mACP disciplines employees sooner and more harshly.  Also, an employee remains on higher steps of the mACP for longer periods of time than s/he would have under the ACP, resulting in a greater likelihood of progression through the mACP and of the employee being suspended and/or discharged from his/er job at Verizon.  (The mACP is attached as Exhibit E.)

12.      CWA immediately objected to the implementation of the mACP.

13.      In a May 19, 2006 letter, CWA and Verizon set forth a framework through which they would attempt to resolve their disagreement about the implementation of the mACP. (Exhibit F.)

14.      The parties were unable to resolve their differences.

15.      On October 6, 2006, Verizon notified CWA that it would unilaterally implement the mACP on November 5, 2006.

16.      Verizon implemented the mACP on November 5, 2006.

3

17.    Since November 5, 2006, CWA-represented employees employed by Verizon have been stepped, suspended, and discharged under the mACP.  Those employees would have been treated differently under the ACP.

Dated:  New York, New York
        May 5, 2008


_____
            \s\
          DENNIS TRAINOR

 ▽Search  ▽Contacts  ▽Site Map                    CORPORATE WIDE WEB

Human Resources

# North Guidelines
## Attendance - New York

### NOTICE

These Guidelines are not a contract of employment between you and the Bell Atlantic Company that employs you, or Bell Atlantic Corporation or any of its subsidiaries, and does not give you rights of any kind. The Guidelines and their contents may be changed or eliminated without notice, at any time by Bell Atlantic Corporation or its subsidiaries.

Bell Atlantic employees must understand that there is no fixed duration and there are no fixed terms or conditions to the employment relationship. Employees can terminate their employment whenever they wish and for whatever reason they might have with or without notice, just as Bell Atlantic Corporation or its subsidiaries can terminate their employment or change the terms and condition of their employment at any time and for any reason with or without notice, unless the employment is covered by a collective bargaining agreement. This is known as employment-at-will. This at-will employment relationship may not be modified except in a written agreement signed by the employee and an authorized representative of the Bell Atlantic Company that employs the employee, and with concurrence from the company's Legal Department.

### 1.0 Policy

1.1 The Company operates communications facilities which must be ready to meet demands for service
day and night. In order to fulfill this obligation the Company needs everyone on duty everyday on which
he or she is scheduled to work. All employees, therefore, are expected to strive for perfect attendance
by:

-Maintaining reasonable health standards
- Taking intelligent precautions against illness.
- Making every effort to live and work safely-- observing safety procedures and practicing safety rules,
both on and off the job.
- Not permitting minor dispositions or inconveniences to keep them away from the job.

1.2 Absence must be regarded as a weakening of the Company's ability to furnish its essential public
service. Employees are expected to report to work with regularity in return for compensation. Good
attendance is, accordingly, a most important job requirement. Failure to meet this requirement will
result in separation from the payroll.

### 2.0 Supervision of Absence

This guide is designed to assist the supervisor in promoting good attendance. Most of our employees
recognize the importance of being on duty when scheduled to work, and as a result, have good
attendance records. It is important to commend these employees for good attendance or improved
performance. Employees respond to appreciation and receive satisfaction from recognition. Good

VER0316

attendance can be acknowledged either by a discussion with the employee
or by a letter from the
appropriate level of supervision.

For those of out employees with poor attendance, the guide suggests steps
which will detect at an early
date the beginning of poor attendance habits and suggests methods of
determining the underlying
reasons for an individuals absence pattern. With this type of an
approach, the supervisor will be able to
aid in rehabilitation, if possible.

Calendar Form G-550 is to be maintained for each employee and each
absence is to be recorded. All
calendar forms should be reviewed regularly in order to be in a position
to recommend good attendance
and to recognize a poor attendance pattern.

The factors to be considered in determining that an employee has a poor
attendance record are:
- Frequency of occurrence
- Total days of absence
- Cause of absence

For example, a frequent absences of short duration for minor ailments can
be considered a poor record
because it involves both dependability and attitude. On the other hand,
repeated disabilities of long
duration where health prospects are poor also constitute an
unsatisfactory record.

The emphasis is on changing a pattern of proneness to absence that an
employee is developing either
as a result of frequent minor indispositions, unexcused absences, or
repeated lengthy absences due to
serious illnesses or off-duty accidents. It is not necessary that each
new occurrence in a poor
attendance record be similar and therefore related to every other
occurrence before action is taken.
Often a poor record will show a completely different reason for each
absence. In such a case each
different occurrence is part of a pattern of poor attendance and
supervisors should proceed to take
action.

Note: All sickness and accident absences as well as unexcused absence
should be considered in the
Supervision of Absence. Excused absences such as time off granted for
personal affairs, leaves of
absences, funerals, military activities and jury duty should not be
included.

2.1 Supervisory Action

The steps to be followed in the Supervision of Absence to help an
employee maintain a satisfactory
attendance record or correct a developing pattern of poor attendance are
shown below. The 1st Step
should never be omitted. Deviation from applying any of the succeeding
steps should be confined to

those cases where supervisory judgement indicates that the step would be inappropriate. For example,
one unrelated occurrence, such as an accident, operation or serious illness, which appears separate
from the pattern of absence and unavoidable may not be sufficient reason to proceed to the next step.
In addition, if absence occurs while the employee is taking approved remedial action that is expected to
correct the cause of the absence problem, the supervisor should normally suspend the steps of the program.

1st Step - Absence Inquiry
2nd Step - Investigation
3rd Step - 1st Discussion
4th Step - 2nd Discussion
5th Step - Final Warning
6th Step - Separation

Note: In the case of very short term employees acceleration or omission of steps may be warranted.
The 5th Step - Final Warning - is never omitted.

2.01 Absence Inquiry (1st Step)

It is expected that he supervisor will welcome the employee back and inquire about the reason for
absence on the return to duty from each occurrence. He should review the induction discussion on
attendance, as appropriate. This step should be recorded on Form G-550/1477 Absence and Tardiness
Record. (See Paragraph 3 for instructions.)

2.02 Investigation (2nd Step)

The supervisor, in reviewing the calendar form, should note the reasons given by the employee for his
absence. The supervisor may decide that a consultation with the Medical Department would be helpful
in assisting the employee to take remedial steps. If the reasons given for his absence are not related to
health, the supervisor may take action where warranted.

2.03 First Discussion (3rd Step)

The supervisor should conduct the First Discussion (3rd Step) with the employee. He should review with
the employee the Company Attendance Policy and earlier conversations during the investigation.
Discussion should be fully documented on Form G-550/1477 by including a summary of what was said
by both the supervisor and the employee.

Points for discussion with the employee:
- It is the supervisors desire to help the employee achieve and maintain a good attendance record.
- The dates and the length of the employees absences as entered on his attendance calendar should be
reviewed.
- It is important that the employee understand that his record of absence, if continued, will not meet the

VER0318

Company requirement for a satisfactory employee.
- An employee is a satisfactory employee only if he can be counted on to be on the job when scheduled
for work. Even though an employee may have legitimate reasons for absence, a continued poor record
may result in his being absent so much that he cannot meet this requirement
- Recurring absence is a cause for separation from the payroll.

2.04 Second Discussion (4th Step)

Prior to the Second Discussion (4th Step), the supervisor should review the case with higher
supervision. The supervisor then should conduct the discussion with the employee. Review First
Discussion points 1 to 5 as appropriate.

Warn the employee that his job is in jeopardy because of his absence record. Discussion should be fully
documented on Form G-550/1477 by including a summary of what was said by both supervisor and the
employee.

2.05 Final Warning (5th Step)

In preparation for this step, the supervisor should thoroughly review the case and obtain a medical
opinion, where applicable. The district level supervisor is responsible to see that the proposed
disciplinary action is consistent when compared with the treatment of accorded employees of
comparable service in the administrative unit. (An administrative unit in the field is normally a district.)
Before giving the Final Warning, higher level approval must be obtained (the supervisor who approves
separation from the payroll). It is the responsibility of the supervisor who approves separation from the
payroll to assure that there are not wide variances within districts of a department.

Where appropriate, the Final Warning may be given in the presence of the employees union delegate,
or a procedure to inform the delegate should be established.

In fairness to the employee and so that there will be no misunderstanding as to what was said, the
supervisor should give the Final Warning in unmistakable form such as the following:

Your attendance is still unsatisfactory, I am now giving you a Final Warning that unless your attendance
becomes satisfactory to the Company and remains satisfactory, you will be separated from the payroll.

It is preferable to prepare the Final Warning in advance of the discussion and to read it to the
employee. The supervisor should ask the employee, and the discussion should be fully documented on
Form G-550/1477 including a summary of what was said by both the supervisor and the employee.

VER0319

Include the names of witnesses.

2.06 Separation from the Payroll (6th Step)

Before seeking approval of Separation from the Payroll, determine that the last absence is associated
with the established poor attendance pattern and that the absence is not one for which the employee
would normally be excused. (See note, Paragraph 2.)

Final approval of Separation from the Payroll must be obtained from the appropriate management level
supervisor. The employee should be separated promptly after he has returned to duty. To expedite this
action the supervisor should try to obtain approval prior to the employees return.

- The supervisor should be ready to review the employees calendar record with him if necessary.
- The employee should be informed that continued recurring absences necessitate separation from the
payroll and advised that the effective date for separation is ...................

2.2 Administration

2.21 Time Elements

In following the steps of this guide, if there is an absence within a three month period following the
previous absence, normally proceed to the next step. However, a single day of absence may not
necessarily be cause for proceeding to the next step unless there is a pattern of No Report or Monday
and Friday absences.

Unless the employee is on Final Warning, if the next absence occurs more than three but less than six
months following the previous absence, the supervisor should repeat the previous step. If six or more
months elapse, an earlier step may be repeated. The exception to this treatment should be where an
employee is subject to disability absences (Absences over seven days duration) in which case the
previous step should be repeated after a twelve month period of satisfactory attendance; earlier steps
should be applied when the employee does not have a disability absence for twenty-four or more
months. An employee can establish satisfactory attendance by continuing a markedly improved record
for one year unless he has been subject to disability absences. In this case the improved attendance
record should be extended.

An employee is on Final Warning for a six-month period unless he is subject to disability absences in
which case the period should be for twelve months. At the end of this period, if not fully satisfied, it may
be advisable, with the concurrence of higher level supervision, to extend the Final Warning to ensure

VER0320

that the employee is maintaining satisfactory attendance. The employee
should be so informed. To be
fully effective, however, a Final Warning should not be extended
repeatedly.

2.22 Requesting Advice of the Medical Department

Following the Investigation Discussion, or at any step in an individuals
attendance program, the
supervisor should consider the advisability of obtaining medical opinion.
When it appears that a
physical, mental or emotional condition may be the reason for an
employees record of recurring
absence, the case should be referred by the district level supervisor to
the Medical Department.

In order that the Medical Department may be able to perform its function
effectively, it is essential
that the request for medical advice include the absence of history of the
employee for the last five
years and longer, if significant, including reasons for each absence. It
should also include any other
information that might be helpful.

The Medical Department, either through examination by a Company examining
physician or by local
Consultants, can ascertain whether or not the employee has basic
physical, mental or emotional
condition that is related to the absence pattern, In addition the Medical
Department can:

- Suggest to the employee what corrective medical action, if any, is
indicated.
- Give a statement to the supervisor as to the general nature of the
medical problem and the future
attendance prospects where the recommended corrective action is taken by
the employee or is not
taken by the employee.

The medical examination will also identify those cases where there are no
physical, mental or
emotional conditions that justify recurring absences and where only
administrative action is indicated.

2.23 Absence Record - Form G-550

The Absence Record - Form G-550, as detailed in Paragraph 3 - should be
used to record and
document all cases of absence.

3.0 Interpretive Guidelines

Under the Absence Control Plan the supervisor is granted a considerable
degree of discretion, a fact
which should not be overlooked.

3.1 Very Short Service

For example, the Plan allows for omission or acceleration of steps in the
case of a very short term

VER0321

employee (generally less than one year of service) as long as Steps 1
(Absence Inquiry) and 5 (Final
Warning) are never omitted (Paragraph 2.1). Retrogression for these
employees is the same as all
other employees; that is, one step at a time.

3.2 Poor Attendance Patterns

In addition, the Time Elements of the Plan may be adjusted, in the
interest of promoting good
attendance, where an employee demonstrates particular poor attendance
patterns (Paragraph 2.06).
Indeed, the Plan requires that such consideration be given to an
employees individual pattern of
absence (Paragraph 2). Factors appropriate in such consideration are:

- frequency of occurrences
- total days of absence
- causes of absence (is ascertainable) (Paragraph 2)

As such, special treatment under the Plan may be appropriate in the
following situations:

- Where it appears than an employee may be timing absences to circumvent
the time elements of the
Plan: that is, there is a pattern of absence occurring within the three
months following retrogression to
an earlier step: or
- An employee has demonstrated a pattern of multiple day absences (three
to five days of absence per
occasion).

In a situation where either one or both of the above poor attendance
patterns is evident, retrogression
should be delayed for six months after (a) the third occasion of absence
which seems to be times to
follow a retrogression period, or (b) the third occasion of three to five
days of absence within an 18-month
time period. In such circumstances where the action being taken is Step 5
(Final Warning), retrogression
should be delayed 12 months, with the concurrence of higher level
management, to insure that the
employee maintains satisfactory attendance. Delayed retrogression is a
rehabilitative stepping action
which should be taken whenever either of the above patterns becomes
apparent.

3.3 Subject to Disabilities

Questions have arisen with respect to administration of the subject to
disability absences provision of
the Plan (Paragraph 2.21). This provision may be invoked on the occasion
of a second disability absence
within a two-year period, in the interest of promoting good attendance.

Under the Plan supervision should apply delayed retrogression treatment
when an employee is subject
to disabilities. Accordingly, an employee who is deemed subject to
disability absences will remain on
the step that is generated at the time of the second disability for 12    **VER0322**

months. If no additional disability
absence occurs during that 12-month period, the employee will retrogress
one step and remain on that
step for another 12 months.

### 3.4 On-the-Job Accidents

Relative to absence administration for on-the-job accidents, while, as
with any other absence stepping
is appropriate, in those cases where such an incident appears separate
from a pattern of absences,
supervision should give consideration to not stepping the employee on the
Plan (Paragraphs 2 and 2.1).
By contrast, however, any subsequent absence occurring, even as a result
of such accident, will, as with
any other absence ordinarily provide reason for advancing under the Plan.

### 3.5 Proof of Personal Illness

On another point, the Plan does not restrict the Company's right to
request an employee to submit
satisfactory proof of personal illness for incidental absences if, in the
opinion of the supervisor, such
information may be beneficial. For example, such information may be
helpful in improving the
employees absence performance or may assist the supervisor in determining
whether payment for the
absence is warranted. In appropriate situations, the employee should be
advised that he requirement of
proof of personal illness may be satisfied by an examination in the
Company's Medical Department. If
the employee declines the services of the Medical Department, the
employee should be informed that
if the required proof offered by the employee ultimately consists of a
personal physician's certification of
illness, the expense associated with such documentation, if any, will be
the employees responsibility.
Such expense may, however, be submitted by the employee to his or her
group medical insurance for
possible reimbursement, which will be entirely dependent on the terms of
the coverage. Failure on the
part of the employee to submit requested satisfactory proof of personal
illness, may, among other
things, result in denial of pay for the days of pay in question.

### 3.6 Review and Documentation

### 4.0 Documentation of Employees Absence/Tardiness Record- Interview Details

The reverse of the NYNEX Employee Absence/Tardiness Record (Form G-
550/1477) and the NYNEX Employee and Tardiness Record - Interview Details
(G550A/1477A) shall be used to support the calendar entries.
Documentation should be in accordance with the Absence and Tardiness
Control Plan contained in NYNEX - New England Telephone CPP, (Section 4)
NYNEX - New York Personnel Policies and Practices (Section 3) and NYNEX
Personnel Policies and Practices (Section 6). The reverse form G-550/1477
and the (G550A/1477A shall be completed as follows:

For Absence:

VER0323

**Date Absent** - Enter the date on which absence occurred. If more than one day is involved, enter the first day of absence and enter the last day of the absence separated by a dash, i.e., 10/5-10/8. Do not enter non-scheduled days or holidays at the beginning or end of an absence as a day of absence. It would be helpful, for record keeping purposes to, note the total number of days absent- not including non-scheduled days.

**Day of Occurrence** - Enter the day of the week the absence occurred, i.e., Monday, Wednesday.

**Reasons for Absence** - Enter the reason given by the employee for the absence, using as few descriptive words as possible. If more detail is required it can be included in the next column with Investigation, Interview Details and Action Taken.

**Investigation, Interview Details and Action Taken** - Record details of investigation, interviews and corrective action planned and taken. Medical visits may also be entered. Any discussions regarding absence must be recorded in sufficient detail to include what was said by the supervisor and the employee. After each interview, the supervisor should legibly sign these notes and indicate their telephone number and record the date of the interview.

**Contact** - Enter the name of the person, if other than employee, who made the contact or who you spoke with when discussing the case.

**Name, Title and Date** - After each contact/discussion, the supervisor should legibly sign this documentation and indicate their title, telephone number and record the date of each discussion. This column may also be used by manager/director to note that a review of the employees absence record has taken place.


Last Updated: 08/04/1997 07:11:12 PM


Last Updated: 04/16/2002 11:17:06 AM



AGREEMENT

between


VERIZON NEW YORK INC.

AND

TELESECTOR RESOURCES GROUP, INC

AND

EMPIRE CITY SUBWAY COMPANY (LIMITED)

AND

VERIZON AVENUE INC.

AND

VERIZON ADVANCED DATA INC.

AND

VERIZON CORPORATE SERVICES CORP.

AND

COMMUNICATIONS WORKERS OF AMERICA
AFL-CIO DISTRICT ONE

EFFECTIVE AUGUST 3, 2003



# AGREEMENT

### between

## VERIZON NEW YORK INC.

### AND

## TELESECTOR RESOURCES GROUP, INC

### AND

## EMPIRE CITY SUBWAY COMPANY (LIMITED)

### AND

## VERIZON AVENUE INC.

### AND

## VERIZON ADVANCED DATA INC.

### AND

## VERIZON CORPORATE SERVICES CORP.

### AND

## COMMUNICATIONS WORKERS OF AMERICA AFL-CIO DISTRICT ONE

### EFFECTIVE AUGUST 3, 2003

# TABLE OF CONTENTS

**ARTICLE**                                                                     **PAGE**

1 - RECOGNITION ...................................................................2
2 - DEFINITIONS ...................................................................3
3 - COLLECTIVE BARGAINING ...................................................6
4 - PROMOTIONS AND TRANSFERS OF UNION REPRESENTATIVES ...............7
5 - PAYROLL DEDUCTIONS OF UNION DUES .................................8
6 - ABSENCE FOR UNION BUSINESS ..........................................11
7 - WAGES ...........................................................................13
8 - TRANSFERS .....................................................................17
9 - WAGE TREATMENT FOR PROMOTIONS OR ASSIGNMENTS ...............21
10 - DISCHARGES, SUSPENSIONS AND DEMOTIONS FOR CAUSE................24
11 - GRIEVANCE PROCEDURE ..................................................28
12 - ARBITRATION.................................................................32
13 - CONTRACTING WORK.......................................................34
14 - LAYOFFS AND DOWNGRADES ............................................34
15 - PENSION AND BENEFIT PLAN.............................................37
16 - RETIREMENT WITHOUT PENSION ........................................37
17 - WORK SCHEDULES...........................................................38
18 - LENGTH OF TOURS .........................................................42
19 - PAYMENT FOR TIME WORKED...........................................47
20 - TRAVEL ON WORKING AND OVERTIME ASSIGNMENTS................52
21 - ALLOWANCE FOR DAILY TRAVEL OR  BOARD AND LODGING ............54
22 - DIFFERENTIAL FOR NIGHT TOURS........................................60
23 - VACATIONS ...................................................................61
24 - HOLIDAYS ....................................................................70
25 - INCIDENTAL ABSENCE DUE TO PERSONAL ILLNESS ...................71
26 - CLASSIFICATION AND TREATMENT OF PART-TIME EMPLOYEES ....................72
27 - EMPLOYEES IN MILITARY SERVICE OR ACTIVE DUTY FOR TRAINING .................75
28 - BULLETIN BOARDS .........................................................77
29 - FEDERAL, STATE AND LOCAL LAWS .....................................77
30 - WAIVER OR MODIFICATION ...............................................77
31 - WAGE PRACTICES...........................................................78
    GENERAL ..........................................................................78
    APLLICATION OF THE WAGE PROGRESSION TABLES .....................78
    PAYMENT FOR EMPLOYEES PERMANENTLY TRANSFERRED ..................79
    PART I Composition Of Wage Zones....................................81
    PART II Top Basic Weekly Wage Rates ...............................W1
    PART III Wage Progression Tables ....................................W8
    PART IV - PENSION BANDS .............................................82
    PART V—CALCULATION OF PENSION .................................87
32 - PROVISION FOR LUNCHES — UPSTATE ONLY .........................88

33 - AGENCY SHOP .................................................................89
34 - TERMINATIONS ................................................................90
35 - INSPECTION OF EMPLOYEE RECORDS .............................90
36 - INTERAREA TRANSFER REQUESTS ...............................91
37 - NON-DISCRIMINATION.....................................................92
38 - SPECIAL CITY ALLOWANCE ............................................93
39 - COPIES OF CONTRACT .....................................................93
40 - SAFETY..............................................................................94
41 - EXCUSED WORK DAYS .....................................................95
42 - INCOME PROTECTION PLAN .............................................96
43 - REASSIGNMENT PAY PROTECTION PLAN .................103
44 - EMPLOYEE STAFFING .....................................................104
45 - EXPEDITED ARBITRATION ...............................................110
46 - JOB BANK........................................................................112
47 - FOUR DAY WORKWEEK ...................................................113
48 - TRAINING AND RETRAINING PROGRAMS........................114
49 - MOTOR VEHICLE USAGE PROGRAM..............................118
50 - NEW BUSINESSES...........................................................120
51 - EMPLOYEE DEVELOPMENT PROGRAMS.........................128
52 - COMMON COMMITTEE ....................................................130
53 - NYNEX/CWA BROADBAND AGREEMENT .........................132
54 - ENHANCED EDUCATIONAL LEAVE...................................135
55 - FORCE ADJUSTMENT PLAN..............................................138
56 - MEDIATION .....................................................................145
57 - WORK AND FAMILY .........................................................148
58 - GRADUAL RETURN TO WORK FROM CARE OF NEWBORN CHILD LEAVE .......149
59 - EQUALIZATION OF OVERTIME PROCEDURES...................150
60 - THIRD MEDICAL OPINION ...............................................157
61 - DURATION OF AGREEMENT .............................................158
LETTERS OF AGREEMENT .......................................................159
CWA LOCALS JURISDICTION....................................................245

Absence - Personal Illness
    Article 25.01 ................................................................71
    Letter ...........................................................160, 172, 218
    Proof of Illness ..........................................................71
Absence Control Plan - Letter ...............................163, 168, 172
Absence for Union Business -Article 6 ................................11
Agency Shop - Article 33.01...............................................89
Arbitration - Article 12.01 ................................................32
Assignments
    On Call - Article 19.11................................................50
    Overtime or Nonscheduled Day - Article 19.09 ..............50
Assignments, Wage Treatment - Article 8.01 ......................17
Board and Lodging - Article 21.04 ....................................56
Broadband Agreement - Article 53 ...................................132
Bulletin Boards - Article 28................................................77
CATV - Letter ...................................................................201
City Allowance - Article 38 ................................................93
Common Committee
    Article 52 ...............................................................130
    Letter ....................................................................200
Contracting Work
    Article 13.01............................................................34
    FAP - Letter ...........................................................183
    New Contracting Initiatives - Letter ..........................238
    Pole & Aerial Cable ................................................167
Corporate Profit Sharing.................................................209
Cost of Living - Article 7.03..............................................16
Daily Travel Allowance - Article 21.03 ...............................55
Definitions - Article 2 .......................................................3
Demotions – Article 10.02 ...............................................25
Dependent Care Reimbursement Fund - Letter .................193
Differential
    CSA - Article 9.08....................................................23
    Night – Article 22.01................................................60
    Saturday – Article 19.07 ..........................................49
Discharge – Article 10.01 .................................................24
Downgrades - Article 14.04 ..............................................36
Dues - Article 5 ................................................................8
Emergency
    Definition - Article 2.18.............................................5
    I/C/W Overtime - Articles 17.03, 17.06 ....................40,41
    I/C/W Vacation - Article 17.01 ..................................38

Employee
    Definition – Article 2.05 ...................................................................4
    Full Time – Article 2.08 ...................................................................4
    Occasional – Article 2.10 ..................................................................4
    Part-Time – Article 2.09 ...................................................................4
    Regular – Article 2.06 ......................................................................4
    Staffing - Article 44 .....................................................................104
    Temporary – Article 2.07 ..................................................................4
Employee Development Program
    Article 51 ..................................................................................128
    Letter .......................................................................................181
Enhanced Educational Leave - Article 54 .......................................................135
Equipment Installation - Letter ..................................................................188
Ergonomics .........................................................................................241
Escorts, Temporary Promotion - Letter .........................................................192
Excused Time
    Death in Immediate Family - Letter .....................................................177
    Excused Work Days - Article 41.01 ........................................................95
    For Rest - Article 17.05 ...................................................................41
    For Union Business - Article 6 ...........................................................11
Final Steps of FAP - Letter .......................................................................183
Force Adjustment Plan - Article 55 ...............................................................138
Four Day Workweek - Article 47 ..................................................................113
Gradual Return to Work - Article 58 .............................................................149
Green Circle Treatment - Letter ..................................................................229
Grievance
    Grievance Issues Committee - Letter .....................................................224
    High Crime Award - Letter ...............................................................159
    Procedure - Article 11 ....................................................................28
Health Care Coordinator - Letter .................................................................239
High Crime Area - Letter ..........................................................................166
High Level Committee - Letter ....................................................................228
Hiring Hall - Letter ...............................................................................227
Holiday
    Day in Lieu of Lincoln's Birthday - Article 24.01 ........................................70
    Observed - Article 24.01 ..................................................................70
    Payment for Time Not Worked - Article 24.06 ..............................................70
    Payment for Time Worked - Article 19.06 ..................................................49
    Saturday - Article 24.03 ..................................................................70
    Sunday - Article 24.02 ....................................................................70
Home Relocation - Letter ..........................................................................185
Income Protection Plan
    Article 42.01 .............................................................................96

Letter .................................................................................174
Inspection of Employee Records - Article 35 ...............................90
Inter-Company Program - Letter ................................................230
Job Bank - Article 46 ...............................................................112
Job Security - Letter ................................................................184
Job Sharing - Article 55 ...........................................................140
LAN Work - Letter ...................................................................197
Layoffs –Article 14.02 ..............................................................34
Leaves of Absence For Union Business - Article 6........................11
Limited Extension Agreement...................................................243
Locals Jurisdiction ..................................................................245
Lunches (Upstate) – Article 32...................................................88
Mass Transit Spending Account - Letter ....................................194
Meal Periods - Article 18.01 .......................................................42
Mediation - Article 56 .............................................................145
Medical Visits - Article 19.10 ......................................................50
Mileage Allowance - Article 20.03...............................................53
Military Leave - Article 27 ..........................................................75
Minimum Payment - Article 19.09...............................................49
Motor Vehicle Usage Program - Article 49 .................................118
Moving Expense
    Article 8.04..........................................................................20
    Letter ...............................................................................169
New Business - Article 50 ........................................................120
New Career Reimbursements - Letter .......................................189
Next Step
    Program - Letter .................................................................232
    TTA Committee - Letter........................................................195
    Wages – Article 31.15 ............................................................81
Non-Scheduled Day - Article 19.04..............................................47
Notice to Union
    Absence Control Warning - Letter...........................................163
    Arbitration - Article 12.01 .......................................................32
    Contracting Pole & Aerial Cable Work - Letter .........................167
    Demotions - Article 10.02 .......................................................25
    Discharges and Suspension - Article 10.01 ...............................24
    Emergency Overtime - Article 17.03..........................................40
    Expiration of Sickness Benefits - Article 34.03...........................90
    FAP Surplus Condition - Article 55.........................................138
    Occupational Classification - Article 7.01 ..................................13
    Overtime in Excess of Limitiations - Article 17.06.......................41
    Promotion and Transfer of Union Representative - Article 4 ..........7

|  |  |
|---|---|
| Termination of Exedited Arbitration Umpire - Article 45.02 | 110 |
| Termination of Mediator - Article 56.02 | 145 |
| Termination of Night Tour Volunteers - Article 17.04 | 40 |
| Terminations - Article 34.01 | 90 |
| Union Dues - Article 5.02, 5.03 | 8 |

**Old Business - Letter** ........................................................................ 201

**On Call Assignments - Article 19.11** .................................................... 50

**Overtime**
| | |
|---|---|
| Assignment - Article 17.03 | 40 |
| Equalization of Overtime Procedures — Article 59 | 150 |
| Extra Allowance - Article 19.05 | 48 |
| Gradual Return to Work — Article 58 | 149 |
| Limitations - Article 17.06 | 41 |
| Meal Period - Article 18.02 | 45 |
| Minimum Payment - Article 19.09 | 49 |
| On Call Assignments - Article 19.11 | 50 |
| Pay Treatment - Article 19.03 | 47 |
| Payment to Part-time Employee - Article 26.02 | 72 |
| Storekeeper - Letter | 225 |
| Sunday - Article 19.04 | 47 |
| Sunday after Vacation — Article 23.06 | 69 |
| Travel on OvertimeAssignment - Article 20.02 | 52 |
| TTA Personnel - Letter | 235 |

**Part-Time Employee**
| | |
|---|---|
| Benefit and Absence Payments - Article 26.06 | 73 |
| Benefit Payments for Change of Status - Letter | 173 |
| Classification and Treatment - Article 26 | 72 |
| Definition - Article 2.09 | 4 |
| Overtime Payment - Article 26.02 | 72 |
| Wage Progression - Article 31.07 | 79 |

**Pay Treatment**
| | |
|---|---|
| Absence - Article 25.01 | 71 |
| Extra Allowance - Article 19.05 | 48 |
| Holiday - Article 19.06 | 49 |
| Hourly Rate - Article 19.01 | 47 |
| Military - Article 27.04 | 75 |
| Minimum Payment - Article 19.09 | 49 |
| Night Tour Differential - Article 22.01 | 60 |
| Non-Scheduled Day - Article 19.04 | 47 |
| Overtime - Article 19.03 | 47 |
| Part-Time Employees - Article 26.01 | 72 |
| Regular Tour - Article 19.02 | 47 |

    Saturday Differential - Article 19.07................................................49
    Shifted Tour - Article 19.08................................................49
    Training Other Employees - Letter................................................190
    Travel Time & Expense - Article 20.01................................................52
Payroll Week, Definition - Article 2.11................................................4
PC Installation and Repair - Letter................................................219
Pension
    Building and Supplies Group Bands – Article 31 Part IV................................................83
    Calculation - Article 31 Part V................................................87
    Clerical Group Bands – Article 31 Part IV................................................84
    Craft Group Bands – Article 31 Part IV................................................82
    Empire City Subway Company Bands – Article 31 Part IV................................................86
    Miscellaneous Group Bands – Article 31 Part IV................................................85
    Monthly Benefit Table - Article 31 Part V................................................87
    Pension and Benefit Plan - Article 15................................................37
Promotion
    Selection - Article 9.07................................................23
    Union Representatives – Article 4................................................7
    Wage Tratment - Article 9.01................................................21
Proof of Illness - Article 25.03................................................71
Reassignment Pay Protection Plan - Article 43................................................103
Reinstatement after Discharge or Suspension – Article 10.03................................................26
Relief Periods - Article 18.03................................................46
Reporting Locality - Article 21.02................................................54
Reporting Point - Article 21.01................................................54
Retirement without Pension - Article 16.01................................................37
Safety - Article 40................................................94
Scheduled Day - Article 2.12................................................4
Scheduled Tour
    Assigning - Article 17.01................................................38
    Definition - Article 2.14................................................5
Special City Allowance - Article 38................................................93
SPV................................................*See* UTP/SPV
Surplus
    Building Mechanic, Elavator Mechanic, Watch Engineer - Letter................................................202
    COTs - Letter................................................188
    FAP - Letter................................................183
    Waiver of Time in Title Requirements - Article 44.02................................................107
Suspensions – Article 10.01................................................24
Temporary Increase - Article 9................................................21
Third Medical Doctor................................................242
Third Medical Opinion - Article 60................................................157

Tour

    Change - Article 17.02................................................................39

    Day - Article 2.16....................................................................5

    Definition - Article 2.13...........................................................4

    Hours - Article 18.01..............................................................42

    Night - Article 2.17.................................................................5

    Night Tour Differential - Article 22............................................60

    Night Tour Exemption - Article 17.04.........................................40

    Night Tour Rotation - Article 17.04...........................................40

    Payment - Article 19.02..........................................................47

    Regular - Article 2.15.............................................................5

    Scheduled - Article 2.14.........................................................5

    Shifted Tour - Article 19.08.....................................................49

Training

    Active Training Duty - Article 27...............................................75

    Advisory Committee on Health Care Training- 1998 MOA................204

    Costs I/C/W IPP - Article 42.09.................................................99

    Cross Training COTs - Letter....................................................164

    Employee Test Taking - Article 51.04.........................................129

    ESAC Training Tours - Letter....................................................196

    FAP - Article 55...................................................................141

    Formal Training - Letter.........................................................190

    Health Care Coordinator - Letter..............................................239

    Job Displacement - Article 48.09..............................................115

    Joint Apprenticeship - Letter...................................................232

    LAN Manager Support- Letter..................................................219

    On the Job - Letter...............................................................190

    Personal or Career Development - Article 48.03............................114

    Retiree - Letter....................................................................189

    SPV Training Modules - Article 44.02.........................................106

    Training Advisory Board - Article 48.11......................................117

    Training and Retraining Program - Article 48...............................114

    Training, Familiarization or Updating Skills - Letter.......................178

Transfer

    Change of Reporting Point - Article 21.01....................................54

    Definition - Article 8.01..........................................................17

    Force Adjustment - Article 8.01, 8.02........................................17

    Interarea - Article 36.............................................................91

    Inter-Company - Letter...........................................................230

    Inter-Unit - Article 8.02..........................................................17

    Intra-Area - Article 44...........................................................104

    Moving Expense - Letter.........................................................169

Moving Expense for Involuntary Transfer - Article 8.04 ..................20
Notifice to Employee - Article 8.05 ...........................................20
Permanent - Article 8.05.......................................................20
SPV - Article 44.01...........................................................105
Temporary - Article 8.05 ......................................................20
Training, Familiarization or Updating Skills - Letter ....................178
Union Officer & Representative - Article 4...................................7
UTP - Article 44.01...........................................................105
Wage Treatment — Article 31.08................................................79

TTA .........................................................................*See* Next Step
TTA Committee ..............................................................244

Union
Dues — Article 5.............................................................8
Group Benefit Plan — Letter ...............................................161
Locals Jurisdiction.......................................................245
Recognition — Article 1....................................................2
Union Representation at Meetings with Management ..........................27

UTP/SPV
Administrative Procedures - Article 44.02 .................................106
General Provisions - Article 44.01 ........................................104
Grievance Procedures .....................................................105

Vacation
Carry-Over — Article 23.04 ...............................................63
Choice — Article 23.02....................................................63
Day at a Time — Article 23.01............................................62
Differential and Temporary Promotional Increases — Article 23.03 ........63
Disability Carry-Over — Article 23.05 ...................................64
Eligibility - Article 23.01.............................................61
Payment — Article 23.03..................................................63
Reserve Week — Article 23.01 ...........................................62
Scheduling — Article 23.06 .............................................65
Selection Procedure — Article 23.01.....................................62
Summer Period - Article 23.01...........................................62
Weekend Assignments — Article 23.06 ....................................69

Wages
Application of Wage Progression Tables — Article 31.02 ..................78
Composition of Wage Zones — Article 31 .................................81
Practices - Article 31.................................................78
TTA — Article 31.15...................................................81
Wage Increases - Article 7.01 ........................................13
Wage Treatment for Transfers — Article 31.08 .........................79

# AGREEMENT

## between

## VERIZON NEW YORK INC.

## AND

## TELESECTOR RESOURCES GROUP, INC

## AND

## EMPIRE CITY SUBWAY COMPANY (LIMITED)

## AND

## VERIZON AVENUE INC.

## AND

## VERIZON ADVANCED DATA INC.

## AND

## VERIZON CORPORATE SERVICES CORP.

## AND

## COMMUNICATIONS WORKERS OF AMERICA
## AFL-CIO DISTRICT ONE

## EFFECTIVE AUGUST 3, 2003

# AGREEMENT

**This Collective Bargaining Agreement is between VERIZON NEW YORK INC. and the TELESECTOR RESOURCES GROUP, INC. and the EMPIRE CITY SUBWAY COMPANY (LIMITED) and the VERIZON AVENUE INC. and VERIZON ADVANCED DATA INC. and VERIZON CORPORATE SERVICES CORP. hereinafter collectively the "Company" and the COMMUNICATIONS WORKERS OF AMERICA, hereinafter called the Union. In consideration of the covenants and terms herein contained, the parties hereto agree:**

## ARTICLE 1
## RECOGNITION

**1.01**     The Company hereby recognizes the Union as the sole and exclusive representative for the purpose of collective bargaining with respect to rates of pay, wages, hours and other terms and conditions of employment for the following certified unit of employees:

Included:     All employees of Verizon New York, Inc. and of the Telesector Resources Group, Inc. in locations that are not within the states of Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont, who were included in the bargaining unit as of August 31, 1991, whose occupational classifications are listed in the craft, building and supplies, clerical and miscellaneous groups appearing in Article 31 and which employees and occupational classifications are part of Company organizations that were formerly part of the New York Telephone Company's plant, network operations, customer services, technical services, engineering and facilities organizations; all employees in the Empire City Subway Company (Limited).

It is understood that it is intended that the bargaining unit shall be the same as the bargaining unit covered by the 1989 Collective Bargaining Agreement.

Excluded:     All guards, watchmen, professional employees, supervisors as defined in the National Labor Relations Act, as amended, and employees regularly performing confidential labor relations duties.

# ARTICLE 2
# DEFINITIONS

**2.01** **"Company" means Verizon New York Inc. and the Telesector Resources Group, Inc., and the Empire City Subway Company (Limited) and Verizon Avenue Inc. and Verizon Advanced Data Inc. and Verizon Corporate Services Corp. and, unless otherwise indicated.**

**2.02** Any change made by the Company of the Areas as defined herein shall not alter the parties' rights or obligations as they existed on August 10, 1980.

**2.03** Unless otherwise specified, when used in this Agreement:
"Mid-State Area" means the geographic locations north of the New York City and south of the Northeast Area where the Company conducts its operations.

**2.04** When used in this Agreement:

    (a) "Downstate" shall mean the following:

        (1) New York City

        (2) Nassau and Suffolk Counties

        (3) That part of the Mid-State Area consisting of Westchester, Rockland and Putnam Counties, and those parts of Orange and Dutchess Counties that are in Wage Zone 1, and Greenwich, Connecticut;

    (b) "Upstate" shall mean the following:

        (1) Central Area

        (2) Western Area

        (3) Northeast Area, which for the purpose of this definition shall include that part of the Mid-State Area not included in the definition of "Downstate."

**2.05**     "Employee" means a regular or temporary full time and a regular or temporary part-time non supervisory employee whose occupational classification is listed in Article 31.

**2.06**     "Regular Employee" means one whose employment is reasonably expected to be permanent at the time he is engaged although the employment may be terminated by action on the part of the Company or the employee.

**2.07**     "Temporary Employee" means one who is engaged for a specific project or a limited period, with the definite understanding that his employment is to terminate upon completion of the project or at the end of the period, and whose employment is expected to continue for more than three (3) weeks but not more than one (1) year.

**2.08**     "Full -Time Employee" means a regular or temporary employee who is scheduled to work five (5) full tours in each payroll week.

**2.09**     "Part - Time Employee" means a regular or temporary employee who is normally scheduled to work less hours per average month than a comparable full-time employee in the same occupational classification and work group working the same normal daily tour.

**2.10**     "Occasional Employee" means one who is engaged on a daily basis for a period of not more than three (3) consecutive weeks, or for a cumulative total of not more than thirty (30) days, in any calendar year, regardless of the length of the daily or weekly assignments.  An occasional employee who actually works or is engaged to work in excess of three (3) consecutive weeks or thirty (30) days in a calendar year shall be reclassified as a regular or temporary, full-time or part-time employee as appropriate.

**2.11**     A "payroll week" is the period from Sunday through the next following Saturday, both inclusive.

**2.12**     A "scheduled day" for any employee is a day within a payroll week for which a tour is scheduled for that employee.  Sunday shall in no event be regarded as a scheduled day.

**2.13**     A "tour" for any employee is a period of hours, beginning at a specified time and ending at a specified time, the number of hours included therein being equal to the number of the employee's regular daily hours of work, plus any unpaid meal period.

**2.14**    A "scheduled tour" for any employee is a tour during which that employee is scheduled to work.

**2.15**    A "regular tour" for any employee is the one particular tour designated by management to be his regular tour throughout one payroll week. The starting and quitting hours of this regular tour shall be the same for the payroll week. The tour so designated serves as a basis for determining payments for time worked by that employee on any day of that week.

**2.16**    A "day tour" is a regular tour which starts at or after 6:00 A.M. and ends at or before 6:00 P.M.

**2.17**    A "night tour" is a regular tour which starts or ends after 6:00 P.M. or before 6:00 A.M.

**2.18**    An "emergency" is an event of national importance, fire, explosion, or other catastrophe, severe weather conditions, or an act of God.

**2.19**    The use of the masculine or feminine gender in this Agreement shall be construed as including both genders and not as a sex limitation unless the Agreement clearly requires a different construction.

# ARTICLE 3
## COLLECTIVE BARGAINING

**3.01**      All collective bargaining on rates of pay, wages, hours, and other terms and conditions of employment shall be conducted by the duly authorized representatives of the Union and by the duly authorized representatives of the Company.  The collective bargaining committees for the Union and for the Company shall not exceed eight (8) members each.

**3.02**      Meetings for collective bargaining shall be held upon request of either party at a time and place agreeable to both parties, and each party agrees to keep the other informed in writing of the names of their respective collective bargaining representatives.

**3.03**      Unless otherwise required by law or lawful authority, the Company shall pay, at their basic weekly wage rates for up to the equivalent of one regular tour per day and no more than the equivalent of 5 regular tours per week, employees who are members of the Union's collective bargaining committee for time which is not worked, but which is spent in attendance at meetings with management in bargaining for the Collective Bargaining Agreement.

# ARTICLE 4
## PROMOTIONS AND TRANSFERS OF
## UNION REPRESENTATIVES

.

**4.01** The Company agrees that it will not promote or transfer an Officer, Chief Steward or member of the Executive Board of a Union Local without the consent of the Union Local if such promotion or transfer affects his status as a representative of the Union Local. The Company shall give the Union Local not less than fourteen (14) calendar days written notice of any proposed promotion or transfer of an Officer, Chief Steward or member of the Executive Board of a Union Local

**4.02** The Company shall give the Local Union not less than seven (7) calendar days written notice of a promotion or transfer of a Steward in excess of ten (10) calendar days which will affect his status as a Steward of the Local Union.

**4.03** The Union and each Local Union shall keep the Company currently advised in writing of the names of the representatives set forth above.

# ARTICLE 5
## PAYROLL DEDUCTIONS OF UNION DUES

**5.01**     The Company agrees while this Agreement is in force and effect to make collection of regular Union dues of any employee through payroll deduction upon the order in writing signed by such employee, and revocable by the employee at any time, and to pay over the amount thus deducted to the Secretary Treasurer of the CWA, together with a record of the names of the employees from whose wages or sickness benefits deductions have been made and the amounts of such deductions, provided that the employee's order is in a form mutually acceptable to the Union and the Company. The Company further agrees to make up, as soon as possible missed dues deductions for four (4) or less consecutive deduction weeks, where failure to make deductions is due to insufficient pay for reasons other than unauthorized absence. If dues deductions are missed for five (5) or more consecutive deduction weeks, there will be no make up of any of the missed deductions.

**5.02**     Cancellation by employees of such written authorization for payroll deductions must be in writing and the Company agrees to notify the Union and the appropriate Union Local of the receipt of any such written cancellations.

**5.03**     Either party may, by written notice given to the other, terminate, with respect to any employee, the obligation and right of the Company to make such deductions. The Company shall give notice of such termination to the employee.

**5.04**     An employee's written authorization for such deductions shall be cancelled automatically by the Company when the employee is transferred, except on an acting basis, to a position wherein he is no longer covered by the terms of this Agreement. The Company will notify the Union of all such permanent transfers.

**5.05**     The amount of regular Union dues as established from time to time by the Union shall be certified to the Company by the Union. When there is any difference in the amount of regular Union dues because of differences in occupation or rate of pay the certification to the Company shall be such as to permit the Company to determine the proper amount to be deducted in each case.

**5.06**     The Union hereby agrees to indemnify the Company and hold it harmless from all claims, damages, costs, fees or charges of any

kind which may arise out of the honoring by the Company of dues deduction authorizations in accordance with the provisions of this Article, and the transmitting of such deducted dues to the Union.

**5.07**    Authorized requests for changes in a Local's dues structure shall be effectuated in the following manner:

    (a) Changes can be introduced only on the first Sunday of the month.

    (b) Requests received prior to or on the 15th of the month will be effective the first Sunday of the following month.

    (c) Requests received after the 15th of the month will be effective the first Sunday of the second following month.

**5.08**

    (a) The Companies will change their payroll practices where necessary to provide that when there are insufficient funds to cover all deductions, then deductions for Union dues and deductions for allotments to the Savings and Security Plan, respectively, shall have priority over all authorized deductions except those required by law and authorized deductions for insurance.

    (b) The Companies will change their payroll practices, where necessary, to provide for make-up of missed Union dues deduction for up to four (4) consecutive deduction weeks, where failure to deduct is the result of insufficient pay for reasons other than unauthorized absence.  If Union dues deductions are missed for five (5) or more consecutive weeks, there will be no make-up through payroll deduction of any of such missed deductions.

**5.09**    The Company shall, while the Collective Bargaining Agreement is in full force and effect, make collection of regular union dues of any employee through payroll deduction for each of 52 weeks in

the calendar year upon receipt of an order in writing from such employee, revocable by that employee at any time, and to remit those dues in accordance with the Company's obligations under this Article.

# ARTICLE 6
## ABSENCE FOR UNION BUSINESS

**6.01**    To the extent that the Company determines that the requirements of the service permit, employees who are authorized representatives of the Union will be excused without pay or granted leaves of absence without pay, at the request of an authorized officer of the Union to attend to the business of the Union.

**6.02**    A Union shall make all requests for excused absences or leaves of absence as far in advance as possible and the Company shall act promptly upon each request. Excused absences granted to a union representative shall not exceed ninety (90) scheduled working days (to Union Officers, namely, President, Vice President, Secretary and Treasurer of each Local and the Members of the Executive Board of each Local, shall not exceed one hundred fifty (150) scheduled working days) in any calendar year and no single period of excused absence shall exceed thirty (30) continuous calendar days. Absence in excess of ninety (90) scheduled working days (one hundred fifty (150) scheduled working days for a Union Officer or Member of the Executive Board) in any calendar year will not be authorized except by a leave of absence to be applied for by the Union in writing. Each period of a leave of absence granted hereunder shall not exceed one year nor be less than one month, provided that the total period of such leaves granted to any employee during his service life with the Company and its subsidiaries, NYNEX and its subsidiaries, and for the period prior to January 1, 1984, with any other former Bell System Company shall not exceed eighteen (18) years.

**6.03**    Meetings with Management (including time spent in collective bargaining) during a period of leave of absence shall not be considered as breaking a continuous period of leave of absence and shall be included in the period of such leave. However, meetings with Management (including time spent in collective bargaining) during a period of excused absence shall not be considered as excused absence.

**6.04**    A union representative upon return from an excused absence or leave of absence shall be reinstated at work generally similar to that in which he was engaged last prior to his absence, subject, however, to the provisions of this Agreement relating to lay-offs. He shall be placed on the payroll at the rate received when such absence began, adjusted for any changes in wage level made during the period of absence. Adjustments shall also be made for any changes in location or position in accordance with existing practices and wage

schedules. No physical or other examination shall be required as a requisite of reinstatement except where the Company finds that an obvious physical or mental condition exists which requires medical advice regarding job placement or fitness for work.

**6.05**     A union representative shall be allowed full credit for periods of leave of absence not in excess of eighteen (18) years in the aggregate in computing net credited service for all purposes except for wage progressions. During any leave of absence, a Union representative shall be entitled to death benefits.

**6.06**     If a union representative is absent attending to the business of the Union to such an extent that the Company pays less than 50% of his basic wage (excluding overtime and premium payments) during the twelve (12) consecutive months immediately preceding the date his vacation would commence, he shall not be entitled to a vacation at Company expense for that calendar year.

# ARTICLE 7
## WAGES

**7.01**

(1) Basic weekly wage rates of the various occupational classifications are shown in Article 31 of this Agreement for employees in the bargaining unit.

**The schedule of wage increases for the term of this Agreement shall be as follows:**

| Effective Date | Percentage Increase | Applied to: |
|---|---|---|
| Sunday, 8/1/04 | 2% | all steps of the basic wage schedules |
| Sunday, 8/7/05 | 2% | all steps of the basic wage schedules |
| Sunday, 8/6/06 | 2% | all steps of the basic wage schedules |
| Sunday, 8/5/07 | 2% | all steps of the basic wage schedules |

(2) Whenever the Company determines it appropriate to create a new occupational classification in the bargaining unit, or restructure or redefine an existing one, it shall notify the Union in writing of such occupational classification and shall furnish a description of the duties and the wage rates or schedules initially determined for such occupational classifications. Such wage rates or schedules shall be designated as temporary. Following such notice to the Union, the Company may proceed to staff such occupational classification.

(3) The Union shall have the right, within thirty (30) days from receipt of notice from the Company, to initiate negotiations concerning the initial wage rates or schedules established as temporary by the Company. If negotiations are not so initiated, the temporary designation shall be removed from the occupational classification.

(4) If negotiations are initiated, the parties will make a good faith attempt to reach agreement within ninety (90) days followingthe initiation of negotiations. If agreement is reached between the parties within this ninety (90) day period, the temporary designation shall be removed from the occupational classification.

(5) If the parties are unable to reach agreement within the afore–said ninety (90) day period, then each party shall deliver to the other, in writing, on the ninetieth (90th) day, its final position on the wage rates and schedules. Within three (3) business days of such delivery to the other party, either party may deliver a written modified final position to the other, providing such written modified final position is closer to the final position of the other party. If no such written modification is delivered, then such final positions may be submitted by the Union to a neutral third party as provided for in paragraph 7. If not so submitted, the temporary designation shall be removed from the occupational classification and the Company's final position will be the wage rate or schedule.

(6) If, however, one party delivers to the other a written modified final position within three (3) business days, then such other party may deliver a written modified final position within three (3) business days following delivery of the first party's written modification. This process may continue as long as either party delivers a written modified final position within three (3) business days following the delivery to it of a written modified final position by the other party. All modified final positions must be closer to the most recent position of the other party. This process shall end when a party stands on its most recent position for three (3) business days after the delivery of the other party's most recent position. The most recent position of each party may then be submitted by the Union to a neutral third party as provided for in paragraph 7. If not so submitted, the temporary designation shall be removed from the occupational classification and the Company's final position will be the wage rate or schedule.

(7) The neutral third party referred to above shall be selected by mutual agreement of the parties following receipt by the Company of written notice from the Union of its intention to submit the final positions of the parties to a neutral third party. Such notice must be received by the Company within thirty (30) days after the delivery of the most recent final position.

(8) Hearing and post-hearing activities shall be conducted in accordance with the provisions of Article 12 and shall commence within thirty (30) days after selection of the neutral

third party.

(9) The neutral third party shall issue a decision and supporting opinion, in writing, within sixty (60) days after the close of the hearing. Such decision, effective on issuance, shall be limited to selecting the most recent position of one of the parties as the wage rate of the occupational classification in dispute. In determining the wage rate, the neutral third party shall not consider any wage rates previously determined by a neutral third party pursuant to this Article. The decision of the neutral third party shall be retroactive to the date on which the company first staffed such occupational classification; provided however, that such retroactivity shall apply only to the basic weekly wage rate and overtime pay and that there will be no other kinds of adjustments.

(10) The decision of the neutral third party shall be binding on the parties. The neutral third party shall have no authority to add to, subtract from or modify any provisions of this Agreement. The sole means for attempting to resolve any question arising in connection with the Company's determinations referenced in this Article, or any other question arising under this Article, shall be through the grievance procedure, the arbitration provisions of this Article and, where applicable in accordance with this Article, the arbitration provisions of Article 12. No question arising under this Article shall be subject to the arbitration provisions of Article 12 except for the question of whether or not the Company was obligated to notify the Union in writing of the creation of a new occupational classification in the bargaining unit or of a restructuring or redefining of an existing one.

**7.02**   When the Company restructures or redefines existing occupational classifications, and employees in such occupational classifications are assigned rates of pay less than the rates of the employees regular occupational classifications, the employees will receive pay treatment in accordance with the Reassignment Pay Protection Plan of the collective bargaining agreement.

## COST OF LIVING

**7.03**      **(1)**      **Effective August 6, 2006 and August 5, 2007, adjustment will be made in basic weekly rates in each wage schedule in accordance with the following:**

         **(a)**      **the amount of the August 6, 2006 adjustment shall be: (i) one-half of the increase above four percent (4.0%) in the "CPI-W" (1982-84 = 100) for May 2006 over May 2004, applied to (ii) the scheduled rates in effect in each wage schedule on August 5, 2006, (iii) rounded to the nearest 50 cents.**

         **(b)**      **the amount of the August 5, 2007 adjustment shall be: (i) one-half of the increase above two percent (2.0%) in the "CPI-W" (1982-84 = 100) for May 2007 over May 2006, applied to (ii) the scheduled rates in effect in each wage schedule on August 4, 2007, (iii) rounded to the nearest 50 cents.**

     **(2)**      **In no event shall a decrease in the CPI-W result in a reduction of any basic weekly wage rate.**

     **(3)**      **In the event the Bureau of Labor Statistics does not issue the appropriate Consumer Price Indexes on or before the dates referred to in Paragraph 1 , the cost-of-living adjustment required by such appropriate indexes shall be effective at the beginning of the first payroll week after receipt of the indexes.**

     **(4)**      **No adjustment, retroactive or otherwise, shall be made as the result of any revision which may later be made in the first published figures for the CPI-W for May 2004, May 2006, and May 2007.**

     **(5)**      **The cost-of-living adjustment is dependent upon the availability of the CPI-W in its present form and calculated on the same basis as the CPI-W for May 2003. In the event the Bureau of Labor Statistics changes the form or the basis of calculating the CPI-W, the Company and the Union agree to request the Bureau to make available, for the life of this agreement, a CPI-W in its present form and calculate it on the same basis as the CPI-W for May 2003, which was 179.4 (1982-84 = 100).**

# ARTICLE 8
# TRANSFERS

**8.01**    The Company may transfer or assign, temporarily or permanently, any employee from an occupational classification to another, or from one assignment to another within the same occupational classification, or from an occupational classification to a position outside of the bargaining unit,* either as a step in force adjustment or for other purposes.

When a temporary transfer or assignment, either as a step in force adjustment or for other purposes, results in reducing an employee's basic weekly wage rate, the employee so transferred or assigned shall not receive wage treatment less than that received by employees at top rates in the position and locality to which the employee is transferred or assigned.

When a permanent transfer or assignment of an employee from an occupational classification to another, or from an occupational classification to a position outside of the bargaining unit, either as a step in force adjustment or for other purposes, results in reducing an employee's basic weekly wage rate, the provisions of Section 14.04 shall apply.

Whenever employees are assigned, they will be paid in accordance with the provisions of Article 9, where applicable.

*In no event shall an employee be transferred to a position outside of the bargaining unit for the purpose of circumventing the provisions of Section 9.07 or Section 14.02.

**8.02**    Effective January 5, 1992, when the Company transfers any employee permanently between Units (set forth below), solely as a step in force adjustment, and such action is not a downgrade as defined in Section 14.04, subparagraph (2), it shall determine the occupational classification and Unit from which such transfers will occur and shall make such transfers from employees in the occupational classification and Unit involved who have on file active requests for such transfers (for purposes of this article "active requests" shall mean requests in the active Upgrade and Transfer File which shall only be used for the purpose of initiating and tracking employee requests), in order of seniority (determined by net credited service), provided that the Company determines that the employees to be so selected for transfer are qualified and can be spared from their existing positions. If the Company determines that the transfers cannot be accomplished with employees who have on file active requests for such transfers, it shall make such transfers from employees in the

occupational classification and Unit involved in inverse order of seniority (determined by net credited service), provided that the Company determines that the employees to be selected for such transfers are qualified and can be spared from their existing positions.

When the Company transfers any employee permanently between reporting localities (as defined in Section 21.02) but within a Unit (set forth below), solely as a step in force adjustment, and such action is not a downgrade as defined in Section 14.04, subparagraph (2), it shall determine the occupational classifications and reporting localities from which such transfers will occur and shall make such transfer from volunteers in the occupational classifications and reporting localities involved in order of seniority (determined by net credited service), provided that the Company determines that the volunteers to be selected for transfer are qualified and can be spared from their existing positions.

If the Company determines that the transfers cannot be accomplished with volunteers, it shall make such transfers from employees in the occupational classifications and reporting localities involved in inverse order of seniority (determined by net credited service), provided that the Company determines that the employees to be selected for such transfers are qualified and can be spared from their existing positions. The Company shall not be obligated to follow the procedures outlined in this Section when permanently transferring any employee within a reporting locality as defined in section 21.02.

In the case of a transfer under this Section from or within a reporting locality which lies within more than one Unit (set forth below):

(1) When the transfer of an employee is from a part of such reporting locality which is in one Unit to another reporting locality in another Unit, the procedures outlined in the first paragraph of this Section shall apply.

(2) When the transfer of an employee is from a part of such reporting locality which is in one Unit to another reporting locality in the same Unit, the procedures outlined in the second paragraph of this Section shall apply.

(3) When an employee is transferred within such reporting locality from one Unit to another Unit, the Company shall not be obligated to follow the

procedures outlined in this Section.

Effective January 5, 1992, an employee who is permanently transferred pursuant to the provisions of this Section because he had on file an active request for such transfer, or because he volunteered for such transfer, shall not be eligible for daily travel allowance by virtue of Section 21.11.

## UNITS

(1)  Rockland County—which for the purposes of this definition shall include Greenwood Lake and Tuxedo.

(2)  Westchester County—which for the purposes of this definition shall include Greenwich, Connecticut; and Putnam County.

(3)  Kings County

(4)  Queens County

(5)  Bronx County

(6)  New York County

(7)  Richmond County

(8)  Nassau County

(9)  Suffolk County

(10) Empire City Subway Company (Limited)

The geographic boundaries of the Units listed below shall be the same as the geographic boundaries, as they exist on the effective date of this Agreement, of the Local Union or Local Unions appearing alongside the Unit name.

| UNIT | LOCAL UNIONS |
| --- | --- |
| (11) Poughkeepsie | 1120 |
| (12) Albany | 1116, 1118 |

| UNIT | LOCAL UNIONS |
|---|---|
| (13) Syracuse-Utica-Oswego | 1114, 1123, 1126 |
| (14) Binghamton | 1111 |
| (15) Glens Falls-Plattsburgh | 1127, 1129 |
| (16) Watertown | 1124, 1128 |
| (17) Buffalo | 1117, 1122 |
| (18) Hamburg | 1115 |

It is the Company's intent to notify the affected Local Unions when it initiates inter-Unit transfers, solely as a step in force adjustment, pursuant to the provisions of Section 8.02 of the collective bargaining agreement.

**8.03** A claim by the Union that the Company has violated the provisions of Section 8.01 or 8.02 in making a permanent transfer of an employee within the bargaining unit or in making a permanent transfer of an employee to a position outside of the bargaining unit may be processed in accordance with the grievance and arbitration provisions of this Agreement only if such transfer is between reporting localities as defined in Section 21.02.

**8.04** Employees who in the judgment of the Company are required to relocate their residences as a result of permanent involuntary transfers initiated by the Company shall receive reasonable moving costs. (See letter on moving costs attached hereto.)

**8.05** An employee shall be advised by the Company upon transfer whether the transfer is temporary or permanent. The advice shall be in writing if the transfer is permanent and qualifies for an allowance under Article 21. No employee is to remain in a position as a result of a temporary transfer in excess of twelve (12) consecutive months. If the Company wishes to continue to fill that position for a period beyond but continuous with the preceding twelve (12) months, it must fill the position in accordance with the contractual provisions utilized by the Company to fill positions permanently.

# ARTICLE 9
## WAGE TREATMENT FOR PROMOTIONS
## OR ASSIGNMENTS

This Article provides for credit and payment as set forth below but does not constitute a limitation of the Company's rights under Articles 7 and 8.

**9.01** When an employee is assigned by management for one or more full days to an occupational classification having a top rate of pay higher than the top rate of pay of the occupational classification in which the employee is classified, such employee will be paid his regular weekly rate plus one-half of the amount of the increase for the next full step of the wage progression applicable to the occupational classification having the higher top rate of pay, pro rated for the number of full days worked in the higher occupational classification on the basis of a five day week. The increase to be pro rated shall be not less than $3.00 on a weekly basis unless:

(a) $3.00 is more than the next full step, in which event the next full step shall be used in computing the increase, or,

(b) the regular weekly rate plus $3.00 will exceed the top rate for the occupational classification in which event the top rate will be applicable.

In no event shall an employee receive a rate which will exceed the top rate for the higher occupational classification involved.

When an employee is assigned as specified above for a full day, he will also be credited for having worked one day in the higher occupational classification, and when the accumulated time credit corresponds to the time required to progress to the next full step of the wage progression applicable to the higher occupational classification the employee will be paid 1/5 of the basic weekly wage rate for the next applicable full step for each day thereafter on which he is so assigned.

If the employee's current rate falls between rates on the wage progression applicable to the higher occupational classification the amount to be used in computing the increases provided above shall be the full step increase associated with the step on the wage progression table immediately preceding the employee's current rate.

**9.02**

    (1) When an employee is assigned by management as specified in Section 9.01 for a number of hours in a day which, when computed in minimum increments of one hour are the equivalent of one-half (1/2) day or more, he shall be credited paid in accordance with the provisions of Section 9.01 for one (1) full day.

    (2) When an employee is assigned by management as specified in Section 9.01 for a number of hours in a day which, when computed in minimum increments of one hour are the equivalent of less than one-half (1/2) day on each day the employee was so assigned, then those hours shall be credited and accumulated until they reach the equivalent, on any day, of one-half (1/2) day more, and on that day he shall be paid for those accumulated hours in accordance with the provisions of Section 9.01 for one (1) full day. No employee shall be entitled to accumulate under this paragraph hours assigned on a day for he is entitled to receive full-day pay treatment under paragraph (1) above. This paragraph shall not apply to a day for which the employee is entitled to receive pay treatment under paragraph (1) above. No employee shall be entitled to receive full-day pay treatment under Section 9.01 more than once in a calendar day. There shall be no accumulation of hours under this paragraph beyond one payroll week.

**9.03**    An employee in a Helper's occupational classification listed in Article 31, who is at the top rate of pay of his occupational classification, when assigned as specified in Section 9.01 shall also be allowed credit for time spent at top rate within the occupational classification, provided that the credit for time spent at top rate and the credit under Sections 9.01 and 9.02 shall not be accumulated simultaneously. The credit for time spent at top rate shall not apply toward more than one full step on the wage progression applicable to the occupational classification having the higher rate of pay.

**9.04**    In all cases of assignments under Sections 9.01, 9.02 and 9.03 if it becomes necessary to return an employee to his former status his rate of pay shall be reduced by the amount of the increase or increases he has received, but he shall not be reduced to a rate below that which he would be entitled to receive had he not been assigned to the higher occupational classification.

**9.05**     In no event under this Article shall the time credit in the higher occupational classification or the amount of the increase exceed that for five full tours in a payroll week.

**9.06**     The Company agrees that it will not, without the agreement of the Union, eliminate any occupational classification.

**9.07**     In selecting individuals for permanent promotion to occupational classifications within the bargaining unit, seniority (determined by net credited service) shall govern if necessary qualifications are substantially equal. A claim by the Union that the qualifications of the individuals in the group which have been considered for permanent promotion are substantially equal may be processed in accordance with the grievance and arbitration provisions of the Agreement.

**9.08**     Customer Service Administrators (CSAs) may be assigned on a emporary basis to handle customer escalations and customer call-backs. Such assignments will be rotated weekly among volunteers by net credited service date and CSAs will receive a wage differential of $20.00 for each day so assigned. CSAs on such temporary assignments will not have access to any personnel records of bargaining unit employees**.**

# ARTICLE 10
## DISCHARGES, SUSPENSIONS AND DEMOTIONS FOR CAUSE

## DISCHARGES AND SUSPENSIONS

**10.01** In the event any employee is suspended or discharged for cause, a written claim that the suspension or discharge was without just cause must be filed by the Union within thirty (30) calendar days of the suspension or discharge.

(1) If an employee is to be discharged, he shall first be suspended for ten (10) calendar days. The Local Union shall be notified in writing immediately that the employee has been suspended prior to discharge. During the ten (10) day period, the Local Union may discuss the reasons for the Company's action with the appropriate district level supervisor (or his alternate) and may protest the action.

(2) If an employee with six (6) months or less of net credited service is discharged at the expiration of the ten (10) day suspension period, the Union's claim that the discharge was without just cause shall be subject to the grievance provisions of this Agreement but shall not be subject to arbitration. If an employee with more than six (6) months of net credited service is discharged at the expiration of the ten (10) day suspension period, the Union's claim shall be subject to the grievance and arbitration provisions of this Agreement.

(3) If an employee with six (6) months or less of net credited service is suspended under circumstances other than prior to discharge, the Union's claim that the suspension was without just cause shall be subject to the grievance provisions of this Agreement, but shall not be subject to arbitration. If an employee with more than six (6) months of net credited service is suspended under circumstances other than prior to discharge, the Company shall give verbal notice to the Local Union within ten (10) calendar days that the employee has been suspended and the Union's claim shall be subject to the grievance and arbitration provisions of this Agreement.

## DEMOTIONS

**10.02**     In the event any employee is demoted for cause, the Union Local shall be notified in writing immediately. A written claim that the demotion was without just cause must be filed by the Union within thirty (30) calendar days of the demotion.

> (1) If an employee with six (6) months or less of continuous service in an occupational classification is demoted to an occupational classification with the next lower top basic weekly wage rate, the Union's claim shall be subject to the grievance provisions of this Agreement, but shall not be subject to arbitration.

> (2) If an employee with more than six (6) months of continuous service in an occupational classification is demoted to an occupational classification with the next lower top basic weekly wage rate, or if an employee is demoted to an occupational classification other than one with the next lower top basic weekly wage rate, the Union's claim shall be subject to the grievance and arbitration provisions of this Agreement.

> (3) When an employee with more than one (1) year of continuous service in an occupational classification is permanently demoted to an occupational classification having a lower top basic weekly wage rate, because he is unable to perform the duties of his former classification due to an injury incurred during and in direct connection with the performance of duties to which he was assigned in the service of the Company, he shall receive the following wage treatment:

>> (a) His basic weekly wage rate shall not be lowered.

>> (b) His further wage increases shall be based on the wage progression table applicable to the lower occupational classification, and his progression on that table will be determined by either his net credited service or his assumed length of service in the higher classification, whichever favors the employee, subject to the following:

>>> (1) If the demoted employee's wage rate at the time of his demotion is below the rate for the appropriate step under the new table, the employee's

basic weekly wages shall be raised to the applicable rate.

(2) If the demoted employee's basic weekly wage rate at the time of his demotion is above the wage rate for the appropriate step under the new table, the demoted employee shall receive no wage increase until such time as his net credited service or assumed length of service entitles him to progress to the next step of the table for the lower classification.

(3) In no event shall an employee so demoted receive a wage increase that would cause his basic weekly wage rate to exceed the maximum rate for the occupational classification to which he has demoted.

For the purposes of this Section continuous service in an occupational classification shall include service in occupational classifications with the same top basic weekly wage rate as the occupational classification from which demoted.

## REINSTATEMENT

**10.03** If it is determined in the grievance procedure by both the Company and the Union that the employee shall be reinstated, the Company agrees to reinstate the employee and reimburse him as follows:

(1) In a discharge case, the employee shall receive his basic weekly wage rate for the time lost (including pay lost during the ten (10) day suspension period) less the amount of any termination pay received from the Company, and unemployment compensation received or receivable, and any amount paid to or receivable by the employee as wages in other employment. If the employee received a termination payment and the number of weeks since the date of discharge is less than the number of weeks upon which the payment was based, less vacation, if any, the amount paid to the employee for the excess number of weeks shall be considered as an advance to him by the Company. Repayment shall be made by the employee on a weekly basis satisfactory to the Company until the amount is fully paid, but the employee shall not be required to repay each week at a rate in excess of 10% of his basic weekly wage rate.

The employee shall also receive:

   (a) reimbursement for premiums paid by him from the date of discharge for insurance coverage that does not exceed coverage provided under the Company's Medical Expense Plan, Group Life and Accidental Death or Dismemberment Insurance Program, Vision Care Plan and Dental Expense Plan.

   (b) insurance coverage retroactive to the date of discharge for uninsured expenses actually incurred that would have been covered under the Company's Medical Expense Plan, Vision Care Plan and Dental Expense Plan and

   (c) reimbursement for the amount of discounted telephone service lost during the period of discharge.

(2) In a suspension case, the employee shall receive his basic weekly wage rate for the time lost less the amount of any unemployment compensation received or receivable and any amount paid to or receivable by the employee as wages in other employment.

(3) In a demotion case, the employee shall be made whole for the difference in basic weekly wage rates for period of demotion, including any applicable differentials.

## POWER OR JURISDICTION OF ARBITRATORS

**10.04** No Arbitrator shall have power or jurisdiction to modify the Company's action. The Arbitrator shall either find that the Company's action was not without just cause, in which event the suspension, demotion or discharge shall be sustained in full; or that the suspension, demotion or discharge was without just cause, in which event the treatment of the case shall be as set forth in Section 10.03 of this Article.

## UNION REPRESENTATION

**10.05** At any meeting between a representative of the Company and an employee in which discipline (including warnings which are to be recorded in the personnel file, suspension, demotion or discharge for cause) is to be announced, a Union representative may be present if the employee so requests.

# ARTICLE 11
## GRIEVANCE PROCEDURE

**11.01**     It is agreed that neither the Company, its representatives and supervisors, nor the Union, its locals, representatives and the employees it represents, will attempt to bring about the settlement of any issue by means other than the grievance provisions and, where applicable, the arbitration provisions of this Agreement.

If an officer, representative, or official of the Union or its locals, violates the provisions of the foregoing paragraph:

    (a)   The Company, in addition to other action it may take, may terminate the payroll deduction of Union dues of all employees under the jurisdiction of the local union in which the violation occurs; and

    (b)   The obligation of all employees under the jurisdiction of the local union in which the violation occurs to pay or tender to the Union amounts equal to the periodic dues applicable to members shall be suspended for one (1) week provided the violation is in excess of two (2) scheduled days of work but not more than seven (7) calendar days.

If the violation continues after seven (7) calendar days, the obligation of all employees under the jurisdiction of the local union in which the violation occurs shall be suspended one (1) week for each additional week or part thereof during which the violation continues.

**11.02**     All grievances shall be presented by the appropriate authorized representatives of the parties to this Agreement at a time and place mutually agreeable to the parties in accordance with the steps outlined below:

**1st Step**     The grievance shall be initially presented to the appropriate authorized representative of the parties or their alternates at the immediate supervisory level of the Company and the steward level of the Union.

The grievance review shall be held promptly after appropriate investigation of the facts, and a reply given within seven (7) calendar days from the time of its initial presentation The management spokesman shall be the person at the immediate supervisory level. A management representative at the second supervisory level (sub-district) may be in attendance at these reviews and at those times he shall be the management spokesman. The parties will seek in

good faith to resolve the grievance at this step, and to this end the review will be informal. Both the presentation of grievance and the reply will be verbal.

If a grievance involves a discharge, a demotion, or suspension of an employee for five (5) days or more, the 1st Step shall be waived at the request of the Local Union and the grievance presented initially at the 2nd Step.

The Company will submit to each Local Union a summary of all 1st Step grievances, filed by each such Local Union, showing for each grievance the grievance number, the subject, the grievant, the date heard, the Company supervisor who heard the grievance and the disposition each such grievance.

**2nd Step**    If not satisfactorily settled at the 1st Step, the grievance may be appealed in writing to the designated authorized representative of the parties within seven (7) days after receiving the reply in the 1st Step. The appeal shall set forth the act or occurrence complained of and if the grievance involves a claimed contract violation, the Article alleged to have been violated.

If a grievance involves a discharge, a demotion, or a suspension of an employee for five (5) days or more, the grievance shall be reviewed at the district or division level of the Company or his designated alternate above the immediate supervisory level with a representative in the field at the district level of the Company or his alternate being present, and with the Local President or his designated alternate above the steward level of the Union. All other grievances shall be reviewed at the district or division level of the Company or his designated alternate above the immediate supervisory level with a Company representative in the field present, and with the Local President or his designated alternate above the steward level of the Union. The review of all grievances shall be held within nine (9) calendar days from the time the written appeal is received. The Company shall mail or deliver a written reply giving the reason for its decision, by the seventh (7th) calendar day following the review of the grievance.

**3rd Step**    If not satisfactorily settled at the 2nd Step, the grievance may be appealed in writing to the authorized representative of the parties within ten (10) days after the reply in the 2nd Step is received. The grievance review shall be at the Assistant Vice President Labor Relations level of the Company and the Area Director level of the Union or their designated representatives. If a grievance involves a discharge, a demotion or a suspension of an employee for five (5) days or more, the Company representative in the field at the division level of the Company or his alternate shall be present at the grievance review. A review of all grievances shall be held within fourteen (14) calendar days from the time the written appeal is received. The Company shall mail or deliver

a written reply giving the reason for its decision, by the seventh (7th) calendar day following the review of the grievance.

**11.03**    No grievance will be considered unless presented
within one year after the action or failure to act complained of occurred, except that a grievance with respect to a discharge, demotion or suspension for cause shall be governed by Article 10.

**11.04**    Once any Union or local representative has notified a
Company representative of a grievance the Company will not attempt to settle the matter with the individual employee or employees involved.

**11.05**    If it is mutually agreed by the parties to this
Agreement, time limits at each step of the grievance procedure may be waived and steps of the procedure may be waived.

**11.06**    No more than two persons shall participate in the Step 1 review, and
no more than four persons shall participate in subsequent reviews on behalf of each of the parties.

Unless otherwise required by law or lawful authority, the Company shall pay, at their basic weekly wage rates, no more than two (2) employees, who are not on leave of absence, for time within their scheduled tours which is not worked but which is spent in attendance at the Step 1 grievance review with management. For such attendance at the Step 2 grievance review not more than three (3) such employees shall be paid by the Company at their basic weekly wage rates. For such attendance at the Step 3 grievance review not more than two (2) such employees shall be paid by the Company at their basic weekly wage rates.

The Company also shall pay at their basic weekly wage rates no more than two (2) employees for time spent travelling to and from a lst Step grievance review with management and no more than three (3) employees for time spent travelling to and from a 2nd Step grievance review with management, and no more than two (2) employees for time spent travelling to and from a 3rd Step grievance review with management, provided that the employees' time spent travelling is within their scheduled tours and takes place on a day of attendance at a grievance review, and the employees are not on leaves of absence.

**11.07**    The Union will endeavor to the best of its ability to
advise the appropriate management representative of the names of the Union representatives attending grievance meetings at least 24 hours in advance of such meetings.

**11.08**    If at either the 1st or 2nd Step, the grievance is not
            reviewed or a reply is not given within the time limits required due to
a Company delay, the grievance at the Union's option may be placed at Step 3.

# ARTICLE 12
# ARBITRATION

**12.01**     Either the Union or the Company may arbitrate a grievance
regarding the true intent and meaning of a provision of this
Agreement, or a grievance involving a claim referable to arbitration as provided
in Articles 8, 9, 10 and 15, provided in all cases that the grievance has been
processed in accordance with the provisions of Article 11 and has not been
adjusted, and that, with the exception of a grievance involving a discharge
referable to arbitration as provided in Article 10, written notice of intention to
arbitrate is given to the other party within sixty (60) calendar days after the review
in Step 3 of Article 11 has been completed.  With respect to a grievance involving
a discharge referable to arbitration as provided in Article 10, written notice of
intention to arbitrate shall be given within thirty (30) calendar days after the
review in Step 3 has been completed.  The time limits set forth above shall not be
extended.  It is understood that the right to require arbitration does not extend to
any matters other than those expressly set forth in this Article.

**12.02**     The procedure for arbitration shall be as follows:

> (1)  If the parties are unable to agree upon an Arbitrator within ten
> (10) calendar days after receipt by either party of a written
> notice of intention to arbitrate, given by the other party, the
> parties shall request the Federal Mediation and Conciliation
> Service to furnish an even numbered list of arbitrators for their
> consideration. If the Company and the Union cannot agree
> upon any arbitrator named in the list within ten (10) calendar
> days from the day the list is received, they shall request an odd
> numbered list from the Service for their consideration.  If the
> Company and the Union cannot agree upon any arbitrator
> from the first and second lists within ten (10) calendar days
> from the day the second list is received, they shall alternately
> strike the names of the arbitrators on the combined list until
> an Arbitrator is agreed upon.

> (2)  Hearings shall commence within thirty (30) days following
> the designation of an Arbitrator if possible. The hearings shall
> be carried to an expeditious conclusion.  The Arbitrator shall,
> if possible, render his decision in writing within thirty (30)
> days following the closing of the hearing, except that with
> respect to a grievance involving a discharge, he shall, if

possible, render his decision in writing within fifteen (15) days following the closing of the hearing.

(3) The decision of the Arbitrator shall be final and binding upon the parties, and the Company and Union agree to abide thereby.

(4) Each party shall bear the expenses of its representatives and witnesses. The compensation and expenses of the Arbitrator and any other expenses of such arbitration shall be borne equally by the parties.

(5) If the party filing a grievance has not commenced arbitration hearings within nine (9) months of the date on which notice of intention to arbitrate is given, the grievance shall no longer be arbitrable.

(6) It is the intention of the parties that arbitration proceedings shall be conducted without transcripts, except that each party may require transcripts in up to 25 % of the cases which are arbitrated in any calendar year. It is also the intention of the parties that arbitration proceedings shall be conducted without briefs, except that each party may require briefs in any case it deems of sufficient importance, or briefs may be required at the request of the Arbitrator.

**12.03**  It is understood that no arbitrator shall have power or jurisdiction:

(a) To deal with any grievance unless it involves a specific instance of action or failure to act with respect to an individual employee or group of employees; or

(b) To make awards retroactive beyond one (1) year prior to the date when the grievance was first presented.

It is understood that no arbitrator shall have power or jurisdiction to deal with any question relating to discretionary payments, and that with respect to matters arising under Article 15, he shall have only the specific jurisdiction provided in that Article.

# ARTICLE 13
## CONTRACTING WORK

**13.01**    The Company will not contract out work if such contracting out will cause, currently and directly, layoffs from employment with the Company or part-timing of present employees.

# ARTICLE 14
## LAYOFFS AND DOWNGRADES

**14.01**    (DELETED)

**14.02**    Layoffs

    (1)  If a layoff of employees is made effective, the Company shall determine the occupational classifications, Areas for Upstate and layoff subdivisions for Downstate affected.

        (a)  The Company shall lay off employees in the inverse order of seniority (determined by net credited service) by each affected Area for Upstate (as defined in Section 2.04 (b), except that for the purpose of this Article, that part of the Mid-State Area included in the definition of Upstate in Section 2.04 (b), shall be part of the Mid-State layoff subdivision for Downstate under Section 14.02, 1.(b)).

        (b)  The Company shall lay off employees in the inverse order of seniority (determined by net credited service) by each affected layoff subdivision for Downstate (as defined in Section 2.04 (a), except that for the purpose of this Article, that part of the Mid-State Area included in the definition of Upstate in Section 2.04 (b) shall be part of the Mid-State layoff subdivision for Downstate under this Section 14.02, 1. (b)).

        For the purpose of this Article the following layoff subdivisions shall exist for Downstate:

        New York City (For the purpose of this Section, the Empire City Subway Company (Limited) shall be considered part of New York City).

Nassau-Suffolk

Mid-State (which for the purpose of this Section shall consist of that part of the Mid-State Area included in the definition of Downstate in Section 2.04 (a) and that part of the Mid-State Area included in the definition of Upstate in Section, 2.04 (b)).

(2) Employees in the affected occupational classifications with five (5) years or less seniority shall first be laid off to the extent necessary.

(3) Thereafter, employees in the Group set forth in Article 31 in which any affected occupational classification is listed shall be laid off to the extent necessary. However, if an employee in the Group whose seniority would otherwise cause his layoff cannot be replaced by an employee in the same work group who is qualified to serve as a replacement with only reasonable training, the next senior employee will be laid off.

(4) Notwithstanding paragraph (2), temporary and occasional employees in the occupational classifications affected shall be laid off first.

(5) In rehiring after a layoff during the period of this Agreement, the Company agrees to offer, reemployment to the extent to which additional help is needed to former employees in the occupational classifications involved in the inverse order within the Area in Upstate or layoff subdivision in Downstate, as the case may be, in which such former employees were laid off (a) provided, however, that the employee is qualified in the judgment of the Company to perform the available work at the time the offer of employment is made and (b) provided, also, that the period of layoff does not exceed two years.

(6) In case of layoffs from employment with the Company, payment of one (1) week's pay for each year of net credited service or fraction thereof up to five years, two (2) weeks' pay for each year of net credited service or fraction thereof from five years to ten years, and three (3) weeks' pay for each year or fraction thereof of net credited service of ten years and more, plus any unused vacation allowance, shall be made to each

employee laid off, exclusive of employees classified as temporary or occasional.

(7) If an employee who has received a layoff allowance is rehired and the number of weeks since the date of his layoff is less than the number of weeks upon which the allowance is based, less vacation if any, the amount paid to the employee for the excess number of weeks shall be considered as an advance to him by the Company. Repayment shall be made by the employee on a weekly basis satisfactory to the Company until the amount is fully paid, but the employee shall not be required to repay each week at a rate in excess of 5 % of his basic weekly wage rate.

**14.03**     (DELETED)

**14.04     Downgrades**

(1) When a permanent transfer or assignment of an employee from one occupational classification to another, or from an occupational classification to a position outside of the bargaining unit, either as a step in force adjustment or for other purposes, results in reducing an employee's basic weekly wage rate, the employee so transferred or assigned shall not receive wage treatment less than that received by employees at top rates in the position and locality to which the employee is transferred or assigned.

(2) The Company will not contract out work if such contracting out will cause, currently and directly, downgrades of present employees.

# ARTICLE 15
## PENSION AND BENEFIT PLAN

**15.01**    Except as provided in this Article, there shall be no negotiations during the life of this Agreement upon changes in pensions or any other subject covered by the existing "NYNEX Pension Plan" and "Sickness and Accident Disability Benefit Plan."

**15.02**    In the event, during the life of this Agreement, the Company proposes to exercise the right provided in Section 10 of the existing "NYNEX Pension Plan" and "Sickness and Accident Disability Benefit Plan" by action affecting the benefits or privileges of employees represented by the Union, it will before doing so notify the Union of its proposal and afford the Union a period of sixty (60) calendar days for bargaining on said proposal; provided, however, that no change may be made in the Plan which would reduce or diminish the benefits or privileges provided thereunder as they apply to employees represented by the Union without its consent.

**15.03**    Any dispute involving the true intent and meaning of Section 15.02 of this Article may be submitted to the grievance and arbitration provisions of this Agreement.   However, nothing herein shall be construed to subject the Plan or its administration or the terms of a proposed change in the Plan to arbitration.

# ARTICLE 16
## RETIREMENT WITHOUT PENSION

**16.01**    Any regular employee who at age 70 is retired by the Company without a pension will be given a termination allowance of one (1) week's pay for each year of net credited service or fraction there of up to five years and two (2) weeks' pay for each year of net credited service or fraction thereof from five years up to ten years.

# ARTICLE 17
## WORK SCHEDULES

**17.01**

    (a) A work schedule showing the days, scheduled tours and regular tour assigned shall, in accordance with Section 17.02, be established, and posted when possible, or made available for each employee for each payroll week and become fixed at 12 o'clock noon, Thursday, or four (4) hours before the end of his fourth scheduled tour, whichever is earlier, of the payroll week immediately preceding.

    (b) The work schedule established for an employee for the payroll week immediately following his vacation shall become fixed at 12 o'clock noon, Thursday, or four (4) hours before the end of his fourth scheduled tour, whichever is earlier, of the payroll week immediately preceding the start of his vacation; provided, however, that should there occur during the employee's vacation an emergency beyond the Company's control (such as an event of national importance, fire, explosion, or other catastrophe, severe weather conditions, or an act of God) the Company may, without incurring any penalty, revise his work schedule for the payroll week immediately following his vacation by notifying the employee of such revision no later than 12 o'clock noon, Thursday, of the last payroll week of his vacation.

**17.02**     Unless a change is made prior to the time specified by Section 17.01, the work schedule established for an employee for a payroll week shall be the same as his work schedule for the immediately preceding payroll week or, if the employee was on vacation during the immediately preceding payroll week, shall be the same as his work schedule for the payroll week immediately preceding the start of his vacation.

    (1) Each employee shall be scheduled in each payroll week to work for five tours. These tours may be on any of the days of the week from Monday to Saturday, both inclusive. A tour, the majority of whose hours are on a weekday, is a weekday tour and may be scheduled notwithstanding that the remainder of the hours may be Sunday hours. An employee shall not be scheduled for a tour the majority of whose hours are on Sunday. The requirement for scheduling five full tours shall not apply to any period during which part-timing within the

meaning of Article 14 of the Agreement is in effect.

(2) When an employee or a group of employees on a board and lodging assignment so request, management may, at its discretion, assign such employees to work for more than the regular number of hours in their tours (specified under Article 18-Length of Tours) on one or more days of the week and offset such additional hours by a smaller number of hours on another day or days in that workweek, provided, however, that all time so worked in that workweek up to the total hours in his scheduled tours for that week shall be considered as time worked during the employee's regular tour for purposes of payment as provided in Article 19.

(3) An individual employee's request to change his scheduled days or tours shall be granted provided it will not require premium payments to him or to some other employee, and provided further, that the employee making the request and the other employee involved, if any, are qualified, in the Company's judgment, to do the work on the scheduled days or tours involved.

(4) When an employee is absent due to sickness or accident disability for 8 or more consecutive calendar days, the scheduled days for each payroll week into which the absence continues shall be the same as the scheduled days of the payroll week in which the absence began. (Where a holiday falls on the non-scheduled day in the second or in a subsequent week of absence such holiday shall be designated as a scheduled day and another weekday shall be designated as the non-scheduled day in that week.)

(5) An employee may be assigned to work on a day or days on which he is not scheduled to work but he will be paid at the premium rate specified for work on a ''Non-scheduled Day'' under Article 19.

(6) Any tour may be designated as an employee's regular tour.

(7) A scheduled tour is a tour during which the employee is scheduled to work.

**17.03**     Any employee may be assigned to work overtime at any time.

When assigning employees to work a period of over-time which is continuous with and follows their scheduled tours, the Company shall give at least two hours' notice to the employees (within the overtime equalization group) who will be required to work the overtime assignments, unless an employee consents to the assignment, there is an emergency, or the assignment which began on the scheduled tour should be continued for a period of thirty (30) minutes, or less, without interruption. Time allowed for an unpaid meal period shall not be considered a break in the continuity of work.

When an employee is assigned overtime in case of an emergency, the Company shall notify the local Union as soon as practicable.

**17.04**     Regular assignments to night tours, rotated for coverage purposes, will be provided on a basis of rotation among the available qualified employees in the occupational classification involved with the following limitations: .

Employees with 25 or more years of net credited service may be exempted from such rotating assignments if they so desire. .

When the number of employees with 25 or more years of net credited service who desire exemption as provided above is more than can be accommodated, choice among such employees with 25 or more years of net credited service shall be in order of seniority based on net credited service.

Local Union officers and members of the Union Executive Board shall be exempted from rotating regular assignments to night tours if they so desire.

As an alternative to rotating night tours for coverage purposes, the Company may, if the Local Union agrees, choose to cover night tours with the senior volunteer for as long as that employee continues to volunteer. Either the Company or the Local Union may terminate any such alternative arrangement by giving thirty (30) days written notice. If no employee volunteers, night tours shall be rotated for coverage purposes as described above.

## EXCUSED TIME FOR REST

**17.05**     When an employee completes one continuous period
of work of unusual duration he shall, if in the judgment of the Company he has had insufficient rest to enable him to work a scheduled tour, be excused for part or all of his next scheduled tour with  pay.

**17.06**     An employee will not be assigned to work overtime
and/or on a non-scheduled day in excess of an aggregate of ten (10) hours in any payroll week during the months of January through May and September through December, and in excess of an aggregate of fifteen (15) hours in any payroll week during the months of June through August, except in case of emergency or where the employee consents to such assignment.

When an employee is assigned to work overtime and/or on a non-scheduled day in excess of the hour limitations in the above paragraph, the Company shall, in case of emergency, notify the local Union as soon as practicable. .

# ARTICLE 18
# LENGTH OF TOURS

**18.01**   The tours and hours of tours shall be as follows:

New York Telephone Company and Telesector Resources Group, Inc.

Downstate

| | Tour | Hours Of Work | Length of Unpaid Meal Period | Overall Period |
|---|---|---|---|---|
| 1.Clerical Group | Day | 7 | 1 | 8 |
| *Miscellaneous Group | Day | 7 | 1 | 8 |
| All other employees | Day | 8 | 1 | 9 |
| | | | | |
| 2.Clerical Group | Night | 7 | $^1/_2$ | $7\,^1/_2$ |
| *Miscellaneous Group | Night | 7 | $^1/_2$ | $7\,^1/_2$ |
| All other employees, except building service attendants | Night | $7\,^1/_2$ | $^1/_2$ | 8 |
| Building Service Attendants | Night | 7 | None | 7 |

Upstate

| | Tour | Hours Of Work | Length of Unpaid Meal Period | Overall Period |
|---|---|---|---|---|
| 1.Clerical Group | Day | $7\frac{1}{2}$ | 1 | $8\frac{1}{2}$ |
| *Miscellaneous Group | Day | $7\frac{1}{2}$ | 1 | $8\frac{1}{2}$ |
| All other employees | Day | 8 | 1 | 9 |
| | | | | |
| 2.Building Service Attendant and Building Service Attendant Leader | Night | 7 | None | 7 |
| All Other Employees (Including Clerical) | Night | $7\frac{1}{2}$ | $\frac{1}{2}$ or 1 | 8 or $8\frac{1}{2}$ |

* Except for the occupational classifications listed below whose tours & hours of tours are as follows:

Downstate and Upstate

| | Tour | Hours Of Work | Length of Unpaid Meal Period | Overall Period |
|---|---|---|---|---|
| Maintenance Day Administrator | Day | 8 | 1 | 9 |
| Customer Service Administrator | Day | 8 | 1 | 9 |
| Facilities Specialist | Day | 8 | 1 | 9 |
| Facilities Assistant | Day | 8 | 1 | 9 |
| Maintenance Administrator | Night | 7 $^1/_2$ | $^1/_2$ | 8 |
| Customer Service Administrator | Night | 7 $^1/_2$ | $^1/_2$ | 8 |
| Facilities Specialist | Night | 7 $^1/_2$ | $^1/_2$ | 8 |
| Facilities Assistant | Night | 7 $^1/_2$ | $^1/_2$ | 8 |

|  | Tour | Hours Of Work | Length of Unpaid Meal Period | Overall Period |
|---|---|---|---|---|
| 1.Clerical Group | Day | 7 | 1 | 8 |
| Miscellaneous Group | Day | 7 | 1 | 8 |
| Chauffeur B | Day | 8 | 1 | 9 |
| All other employees | Day | 8 | $^1/_2$ | $8^1/_2$ |
| 2. Clerical Group | Night | 7 | $^1/_2$ | $7^1/_2$ |
| Miscellaneous Group | Night | 7 | $^1/_2$ | $7^1/_2$ |
| All other employees | Night | $7^1/_2$ | $^1/_2$ | 8 |

**18.02**    Meal Periods specified above shall be taken at a time designated by Management near the midpoint of tours.  Whenever an employee is required to work or remain on Company premises subject to call throughout his meal period in addition to working the number of hours in his normal tour, the meal period shall be treated as working time and any resulting working time in excess of the number of hours in the normal tour shall be treated as overtime in the manner prescribed in Article 19.

**18.03** Except where continuous coverage is required, paid relief periods shall be granted during each half tour of duty at a time designated by Management as follows:

| Occupational Classifications and Groups | Length of Relief Period |
|---|---|
| Clerical Group | 15 Minutes |
| Miscellaneous Group | 15 Minutes |
| Test Desk Technician | 15 Minutes |
| Elevator Operator | 30 Minutes |
| Sub-Supervisor in charge of elevator operation | 30 Minutes |

Building Service Attendants on a night tour shall be granted one (1) paid relief period of 30 minutes.

# ARTICLE 19
## PAYMENT FOR TIME WORKED

## DEFINITION OF HOURLY RATE FOR COMPUTING WAGE PAYMENTS

**19.01**    An employee's hourly rate shall be determined by dividing 1/5 of the sum of the employee's basic weekly wage rate and his night tour differential, if any, and his Saturday differential, if any, by the number of hours of work in his regular tour.

## REGULAR TOUR

**19.02**    All work performed during the hours of an employee's regular tour on any scheduled working day shall be paid for at the hourly rate except as provided in Section 19.06.

## OVERTIME

**19.03**    Time worked before or after an employee's regular tour shall be considered overtime and shall be paid for at the rate of $1\frac{1}{2}$ times the hourly rate except as provided in Section 19.06.

Payment of a field employee temporarily assigned for a week or more to clerical work in an office where clerical forces are also working, shall be computed on the basis that authorized time worked outside his regular eight (8) hour tour shall be paid at $1\frac{1}{2}$ times the hourly rate for his regular tour. When such employee performs the same work as that performed by the clerical force, he shall generally work the same hours as the clerical force.

## NON-SCHEDULED DAY

**19.04**

(a) All time worked within a day or part of a day during which the employee was not scheduled to work and within the employee's regular tour of duty shall be paid for at the rate of $1\frac{1}{2}$ times the hourly rate.

(b) In addition to the pay treatment provided in subsection (a) of this Section, when an employee is scheduled to work assigned overtime on a Sunday for rotational coverage purposes, that employee (or another employee who works in his place with

Company permission) shall receive one-half ($^{1}/_{2}$) hour's extra pay for every hour he works within such scheduled Sunday rotational coverage assignment, but such hours worked shall not be counted toward the 9 hours worked in excess of the total number of hours in the employee's 5 scheduled tours for purposes of Section 19.05 (a), (b) and (c).

Effective January 5, 1992, in addition to the pay treatment provided in subsection (a) of this Section, when an employee works overtime on a Sunday, that employee (or another employee who works in his place with Company permission) shall receive one-half ($^{1}/_{2}$) hour's extra pay for every hour he works on Sunday, but such hours worked shall not be counted toward the 9 hours worked in excess of the total number of hours in the employee's 5 scheduled tours for purposes of Section 19.05 (a), (b) and (c).

## EXTRA ALLOWANCE

## 19.05

(a) A regular full time employee whose daily hours of work as defined in Section 18.01 are 7 hours, shall receive one-half ($^{1}/_{2}$)hour's extra pay for every hour he works more than 9 hours in excess of 35 hours in any payroll week if that employee's 5 scheduled tours, whether worked or not, and the hours he works outside his 5 scheduled tours are more than 9 hours in excess of 35 hours for his payroll week.

(b) A regular full time employee whose daily hours of work as defined in Section 18.01 are 7$^{1}/_{2}$ hours, shall receive one-half ($^{1}/_{2}$) hour's extra pay for every hour he works more than 9 hours in excess of 37$^{1}/_{2}$ hours in any payroll week if that employee's 5 scheduled tours, whether worked or not, and the hours he works outside his 5 scheduled tours are more than 9 hours in excess of 37$^{1}/_{2}$ hours for his payroll week.

(c) A regular full time employee whose daily hours of work as defined in Section 18.01 are 8 hours, shall receive one-half ($^{1}/_{2}$) hour's extra pay for every hour he works more than 9 hours in excess of 40 hours in any payroll week if that employee's 5 scheduled tours, whether worked or not, and the hours he works outside his 5 scheduled tours are more than 9 hours in excess of 40 hours for his payroll week.

## HOLIDAY WORK

**19.06**　　An employee who works on a holiday shall receive payment at the rate of 1$\frac{1}{2}$ times the hourly wage rate for hours worked during his regular tour. This shall be in addition to the payment for time not worked on a holiday provided in Article 24.

For hours worked on a holiday in excess of his regular tour an employee shall receive payment at the rate of two and one-half (2$\frac{1}{2}$) times the hourly wage rate.

## SATURDAY TOUR DIFFERENTIAL

**19.07**　　Each employee shall receive a Saturday differential payment in his wage payments of twenty-five (25) per cent of 1/5th of his basic weekly wage rate for time worked during a regular scheduled tour, the majority of whose hours are on a Saturday, which is his fifth scheduled day of work.

## PAYMENT FOR SHIFTED TOUR

**19.08**　　When an employee is requested by the Company and agrees to change his scheduled tour after it has become fixed in accordance with the provisions of Section 17.01 (a), he shall be paid as follows:

(a) The hourly rate as provided in Article 19.02 for all hours during his fixed regular tour whether worked or not.

(b) One and one-half times the hourly rate for all time worked outside the hours of his fixed regular tour which is within the hours of his newly scheduled tour. These hours shall not be considered hours worked outside the five scheduled tours in determining any extra allowance under Section 19.05.

## MINIMUM PAYMENTS

**19.09**　　When an employee is required to report for overtime work or for work on a non-scheduled day which in either instance is not continuous with a scheduled tour or other overtime assignment, the minimum payment for such work shall be one-half day's pay at his basic hourly wage rate. Time allowed for an unpaid meal period shall not be considered a break in the continuity of work. The time allowed for an unpaid meal period shall not exceed one hour unless a longer period is granted by the Company at the request of the employee.

If an employee works two or more such noncontinuous overtime assignments in one calendar day, he shall receive one minimum payment of one-half day's pay for each of the periods 12:00 midnight to 8:00 A.M., 8:00 A.M. to 5:00 P.M. and 5:00 P.M. to 12:00 midnight in which one or more such noncontinuous overtime assignments were started.

If overtime work or work on a nonscheduled day is assigned to an employee within ten minutes following the completion of his scheduled tour or prior to overtime assignment and the employee is still in the building, garage (including a Company parking area outside the garage), or other work location when such work is assigned to him, such work shall be treated as continuous with his scheduled tour or prior overtime assignment and as having begun at the start of the ten-minute period.

Time worked for the purpose of computing minimum payments shall include associated travel time, if any, payable under the provisions of Article 20.

For purposes of minimum payments, work on a holiday shall be treated as though it were work on a non-scheduled day.

## VISITS TO MEDICAL DEPARTMENT

**19.10**   When an employee, who is not receiving sickness or accident benefits or payments under the "NYNEX Pension Plan" and "Sickness and Accident Disability Benefit Plan" or Workers' Compensation Law or Disability Benefits Law, is directed to visit the Company's Medical Department or an authorized Company medical consultant, time spent with the Medical Department or consultant shall be treated as working time and travel to and from such visit shall be treated as travel to and from or travel on a working assignment for the purposes of Article 19 (except Section 19.09), Article 20 and Article 21 (except Sections 21.04, 21.05, 21.06, 21.07, 21.08 and 21.09).

## ON CALL ASSIGNMENTS
## 19.11

(a) The Company may, at its option, assign, on a rotational basis, for a payroll week, one employee per first level supervisor's group to be on call with a pager or cellular telephone provided by the Company and to be available for overtime work or work on a non-scheduled day which in either instance is not continuous with a scheduled tour

or other overtime assignment. When so assigned, the employee will carry the pager or cellular telephone at all times from the end of his shift to the beginning of his next scheduled shift.

(b) In addition to payment for any time worked, the employee will be paid 15% of his basic weekly wage rate for the payroll week during which he is on call.

(c) The weekly limits on involuntary overtime contained in Section 17.06 shall not apply to an employee who is on an on call assignment.

# ARTICLE 20
# TRAVEL ON WORKING AND
# OVERTIME ASSIGNMENTS

## TRAVEL ON A WORKING ASSIGNMENT

**20.01**     Travel time spent by an employee on Company business while on a working assignment shall be treated as working time. However, travel time spent by an employee during an unpaid meal period shall not be treated as working time. Whenever the travel time of an employee is treated as working time, in accordance with the provisions of Section 20.01, the transportation cost shall be paid by the Company.

## TRAVEL ON OVERTIME ASSIGNMENTS

**20.02**     When an employee is notified within the fifteen (15) minute period immediately prior to the end of his scheduled tour, or after the end of his scheduled tour to report for work and is to report before the start of his next scheduled tour, traveling time from his home (or other off-the-job location) on any day, whether scheduled or non-scheduled, shall be paid for as though it were working time.

## EXCEPTION:

Traveling time to the job shall not be paid for when an employee is notified while on duty on a non- scheduled day during the hours of his normal tour (but not within the fifteen (15) minute period prior to the end of the normal tour) to report on any subsequent day or days prior to his next scheduled tour.

If any employee whose traveling time to the job is paid for as though it were working time, is released from the work before the start of his next scheduled tour, time spent in traveling from the job to his home (or other off-the-job location) shall be paid for as though it were working time.

Time allowed for an unpaid meal period shall not be considered a break in the continuity of work. The time allowed for an unpaid meal period shall not exceed one hour unless a longer period is granted by the Company at the request of the employee.

Whenever the travel time of an employee is treated as working time in accordance with the provisions of this Section 20.02, the transportation cost shall be paid by the Company.

## BASIS FOR COMPENSATION FOR TRANSPORTATION COST

**20.03**   When normal transportation facilities are used (i.e., subway, elevated, bus, railway or ferry), the transportation cost referred to in Sections 20.01 and 20.02 will be in the amount paid on such normal transportation facilities available to the general public for the route involved. Whenever an employee uses his personal car in lieu of normal transportation facilities, the transportation cost to be paid by the Company will be for the distance actually traveled, plus transportation tolls incurred.

The rate per mile at which the Company shall pay for such use by an employee of his or her personal car shall be as follows:

        (a)   at the rate of twenty-nine cents ($.29 per mile);

        (b)   in the event the Internal Revenue Service (IRS) increases the standard mileage rate allowable as a business use deduction from gross income during the term of the Agreement, the Company will increase the amount of reimbursement accordingly effective on the first day of the second month following the date of announcement of the change by the IRS or the effective date of the change, whichever is later.

When facilities other than normal, or other than the employee's personal car are used, reimbursement will be the actual cost incurred.

An employee shall not be paid for the use of his personal car or the use of facilities other than normal, either on a working assignment or in traveling from his home (or other off-the-job location) to a non-continuous work assignment and return, unless he has secured advance permission from his supervisor to use his car or such facilities.

# ARTICLE 21
## ALLOWANCE FOR DAILY TRAVEL OR BOARD AND LODGING

## REPORTING POINT

**21.01**     For the purpose of computing allowances under this Article 21, the Company shall designate a reporting point for each employee. In the case of an employee who normally reports to a fixed location, the Company shall designate such location as his reporting point. In the case of an employee who normally does not report to a fixed location, the Company shall designate for him a reporting point such as a central office building, a storeroom, a locker, a garage, a customer location, or a job location. The Company may change the designation of an employee's reporting point and such change shall be treated as a transfer under this Article 21 only if the employee's new reporting point lies outside his former reporting locality.

## REPORTING LOCALITY

**21.02**     For the purpose of determining whether an employee is entitled to an allowance under this Article 21, each employee shall have a reporting locality, the boundaries of which shall be established on the basis of his reporting point in the following manner:

> (1) Downstate (except Suffolk County). The reporting locality for an employee Downstate (except Suffolk County) who normally works in only one central office building area (the geographical area served by a single central office building) shall be the central office building area in which the employee's reporting point is located, except that, in the case of an employee whose reporting point is a garage serving a central office building area other than the area in which the garage is located, the reporting locality for such employee shall be the garage and the central office building area where the employee normally works. The reporting locality for an employee Downstate (except Suffolk County) who normally works in more than one central office building area shall be the geographical area within a three-mile radius of the employee's reporting point.

> (2) Upstate and Suffolk County. The reporting locality for an employee in the Upstate or Suffolk County shall be the geographical area within a three-mile radius of the employee's reporting point.

## DAILY TRAVEL ON TEMPORARY TRANSFER

**21.03**     When an employee is temporarily transferred to an assignment which requires him to begin or end his work day outside his reporting locality, he shall make his own arrangements for transportation between the temporary assignment and his home (or other off-the-job location) and shall receive a travel allowance for each such work day in an amount determined by the road mile distance from his reporting point to the point where he began or ended such work day, as the case may be, in accordance with the following table:

### Downstate, Except Suffolk County

| Road Mile Distance | Daily Travel Allowance |
|---|---|
| More than 0 but not more than 2 | 4.15 |
| More than 2 but not more than 5 | 4.85 |

### Upstate and Suffolk County

| Road Mile Distance | Daily Travel Allowance |
|---|---|
| More than 3 but not more than 5 | 4.85 |

### Downstate, Upstate and Suffolk County

| Road Mile Distance | Daily Travel Allowance |
|---|---|
| More than 5 but not more than 10 | 5.55 |
| More than 10 but not more than 15 | 8.30 |
| More than 15 but not more than 20 | 11.05 |
| More than 20 but not more than 25 | 13.80 |
| More than 25 but not more than 30 | 17.95 |
| More than 30 but not more than 35 | 22.10 |
| More than 35 but not more than 45 | 34.50 |
| More than 45 | 41.40 |

An employee who is paid a daily travel allowance pursuant to this Section shall be reimbursed for bridge and tunnel tolls incurred, to the extent such tolls exceed the tolls incurred in traveling to and from the employee's reporting point.

## BOARD AND LODGING ON TEMPORARY TRANSFER

**21.04** When an employee is temporarily transferred to an assignment which requires him to begin or end his work day outside his reporting locality at a point more than thirty-five (35) road miles from his reporting point, he shall board and lodge at or near the location of his temporary assignment and, before the start of such assignment, he shall elect one of the following methods of treatment in lieu of a daily travel allowance provided by Section 21.03:

> (a) The employee may elect to have the Company make arrangements to board and lodge him at its expense and to have the Company reimburse him for laundry expenses up to $3.50 per day to a maximum of $17.50 per week, provided, however, that such reimbursement for laundry expenses will be required only if the duration of the board and lodging assignment is 2 or more days.

> (b) The employee may elect to have the Company make arrangements to lodge him at its expense; pay him a $40.25 daily meal allowance and reimburse him for laundry expenses up to $3.50 per day to a maximum of $17.50 per week, provided, however, that such reimbursement for laundry expenses will be required only if the duration of the board and lodging assignment is 2 or more days.

The employee may change his initial election once during a board and lodging assignment.

## DAILY TRAVEL ON BOARD AND LODGING ASSIGNMENT

**21.05** When an employee has been temporarily transferred to an assignment which is a board and lodging assignment under Section 21.04, the Company, at the employee's request, shall permit him to return to his home each evening, and the employee shall receive a daily travel allowance under Section 21.03 in lieu of board and lodging treatment under Section 21.04. The employee shall report to the job at the designated starting time and shall

leave the job at the designated quitting time, and travel time, except at the start and completion of the temporary assignment, shall not be treated as working time.

## TRAVEL TIME ON BOARD AND LODGING ASSIGNMENT

**21.06**

(a) When an employee has been temporarily transferred to an assignment which is a board and lodging assignment under Section 21.04, the time required to be spent by the employee in traveling between his home and the location of the temporary assignment at the start and completion of the temporary assignment shall be treated as working time, except that such time which is outside the hours of the employee's regular tour for the first and last payroll weeks of the temporary assignment shall not be so treated if sleeping car accommodations are furnished to the employee at Company expense.

(b) When an employee who has been temporarily transferred to an assignment which is a board and lodging assignment under Section 21.04 thereafter performs any assigned work in his reporting locality, takes a vacation, a military service leave of absence, or a training duty leave of absence, or is excused for jury duty, the board and lodging assignment shall be treated as having been completed with respect to that employee for the purposes of Paragraph (a) of the Section 21.06 and Sections 21.04 and 21.07. If the employee is temporarily transferred to the same assignment after the performance of such work, the taking of such vacation or leave of absence, or the performance of such jury duty, such temporary transfer shall be treated as a new assignment for the purpose of Paragraph (a) of this Section 21.06 and Sections 21.04 and 21.07.

## TRAVEL EXPENSE ON BOARD AND LODGING ASSIGNMENT

**21.07**

(a) When an employee has been temporarily transferred to an assignment which is a board and lodging assignment under Section 21.04, the Company shall pay for the actual cost of the employee's transportation between his home and the location of the temporary assignment at the start and completion of the temporary assignment.

(b) When the Company is required under Paragraph (a) of this Section 21.07 to pay for part or all of the actual cost of an employee's transportation, the Company may select the method of transportation to be used by the employee or may furnish part or all of such transportation by arranging for the employee to drive or ride in a Company motor vehicle without cost or by arranging for the employee to ride in a supervisor's car without cost.

(c) When an employee who has boarded and lodged under Section 21.04 during any payroll week of a temporary assignment is relieved from duty on both the Saturday ending such payroll week and the Sunday beginning the next payroll week of the same temporary assignment and the employee chooses to spend the Saturday and Sunday at his home, the Company shall pay for that portion of the actual cost of the employee's transportation between his home and the location of the temporary assignment as does not exceed $92.00. If such employee is relieved from duty only on the Sunday beginning the next payroll week of the same assignment and he chooses to spend the Sunday at his home, the Company shall pay for that portion of the actual cost of the employee's transportation between his home and the location of the temporary assignment as does not exceed $46.00. An employee shall not receive board and lodging treatment under Section 21.04 for any such Saturday or Sunday which he chooses to spend at his home.

(d) When an employee is temporarily transferred to a board and lodging assignment under Section 21.04 which is longer than four (4) payroll weeks in duration, the Company once every fourth payroll week shall insure that the employee is relieved from duty on both the Saturday ending one payroll week and the Sunday beginning the next payroll week of the same temporary assignment, and if the employee chooses to spend the Saturday and Sunday at home the Company shall pay the employee for the actual cost of normal transportation between the employee's home and the location of the temporary assignment. In such event, the provisions of Section 21.07 (c) shall not apply, and the employee shall not receive board and lodging treatment under Section 21.04 for any such Saturday or Sunday which he chooses to spend at his home.

## LENGTH OF BOARD AND LODGING ASSIGNMENTS

**21.08**     When an employee is temporarily transferred to an assignment which is a board and lodging assignment under Section 21.04 the employee's temporary transfer to such assignment shall be limited to four consecutive payroll weeks if it is practicable to do so.

## LIMITS OF WORKING TIME

**21.09**     Except as otherwise provided under Section 21.06, working time for an employee who has been temporarily transferred to an assignment which requires him to begin or end his work day outside his reporting locality shall begin when he reports, as directed, on the job or at the garage where his Company motor vehicle is stored at the designated starting time, and working time for such employee shall end when he, as directed, leaves the job or returns to the garage in which his Company motor vehicle is stored at the designated quitting time.

## GENERAL

**21.10**     The temporary transfer of an employee to an assignment which requires him to begin or end his work day outside his reporting locality shall not result in a change of his reporting locality or his wage treatment.

**21.11**     When the Company permanently transfers an employee to a new reporting point lying outside his former reporting locality, the first 30 calendar days of such permanent transfer shall be treated as a temporary transfer for the purposes of this Article 21 and the governing distance shall be the road mile distance between the employee's former reporting point and his new reporting point.  This section shall not apply to any employee who, on or after January 5, 1992, is permanently transferred pursuant to the provisions of Section 8.02 because he has on file an active request for such transfer or because he volunteered for such transfer.

**21.12**     The provisions of this Article 21 shall not apply to any assignment to which Section 20.01 or 20.02 is applicable.

**21.13**     If an employee with 30 or more years of net credited service makes a request to be exempted from board and lodging assignments, the Company will give consideration to such request.

## ARTICLE 22
## DIFFERENTIAL FOR NIGHT TOURS

.

**22.01**     Each night tour employee shall receive a night differential payment in his wage payments for time worked.

**22.02**     The differential for a night tour employee shall be ten (10) percent of the employee's basic weekly wage rate.

**22.03**     The differential shall be included in wage payments for time worked by adding the amount to the basic weekly wage rate in determining the hourly rate used in the computation of wage payments as prescribed in Article 19.

**22.04**     If an employee is to be paid for absence, differential payments at the rate that would have been paid on the first day of absence had the employee worked shall be included in such absence pay allowances.

# ARTICLE 23
# VACATIONS

## ELIGIBILITY FOR VACATIONS

**23.01**    Unless otherwise specified in this Agreement, vacations with pay shall be granted in each calendar year in accordance with the following schedule, provided that no employee shall be entitled to a vacation prior to the completion of six (6) months of net credited service following his or her latest date of engagement. and provided further that an employee shall begin his vacation before the end of the calendar year:

> (a) Employees who will complete 6 months
>     of net credited service within the current
>     calendar year                                                                    1 week

> (b) Employees who will complete 12 months
>     of net credited service within the current
>     calendar year                                                                   2 weeks

If an employee becomes eligible for a vacation week under the above 2 paragraphs on or after December 1, only 1 such vacation week may be taken in the following calendar year, provided it is completed no later than the payroll week ending on or immediately after April 1 of the year in which the vacation is to be taken and prior to the taking of any of the current year's vacation. This is an alternative to the vacation carry-over provisions of this Agreement to which the employee may be eligible.

However, if the employee completes 6 months and 12 months of net credited service in the same calendar year, only 2 weeks of vacation will be granted during the calendar year, with the second week to be granted after the completion of 12 months of net credited service.

> (c) Employees who will complete 2 or more
>     but less than 7 years of net credited service
>     within the current calendar year                                      2 weeks

> (d) Employees who will complete 7 or more
>     but less than 15 years of net credited
>     service within the current calendar year                          3 weeks

(e) Employees who will complete 15 or more
but less than 25 years of net credited
service within the current calendar year                4 weeks

(f) Employees who will complete 25 or
more years of net credited service within
the current calendar year                5 weeks

Unless otherwise specified in this Agreement, the employee shall begin his vacation before the end of the calendar year.

Employees who will complete at least twelve (12) months of net credited service within the current calendar year shall be entitled to take one (1) week of vacation during the 12-week summer period in that calendar year.

**For the 2004 calendar year, the summer period commences with week ending June 19 and terminating week ending September 4. For the 2005 calendar year, the summer period commences with week ending June 18 and terminating week ending September 3. For the 2006 calendar year, the summer period commences with week ending June 17 and terminating week ending September 2. For the 2007 calendar year, the summer period commences with week ending June 16 and terminating week ending September 1. For the 2008 calendar year, the summer period commences with week ending June 15 and terminating week ending August 30.**

Employees who are eligible for two (2) weeks of vacation may choose to use one week to be taken on a day-at-a-time basis. Employees may choose to use one or two (2) weeks of the vacation to which they are eligible on a day-at-a-time basis. Weeks are subject to the following conditions:

(1) Vacation weeks to be taken as full vacation weeks shall be selected first on the initial vacation schedule. After all selections of the full vacation weeks on that initial schedule have been made, a week will be reserved and scheduled in order of seniority from the unselected weeks remaining. The reserved week may be scheduled through the last full calendar week of March of the following calendar year.

(2) Single vacation days may then be set aside in accordance with the needs of the business. They shall be granted to eligible employees and selected by employees initially in order of

seniority to be taken prior to and in lieu of an equal number of days in the reserved week. After the initial selection of the single vacation days, all subsequent selections of single vacation days shall be made on the basis of the earliest request.

(3) If part of the week has not been used on a day-at-a-time basis under Paragraph 2 above when the reserved week is reached, then the remaining days must be taken during the scheduled reserved week.

(4) Vacation periods so scheduled shall not be subject to the vacation carry-over provisions of Article 23.04.

## CHOICE OF VACATIONS

**23.02**    The basic employee vacation groups involved and the number of people within each of these groups to be on vacation at any particular time during the entire calendar year will be determined by the Company. Choice of vacation periods within each group will be in the order of seniority based on net credited service.

## VACATION PAYMENTS

**23.03**    An employee shall be paid his basic weekly wage for each week of the vacation period to which he is eligible, unless part-timing, within the meaning of Article 14 of this Agreement, is in effect, in which case the vacation pay shall be reduced proportionately to the reduction in hours.

Weekly night differential payments and temporary promotional increases shall be included in the weekly vacation payments only when an employee has been receiving the differential payment or promotional increase for one or more payroll weeks immediately preceding his vacation assignment.

## VACATION CARRY-OVER

**23.04**    Subject to the provisions of Section 23.02: An employee who is eligible for two (2) or more weeks of vacation may, when he is selecting his vacation, elect to take in the following calendar year a part of his vacation for which he is eligible in the then current calendar year, subject to the following limitations:

(1) In order to be eligible to carry over a part of his vacation to the following calendar year, the employee must take in the then current calendar year at least one week of the vacation for which he is eligible during the current year.

(2) Only full weeks of vacation may be carried over from one calendar year to another.

(3) (DELETED)

(4) Any week or weeks of vacation carried over from one calendar year into the next must be scheduled and completed no later than the payroll week ending on or immediately after June 15 of the year in which the vacation is to be taken.

(5) An employee who does not elect to carry over a part of his vacation into the following calendar year and who wants a vacation in the period from January 1 to the payroll week ending on or immediately after June 15 of that year will participate, based on net credited service, in the process of selecting vacations with those who elect to carry over some part of their vacation. Such employee must make his selection at the same time as the employee who elects to carry over part of his vacation.

## VACATION CARRY-OVER (DISABILITY)

**23.05**    Subject to the provisions of the first sentence of Section 23.02:

When an employee is unable to take a previously scheduled vacation in July through December in any calendar year because of disability absence approved by the Company, the Company will allow him to take his unused vacation in the succeeding calendar year chosen from those available weeks not already selected, subject to the following limitations:

(1) The employee's disability absence must begin on or after July 1 and before the start of his vacation.

(2) As much of the unused vacation as possible shall be rescheduled in the calendar year for which granted.

(3) The unused vacation may be rescheduled, to be taken before any part of the employee's vacation granted for the succeeding calendar year, if a week or weeks are available.

(4) The unused vacation must be scheduled and completed no later than the payroll week ending on or immediately after June 15 of the succeeding calendar year.

## VACATION SCHEDULING

**23.06**     For each calendar year, the following shall be applicable:

(a) In each calendar year, the summer period shall be a 12-week period. This 12-week summer period described in Article 23.01 of the Collective Bargaining Agreement may be shifted by local management to conform more closely with local school vacation schedules. Such adjustment will be decided upon by local management and any adjustment in the beginning of the 12-week summer period will result in a similar compensating adjustment in the closing date of the period.

(b) By November 15 of each year, the Company shall post vacation schedules for the following calendar year. Prior to the posting of these schedules, the Company shall afford the Union a period of fifteen (15) days during which period representatives of the Company and the appropriate Local Union shall discuss the vacation schedules for the following calendar year. Where any employee in any vacation group is required to take one week of vacation in accordance with schedules determined by the Company under Paragraph C of this Memorandum Agreement, the Company shall, during this 15-day period, give the appropriate Local Union the Company's reason for such requirement.

(c) Each employee in any vacation group who is entitled to take two (2) or more weeks of vacation in a calendar year may be required to take one of those weeks during the first four (4) months of that calendar year in accordance with schedules determined by the Company. (These vacation groups are referred to hereafter as affected groups.)

(1) This one week of vacation which the employee may be required to take during the first four

months may not be carried over into the following calendar year under Article 23.04 of the Agreement. However, employees may satisfy this one-vacation-week requirement with a vacation week carried over from the prior calendar year under Article 23.04 of the Agreement, provided that the week carried over is a week other than one required to be taken during the first four months of the prior calendar year.

(2) This one week of vacation which the employee may be required to take during the first four months may not be reserved as a vacation week for day-at-a-time vacation under Article 23.01 of the Agreement. Employees may not satisfy this one-vacation-week requirement with a day-at-a-time vacation week reserved from the prior calendar year under Article 23.01 of the Agreement.

(3) The number of vacation weeks the Company shall schedule in each affected group for the summer period in each calendar year shall be 48% of the total number of vacation weeks that all employees in that affected group are entitled to take in each of those years. These summer vacation weeks (i.e., 48%) shall be distributed over the summer period in accordance with schedules determined by the Company. This percentage is subject to the limitations outlined in paragraph I below.

(4) The minimum number of vacation weeks that shall be scheduled for each affected group in each week of the calendar year outside the summer period and outside of the first four months of the year shall be equal to the highest number of vacation weeks scheduled by the Company for that affected group in any week of the summer period, subject to the limitations outlined in Paragraph I below.

(d) For vacation groups in which employees are not required to take one of their vacation weeks during the first four months of the calendar year, the percentage set forth in paragraph C(3) above shall represent the minimum the Company will schedule in the summer period for each calendar year, subject to the limitations outlined in Paragraph I below. The extent to which the vacation weeks in the summer period in any vacation group for any calendar year may be increased above the percentage set forth in paragraph C (3) above shall be determined by the Company.

(e) The weeks included in the percentage figures set forth in Paragraphs C (3) and D above shall include the one week each employee is entitled to take in the summer period under Article 23.01 of the Agreement. The Company shall not be obligated to schedule additional vacation weeks above those percentage figures for the purpose of making available to any employee in the vacation group the one week each employee is entitled to take in the summer period.

(f) Once an employee has selected his vacation weeks to be taken in the summer period:

(1) He may not exchange any of his vacation weeks to be taken in the summer period for any vacation weeks that may become available in that period.

(2) He may not select additional weeks to be taken in the summer period that may become available in that period, except as follows: Employees in any vacation group who were restricted in the selection of vacation weeks in the summer period because at the time of their vacation selection the number of employees who had not selected equaled the number of remaining open summer weeks, may then

select, in order of seniority, any additional week that may become available in that period as a result of a less senior employee not selecting the one week the employee is entitled to take in the summer period.

(3) He may exchange any of his selected weeks to be taken in the summer period for weeks selected to be taken in that period by other employees in his vacation group.

(g) An employee who is eligible for five (5) weeks of vacation must take one vacation week outside of the summer period. This one week may not be reserved as a vacation week for day-at-a-time vacation under Article 23.01 of the Agreement. The employee who is eligible for five weeks of vacation may be required by the Company to take one of those weeks during the first four months of the vacation year under Paragraph C above in accordance with schedules determined by the Company.

(h) Vacation schedules shall not have blocked out* vacation weeks except where the vacation group involved historically has had vacation schedules with blocked-out weeks. However, vacation schedules may still have blocked-out weeks for vacation groups that may be subject to or involved with unusual service requirements or special projects within the meaning of Paragraph I below.

* Blocked-out weeks shall mean weeks on vacation schedules for which it is indicated that no employee may take vacation.

(i) Notwithstanding Paragraphs C (3) & (4), and D above:

Where there are unusual service requirements, such as political conventions, or Olympics, or where there are special projects, such as cutovers,

then in any calendar year the Company may reduce the percentage set forth in Paragraphs C (3) and D above and reduce the minimum number of vacation weeks set forth in Paragraph C (4) above for all vacation weeks set forth in Paragraph C (4) above for all vacation groups that may be subject to or involved with those unusual service requirements or special projects. However, the Company shall not eliminate entirely the summer vacation weeks provided for under Paragraphs C (3) & (4) and D above because of these unusual service requirements or special projects.

(j) An employee will not be scheduled for an assignment on the Saturday before his or her vacation or be scheduled for assigned overtime on the Sunday after his or her vacation.

(k) Vacation weeks, vacation days, and H days will be selected by employees in that sequence in a number of circulations to be determined by the Company.

(l) The maximum number of employees on vacation and H day and vacation day at any one time will not exceed the maximum number of employees permitted to be off as determined by the management.

(m) Vacation day conflicts will be treated in the same fashion as the Company now treats H day conflicts.

# ARTICLE 24
## HOLIDAYS

**24.01**    The following holidays will be observed as holidays by the Company:

| | |
|---|---|
| New Year's Day | Columbus Day |
| Lincoln's Birthday | Election Day |
| Washington's Birthday | Veteran's Day |
| Memorial Day | Thanksgiving |
| Independence Day | Christmas |
| Labor Day | |

## LINCOLN'S BIRTHDAY

Employees shall have the option of observing either Martin Luther King Day or the day after Thanksgiving as a holiday instead of Lincoln's Birthday. Employees shall indicate their choice when they select their vacation for that year.

**24.02**    If a holiday occurs on a Sunday, the following Monday shall be designated as a holiday. The holiday tour for night tour employees shall be that tour which has the majority of its hours within the calendar holiday.

**24.03**    When a holiday falls on a Saturday, the preceding Friday shall be designated as the holiday. The provisions of this Agreement relative to the treatment of holidays shall apply to such designated Friday instead of to the Saturday holiday.

**24.04**    When a holiday falls in an employee's vacation, the Company, after considering any specific request of the employee, shall designate another day within the calendar year or the first quarter of the following calendar year to be treated as the holiday for that employee.

**24.05**    A holiday or a day assigned in lieu of a Saturday holiday, whether worked or not. is a scheduled day of work.

## PAYMENT FOR TIME NOT WORKED ON HOLIDAYS

**24.06**    An employee, who is not required to work on a holiday, shall receive one day's pay, that is 1/5 of the sum of his basic weekly wage rate and his night differential payment, if any, and his Saturday differential payment, if any, provided he works or is absent with pay or is absent on a scheduled unpaid Excused Work Day on either the last scheduled working day before the holiday or the first scheduled working day after the holiday.

**24.07**     An employee absent (not to be paid) on both the last scheduled
              working day before the holiday and the first scheduled working day
after the holiday shall not be paid for the holiday.


# ARTICLE 25
# INCIDENTAL ABSENCE DUE
# TO PERSONAL ILLNESS

**25.01**     An employee with two (2) or more years of net credited service at
              the beginning of his absence shall be paid for all incidental absence
due to personal illness.

**25.02**     Incidental absence as referred to herein shall be understood to
              mean absence on scheduled working days occurring within a
period of seven (7) consecutive calendar days or less beginning with the first day
of absence. A day of absence as referred to herein is a day on which an employee
is regularly scheduled to work as part of his basic workweek as established under
Article 17 but on which he does not work because of personal illness. In no case
will more than one (1) day's pay be allowed for a holiday on which an employee
does not work for any reason.

**25.03**     Whenever the Company requires an employee to submit proof of
              illness in order to be paid for an incidental absence due to personal
illness, the Company will reimburse the employee at departmental expense for
any payments the employee is required to make to a doctor in connection with
securing a note after the supervisor's request. Proof of illness, in the form of a
doctor's note or other documentation, may be required in supervision's discretion
in particular absence situations where, for example, poor attendance patterns are
evident, or circumstances raise questions that the absence may not be caused by
an illness.

# ARTICLE 26
## CLASSIFICATION AND TREATMENT
## OF PART-TIME EMPLOYEES

**26.01** The hours of work for part-time employees shall be assigned according to the requirements of the job and need not conform with the provisions covering the hours of work for employees. Time worked by a part-time employee within the number of hours in a tour for a corresponding fulltime employee in any day shall be paid for at the hourly rate.

**26.02** Payment for overtime at $1^1/_2$ times the hourly rate to the part-time employee who works in excess of his regular tour of duty shall not begin until he has worked as many hours as the equivalent tour for a full-time employee.

**26.03** Except for payment for overtime hours worked, all hours worked by a part-time employee in Customer Service Centers, Kiosks, Direct Marketing/Direct Response (DM/DR) Centers and any retail sales or service centers operation shall be paid at the equivalent basic hourly rate for a comparable full-time employee working a normal daily tour in the same occupational classification and work group. Payment to a part-time employee for hours worked in excess of an equivalent normal daily tour or workweek for a comparable full-time employee shall be at the applicable overtime rate for a comparable full-time employee based on such part-time employee's basic hourly rate.

**26.04** The classification of a part-time employee is based on the employee's "part-time equivalent workweek" which shall be determined prospectively by dividing the employee's total normally scheduled hours per month by 4.35 and rounding the result to the next higher whole number. (Illustration: 68 hours per month divided by 4.35 equals 15.6, rounded to a "part-time equivalent workweek" classification of 16.)

**26.05** The "part-time equivalent workweek" classification of each part-time employee shall be reviewed by the Company no less often than every six (6) months on April 1 and October 1 of each year and adjusted on a prospective basis, if appropriate. In determining whether such adjustment is appropriate, the Company will consider the actual average number of hours worked per month during the preceding six (6) month period and the likelihood that such number of work hours will continue for a reasonably foreseeable period of time except that any hours worked which are paid at the overtime rate shall not be counted in computing the average number of hours worked.

**26.06**     Payments to a regular part-time employee for sickness disability, accident disability, or death benefits under the NYNEX Pension Plan and Sickness and Accident Disability Benefit Plan, vacations, anticipated disability leave. sickness absence (not under the NYNEX Pension Plan and Sickness and Accident Disability Benefit Plan) or termination allowance (or its equivalent) shall be pro rated based on the relationship of the individual part-time employee's "part-time equivalent workweek" to the normal workweek of a comparable full-time employee in the same occupational classification and work group.  A part-time employee shall not be paid for absence due to sickness (not under the NYNEX Pension Plan and Sickness and Accident Disability Benefit Plan) unless such absence due to sickness occurs on a day of the week on which the employee is normally scheduled to work.

**26.07**     Part-time employees shall, if otherwise eligible to participate under the terms of such plans, be eligible for coverage under the Medical Expense Plan, Dental Expense Plan, and Vision Care Plan, as follows:

        (a)  Employees whose part-time equivalent workweek is sixteen (16) or less shall be eligible by enrollment and payment of 100% of the premiums for such coverage;

        (b)  Employees whose part-time equivalent workweek classification is seventeen (17) through twenty-four (24) shall be eligible by enrollment and payment of 50% of the premiums for such coverage;

        (c)  Employees whose part-time equivalent workweek classification is twenty-five (25) or more shall be eligible for such coverage on the same basis as a regular full-time employee.

**26.08**     Part-time employees, regardless of classification, shall be eligible for Excused Work Days on a pro rata basis based upon the ratio of any such part-time employee's equivalent workweek to the normal workweek of a comparable full-time employee.

        Part-time employees, regardless of classification, shall be eligible for other scheduled working days off with or without pay for which comparable full-time employees are eligible on a pro rata basis based upon the ratio of any such part-time employee's equivalent workweek to the normal workweek of a comparable full-time employee

**26.09**    A part-time employee who is not required to work on a holiday shall receive payment for the holiday which shall be pro rated based on the relationship of the individual part-time employee's "part-time equivalent workweek" to the normal workweek of a comparable full-time employee in the same occupational classification and work group.

**26.10**    In other respects not expressly provided for in this Agreement, part-time employees will receive payment proportionate to that provided for the employees in this Agreement.

# ARTICLE 27
## EMPLOYEES IN MILITARY SERVICE OR
## ACTIVE DUTY FOR TRAINING

**27.01**     A regular employee who enters the Armed Forces of the United States for active military service shall be granted a military service leave of absence for the period of his necessary absence. Voluntary extension of military service beyond four years shall not be construed as necessary absence. A regular employee who is a member of a reserve component or the organized militia of the state and enters upon active training duty for which he will receive compensation from the government will be granted a training duty leave of absence for the period of his necessary absence to participate in such training. The term ''Armed Forces'' as used herein shall be as defined in Section 16 of the Universal Military Training and Service Act.

**27.02**     An employee, either on a military service leave or absence or a training duty leave of absence and who has reemployment rights under the law and who makes application for reinstatement within the period provided in the law, will receive upon reinstatement, full service credit for the period of absence for military service or training duty.

**27.03**     A military service leave of absence and a training duty leave of absence will be with eligibility to death benefits and with eligibility to sickness disability benefits at the termination of the leave if the employee is then disabled but is otherwise entitled to reinstatement all in accordance with the terms of the Benefit Plan.

     In death cases occurring during a military service leave of absence or training duty leave of absence, sickness death benefits, where payable, shall be based upon the term of net credited service at the time the leave was granted, plus the elapsed time of military service leave of absence to the date of death, and shall be computed at the rate of the Company pay which the employee was receiving at the time the leave began. Sickness disability benefits, where payable, shall be based upon the net credited service at the time the leave was granted plus the elapsed time on either a military service leave of absence or training duty leave of absence to the termination of such leave and shall be computed on the basis of Company pay in effect at the time of the employee's reinstatement.

**27.04**     An employee on a military service leave of absence shall receive payments from the Company during the period indicated below, or the period of military service, whichever is shorter:

An employee whose net credited service at the beginning of his leave is

      (a)  Over one (1) year payment for three (3) months.

      (b)  One (1) year or less payments for two (2) weeks.

Such payments will be at a rate equal to the amount by which the employee's total Company pay at the beginning of the leave exceeds his total government pay.

Upon completion of the payments provided in this Section 27.04, an employee who at the beginning of his leave had, and continues to have, a wife or dependent child or children under eighteen (18) years of age shall receive payments for a further period of three (3) months or the remainder of his leave for military service, whichever is shorter, at a rate equal to the amount by which his total Company pay at the beginning of his leave exceeds his total government pay.

Government pay for the purpose of this Article will include basic pay, pay for special or hazardous duty, and for an employee with dependents, the difference between his quarter's allowance and the quarter's allowance established for a member of the Armed Forces of equal rank without dependents.

**27.05**      An employee on a training duty leave of absence will be allowed pay for only the time spent on such training duty but not to exceed the first thirteen (13) scheduled working days of such absence in any governmental fiscal year caused by a tour or tours starting in that year. Payment will be at a rate equal to the amount by which the employee's total Company pay at the beginning of the leave exceeds his total government pay. Government pay herein shall be as defined in Section 27.04. However, in computing government pay under this Section 27.05, the Company shall count only that portion of the total government weekly pay attributable to five (5) work days in each week for which the employee received government pay while on training duty leave of absence.

**27.06**      A regular employee who is a member of a reserve component or the organized militia of the state and who is ordered out for emergency service will receive the pay treatment as provided in Section 27.04. The time spent in emergency service will not affect the employee's eligibility for treatment with respect to training duty outlined in Section 27.05**.**

**27.07**    An employee who is granted a leave of absence as provided herein will receive, if appropriate, at or before the beginning of the leave a payment equivalent to the vacation pay for any unused portion of his vacation for the current year.

**27.08**    An employee who receives a notice to report to the Armed Forces, for active service or training duty, shall immediately present such notice to his supervisor.

# ARTICLE 28
# BULLETIN BOARDS

**28.01**    The Company agrees that the Union may post on Company bulletin boards factual and non-controversial material which a responsible representative of the Union may desire to post. If Management contends posted notices are not within the spirit of this Article, the responsible Union Representative, when available, will remove such notice. However, if the Union Representative is not available, Management reserves the right to remove such material.

# ARTICLE 29
# FEDERAL, STATE AND LOCAL LAWS

**29.01**    Should any valid Federal, State or Local Law, or the final determination of any Board or Court of competent jurisdiction, affect any provision of this Agreement, the provision or provisions so affected shall be made to conform to the law or determination, and otherwise the Agreement shall continue in full force and effect.

# ARTICLE 30
# WAIVER OR MODIFICATION

**30.01**    This Agreement constitutes the entire agreement between the parties, and no waiver or modification shall be effective unless signed by the parties hereto, and no such writing, applicable to any particular instance or instances shall be construed as any general waiver or modification, but shall be strictly limited to the extent and occasion specified herein.

# ARTICLE 31
## WAGE PRACTICES

## GENERAL

**31.01**     Part I shows the composition of the wage zones.  Part II of Wage Rates and Progressions in this Article shows the top basic weekly wage rate for each occupational classification, by wage zone, and the reference number of the applicable wage progression table.  Part III shows the wage progression tables.  Part IV shows the Pension bands for each occupational classification.  Part V shows the monthly Pension benefit for each Pension band.

## APPLICATION OF THE WAGE PROGRESSION TABLES

**31.02**     Each Wage Progression Table consists of columns of Intervals in months and Rates of Pay for each applicable Wage Zone.  The normal interval for increase consideration in months, is shown opposite the basic weekly wage to which it applies.  Thus the normal increase treatment for any employee is determined by locating his basic weekly rate on the appropriate table.

**31.03**     When an employee's rate on entry into an occupational classification is between rates shown on the table, the employee normally will be increased to the next higher rate on the table in a period of time which is the same proportion to a full interval as the amount of increase is to a full progression step.  However, if it would be more favorable to the employee, he shall first receive a full step progression increase in a full interval and then be adjusted to the next higher rate on the table in a proportionately shortened interval.  In either event, the employee shall receive credit for any amount earned since his last progression increase under Section 31.11 of this Article.

**31.04**     Progression under each table ceases with attainment of the applicable top rate.

**31.05**     The effective date of a normal wage progression increase shall be the first day of the payroll week in which the specified interval ends.  If this date falls within a period of absence exceeding seven (7) calendar days, the date the employee's return to duty shall be the effective date, but the date determined in the first sentence shall be used as the date from which the interval for the next increase will be measured.

**31.06**     The number of days by which any period of continuous absence exceeds thirty (30) days shall be added to the normal time interval specified for wage progression.

**31.07** Part-time employees will be given the same increase treatment as full-time employees except that the amount of wage increase shall be in proportion to the number of hours worked.

## PAYMENT FOR EMPLOYEES PERMANENTLY TRANSFERRED

## PERMANENT TRANSFERS INVOLVING A CHANGE IN WAGE PROGRESSION TABLE WITHOUT CHANGE IN OCCUPATIONAL CLASSIFICATION

**31.08** When an employee is permanently transferred, without change in occupational classification, from one location to another location and the applicable wage progression table for the new location provides for a higher rate at any step in that table, the employee's rate of pay shall be raised as necessary to reflect any difference, at his assumed length of service in the occupational classification, between the wage progression tables applicable to the two locations.

**31.09** When an employee is permanently transferred, without change in occupational classification, from one location to another location and the applicable wage progression table for the new location provides for a lower rate at any step in that table, unless required by the new top rate, the employee's rate of pay shall not be lowered, but any further wage progression shall be calculated on the same basis as though his rate had been lowered to reflect any difference, at his assumed length of service in the occupational classification, between the wage progression tables applicable to the two locations.

## TEMPORARY TRANSFERS INVOLVING A CHANGE IN WAGE PROGRESSION TABLE WITHOUT CHANGE IN OCCUPATIONAL CLASSIFICATION

**31.10** When an employee is temporarily transferred for one or more full days, without change in occupation classification, from one location to another location the applicable wage progression table for the new location provides for a higher rate at any step in that table, the employee shall be paid his regular weekly rate plus, for each full day worked in such location, 1/5 of any difference, at his assumed length of service in the occupational classification, between the wage progression tables applicable to the two locations. In no event shall the amount of the increase in a payroll week exceed the full difference between the two wage progression tables.

## ASSUMED LENGTH OF SERVICE

**31.11**     For the purposes of Sections 31.08, 31.09 and 31.10 an employee's assumed length of service in the occupational classification shall be calculated by determining the length of time required for normal progression from the minimum rate of the occupational classification to his current rate (including time spent at his current rate if less than the top rate) on the wage progression table applicable to the location from which he is being transferred.

## PERMANENT TRANSFERS INVOLVING A CHANGE IN OCCUPATIONAL CLASSIFICATION ONLY

**31.12**     When an employee is permanently transferred from one occupational classification to another occupational classification with no change in the wage progression table required due to a change in location and if the employee's rate of pay is less than the top basic weekly rate for new occupational classification, the normal amount of, time interval to, the employee's next scheduled wage increase shall be as specified for his rate of pay in the wage progression table for his new occupational classification. Such time interval shall be measured from the date of his transfer except that, if the employee was below the top rate for his old occupational classification, he shall be allowed credit for time since his last increase, taking into account the normal amount of the next scheduled increase in his old classification.

## PERMANENT TRANSFERS INVOLVING BOTH A CHANGE IN LOCATION AND A CHANGE IN OCCUPATIONAL CLASSIFICATION

**31.13**     When an employee is permanently transferred simultaneously between locations having different applicable wage progression tables and between occupational classifications, his new rate and progression treatment shall be determined by first applying the rules applicable to "Permanent Transfers Involving a Change in Wage Progression Table Without Change in Occupational Classification" and then applying to the new situation thus created the rules applicable to "Permanent Transfers Involving a Change in Occupational Classification Only."

**31.14**     When an employee is temporarily transferred simultaneously between locations having different applicable wage progression tables and between occupational classifications, his treatment shall be determined by first applying the rules applicable to "Temporary Transfers Involving a Change in Wage Progression Table Without Change in Occupational Classification" and then applying to the new situation thus created the rules applicable to "Wage Treatment for Promotions or Assignments."

## NYNEX UNIVERSITY TECHNICAL
## EDUCATIONAL PROGRAM

**31.15** Upon commencing coursework in the degree program in Telecommunications Technology ("Program"), the employee's wage rate shall be adjusted to the maximum weekly wage rate of a Field Technician/Central Office Technician. Upon successful completion of one half of the credits in the Program, the employee's weekly wage rate shall be adjusted upwards. The new wage shall be half of the difference between the maximum wage for the Field Technician/Central Office Technician and the maximum rate for Telecommunications Technical Associate. Upon completion of the Program the employee's wage rate shall be adjusted to the maximum wage rate for a Telecommunications Technical Associate. In determining whether an employee has successfully completed one half the Program credits or the entire Program, the Company will take into account credits that an employee has earned even though the employee was exempted from taking a certain course because the employee passed a required test. The new pension band will be effective with respect to an employee upon placement in the title Telecommunications Technical Associate.

## WAGE RATES AND PROGRESSIONS
## PART I Composition Of Wage Zones

### WAGE ZONE 1

Wage Zone 1 includes Manhattan, Bronx, Brooklyn, Queens and Richmond Boroughs, Nassau County, Suffolk County, Westchester County, Rockland County, Putnam County and the territory served from the central office buildings in Greenwood Lake, Highland Falls, Tuxedo, Patterson and Greenwich, Conn.

### WAGE ZONE 2

Wage Zone 2 includes the territory not included in Wage Zone 1.

This page left blank intentionally

# CWA PLANT
# EFFECTIVE AUGUST 3, 2003
# WAGES

## WAGE RATES AND PROGRESSIONS
## PART II - TOP BASIC WEEKLY WAGE RATES

VERIZON NEW YORK AND TELESECTOR RESOURCES GROUP, INC

| CRAFT GROUP | Table No. | Wage Zone 1 | Wage Zone 2 |
|---|---|---|---|
| Apparatus Servicer | 36 | 780.50 | 763.50 |
| Cable Splicing Tech Helper | 4 | 868.50 | 861.50 |
| Central Office Technician | 1 | 1,218.00 | 1,192.50 |
| Escort | 43# | 407.50 | 0.00 |
| Field Dispatcher | 1* | 1,218.00 | 1,192.50 |
| Field Technician | 1 | 1,218.00 | 1,192.50 |
| Frame Specialist | 5 | 1,1,37.00 | 1,113.00 |
| Technical Assistant | 3 | 662.50 | 649.00 |
| Telecommunication Tech Assoc | 2 | 1,289.50 | 1,260.00 |

\* The rates of this occupational classifiaction shall be $15.00 above the rate shown at each step of Table 1.

\# 4 Boros

**W2**

VERIZON NEW YORK AND TELESECTOR RESOURCES GROUP, INC

| BUILDING & SUPPLIES GROUP | Table No. | Wage Zone 1 | Wage Zone 2 |
|---|---|---|---|
| Building Mechanic | 38 | 1,112.00 | 1,093.00 |
| Building Mechanic Helper | 36 | 780.50 | 763.50 |
| Building Serv Att'd (35 hrs) | 33 | 632.00 | 628.50 |
| Building Serv Att'd (40 hrs) | 34 | 654.50 | 643.50 |
| Building Att'd Ldr (35 hrs) | 34 | 0.00 | 643.50 |
| Building Servicer | 35 | 760.00 | 749.50 |
| Chauffeur A | 32 | 999.50 | 991.50 |
| Chauffeur B | 31 | 973.50 | 954.00 |
| Chauffeur C | 29 | 955.50 | 936.00 |
| Chauffeur's Helper | 28 | 816.50 | 0.00 |
| Elevator Mechanic | 42 | 1,218.50 | 0.00 |
| Garage Attendant | 36 | 780.50 | 763.50 |
| Garage Mechanic | 38 | 1,112.00 | 1,093.00 |
| House Service Attendant | 36 | 780.50 | 763.50 |
| Storekeeper | 30 | 982.00 | 966.50 |
| Storeroom Attendant | 29 | 955.50 | 936.00 |
| Sub-Supervisor-Building | 37 | 819.50 | 0.00 |
| Sub-'s Supervisor-Garage | 39 | 1,129.50 | 1,106.00 |
| Watch Engineer | 42 | 1,218.00 | 1,192.50 |
| Watch Engineer's Helper | 41 | 818.50 | 805.50 |

**WAGE RATES AND PROGRESSIONS**
**PART II - TOP BASIC WEEKLY WAGE RATES**

VERIZON NEW YORK AND TELESECTOR RESOURCES GROUP, INC

| CLERICAL GROUP | Table No. | Wage Zone 1 | Wage Zone 2 |
|---|---|---|---|
| Administrative Assistant | 24 | 833.50 | 812.00 |
| Office Assistant | 23 | 807.00 | 787.00 |
| Senior Administrative Assistant | 25 | 862.50 | 858.00 |
| Senior Special Assistant | 27 | 914.50 | 909.50 |
| Special Assistant | 26 | 887.50 | 882.50 |

**W4**

**WAGE RATES AND PROGRESSIONS**
**PART II - TOP BASIC WEEKLY WAGE RATES**

VERIZON NEW YORK AND TELESECTOR RESOURCES GROUP, INC

| MISCELLANEOUS GROUP | Table No. | Wage Zone 1 | Wage Zone 2 |
|---|---|---|---|
| Back Tap Assignor | 9 | 1,011.50 | 991.50 |
| Construction Coordinator | 8 | 943.50 | 932.00 |
| Customer Svc. Administrator | 12 | 1,048.50 | 1,031.00 |
| Drafter | 7 | 922.50 | 900.00 |
| Facilities Assistant | 6 | 1,113.50 | 1,090.00 |
| Facilities Specialist | 11 | 1,195.50 | 1,176.50 |
| Maintenance Administrator | 12 | 1,048.50 | 1,031.00 |
| Supplies Coordinator | 8 | 943.50 | 932.00 |
| Translator Administrator | 6 | 1,113.50 | 1,090.00 |
| Trunk Assignor | 11 | 1,195.50 | 1,176.50 |

**W5**

## WAGE RATES AND PROGRESSIONS
## PART II - TOP BASIC WEEKLY WAGE RATES

EMPIRE CITY SUBWAY COMPANY

| CRAFT GROUP | Table No. | Top Rate |
|---|---|---|
| Blacksmith | 22 | 1,218.00 |
| Conduit worker | 15 | 971.50 |
| Construction Eqpt. Operator | 20 | 1,166.00 |
| Field Coordinator | 21 | 1,171.50 |
| Mechanic | 19 | 1,069.50 |
| Plant Inspector | 16 | 989.50 |
| Senior Conduit Worker | 17 | 1,038.50 |
| Utility Worker | 18 | 1,081.00 |

| MOTOR VEHICLE GROUP | Table No. | Top Rate |
|---|---|---|
| Chauffer A | 32 | 999.50 |
| Chauffer B | 31 | 973.50 |
| Garage Mechanic | 38 | 1,112.00 |

Defintion of Field Employees - All employees in the bargaining unit in occupational classifications for which the length of the day tour is eight hours

**W6**

**WAGE RATES AND PROGRESSIONS**
**PART II - TOP BASIC WEEKLY WAGE RATES**

EMPIRE CITY SUBWAY COMPANY

| CLERICAL GROUP | Table No. | Top Rate |
|---|---|---|
| Administrative Assistant | 24 | 833.50 |
| Office Assistant | 23 | 807.00 |
| Special Assistant | 26 | 887.50 |

| MISCELLANEOUS GROUP | Table No. | Top Rate |
|---|---|---|
| Construction Coordinator | 8 | 943.50 |
| Drafter | 7 | 922.50 |
| Engineering Drafter | 13 | 971.50 |
| Senior Engineering Drafter | 14 | 1,067.00 |

Defintion of Field Employees - All employees in the bargaining unit in occupational classifications for which the length of the day tour is eight hours

**TABLE 1**                                                                                                    **EFFECTIVE AUGUST 03, 2003**

CENTRAL OFFICE TECHNICIAN, FIELD TECHNICIAN

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $328.50 | | $322.00 | | $312.00 | |
| 6 Mos. | 6 Mos. | $375.50 | $47.00 | $367.00 | $45.00 | $357.00 | $45.00 |
| 12 Mos. | 6 Mos. | $427.50 | $52.00 | $419.50 | $52.50 | $408.50 | $51.50 |
| 18 Mos. | 6 Mos. | $487.00 | $59.50 | $480.00 | $60.50 | $466.50 | $58.00 |
| 24 Mos. | 6 Mos. | $555.00 | $68.00 | $547.50 | $67.50 | $534.00 | $67.50 |
| 30 Mos. | 6 Mos. | $632.50 | $77.50 | $626.50 | $79.00 | $610.00 | $76.00 |
| 36 Mos. | 6 Mos. | $721.50 | $89.00 | $715.00 | $88.50 | $697.50 | $87.50 |
| 42 Mos. | 6 Mos. | $822.00 | $100.50 | $816.50 | $101.50 | $797.50 | $100.00 |
| 48 Mos. | 6 Mos. | $937.00 | $115.00 | $933.00 | $116.50 | $912.50 | $115.00 |
| 54 Mos. | 6 Mos. | $1,068.00 | $131.00 | $1,066.00 | $133.00 | $1,042.50 | $130.00 |
| 60 Mos. (Maximum) | | $1,218.00 | $150.00 | $1,218.00 | $152.00 | $1,192.50 | $150.00 |
| **PENSION BAND** | | **124** | | **124** | | **123** | |

**W8**

TABLE  2                                                                            EFFECTIVE AUGUST 03, 2003

TELECOMMUNICATIONS TECHNICAL ASSOCIATE

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $1,218.00 | | $1,218.00 | | $1,192.50 | |
| 6 Mo. | 6 Mos. | $1,253.75 | $35.75 | $1,253.75 | $35.75 | $1,226.25 | $33.75 |
| Top (Maximum) | | $1,289.50 | $35.75 | $1,289.50 | $35.75 | $1,260.00 | $33.75 |
| **PENSION BAND** | | **126** | | **126** | | **125** | |

TABLE  3

## TECHNICAL ASSISTANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $336.00 | | $332.00 | | $326.50 | |
| 6 Mos. | 6 Mos. | $365.50 | $29.50 | $361.50 | $29.50 | $356.00 | $29.50 |
| 12 Mos. | 6 Mos. | $398.00 | $32.50 | $394.50 | $33.00 | $388.50 | $32.50 |
| 18 Mos. | 6 Mos. | $433.00 | $35.00 | $430.50 | $36.00 | $422.50 | $34.00 |
| 24 Mos. | 6 Mos. | $472.00 | $39.00 | $469.00 | $38.50 | $461.00 | $38.50 |
| 30 Mos. | 6 Mos. | $514.00 | $42.00 | $511.00 | $42.00 | $502.00 | $41.00 |
| 36 Mos. | 6 Mos. | $559.00 | $45.00 | $557.50 | $46.50 | $546.50 | $44.50 |
| 42 Mos. | 6 Mos. | $608.50 | $49.50 | $607.50 | $50.00 | $595.50 | $49.00 |
| 48 Mos. (Maximum) | | $662.50 | $54.00 | $662.50 | $55.00 | $649.00 | $53.50 |
| **PENSION BAND** | | **102** | | **102** | | **102** | |

**W10**

CABLE SPLICING TECHNICIAN'S HELPER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $287.50 | | $283.50 | | $280.00 | |
| 6 Mos. | 6 Mos. | $331.00 | $43.50 | $326.00 | $42.50 | $322.00 | $42.00 |
| 12 Mos. | 6 Mos. | $379.50 | $48.50 | $375.50 | $49.50 | $370.50 | $48.50 |
| 18 Mos. | 6 Mos. | $436.00 | $56.50 | $431.50 | $56.00 | $426.50 | $56.00 |
| 24 Mos. | 6 Mos. | $500.50 | $64.50 | $496.00 | $64.50 | $491.00 | $64.50 |
| 30 Mos. | 6 Mos. | $574.50 | $74.00 | $571.00 | $75.00 | $564.50 | $73.50 |
| 36 Mos. | 6 Mos. | $659.50 | $85.00 | $656.50 | $85.50 | $650.00 | $85.50 |
| 42 Mos. | 6 Mos. | $756.50 | $97.00 | $755.00 | $98.50 | $748.50 | $98.50 |
| 48 Mos. (Maximum) | | $868.50 | $112.00 | $868.50 | $113.50 | $861.50 | $113.00 |
| **PENSION BAND** | | **110** | | **110** | | **110** | |

TABLE 5

## FRAME SPECIALIST

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $328.50 | | $322.00 | | $312.00 | |
| 6 Mos. | 6 Mos. | $384.00 | $55.50 | $377.00 | $55.00 | $366.00 | $54.00 |
| 12 Mos. | 6 Mos. | $449.00 | $65.00 | $440.50 | $63.50 | $429.50 | $63.50 |
| 18 Mos. | 6 Mos. | $523.50 | $74.50 | $516.50 | $76.00 | $503.00 | $73.50 |
| 24 Mos. | 6 Mos. | $612.00 | $88.50 | $605.00 | $88.50 | $589.50 | $86.50 |
| 30 Mos. | 6 Mos. | $714.50 | $102.50 | $707.50 | $102.50 | $691.00 | $101.50 |
| 36 Mos. | 6 Mos. | $833.50 | $119.00 | $829.50 | $122.00 | $810.00 | $119.00 |
| 42 Mos. | 6 Mos. | $974.00 | $140.50 | $971.50 | $142.00 | $949.50 | $139.50 |
| 48 Mos. (Maximum) | | $1,137.00 | $163.00 | $1,137.00 | $165.50 | $1,113.00 | $163.50 |
| **PENSION BAND** | | **120** | | **120** | | **119** | |

**W12**

**TABLE 6**                                                                    **EFFECTIVE AUGUST 03, 2003**

FACILITIES ASSISTANT, TRANSLATIONS ADMINISTRATOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $278.50 | | $272.50 | | $270.50 | |
| 6 Mos. | 6 Mos. | $331.50 | $53.00 | $325.00 | $52.50 | $322.50 | $52.00 |
| 12 Mos. | 6 Mos. | $394.00 | $62.50 | $388.00 | $63.00 | $382.50 | $60.00 |
| 18 Mos. | 6 Mos. | $468.00 | $74.00 | $462.50 | $74.50 | $455.50 | $73.00 |
| 24 Mos. | 6 Mos. | $557.00 | $89.00 | $551.50 | $89.00 | $543.00 | $87.50 |
| 30 Mos. | 6 Mos. | $662.00 | $105.00 | $657.00 | $105.50 | $646.50 | $103.50 |
| 36 Mos. | 6 Mos. | $787.50 | $125.50 | $783.50 | $126.50 | $769.50 | $123.00 |
| 42 Mos. | 6 Mos. | $936.50 | $149.00 | $934.00 | $150.50 | $915.50 | $146.00 |
| 48 Mos. (Maximum) | | $1,113.50 | $177.00 | $1,113.50 | $179.50 | $1,090.00 | $174.50 |
| **PENSION BAND** | | **119** | | **119** | | **119** | |

**TABLE 7**                                                                                   **EFFECTIVE AUGUST 03, 2003**

DRAFTER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $285.00 | | $283.00 | | $271.50 | |
| 6 Mos. | 6 Mos. | $321.00 | $36.00 | $318.50 | $35.50 | $306.00 | $34.50 |
| 12 Mos. | 6 Mos. | $360.50 | $39.50 | $358.00 | $39.50 | $345.50 | $39.50 |
| 18 Mos. | 6 Mos. | $406.00 | $45.50 | $403.00 | $45.00 | $389.50 | $44.00 |
| 24 Mos. | 6 Mos. | $455.50 | $49.50 | $453.50 | $50.50 | $438.50 | $49.00 |
| 30 Mos. | 6 Mos. | $512.50 | $57.00 | $510.50 | $57.00 | $494.00 | $55.50 |
| 36 Mos. | 6 Mos. | $576.50 | $64.00 | $575.00 | $64.50 | $557.50 | $63.50 |
| 42 Mos. | 6 Mos. | $648.50 | $72.00 | $647.00 | $72.00 | $628.50 | $71.00 |
| 48 Mos. | 6 Mos. | $729.00 | $80.50 | $728.00 | $81.00 | $707.50 | $79.00 |
| 54 Mos. | 6 Mos. | $819.50 | $90.50 | $819.00 | $91.00 | $798.00 | $90.50 |
| 60 Mos. (Maximum) | | $922.50 | $103.00 | $922.50 | $103.50 | $900.00 | $102.00 |
| **PENSION BAND** | | **112** | | **112** | | **111** | |

**W14**

TABLE  8

CONSTRUCTION COORDINATOR, SUPPLIES COORDINATOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $279.00 | | $273.00 | | $271.00 | |
| 6 Mos. | 6 Mos. | $314.50 | $35.50 | $309.00 | $36.00 | $306.50 | $35.50 |
| 12 Mos. | 6 Mos. | $356.00 | $41.50 | $350.00 | $41.00 | $347.00 | $40.50 |
| 18 Mos. | 6 Mos. | $402.00 | $46.00 | $396.50 | $46.50 | $392.50 | $45.50 |
| 24 Mos. | 6 Mos. | $454.00 | $52.00 | $449.00 | $52.50 | $444.50 | $52.00 |
| 30 Mos. | 6 Mos. | $512.50 | $58.50 | $507.50 | $58.50 | $503.00 | $58.50 |
| 36 Mos. | 6 Mos. | $579.50 | $67.00 | $575.00 | $67.50 | $568.50 | $65.50 |
| 42 Mos. | 6 Mos. | $654.50 | $75.00 | $650.50 | $75.50 | $643.50 | $75.00 |
| 48 Mos. | 6 Mos. | $739.50 | $85.00 | $736.50 | $86.00 | $727.50 | $84.00 |
| 54 Mos. | 6 Mos. | $835.00 | $95.50 | $833.00 | $96.50 | $824.50 | $97.00 |
| 60 Mos. (Maximum) | | $943.50 | $108.50 | $943.50 | $110.50 | $932.00 | $107.50 |
| **PENSION BAND** | | **113** | | **113** | | **112** | |

**W15**

**TABLE  9**                                                    **EFFECTIVE AUGUST 03, 2003**

BACK TAP ASSIGNOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $281.00 | | $277.50 | | $265.50 | |
| 6 Mos. | 6 Mos. | $319.00 | $38.00 | $316.00 | $38.50 | $303.00 | $37.50 |
| 12 Mos. | 6 Mos. | $363.00 | $44.00 | $360.00 | $44.00 | $345.50 | $42.50 |
| 18 Mos. | 6 Mos. | $412.00 | $49.00 | $409.50 | $49.50 | $394.50 | $49.00 |
| 24 Mos. | 6 Mos. | $468.50 | $56.50 | $465.50 | $56.00 | $450.00 | $55.50 |
| 30 Mos. | 6 Mos. | $533.00 | $64.50 | $530.50 | $65.00 | $512.50 | $62.50 |
| 36 Mos. | 6 Mos. | $606.00 | $73.00 | $603.00 | $72.50 | $585.50 | $73.00 |
| 42 Mos. | 6 Mos. | $688.50 | $82.50 | $686.50 | $83.50 | $667.50 | $82.00 |
| 48 Mos. | 6 Mos. | $783.00 | $94.50 | $781.00 | $94.50 | $762.00 | $94.50 |
| 54 Mos. | 6 Mos. | $889.50 | $106.50 | $889.00 | $108.00 | $869.00 | $107.00 |
| 60 Mos. (Maximum) | | $1,011.50 | $122.00 | $1,011.50 | $122.50 | $991.50 | $122.50 |
| **PENSION BAND** | | **115** | | **115** | | **115** | |

**W16**

**TABLE 11**                                                                    **EFFECTIVE AUGUST 03, 2003**

FACILITIES SPECIALIST, TRUNK ASSIGNOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $331.50 | | $325.00 | | $322.50 | |
| 6 Mos. | 6 Mos. | $377.00 | $45.50 | $370.00 | $45.00 | $366.50 | $44.00 |
| 12 Mos. | 6 Mos. | $428.00 | $51.00 | $421.50 | $51.50 | $417.50 | $51.00 |
| 18 Mos. | 6 Mos. | $487.00 | $59.00 | $480.50 | $59.00 | $475.00 | $57.50 |
| 24 Mos. | 6 Mos. | $553.50 | $66.50 | $547.00 | $66.50 | $541.00 | $66.00 |
| 30 Mos. | 6 Mos. | $629.50 | $76.00 | $623.50 | $76.50 | $616.00 | $75.00 |
| 36 Mos. | 6 Mos. | $715.50 | $86.00 | $710.50 | $87.00 | $701.00 | $85.00 |
| 42 Mos. | 6 Mos. | $814.00 | $98.50 | $809.00 | $98.50 | $798.00 | $97.00 |
| 48 Mos. | 6 Mos. | $925.00 | $111.00 | $921.50 | $112.50 | $908.50 | $110.50 |
| 54 Mos. | 6 Mos. | $1,051.50 | $126.50 | $1,049.50 | $128.00 | $1,033.50 | $125.00 |
| 60 Mos. (Maximum) | | $1,195.50 | $144.00 | $1,195.50 | $146.00 | $1,176.50 | $143.00 |
| **PENSION BAND** | | **123** | | **123** | | **122** | |

**W17**

**TABLE 12**                                                                 **EFFECTIVE AUGUST 03, 2003**

CUSTOMER SERVICE ADMINISTRATOR,
MAINTENANCE ADMINISTRATOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $314.50 | | $310.50 | | $307.50 | |
| 6 Mos. | 6 Mos. | $366.00 | $51.50 | $361.50 | $51.00 | $357.50 | $50.00 |
| 12 Mos. | 6 Mos. | $425.50 | $59.50 | $420.50 | $59.00 | $416.50 | $59.00 |
| 18 Mos. | 6 Mos. | $494.00 | $68.50 | $490.00 | $69.50 | $484.00 | $67.50 |
| 24 Mos. | 6 Mos. | $575.00 | $81.00 | $570.50 | $80.50 | $563.50 | $79.50 |
| 30 Mos. | 6 Mos. | $667.50 | $92.50 | $664.00 | $93.50 | $655.00 | $91.50 |
| 36 Mos. | 6 Mos. | $776.00 | $108.50 | $773.50 | $109.50 | $762.00 | $107.00 |
| 42 Mos. | 6 Mos. | $902.00 | $126.00 | $900.50 | $127.00 | $886.50 | $124.50 |
| 48 Mos. (Maximum) | | $1,048.50 | $146.50 | $1,048.50 | $148.00 | $1,031.00 | $144.50 |
| **PENSION BAND** | | **117** | | **117** | | **116** | |

**W18**

TABLE 13

**EFFECTIVE AUGUST 03, 2003**

ENGINEERING DRAFTER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $295.50 | |
| 6 Mos. | 6 Mos. | $333.00 | $37.50 |
| 12 Mos. | 6 Mos. | $375.50 | $42.50 |
| 18 Mos. | 6 Mos. | $422.00 | $46.50 |
| 24 Mos. | 6 Mos. | $475.50 | $53.50 |
| 30 Mos. | 6 Mos. | $536.00 | $60.50 |
| 36 Mos. | 6 Mos. | $603.00 | $67.00 |
| 42 Mos. | 6 Mos. | $680.00 | $77.00 |
| 48 Mos. | 6 Mos. | $765.50 | $85.50 |
| 54 Mos. | 6 Mos. | $862.00 | $96.50 |
| 60 Mos. (Maximum) | | $971.50 | $109.50 |
| **PENSION BAND** | **114** | | |

**W19**

**TABLE 14**                                                                 **EFFECTIVE AUGUST 03, 2003**

SENIOR ENGINEERING DRAFTER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $295.50 | |
| 6 Mos. | 6 Mos. | $336.50 | $41.00 |
| 12 Mos. | 6 Mos. | $382.00 | $45.50 |
| 18 Mos. | 6 Mos. | $434.50 | $52.50 |
| 24 Mos. | 6 Mos. | $494.00 | $59.50 |
| 30 Mos. | 6 Mos. | $562.00 | $68.00 |
| 36 Mos. | 6 Mos. | $638.50 | $76.50 |
| 42 Mos. | 6 Mos. | $726.00 | $87.50 |
| 48 Mos. | 6 Mos. | $826.00 | $100.00 |
| 54 Mos. | 6 Mos. | $938.50 | $112.50 |
| 60 Mos. (Maximum) | | $1,067.00 | $128.50 |
| **PENSION BAND** | | **118** | |

**W20**

**TABLE 15**                                                                    **EFFECTIVE AUGUST 03, 2003**

CONDUIT WORKER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $284.50 | |
| 6 Mos. | 6 Mos. | $332.00 | $47.50 |
| 12 Mos. | 6 Mos. | $387.00 | $55.00 |
| 18 Mos. | 6 Mos. | $451.00 | $64.00 |
| 24 Mos. | 6 Mos. | $525.50 | $74.50 |
| 30 Mos. | 6 Mos. | $613.00 | $87.50 |
| 36 Mos. | 6 Mos. | $715.00 | $102.00 |
| 42 Mos. | 6 Mos. | $832.50 | $117.50 |
| 48 Mos. (Maximum) | | $971.50 | $139.00 |
| **PENSION BAND** | | **114** | |

**W21**

**TABLE 16**                                                                                   **EFFECTIVE AUGUST 03, 2003**

PLANT INSPECTOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $294.00 | |
| 6 Mos. | 6 Mos. | $342.50 | $48.50 |
| 12 Mos. | 6 Mos. | $398.00 | $55.50 |
| 18 Mos. | 6 Mos. | $463.50 | $65.50 |
| 24 Mos. | 6 Mos. | $539.00 | $75.50 |
| 30 Mos. | 6 Mos. | $628.50 | $89.50 |
| 36 Mos. | 6 Mos. | $731.00 | $102.50 |
| 42 Mos. | 6 Mos. | $850.00 | $119.00 |
| 48 Mos. (Maximum) | | $989.50 | $139.50 |
| **PENSION BAND** | **115** | | |

**W22**

**TABLE 17**                                                                                         **EFFECTIVE AUGUST 03, 2003**

SENIOR CONDUIT WORKER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $295.50 | |
| 6 Mos. | 6 Mos. | $346.00 | $50.50 |
| 12 Mos. | 6 Mos. | $405.00 | $59.00 |
| 18 Mos. | 6 Mos. | $473.50 | $68.50 |
| 24 Mos. | 6 Mos. | $554.00 | $80.50 |
| 30 Mos. | 6 Mos. | $648.50 | $94.50 |
| 36 Mos. | 6 Mos. | $758.50 | $110.00 |
| 42 Mos. | 6 Mos. | $887.50 | $129.00 |
| 48 Mos. (Maximum) | | $1,038.50 | $151.00 |
| **PENSION BAND** | | **117** | |

**W23**

**TABLE 18**                                                                **EFFECTIVE AUGUST 03, 2003**

UTILITY WORKER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $305.50 | |
| 6 Mos. | 6 Mos. | $357.50 | $52.00 |
| 12 Mos. | 6 Mos. | $419.00 | $61.50 |
| 18 Mos. | 6 Mos. | $490.50 | $71.50 |
| 24 Mos. | 6 Mos. | $575.00 | $84.50 |
| 30 Mos. | 6 Mos. | $672.50 | $97.50 |
| 36 Mos. | 6 Mos. | $788.00 | $115.50 |
| 42 Mos. | 6 Mos. | $923.00 | $135.00 |
| 48 Mos. (Maximum) | | $1,081.00 | $158.00 |
| **PENSION BAND** | | **118** | |

**W24**

**TABLE 19**                                                    **EFFECTIVE AUGUST 03, 2003**

MECHANIC

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $312.50 | |
| 6 Mos. | 6 Mos. | $364.50 | $52.00 |
| 12 Mos. | 6 Mos. | $425.50 | $61.00 |
| 18 Mos. | 6 Mos. | $496.00 | $70.50 |
| 24 Mos. | 6 Mos. | $578.00 | $82.00 |
| 30 Mos. | 6 Mos. | $674.00 | $96.00 |
| 36 Mos. | 6 Mos. | $787.00 | $113.00 |
| 42 Mos. | 6 Mos. | $917.00 | $130.00 |
| 48 Mos. (Maximum) | | $1,069.50 | $152.50 |
| **PENSION BAND** | | **118** | |

**W25**

**TABLE 20**

CONSTRUCTION EQUIPMENT OPERATOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $305.50 | |
| 6 Mos. | 6 Mos. | $361.00 | $55.50 |
| 12 Mos. | 6 Mos. | $427.00 | $66.00 |
| 18 Mos. | 6 Mos. | $504.50 | $77.50 |
| 24 Mos. | 6 Mos. | $596.50 | $92.00 |
| 30 Mos. | 6 Mos. | $705.00 | $108.50 |
| 36 Mos. | 6 Mos. | $833.50 | $128.50 |
| 42 Mos. | 6 Mos. | $986.00 | $152.50 |
| 48 Mos. (Maximum) | | $1,166.00 | $180.00 |
| **PENSION BAND** | **121** | | |

**W26**

TABLE 21

FIELD COORDINATOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $312.50 | |
| 6 Mos. | 6 Mos. | $368.50 | $56.00 |
| 12 Mos. | 6 Mos. | $435.00 | $66.50 |
| 18 Mos. | 6 Mos. | $512.50 | $77.50 |
| 24 Mos. | 6 Mos. | $605.50 | $93.00 |
| 30 Mos. | 6 Mos. | $714.00 | $108.50 |
| 36 Mos. | 6 Mos. | $842.00 | $128.00 |
| 42 Mos. | 6 Mos. | $993.50 | $151.50 |
| 48 Mos. (Maximum) | | $1,171.50 | $178.00 |
| **PENSION BAND** | | **122** | |

**TABLE 22**                                                                                                                    **EFFECTIVE AUGUST 03, 2003**

BLACKSMITH

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $328.50 | |
| 6 Mos. | 6 Mos. | $388.00 | $59.50 |
| 12 Mos. | 6 Mos. | $455.50 | $67.50 |
| 18 Mos. | 6 Mos. | $537.50 | $82.00 |
| 24 Mos. | 6 Mos. | $632.50 | $95.00 |
| 30 Mos. | 6 Mos. | $745.00 | $112.50 |
| 36 Mos. | 6 Mos. | $878.00 | $133.00 |
| 42 Mos. | 6 Mos. | $1,033.50 | $155.50 |
| 48 Mos. (Maximum) | | $1,218.00 | $184.50 |
| **PENSION BAND** | **124** | | |

**W28**

**TABLE  23**                                                                                                          **EFFECTIVE AUGUST 03, 2003**

OFFICE ASSISTANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $278.50 | | $272.50 | | $267.00 | |
| 6 Mos. | 6 Mos. | $318.00 | $39.50 | $312.00 | $39.50 | $306.00 | $39.00 |
| 12 Mos. | 6 Mos. | $363.50 | $45.50 | $357.50 | $45.50 | $349.50 | $43.50 |
| 18 Mos. | 6 Mos. | $415.50 | $52.00 | $409.50 | $52.00 | $400.00 | $50.50 |
| 24 Mos. | 6 Mos. | $474.00 | $58.50 | $469.00 | $59.50 | $458.50 | $58.50 |
| 30 Mos. | 6 Mos. | $542.00 | $68.00 | $537.00 | $68.00 | $524.50 | $66.00 |
| 36 Mos. | 6 Mos. | $618.50 | $76.50 | $615.50 | $78.50 | $600.50 | $76.00 |
| 42 Mos. | 6 Mos. | $706.00 | $87.50 | $704.50 | $89.00 | $687.00 | $86.50 |
| 48 Mos. (Maximum) | | $807.00 | $101.00 | $807.00 | $102.50 | $787.00 | $100.00 |
| **PENSION BAND** | | **108** | | **108** | | **107** | |

**TABLE 24**                                                                                          **EFFECTIVE AUGUST 03, 2003**

ADMINISTRATIVE ASSISTANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $278.50 | | $272.50 | | $268.00 | |
| 6 Mos. | 6 Mos. | $319.50 | $41.00 | $313.50 | $41.00 | $307.50 | $39.50 |
| 12 Mos. | 6 Mos. | $366.00 | $46.50 | $360.50 | $47.00 | $353.50 | $46.00 |
| 18 Mos. | 6 Mos. | $420.00 | $54.00 | $415.50 | $55.00 | $406.50 | $53.00 |
| 24 Mos. | 6 Mos. | $482.00 | $62.00 | $476.50 | $61.00 | $466.00 | $59.50 |
| 30 Mos. | 6 Mos. | $553.00 | $71.00 | $548.00 | $71.50 | $535.50 | $69.50 |
| 36 Mos. | 6 Mos. | $633.50 | $80.50 | $630.50 | $82.50 | $615.50 | $80.00 |
| 42 Mos. | 6 Mos. | $727.00 | $93.50 | $725.50 | $95.00 | $706.50 | $91.00 |
| 48 Mos. (Maximum) | | $833.50 | $106.50 | $833.50 | $108.00 | $812.00 | $105.50 |
| **PENSION BAND** | | **109** | | **109** | | **108** | |

**W30**

**TABLE 25**

**EFFECTIVE AUGUST 03, 2003**

SENIOR ADMINISTRATIVE ASSISTANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $279.00 | | $273.00 | | $270.50 | |
| 6 Mos. | 6 Mos. | $321.50 | $42.50 | $315.00 | $42.00 | $312.50 | $42.00 |
| 12 Mos. | 6 Mos. | $370.00 | $48.50 | $364.50 | $49.50 | $361.00 | $48.50 |
| 18 Mos. | 6 Mos. | $426.00 | $56.00 | $420.50 | $56.00 | $417.00 | $56.00 |
| 24 Mos. | 6 Mos. | $490.50 | $64.50 | $485.50 | $65.00 | $481.50 | $64.50 |
| 30 Mos. | 6 Mos. | $564.50 | $74.00 | $560.50 | $75.00 | $556.50 | $75.00 |
| 36 Mos. | 6 Mos. | $650.50 | $86.00 | $647.50 | $87.00 | $643.00 | $86.50 |
| 42 Mos. | 6 Mos. | $749.00 | $98.50 | $747.00 | $99.50 | $742.50 | $99.50 |
| 48 Mos. (Maximum) | | $862.50 | $113.50 | $862.50 | $115.50 | $858.00 | $115.50 |
| **PENSION BAND** | | **110** | | **110** | | **110** | |

TABLE 26                                                    EFFECTIVE AUGUST 03, 2003

SPECIAL ASSISTANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $278.50 | | $272.50 | | $270.50 | |
| 6 Mos. | 6 Mos. | $322.00 | $43.50 | $316.00 | $43.50 | $313.50 | $43.00 |
| 12 Mos. | 6 Mos. | $371.50 | $49.50 | $366.00 | $50.00 | $363.50 | $50.00 |
| 18 Mos. | 6 Mos. | $430.50 | $59.00 | $424.50 | $58.50 | $421.00 | $57.50 |
| 24 Mos. | 6 Mos. | $497.00 | $66.50 | $492.00 | $67.50 | $489.00 | $68.00 |
| 30 Mos. | 6 Mos. | $575.00 | $78.00 | $570.50 | $78.50 | $566.00 | $77.00 |
| 36 Mos. | 6 Mos. | $664.00 | $89.00 | $661.00 | $90.50 | $656.50 | $90.50 |
| 42 Mos. | 6 Mos. | $768.00 | $104.00 | $765.50 | $104.50 | $760.50 | $104.00 |
| 48 Mos. (Maximum) | | $887.50 | $119.50 | $887.50 | $122.00 | $882.50 | $122.00 |
| **PENSION BAND** | | **111** | | **111** | | **111** | |

**W32**

TABLE 27

SENIOR SPECIAL ASSISTANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $278.50 | | $272.50 | | $271.00 | |
| 6 Mos. | 6 Mos. | $323.00 | $44.50 | $317.50 | $45.00 | $315.00 | $44.00 |
| 12 Mos. | 6 Mos. | $375.00 | $52.00 | $368.50 | $51.00 | $366.50 | $51.50 |
| 18 Mos. | 6 Mos. | $434.50 | $59.50 | $429.50 | $61.00 | $427.00 | $60.50 |
| 24 Mos. | 6 Mos. | $504.50 | $70.00 | $500.00 | $70.50 | $496.50 | $69.50 |
| 30 Mos. | 6 Mos. | $585.50 | $81.00 | $580.50 | $80.50 | $577.50 | $81.00 |
| 36 Mos. | 6 Mos. | $679.50 | $94.00 | $676.00 | $95.50 | $672.00 | $94.50 |
| 42 Mos. | 6 Mos. | $788.00 | $108.50 | $786.50 | $110.50 | $781.50 | $109.50 |
| 48 Mos. (Maximum) | | $914.50 | $126.50 | $914.50 | $128.00 | $909.50 | $128.00 |
| **PENSION BAND** | | **112** | | **112** | | **112** | |

**W33**

TABLE 28                                                                EFFECTIVE AUGUST 03, 2003

CHAUFFEUR'S HELPER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $273.00 | | $269.00 | |
| 6 Mos. | 6 Mos. | $313.00 | $40.00 | $308.50 | $39.50 |
| 12 Mos. | 6 Mos. | $359.50 | $46.50 | $355.00 | $46.50 |
| 18 Mos. | 6 Mos. | $412.00 | $52.50 | $408.00 | $53.00 |
| 24 Mos. | 6 Mos. | $472.50 | $60.50 | $468.50 | $60.50 |
| 30 Mos. | 6 Mos. | $542.00 | $69.50 | $538.00 | $69.50 |
| 36 Mos. | 6 Mos. | $620.50 | $78.50 | $618.50 | $80.50 |
| 42 Mos. | 6 Mos. | $712.50 | $92.00 | $711.00 | $92.50 |
| 48 Mos. (Maximum) | | $816.50 | $104.00 | $816.50 | $105.50 |
| **PENSION BAND** | | **108** | | **108** | |

W34

TABLE 29

CHAUFFEUR C, STOREROOM ATTENDANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $298.50 | | $293.50 | | $287.50 | |
| 6 Mos. | 6 Mos. | $345.50 | $47.00 | $340.00 | $46.50 | $334.00 | $46.50 |
| 12 Mos. | 6 Mos. | $399.00 | $53.50 | $394.50 | $54.50 | $386.00 | $52.00 |
| 18 Mos. | 6 Mos. | $462.00 | $63.00 | $457.50 | $63.00 | $448.50 | $62.50 |
| 24 Mos. | 6 Mos. | $534.50 | $72.50 | $529.50 | $72.00 | $519.00 | $70.50 |
| 30 Mos. | 6 Mos. | $617.50 | $83.00 | $613.50 | $84.00 | $601.50 | $82.50 |
| 36 Mos. | 6 Mos. | $714.50 | $97.00 | $711.50 | $98.00 | $697.00 | $95.50 |
| 42 Mos. | 6 Mos. | $826.50 | $112.00 | $825.00 | $113.50 | $807.50 | $110.50 |
| 48 Mos. (Maximum) | | $955.50 | $129.00 | $955.50 | $130.50 | $936.00 | $128.50 |
| **PENSION BAND** | | **113** | | **113** | | **113** | |

**W35**

**TABLE 30**

**EFFECTIVE AUGUST 03, 2003**

STOREKEEPER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $307.00 | | $301.00 | | $295.50 | |
| 6 Mos. | 6 Mos. | $355.00 | $48.00 | $348.50 | $47.50 | $343.00 | $47.50 |
| 12 Mos. | 6 Mos. | $410.50 | $55.50 | $404.50 | $56.00 | $397.50 | $54.50 |
| 18 Mos. | 6 Mos. | $474.50 | $64.00 | $469.00 | $64.50 | $461.50 | $64.00 |
| 24 Mos. | 6 Mos. | $548.50 | $74.00 | $543.50 | $74.50 | $535.00 | $73.50 |
| 30 Mos. | 6 Mos. | $634.50 | $86.00 | $630.00 | $86.50 | $619.50 | $84.50 |
| 36 Mos. | 6 Mos. | $734.50 | $100.00 | $731.00 | $101.00 | $718.50 | $99.00 |
| 42 Mos. | 6 Mos. | $849.00 | $114.50 | $847.00 | $116.00 | $833.00 | $114.50 |
| 48 Mos. (Maximum) | | $982.00 | $133.00 | $982.00 | $135.00 | $966.50 | $133.50 |
| **PENSION BAND** | | **114** | | **114** | | **114** | |

**W36**

**TABLE 31**　　　　　　　　　　　　　　　　　　　　　　　**EFFECTIVE AUGUST 03, 2003**

CHAUFFEUR B

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $311.50 | | $305.00 | | $296.50 | |
| 6 Mos. | 6 Mos. | $360.50 | $49.00 | $354.00 | $49.00 | $345.50 | $49.00 |
| 12 Mos. | 6 Mos. | $417.50 | $57.00 | $410.00 | $56.00 | $401.50 | $56.00 |
| 18 Mos. | 6 Mos. | $482.50 | $65.00 | $475.50 | $65.50 | $466.50 | $65.00 |
| 24 Mos. | 6 Mos. | $558.00 | $75.50 | $552.50 | $77.00 | $543.00 | $76.50 |
| 30 Mos. | 6 Mos. | $646.00 | $88.00 | $641.00 | $88.50 | $631.00 | $88.00 |
| 36 Mos. | 6 Mos. | $746.50 | $100.50 | $743.00 | $102.00 | $733.50 | $102.50 |
| 42 Mos. | 6 Mos. | $864.00 | $117.50 | $862.00 | $119.00 | $852.50 | $119.00 |
| 48 Mos. (Maximum) | | $999.50 | $135.50 | $999.50 | $137.50 | $991.50 | $139.00 |
| **PENSION BAND** | | **115** | | **115** | | **115** | |

**W37**

**TABLE 32**                                                          **EFFECTIVE AUGUST 03, 2003**

CHAUFFEUR A

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $311.50 | | $305.00 | | $296.50 | |
| 6 Mos. | 6 Mos. | $360.50 | $49.00 | $354.00 | $49.00 | $345.50 | $49.00 |
| 12 Mos. | 6 Mos. | $417.50 | $57.00 | $410.00 | $56.00 | $401.50 | $56.00 |
| 18 Mos. | 6 Mos. | $482.50 | $65.00 | $475.50 | $65.50 | $466.50 | $65.00 |
| 24 Mos. | 6 Mos. | $558.00 | $75.50 | $552.50 | $77.00 | $543.00 | $76.50 |
| 30 Mos. | 6 Mos. | $646.00 | $88.00 | $641.00 | $88.50 | $631.00 | $88.00 |
| 36 Mos. | 6 Mos. | $746.50 | $100.50 | $743.00 | $102.00 | $733.50 | $102.50 |
| 42 Mos. | 6 Mos. | $864.00 | $117.50 | $862.00 | $119.00 | $852.50 | $119.00 |
| 48 Mos. (Maximum) | | $999.50 | $135.50 | $999.50 | $137.50 | $991.50 | $139.00 |
| **PENSION BAND** | | **115** | | **115** | | **115** | |

**W38**

**TABLE  33**                                                                 **EFFECTIVE AUGUST 03, 2003**

BUILDING SERVICE ATTENDANT (35 HRS)

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $204.00 | | $202.50 | | $200.00 | |
| 6 Mos. | 6 Mos. | $235.00 | $31.00 | $234.00 | $31.50 | $231.00 | $31.00 |
| 12 Mos. | 6 Mos. | $271.00 | $36.00 | $270.00 | $36.00 | $266.50 | $35.50 |
| 18 Mos. | 6 Mos. | $312.00 | $41.00 | $311.00 | $41.00 | $307.50 | $41.00 |
| 24 Mos. | 6 Mos. | $359.50 | $47.50 | $358.00 | $47.00 | $355.00 | $47.50 |
| 30 Mos. | 6 Mos. | $413.50 | $54.00 | $412.50 | $54.50 | $409.00 | $54.00 |
| 36 Mos. | 6 Mos. | $476.00 | $62.50 | $475.50 | $63.00 | $472.00 | $63.00 |
| 42 Mos. | 6 Mos. | $548.50 | $72.50 | $548.00 | $72.50 | $544.50 | $72.50 |
| 48 Mos. (Maximum) | | $632.00 | $83.50 | $632.00 | $84.00 | $628.50 | $84.00 |
| **PENSION BAND** | | **101** | | **101** | | **101** | |

BLDG. SVC. ATTENDANT LEADER (35 HRS)* (*ZONE 2 ONLY), BUILDING SERVICE ATTENDANT (40 HRS)

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $228.50 | | $226.50 | | $223.50 | |
| 6 Mos. | 6 Mos. | $260.50 | $32.00 | $258.00 | $31.50 | $255.00 | $31.50 |
| 12 Mos. | 6 Mos. | $296.50 | $36.00 | $294.50 | $36.50 | $291.50 | $36.50 |
| 18 Mos. | 6 Mos. | $339.00 | $42.50 | $337.00 | $42.50 | $332.50 | $41.00 |
| 24 Mos. | 6 Mos. | $386.00 | $47.00 | $384.50 | $47.50 | $379.50 | $47.00 |
| 30 Mos. | 6 Mos. | $440.50 | $54.50 | $439.00 | $54.50 | $433.00 | $53.50 |
| 36 Mos. | 6 Mos. | $503.50 | $63.00 | $502.00 | $63.00 | $494.00 | $61.00 |
| 42 Mos. | 6 Mos. | $574.00 | $70.50 | $573.50 | $71.50 | $564.00 | $70.00 |
| 48 Mos. (Maximum) | | $654.50 | $80.50 | $654.50 | $81.00 | $643.50 | $79.50 |
| **PENSION BAND** | | **102** | | **102** | | **101** | |

**W40**

TABLE  35

BUILDING SERVICER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $268.50 | | $265.00 | | $258.50 | |
| 6 Mos. | 6 Mos. | $305.50 | $37.00 | $302.00 | $37.00 | $295.00 | $36.50 |
| 12 Mos. | 6 Mos. | $348.00 | $42.50 | $345.00 | $43.00 | $337.50 | $42.50 |
| 18 Mos. | 6 Mos. | $396.50 | $48.50 | $393.00 | $48.00 | $385.50 | $48.00 |
| 24 Mos. | 6 Mos. | $451.50 | $55.00 | $449.00 | $56.00 | $440.00 | $54.50 |
| 30 Mos. | 6 Mos. | $515.00 | $63.50 | $511.50 | $62.50 | $503.00 | $63.00 |
| 36 Mos. | 6 Mos. | $586.50 | $71.50 | $584.50 | $73.00 | $575.00 | $72.00 |
| 42 Mos. | 6 Mos. | $667.50 | $81.00 | $666.00 | $81.50 | $656.50 | $81.50 |
| 48 Mos. (Maximum) | | $760.00 | $92.50 | $760.00 | $94.00 | $749.50 | $93.00 |
| PENSION BAND | | 106 | | 106 | | 105 | |

**TABLE 36**

APPARATUS SERVICER, BUILDING MECHANIC'S HELPER,
GARAGE ATTENDANT, HOUSE SERVICE ATTENDANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $273.00 | | $269.00 | | $262.00 | |
| 6 Mos. | 6 Mos. | $311.50 | $38.50 | $307.00 | $38.00 | $299.50 | $37.50 |
| 12 Mos. | 6 Mos. | $355.50 | $44.00 | $350.50 | $43.50 | $342.00 | $42.50 |
| 18 Mos. | 6 Mos. | $405.00 | $49.50 | $401.00 | $50.50 | $391.00 | $49.00 |
| 24 Mos. | 6 Mos. | $462.00 | $57.00 | $458.50 | $57.50 | $447.50 | $56.50 |
| 30 Mos. | 6 Mos. | $526.00 | $64.00 | $523.50 | $65.00 | $511.00 | $63.50 |
| 36 Mos. | 6 Mos. | $600.50 | $74.50 | $598.00 | $74.50 | $584.50 | $73.50 |
| 42 Mos. | 6 Mos. | $684.50 | $84.00 | $683.50 | $85.50 | $668.50 | $84.00 |
| 48 Mos. (Maximum) | | $780.50 | $96.00 | $780.50 | $97.00 | $763.50 | $95.00 |
| **PENSION BAND** | | **107** | | **107** | | **106** | |

**W42**

**TABLE 37**                                                                                          **EFFECTIVE AUGUST 03, 2003**

SUB-SUPERVISOR-BUILDING

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $276.00 | | $271.50 | |
| 6 Mos. | 6 Mos. | $317.00 | $41.00 | $312.00 | $40.50 |
| 12 Mos. | 6 Mos. | $363.00 | $46.00 | $358.00 | $46.00 |
| 18 Mos. | 6 Mos. | $415.50 | $52.50 | $411.00 | $53.00 |
| 24 Mos. | 6 Mos. | $475.50 | $60.00 | $472.00 | $61.00 |
| 30 Mos. | 6 Mos. | $545.00 | $69.50 | $542.00 | $70.00 |
| 36 Mos. | 6 Mos. | $625.00 | $80.00 | $622.00 | $80.00 |
| 42 Mos. | 6 Mos. | $716.00 | $91.00 | $714.50 | $92.50 |
| 48 Mos. (Maximum) | | $819.50 | $103.50 | $819.50 | $105.00 |
| **PENSION BAND** | | **108** | | **108** | |

**TABLE 38**                                                                     **EFFECTIVE AUGUST 03, 2003**

BUILDING MECHANIC, GARAGE MECHANIC

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $328.50 | | $322.00 | | $312.00 | |
| 6 Mos. | 6 Mos. | $382.50 | $54.00 | $376.00 | $54.00 | $365.00 | $53.00 |
| 12 Mos. | 6 Mos. | $446.50 | $64.00 | $438.50 | $62.50 | $427.00 | $62.00 |
| 18 Mos. | 6 Mos. | $520.00 | $73.50 | $512.00 | $73.50 | $500.00 | $73.00 |
| 24 Mos. | 6 Mos. | $605.00 | $85.00 | $598.00 | $86.00 | $584.00 | $84.00 |
| 30 Mos. | 6 Mos. | $704.00 | $99.00 | $699.00 | $101.00 | $683.50 | $99.50 |
| 36 Mos. | 6 Mos. | $819.50 | $115.50 | $815.50 | $116.50 | $798.50 | $115.00 |
| 42 Mos. | 6 Mos. | $955.00 | $135.50 | $952.50 | $137.00 | $934.00 | $135.50 |
| 48 Mos. (Maximum) | | $1,112.00 | $157.00 | $1,112.00 | $159.50 | $1,093.00 | $159.00 |
| **PENSION BAND** | | **119** | | **119** | | **119** | |

**W44**

TABLE  39

SUB-SUPERVISOR-GARAGE

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $338.50 | | $337.00 | | $312.00 | |
| 6 Mos. | 6 Mos. | $394.00 | $55.50 | $392.00 | $55.00 | $365.50 | $53.50 |
| 12 Mos. | 6 Mos. | $458.00 | $64.00 | $455.50 | $63.50 | $428.50 | $63.00 |
| 18 Mos. | 6 Mos. | $532.50 | $74.50 | $530.50 | $75.00 | $502.00 | $73.50 |
| 24 Mos. | 6 Mos. | $618.00 | $85.50 | $617.00 | $86.50 | $588.00 | $86.00 |
| 30 Mos. | 6 Mos. | $718.50 | $100.50 | $717.50 | $100.50 | $688.50 | $100.50 |
| 36 Mos. | 6 Mos. | $835.50 | $117.00 | $834.00 | $116.50 | $806.50 | $118.00 |
| 42 Mos. | 6 Mos. | $971.50 | $136.00 | $970.50 | $136.50 | $944.00 | $137.50 |
| 48 Mos. (Maximum) | | $1,129.50 | $158.00 | $1,129.50 | $159.00 | $1,106.00 | $162.00 |
| **PENSION BAND** | | **120** | | **120** | | **119** | |

**TABLE 41**                                                                      **EFFECTIVE AUGUST 03, 2003**

WATCH ENGINEER'S HELPER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $277.50 | | $271.50 | | $265.50 | |
| 6 Mos. | 6 Mos. | $318.00 | $40.50 | $311.50 | $40.00 | $305.00 | $39.50 |
| 12 Mos. | 6 Mos. | $364.00 | $46.00 | $357.50 | $46.00 | $350.00 | $45.00 |
| 18 Mos. | 6 Mos. | $417.00 | $53.00 | $411.00 | $53.50 | $402.50 | $52.50 |
| 24 Mos. | 6 Mos. | $476.50 | $59.50 | $472.00 | $61.00 | $462.50 | $60.00 |
| 30 Mos. | 6 Mos. | $546.00 | $69.50 | $542.00 | $70.00 | $531.00 | $68.50 |
| 36 Mos. | 6 Mos. | $625.00 | $79.00 | $621.00 | $79.00 | $610.00 | $79.00 |
| 42 Mos. | 6 Mos. | $715.50 | $90.50 | $713.50 | $92.50 | $701.50 | $91.50 |
| 48 Mos. (Maximum) | | $818.50 | $103.00 | $818.50 | $105.00 | $805.50 | $104.00 |
| **PENSION BAND** | | **108** | | **108** | | **107** | |

**W46**

TABLE 42

ELEVATOR MECHANIC (ZONE 1 ONLY), WATCH ENGINEER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $328.50 | | $322.00 | | $312.00 | |
| 6 Mos. | 6 Mos. | $375.50 | $47.00 | $367.00 | $45.00 | $357.00 | $45.00 |
| 12 Mos. | 6 Mos. | $427.50 | $52.00 | $419.50 | $52.50 | $408.50 | $51.50 |
| 18 Mos. | 6 Mos. | $487.00 | $59.50 | $480.00 | $60.50 | $466.50 | $58.00 |
| 24 Mos. | 6 Mos. | $555.00 | $68.00 | $547.50 | $67.50 | $534.00 | $67.50 |
| 30 Mos. | 6 Mos. | $632.50 | $77.50 | $626.50 | $79.00 | $610.00 | $76.00 |
| 36 Mos. | 6 Mos. | $721.50 | $89.00 | $715.00 | $88.50 | $697.50 | $87.50 |
| 42 Mos. | 6 Mos. | $822.00 | $100.50 | $816.50 | $101.50 | $797.50 | $100.00 |
| 48 Mos. | 6 Mos. | $937.00 | $115.00 | $933.00 | $116.50 | $912.50 | $115.00 |
| 54 Mos. | 6 Mos. | $1,068.00 | $131.00 | $1,066.00 | $133.00 | $1,042.50 | $130.00 |
| 60 Mos. (Maximum) | | $1,218.00 | $150.00 | $1,218.00 | $152.00 | $1,192.50 | $150.00 |
| **PENSION BAND** | | **124** | | **124** | | **123** | |

TABLE  43

EFFECTIVE AUGUST 03, 2003

ESCORT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $231.50 | |
| 6 Mos. | 6 Mos. | $276.50 | $45.00 |
| 12 Mos. | 6 Mos. | $336.00 | $59.50 |
| 18 Mos. (Maximum) | | $407.50 | $71.50 |
| **PENSION BAND** | | **0** | |

**W48**

This page left blank intentionally

# CWA PLANT
# EFFECTIVE AUGUST 1, 2004
# WAGES

2% Wage increase applied to all steps

**WAGE RATES AND PROGRESSIONS**
**PART II - TOP BASIC WEEKLY WAGE RATES**

VERIZON NEW YORK AND TELESECTOR RESOURCES GROUP, INC

| CRAFT GROUP | Table No. | Wage Zone 1 | Wage Zone 2 |
|---|---|---|---|
| Apparatus Servicer | 36 | 796.00 | 779.00 |
| Cable Splicing Tech Helper | 4 | 886.00 | 878.50 |
| Central Office Technician | 1 | 1,242.50 | 1,216.50 |
| Escort | 43# | 415.50 | 0.00 |
| Field Dispatcher | 1* | 1,242.50 | 1,216.50 |
| Field Technician | 1 | 1,242.50 | 1,216.50 |
| Frame Specialist | 5 | 1,159.50 | 1,135.50 |
| Technical Assistant | 3 | 676.00 | 662.00 |
| Telecommunication Tech Assoc | 2 | 1,315.50 | 1,285.00 |

\* The rates of this occupational classifiaction shall be $15.00 above the rate shown at each step of Table 1.

\# 4 Boros

VERIZON NEW YORK AND TELESECTOR RESOURCES GROUP, INC

| BUILDING & SUPPLIES GROUP | Table No. | Wage Zone 1 | Wage Zone 2 |
|---|---|---|---|
| Building Mechanic | 38 | 1,134.00 | 1,115.00 |
| Building Mechanic Helper | 36 | 796.00 | 779.00 |
| Building Serv Att'd (35 hrs) | 33 | 644.50 | 641.00 |
| Building Serv Att'd (40 hrs) | 34 | 667.50 | 656.50 |
| Building Att'd Ldr (35 hrs) | 34 | 0.00 | 656.50 |
| Building Servicer | 35 | 775.00 | 764.50 |
| Chauffeur A | 32 | 1,019.50 | 1,011.50 |
| Chauffeur B | 31 | 993.00 | 973.00 |
| Chauffeur C | 29 | 974.50 | 954.50 |
| Chauffeur's Helper | 28 | 833.00 | 0.00 |
| Elevator Mechanic | 42 | 1,242.50 | 0.00 |
| Garage Attendant | 36 | 796.00 | 779.00 |
| Garage Mechanic | 38 | 1,134.00 | 1,115.00 |
| House Service Attendant | 36 | 796.00 | 779.00 |
| Storekeeper | 30 | 1,001.50 | 986.00 |
| Storeroom Attendant | 29 | 974.50 | 954.50 |
| Sub-'s Supervisor-Garage | 39 | 1,152.00 | 1,128.00 |
| Sub-Supervisor-Building | 37 | 836.00 | 0.00 |
| Watch Engineer | 42 | 1,242.50 | 1,216.50 |
| Watch Engineer's Helper | 41 | 835.00 | 821.50 |

**WAGE RATES AND PROGRESSIONS**
**PART II - TOP BASIC WEEKLY WAGE RATES**

VERIZON NEW YORK AND TELESECTOR RESOURCES GROUP, INC

| CLERICAL GROUP | Table No. | Wage Zone 1 | Wage Zone 2 |
|---|---|---|---|
| Administrative Assistant | 24 | 850.00 | 828.00 |
| Office Assistant | 23 | 823.00 | 802.50 |
| Senior Administrative Assistant | 25 | 880.00 | 875.00 |
| Senior Special Assistant | 27 | 933.00 | 927.50 |
| Special Assistant | 26 | 905.50 | 900.00 |

**WAGE RATES AND PROGRESSIONS**
**PART II - TOP BASIC WEEKLY WAGE RATES**

VERIZON NEW YORK AND TELESECTOR RESOURCES GROUP, INC

| MISCELLANEOUS GROUP | Table No. | Wage Zone 1 | Wage Zone 2 |
|---|---|---|---|
| Back Tap Assignor | 9 | 1,031.50 | 1,011.50 |
| Construction Coordinator | 8 | 962.50 | 950.50 |
| Customer Svc. Administrator | 12 | 1,069.50 | 1,051.50 |
| Drafter | 7 | 941.00 | 918.00 |
| Facilities Assistant | 6 | 1,136.00 | 1,112.00 |
| Facilities Specialist | 11 | 1,219.50 | 1,200.00 |
| Maintenance Administrator | 12 | 1,069.50 | 1,051.50 |
| Supplies Coordinator | 8 | 962.50 | 950.50 |
| Translator Administrator | 6 | 1,136.00 | 1,112.00 |
| Trunk Assignor | 11 | 1,219.50 | 1,200.00 |

**WAGE RATES AND PROGRESSIONS**
**PART II - TOP BASIC WEEKLY WAGE RATES**

EMPIRE CITY SUBWAY COMPANY

| CRAFT GROUP | Table No. | Top Rate |
|---|---|---|
| Conduit Worker | 15 | 991.00 |
| Plant Inspector | 16 | 1,009.50 |
| Senior Conduit Worker | 17 | 1,059.50 |
| Utility Worker | 18 | 1,102.50 |
| Mechanic | 19 | 1,091.00 |
| Construction Eqpt. Operator | 20 | 1,189.50 |
| Field Coordinator | 21 | 1,195.00 |
| Blacksmith | 22 | 1,242.50 |

| MOTOR VEHICLE GROUP | Table No. | Top Rate |
|---|---|---|
| Chauffer A | 32 | 1,019.50 |
| Chauffer B | 31 | 993.00 |
| Garage Mechanic | 38 | 1,134.00 |

Defintion of Field Employees - All employees in the bargaining unit in occupational classifications for which the length of the day tour is eight hours

**WAGE RATES AND PROGRESSIONS**
**PART II - TOP BASIC WEEKLY WAGE RATES**

EMPIRE CITY SUBWAY COMPANY

| CLERICAL GROUP | Table No. | Top Rate |
|---|---|---|
| Administrative Assistant | 24 | 850.00 |
| Office Assistant | 23 | 823.00 |
| Special Assistant | 26 | 905.50 |

| MISCELLANEOUS GROUP | Table No. | Top Rate |
|---|---|---|
| Construction Coordinator | 8 | 962.50 |
| Drafter | 7 | 941.00 |
| Engineering Drafter | 13 | 991.00 |
| Senior Engineering Drafter | 14 | 1,088.50 |

Defintion of Field Employees - All employees in the bargaining unit in occupational classifications for which the length of the day tour is eight hours

**W56**

TABLE 1                                                          EFFECTIVE AUGUST 01, 2004

CENTRAL OFFICE TECHNICIAN, FIELD TECHNICIAN

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $335.00 | | $328.50 | | $318.00 | |
| 6 Mos. | 6 Mos. | $383.00 | $48.00 | $374.50 | $46.00 | $364.00 | $46.00 |
| 12 Mos. | 6 Mos. | $436.00 | $53.00 | $428.00 | $53.50 | $416.50 | $52.50 |
| 18 Mos. | 6 Mos. | $496.50 | $60.50 | $489.50 | $61.50 | $476.00 | $59.50 |
| 24 Mos. | 6 Mos. | $566.00 | $69.50 | $558.50 | $69.00 | $544.50 | $68.50 |
| 30 Mos. | 6 Mos. | $645.00 | $79.00 | $639.00 | $80.50 | $622.00 | $77.50 |
| 36 Mos. | 6 Mos. | $736.00 | $91.00 | $729.50 | $90.50 | $711.50 | $89.50 |
| 42 Mos. | 6 Mos. | $838.50 | $102.50 | $833.00 | $103.50 | $813.50 | $102.00 |
| 48 Mos. | 6 Mos. | $955.50 | $117.00 | $951.50 | $118.50 | $931.00 | $117.50 |
| 54 Mos. | 6 Mos. | $1,089.50 | $134.00 | $1,087.50 | $136.00 | $1,063.50 | $132.50 |
| 60 Mos. (Maximum) | | $1,242.50 | $153.00 | $1,242.50 | $155.00 | $1,216.50 | $153.00 |
| PENSION BAND | | 124 | | 124 | | 123 | |

TABLE  2

TELECOMMUNICATIONS TECHNICAL ASSOCIATE

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $1,242.50 | | $1,242.50 | | $1,216.50 | |
| 6 Mo. | 6 Mos. | $1,279.00 | $36.50 | $1,279.00 | $36.50 | $1,250.75 | $34.25 |
| Top (Maximum) | | $1,315.50 | $36.50 | $1,315.50 | $36.50 | $1,285.00 | $34.25 |
| **PENSION BAND** | | **126** | | **126** | | **125** | |

**W58**

TABLE  3

TECHNICAL ASSISTANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $342.50 | | $338.50 | | $333.00 | |
| 6 Mos. | 6 Mos. | $373.00 | $30.50 | $368.50 | $30.00 | $363.00 | $30.00 |
| 12 Mos. | 6 Mos. | $406.00 | $33.00 | $402.50 | $34.00 | $396.50 | $33.50 |
| 18 Mos. | 6 Mos. | $441.50 | $35.50 | $439.00 | $36.50 | $431.00 | $34.50 |
| 24 Mos. | 6 Mos. | $481.50 | $40.00 | $478.50 | $39.50 | $470.00 | $39.00 |
| 30 Mos. | 6 Mos. | $524.50 | $43.00 | $521.00 | $42.50 | $512.00 | $42.00 |
| 36 Mos. | 6 Mos. | $570.00 | $45.50 | $568.50 | $47.50 | $557.50 | $45.50 |
| 42 Mos. | 6 Mos. | $620.50 | $50.50 | $619.50 | $51.00 | $607.50 | $50.00 |
| 48 Mos. (Maximum) | | $676.00 | $55.50 | $676.00 | $56.50 | $662.00 | $54.50 |
| **PENSION BAND** | | **102** | | **102** | | **102** | |

**TABLE 4**                                                                      **EFFECTIVE AUGUST 01, 2004**

CABLE SPLICING TECHNICIAN'S HELPER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $293.50 | | $289.00 | | $285.50 | |
| 6 Mos. | 6 Mos. | $337.50 | $44.00 | $332.50 | $43.50 | $328.50 | $43.00 |
| 12 Mos. | 6 Mos. | $387.00 | $49.50 | $383.00 | $50.50 | $378.00 | $49.50 |
| 18 Mos. | 6 Mos. | $444.50 | $57.50 | $440.00 | $57.00 | $435.00 | $57.00 |
| 24 Mos. | 6 Mos. | $510.50 | $66.00 | $506.00 | $66.00 | $501.00 | $66.00 |
| 30 Mos. | 6 Mos. | $586.00 | $75.50 | $582.50 | $76.50 | $576.00 | $75.00 |
| 36 Mos. | 6 Mos. | $672.50 | $86.50 | $669.50 | $87.00 | $663.00 | $87.00 |
| 42 Mos. | 6 Mos. | $771.50 | $99.00 | $770.00 | $100.50 | $763.50 | $100.50 |
| 48 Mos. (Maximum) | | $886.00 | $114.50 | $886.00 | $116.00 | $878.50 | $115.00 |
| **PENSION BAND** | | **110** | | **110** | | **110** | |

**W60**

**TABLE  5**                                                           **EFFECTIVE AUGUST 01, 2004**

FRAME SPECIALIST

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $335.00 | | $328.50 | | $318.00 | |
| 6 Mos. | 6 Mos. | $391.50 | $56.50 | $384.50 | $56.00 | $373.50 | $55.50 |
| 12 Mos. | 6 Mos. | $458.00 | $66.50 | $449.50 | $65.00 | $438.00 | $64.50 |
| 18 Mos. | 6 Mos. | $534.00 | $76.00 | $527.00 | $77.50 | $513.00 | $75.00 |
| 24 Mos. | 6 Mos. | $624.00 | $90.00 | $617.00 | $90.00 | $601.50 | $88.50 |
| 30 Mos. | 6 Mos. | $729.00 | $105.00 | $721.50 | $104.50 | $705.00 | $103.50 |
| 36 Mos. | 6 Mos. | $850.00 | $121.00 | $846.00 | $124.50 | $826.00 | $121.00 |
| 42 Mos. | 6 Mos. | $993.50 | $143.50 | $991.00 | $145.00 | $968.50 | $142.50 |
| 48 Mos. (Maximum) | | $1,159.50 | $166.00 | $1,159.50 | $168.50 | $1,135.50 | $167.00 |
| **PENSION BAND** | | **120** | | **120** | | **119** | |

TABLE  6

FACILITIES ASSISTANT, TRANSLATIONS ADMINISTRATOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $284.00 | | $278.00 | | $276.00 | |
| 6 Mos. | 6 Mos. | $338.00 | $54.00 | $331.50 | $53.50 | $329.00 | $53.00 |
| 12 Mos. | 6 Mos. | $402.00 | $64.00 | $396.00 | $64.50 | $390.00 | $61.00 |
| 18 Mos. | 6 Mos. | $477.50 | $75.50 | $472.00 | $76.00 | $464.50 | $74.50 |
| 24 Mos. | 6 Mos. | $568.00 | $90.50 | $562.50 | $90.50 | $554.00 | $89.50 |
| 30 Mos. | 6 Mos. | $675.00 | $107.00 | $670.00 | $107.50 | $659.50 | $105.50 |
| 36 Mos. | 6 Mos. | $803.50 | $128.50 | $799.00 | $129.00 | $785.00 | $125.50 |
| 42 Mos. | 6 Mos. | $955.00 | $151.50 | $952.50 | $153.50 | $934.00 | $149.00 |
| 48 Mos. (Maximum) | | $1,136.00 | $181.00 | $1,136.00 | $183.50 | $1,112.00 | $178.00 |
| **PENSION BAND** | | **119** | | **119** | | **119** | |

**W62**

TABLE 7

DRAFTER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $290.50 | | $288.50 | | $277.00 | |
| 6 Mos. | 6 Mos. | $327.50 | $37.00 | $325.00 | $36.50 | $312.00 | $35.00 |
| 12 Mos. | 6 Mos. | $367.50 | $40.00 | $365.00 | $40.00 | $352.50 | $40.50 |
| 18 Mos. | 6 Mos. | $414.00 | $46.50 | $411.00 | $46.00 | $397.50 | $45.00 |
| 24 Mos. | 6 Mos. | $464.50 | $50.50 | $462.50 | $51.50 | $447.50 | $50.00 |
| 30 Mos. | 6 Mos. | $523.00 | $58.50 | $520.50 | $58.00 | $504.00 | $56.50 |
| 36 Mos. | 6 Mos. | $588.00 | $65.00 | $586.50 | $66.00 | $568.50 | $64.50 |
| 42 Mos. | 6 Mos. | $661.50 | $73.50 | $660.00 | $73.50 | $641.00 | $72.50 |
| 48 Mos. | 6 Mos. | $743.50 | $82.00 | $742.50 | $82.50 | $721.50 | $80.50 |
| 54 Mos. | 6 Mos. | $836.00 | $92.50 | $835.50 | $93.00 | $814.00 | $92.50 |
| 60 Mos. (Maximum) | | $941.00 | $105.00 | $941.00 | $105.50 | $918.00 | $104.00 |
| **PENSION BAND** | | **112** | | **112** | | **111** | |

**W63**

**TABLE  8**                                                                                                    **EFFECTIVE AUGUST 01, 2004**

CONSTRUCTION COORDINATOR, SUPPLIES COORDINATOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $284.50 | | $278.50 | | $276.50 | |
| 6 Mos. | 6 Mos. | $321.00 | $36.50 | $315.00 | $36.50 | $312.50 | $36.00 |
| 12 Mos. | 6 Mos. | $363.00 | $42.00 | $357.00 | $42.00 | $354.00 | $41.50 |
| 18 Mos. | 6 Mos. | $410.00 | $47.00 | $404.50 | $47.50 | $400.50 | $46.50 |
| 24 Mos. | 6 Mos. | $463.00 | $53.00 | $458.00 | $53.50 | $453.50 | $53.00 |
| 30 Mos. | 6 Mos. | $523.00 | $60.00 | $517.50 | $59.50 | $513.00 | $59.50 |
| 36 Mos. | 6 Mos. | $591.00 | $68.00 | $586.50 | $69.00 | $580.00 | $67.00 |
| 42 Mos. | 6 Mos. | $667.50 | $76.50 | $663.50 | $77.00 | $656.50 | $76.50 |
| 48 Mos. | 6 Mos. | $754.50 | $87.00 | $751.00 | $87.50 | $742.00 | $85.50 |
| 54 Mos. | 6 Mos. | $851.50 | $97.00 | $849.50 | $98.50 | $841.00 | $99.00 |
| 60 Mos. (Maximum) | | $962.50 | $111.00 | $962.50 | $113.00 | $950.50 | $109.50 |
| **PENSION BAND** | | **113** | | **113** | | **112** | |

**W64**

**TABLE 9**                                                                                              **EFFECTIVE AUGUST 01, 2004**

BACK TAP ASSIGNOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $286.50 | | $283.00 | | $271.00 | |
| 6 Mos. | 6 Mos. | $325.50 | $39.00 | $322.50 | $39.50 | $309.00 | $38.00 |
| 12 Mos. | 6 Mos. | $370.50 | $45.00 | $367.00 | $44.50 | $352.50 | $43.50 |
| 18 Mos. | 6 Mos. | $420.00 | $49.50 | $417.50 | $50.50 | $402.50 | $50.00 |
| 24 Mos. | 6 Mos. | $478.00 | $58.00 | $475.00 | $57.50 | $459.00 | $56.50 |
| 30 Mos. | 6 Mos. | $543.50 | $65.50 | $541.00 | $66.00 | $523.00 | $64.00 |
| 36 Mos. | 6 Mos. | $618.00 | $74.50 | $615.00 | $74.00 | $597.00 | $74.00 |
| 42 Mos. | 6 Mos. | $702.50 | $84.50 | $700.00 | $85.00 | $681.00 | $84.00 |
| 48 Mos. | 6 Mos. | $798.50 | $96.00 | $796.50 | $96.50 | $777.00 | $96.00 |
| 54 Mos. | 6 Mos. | $907.50 | $109.00 | $907.00 | $110.50 | $886.50 | $109.50 |
| 60 Mos. (Maximum) | | $1,031.50 | $124.00 | $1,031.50 | $124.50 | $1,011.50 | $125.00 |
| **PENSION BAND** | | **115** | | **115** | | **115** | |

**W65**

**TABLE 11**                                                                    **EFFECTIVE AUGUST 01, 2004**

FACILITIES SPECIALIST, TRUNK ASSIGNOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $338.00 | | $331.50 | | $329.00 | |
| 6 Mos. | 6 Mos. | $384.50 | $46.50 | $377.50 | $46.00 | $374.00 | $45.00 |
| 12 Mos. | 6 Mos. | $436.50 | $52.00 | $430.00 | $52.50 | $426.00 | $52.00 |
| 18 Mos. | 6 Mos. | $496.50 | $60.00 | $490.00 | $60.00 | $484.50 | $58.50 |
| 24 Mos. | 6 Mos. | $564.50 | $68.00 | $558.00 | $68.00 | $552.00 | $67.50 |
| 30 Mos. | 6 Mos. | $642.00 | $77.50 | $636.00 | $78.00 | $628.50 | $76.50 |
| 36 Mos. | 6 Mos. | $730.00 | $88.00 | $724.50 | $88.50 | $715.00 | $86.50 |
| 42 Mos. | 6 Mos. | $830.50 | $100.50 | $825.00 | $100.50 | $814.00 | $99.00 |
| 48 Mos. | 6 Mos. | $943.50 | $113.00 | $940.00 | $115.00 | $926.50 | $112.50 |
| 54 Mos. | 6 Mos. | $1,072.50 | $129.00 | $1,070.50 | $130.50 | $1,054.00 | $127.50 |
| 60 Mos. (Maximum) | | $1,219.50 | $147.00 | $1,219.50 | $149.00 | $1,200.00 | $146.00 |
| **PENSION BAND** | | **123** | | **123** | | **122** | |

**W66**

**TABLE 12**

CUSTOMER SERVICE ADMINISTRATOR,
MAINTENANCE ADMINISTRATOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $321.00 | | $316.50 | | $313.50 | |
| 6 Mos. | 6 Mos. | $373.50 | $52.50 | $368.50 | $52.00 | $364.50 | $51.00 |
| 12 Mos. | 6 Mos. | $434.00 | $60.50 | $429.00 | $60.50 | $425.00 | $60.50 |
| 18 Mos. | 6 Mos. | $504.00 | $70.00 | $500.00 | $71.00 | $493.50 | $68.50 |
| 24 Mos. | 6 Mos. | $586.50 | $82.50 | $582.00 | $82.00 | $575.00 | $81.50 |
| 30 Mos. | 6 Mos. | $681.00 | $94.50 | $677.50 | $95.50 | $668.00 | $93.00 |
| 36 Mos. | 6 Mos. | $791.50 | $110.50 | $789.00 | $111.50 | $777.00 | $109.00 |
| 42 Mos. | 6 Mos. | $920.00 | $128.50 | $918.50 | $129.50 | $904.00 | $127.00 |
| 48 Mos. (Maximum) | | $1,069.50 | $149.50 | $1,069.50 | $151.00 | $1,051.50 | $147.50 |
| **PENSION BAND** | | **117** | | **117** | | **116** | |

**TABLE 13**                                                                 **EFFECTIVE AUGUST 01, 2004**

ENGINEERING DRAFTER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $301.50 | |
| 6 Mos. | 6 Mos. | $343.00 | $41.50 |
| 12 Mos. | 6 Mos. | $389.50 | $46.50 |
| 18 Mos. | 6 Mos. | $443.00 | $53.50 |
| 24 Mos. | 6 Mos. | $504.00 | $61.00 |
| 30 Mos. | 6 Mos. | $573.00 | $69.00 |
| 36 Mos. | 6 Mos. | $651.50 | $78.50 |
| 42 Mos. | 6 Mos. | $740.50 | $89.00 |
| 48 Mos. | 6 Mos. | $842.50 | $102.00 |
| 54 Mos. | 6 Mos. | $957.50 | $115.00 |
| 60 Mos. (Maximum) | | $1,088.50 | $131.00 |
| **PENSION BAND** | | **118** | |

**W68**

**TABLE 14**

**EFFECTIVE AUGUST 01, 2004**

SENIOR ENGINEERING DRAFTER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $301.50 | |
| 6 Mos. | 6 Mos. | $343.00 | $41.50 |
| 12 Mos. | 6 Mos. | $389.50 | $46.50 |
| 18 Mos. | 6 Mos. | $443.00 | $53.50 |
| 24 Mos. | 6 Mos. | $504.00 | $61.00 |
| 30 Mos. | 6 Mos. | $573.00 | $69.00 |
| 36 Mos. | 6 Mos. | $651.50 | $78.50 |
| 42 Mos. | 6 Mos. | $740.50 | $89.00 |
| 48 Mos. | 6 Mos. | $842.50 | $102.00 |
| 54 Mos. | 6 Mos. | $957.50 | $115.00 |
| 60 Mos. (Maximum) | | $1,088.50 | $131.00 |
| **PENSION BAND** | **118** | | |

**W69**

**TABLE 15**                                                     **EFFECTIVE AUGUST 01, 2004**

CONDUIT WORKER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $290.00 | |
| 6 Mos. | 6 Mos. | $338.50 | $48.50 |
| 12 Mos. | 6 Mos. | $394.50 | $56.00 |
| 18 Mos. | 6 Mos. | $460.00 | $65.50 |
| 24 Mos. | 6 Mos. | $536.00 | $76.00 |
| 30 Mos. | 6 Mos. | $625.50 | $89.50 |
| 36 Mos. | 6 Mos. | $729.50 | $104.00 |
| 42 Mos. | 6 Mos. | $849.00 | $119.50 |
| 48 Mos. (Maximum) | | $991.00 | $142.00 |
| **PENSION BAND** | | **114** | |

**W70**

**TABLE 16**                                                                                **EFFECTIVE AUGUST 01, 2004**

PLANT INSPECTOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $300.00 | |
| 6 Mos. | 6 Mos. | $349.50 | $49.50 |
| 12 Mos. | 6 Mos. | $406.00 | $56.50 |
| 18 Mos. | 6 Mos. | $473.00 | $67.00 |
| 24 Mos. | 6 Mos. | $550.00 | $77.00 |
| 30 Mos. | 6 Mos. | $641.00 | $91.00 |
| 36 Mos. | 6 Mos. | $745.50 | $104.50 |
| 42 Mos. | 6 Mos. | $867.00 | $121.50 |
| 48 Mos. (Maximum) | | $1,009.50 | $142.50 |
| **PENSION BAND** | | **115** | |

**TABLE 17**                                                                                                    **EFFECTIVE AUGUST 01, 2004**

SENIOR CONDUIT WORKER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $301.50 | |
| 6 Mos. | 6 Mos. | $353.00 | $51.50 |
| 12 Mos. | 6 Mos. | $413.00 | $60.00 |
| 18 Mos. | 6 Mos. | $483.00 | $70.00 |
| 24 Mos. | 6 Mos. | $565.00 | $82.00 |
| 30 Mos. | 6 Mos. | $661.50 | $96.50 |
| 36 Mos. | 6 Mos. | $773.50 | $112.00 |
| 42 Mos. | 6 Mos. | $905.50 | $132.00 |
| 48 Mos. (Maximum) | | $1,059.50 | $154.00 |
| **PENSION BAND** | | **117** | |

**W72**

TABLE 18

UTILITY WORKER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $311.50 | |
| 6 Mos. | 6 Mos. | $364.50 | $53.00 |
| 12 Mos. | 6 Mos. | $427.50 | $63.00 |
| 18 Mos. | 6 Mos. | $500.50 | $73.00 |
| 24 Mos. | 6 Mos. | $586.50 | $86.00 |
| 30 Mos. | 6 Mos. | $686.00 | $99.50 |
| 36 Mos. | 6 Mos. | $804.00 | $118.00 |
| 42 Mos. | 6 Mos. | $941.50 | $137.50 |
| 48 Mos. (Maximum) | | $1,102.50 | $161.00 |
| **PENSION BAND** | | **118** | |

**W73**

**TABLE 19**                                                                                                    **EFFECTIVE AUGUST 01, 2004**

MECHANIC

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $319.00 | |
| 6 Mos. | 6 Mos. | $372.00 | $53.00 |
| 12 Mos. | 6 Mos. | $434.00 | $62.00 |
| 18 Mos. | 6 Mos. | $506.00 | $72.00 |
| 24 Mos. | 6 Mos. | $589.50 | $83.50 |
| 30 Mos. | 6 Mos. | $687.50 | $98.00 |
| 36 Mos. | 6 Mos. | $802.50 | $115.00 |
| 42 Mos. | 6 Mos. | $935.50 | $133.00 |
| 48 Mos. (Maximum) | | $1,091.00 | $155.50 |
| **PENSION BAND** | 118 | | |

**W74**

**TABLE  20**                                                  **EFFECTIVE AUGUST 01, 2004**

CONSTRUCTION EQUIPMENT OPERATOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $311.50 | |
| 6 Mos. | 6 Mos. | $368.00 | $56.50 |
| 12 Mos. | 6 Mos. | $435.50 | $67.50 |
| 18 Mos. | 6 Mos. | $514.50 | $79.00 |
| 24 Mos. | 6 Mos. | $608.50 | $94.00 |
| 30 Mos. | 6 Mos. | $719.00 | $110.50 |
| 36 Mos. | 6 Mos. | $850.00 | $131.00 |
| 42 Mos. | 6 Mos. | $1,005.50 | $155.50 |
| 48 Mos. (Maximum) | | $1,189.50 | $184.00 |
| **PENSION BAND** | | **121** | |

**TABLE 21**                                                                                   **EFFECTIVE AUGUST 01, 2004**

FIELD COORDINATOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $319.00 | |
| 6 Mos. | 6 Mos. | $376.00 | $57.00 |
| 12 Mos. | 6 Mos. | $443.50 | $67.50 |
| 18 Mos. | 6 Mos. | $523.00 | $79.50 |
| 24 Mos. | 6 Mos. | $617.50 | $94.50 |
| 30 Mos. | 6 Mos. | $728.50 | $111.00 |
| 36 Mos. | 6 Mos. | $859.00 | $130.50 |
| 42 Mos. | 6 Mos. | $1,013.50 | $154.50 |
| 48 Mos. (Maximum) | | $1,195.00 | $181.50 |
| **PENSION BAND** | | **122** | |

**W76**

TABLE 22                                                    EFFECTIVE AUGUST 01, 2004

BLACKSMITH

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $335.00 | |
| 6 Mos. | 6 Mos. | $396.00 | $61.00 |
| 12 Mos. | 6 Mos. | $464.50 | $68.50 |
| 18 Mos. | 6 Mos. | $548.50 | $84.00 |
| 24 Mos. | 6 Mos. | $645.00 | $96.50 |
| 30 Mos. | 6 Mos. | $760.00 | $115.00 |
| 36 Mos. | 6 Mos. | $895.50 | $135.50 |
| 42 Mos. | 6 Mos. | $1,054.00 | $158.50 |
| 48 Mos. (Maximum) | | $1,242.50 | $188.50 |
| **PENSION BAND** | | **124** | |

**TABLE 23**                                                                                    **EFFECTIVE AUGUST 01, 2004**

OFFICE ASSISTANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $284.00 | | $278.00 | | $272.50 | |
| 6 Mos. | 6 Mos. | $324.50 | $40.50 | $318.00 | $40.00 | $312.00 | $39.50 |
| 12 Mos. | 6 Mos. | $371.00 | $46.50 | $364.50 | $46.50 | $356.50 | $44.50 |
| 18 Mos. | 6 Mos. | $424.00 | $53.00 | $417.50 | $53.00 | $408.00 | $51.50 |
| 24 Mos. | 6 Mos. | $483.50 | $59.50 | $478.50 | $61.00 | $467.50 | $59.50 |
| 30 Mos. | 6 Mos. | $553.00 | $69.50 | $547.50 | $69.00 | $535.00 | $67.50 |
| 36 Mos. | 6 Mos. | $631.00 | $78.00 | $628.00 | $80.50 | $612.50 | $77.50 |
| 42 Mos. | 6 Mos. | $720.00 | $89.00 | $718.50 | $90.50 | $700.50 | $88.00 |
| 48 Mos. (Maximum) | | $823.00 | $103.00 | $823.00 | $104.50 | $802.50 | $102.00 |
| **PENSION BAND** | | **108** | | **108** | | **107** | |

**W78**

TABLE 24

ADMINISTRATIVE ASSISTANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $284.00 | | $278.00 | | $273.50 | |
| 6 Mos. | 6 Mos. | $326.00 | $42.00 | $320.00 | $42.00 | $313.50 | $40.00 |
| 12 Mos. | 6 Mos. | $373.50 | $47.50 | $367.50 | $47.50 | $360.50 | $47.00 |
| 18 Mos. | 6 Mos. | $428.50 | $55.00 | $424.00 | $56.50 | $414.50 | $54.00 |
| 24 Mos. | 6 Mos. | $491.50 | $63.00 | $486.00 | $62.00 | $475.50 | $61.00 |
| 30 Mos. | 6 Mos. | $564.00 | $72.50 | $559.00 | $73.00 | $546.00 | $70.50 |
| 36 Mos. | 6 Mos. | $646.00 | $82.00 | $643.00 | $84.00 | $628.00 | $82.00 |
| 42 Mos. | 6 Mos. | $741.50 | $95.50 | $740.00 | $97.00 | $720.50 | $92.50 |
| 48 Mos. (Maximum) | | $850.00 | $108.50 | $850.00 | $110.00 | $828.00 | $107.50 |
| **PENSION BAND** | | **109** | | **109** | | **108** | |

**TABLE 25**                                              **EFFECTIVE AUGUST 01, 2004**

SENIOR ADMINISTRATIVE ASSISTANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $284.50 | | $278.50 | | $276.00 | |
| 6 Mos. | 6 Mos. | $328.00 | $43.50 | $321.50 | $43.00 | $319.00 | $43.00 |
| 12 Mos. | 6 Mos. | $377.50 | $49.50 | $372.00 | $50.50 | $368.00 | $49.00 |
| 18 Mos. | 6 Mos. | $434.50 | $57.00 | $429.00 | $57.00 | $425.50 | $57.50 |
| 24 Mos. | 6 Mos. | $500.50 | $66.00 | $495.00 | $66.00 | $491.00 | $65.50 |
| 30 Mos. | 6 Mos. | $576.00 | $75.50 | $571.50 | $76.50 | $567.50 | $76.50 |
| 36 Mos. | 6 Mos. | $663.50 | $87.50 | $660.50 | $89.00 | $656.00 | $88.50 |
| 42 Mos. | 6 Mos. | $764.00 | $100.50 | $762.00 | $101.50 | $757.50 | $101.50 |
| 48 Mos. (Maximum) | | $880.00 | $116.00 | $880.00 | $118.00 | $875.00 | $117.50 |
| **PENSION BAND** | | **110** | | **110** | | **110** | |

**W80**

TABLE 26

SPECIAL ASSISTANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $284.00 | | $278.00 | | $276.00 | |
| 6 Mos. | 6 Mos. | $328.50 | $44.50 | $322.50 | $44.50 | $320.00 | $44.00 |
| 12 Mos. | 6 Mos. | $379.00 | $50.50 | $373.50 | $51.00 | $371.00 | $51.00 |
| 18 Mos. | 6 Mos. | $439.00 | $60.00 | $433.00 | $59.50 | $429.50 | $58.50 |
| 24 Mos. | 6 Mos. | $507.00 | $68.00 | $502.00 | $69.00 | $499.00 | $69.50 |
| 30 Mos. | 6 Mos. | $586.50 | $79.50 | $582.00 | $80.00 | $577.50 | $78.50 |
| 36 Mos. | 6 Mos. | $677.50 | $91.00 | $674.00 | $92.00 | $669.50 | $92.00 |
| 42 Mos. | 6 Mos. | $783.50 | $106.00 | $781.00 | $107.00 | $775.50 | $106.00 |
| 48 Mos. (Maximum) | | $905.50 | $122.00 | $905.50 | $124.50 | $900.00 | $124.50 |
| **PENSION BAND** | | **111** | | **111** | | **111** | |

**W81**

**TABLE 27**                                                                                           **EFFECTIVE AUGUST 01, 2004**

SENIOR SPECIAL ASSISTANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $284.00 | | $278.00 | | $276.50 | |
| 6 Mos. | 6 Mos. | $329.50 | $45.50 | $324.00 | $46.00 | $321.50 | $45.00 |
| 12 Mos. | 6 Mos. | $382.50 | $53.00 | $376.00 | $52.00 | $374.00 | $52.50 |
| 18 Mos. | 6 Mos. | $443.00 | $60.50 | $438.00 | $62.00 | $435.50 | $61.50 |
| 24 Mos. | 6 Mos. | $514.50 | $71.50 | $510.00 | $72.00 | $506.50 | $71.00 |
| 30 Mos. | 6 Mos. | $597.00 | $82.50 | $592.00 | $82.00 | $589.00 | $82.50 |
| 36 Mos. | 6 Mos. | $693.00 | $96.00 | $689.50 | $97.50 | $685.50 | $96.50 |
| 42 Mos. | 6 Mos. | $804.00 | $111.00 | $802.00 | $112.50 | $797.00 | $111.50 |
| 48 Mos. (Maximum) | | $933.00 | $129.00 | $933.00 | $131.00 | $927.50 | $130.50 |
| **PENSION BAND** | | **112** | | **112** | | **112** | |

**W82**

**TABLE 28**                                                                                               **EFFECTIVE AUGUST 01, 2004**

CHAUFFEUR'S HELPER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $278.50 | | $274.50 | |
| 6 Mos. | 6 Mos. | $319.50 | $41.00 | $314.50 | $40.00 |
| 12 Mos. | 6 Mos. | $366.50 | $47.00 | $362.00 | $47.50 |
| 18 Mos. | 6 Mos. | $420.00 | $53.50 | $416.00 | $54.00 |
| 24 Mos. | 6 Mos. | $482.00 | $62.00 | $478.00 | $62.00 |
| 30 Mos. | 6 Mos. | $553.00 | $71.00 | $549.00 | $71.00 |
| 36 Mos. | 6 Mos. | $633.00 | $80.00 | $631.00 | $82.00 |
| 42 Mos. | 6 Mos. | $727.00 | $94.00 | $725.00 | $94.00 |
| 48 Mos. (Maximum) | | $833.00 | $106.00 | $833.00 | $108.00 |
| **PENSION BAND** | | **108** | | **108** | |

**TABLE 29**                                                                                                    **EFFECTIVE AUGUST 01, 2004**

CHAUFFEUR C, STOREROOM ATTENDANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $304.50 | | $299.50 | | $293.50 | |
| 6 Mos. | 6 Mos. | $352.50 | $48.00 | $347.00 | $47.50 | $340.50 | $47.00 |
| 12 Mos. | 6 Mos. | $407.00 | $54.50 | $402.50 | $55.50 | $393.50 | $53.00 |
| 18 Mos. | 6 Mos. | $471.00 | $64.00 | $466.50 | $64.00 | $457.50 | $64.00 |
| 24 Mos. | 6 Mos. | $545.00 | $74.00 | $540.00 | $73.50 | $529.50 | $72.00 |
| 30 Mos. | 6 Mos. | $630.00 | $85.00 | $626.00 | $86.00 | $613.50 | $84.00 |
| 36 Mos. | 6 Mos. | $729.00 | $99.00 | $725.50 | $99.50 | $711.00 | $97.50 |
| 42 Mos. | 6 Mos. | $843.00 | $114.00 | $841.50 | $116.00 | $823.50 | $112.50 |
| 48 Mos. (Maximum) | | $974.50 | $131.50 | $974.50 | $133.00 | $954.50 | $131.00 |
| **PENSION BAND** | | **113** | | **113** | | **113** | |

**W84**

**TABLE 30**                                                          **EFFECTIVE AUGUST 01, 2004**

STOREKEEPER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $313.00 | | $307.00 | | $301.50 | |
| 6 Mos. | 6 Mos. | $362.00 | $49.00 | $355.50 | $48.50 | $350.00 | $48.50 |
| 12 Mos. | 6 Mos. | $418.50 | $56.50 | $412.50 | $57.00 | $405.50 | $55.50 |
| 18 Mos. | 6 Mos. | $484.00 | $65.50 | $478.50 | $66.00 | $470.50 | $65.00 |
| 24 Mos. | 6 Mos. | $559.50 | $75.50 | $554.50 | $76.00 | $545.50 | $75.00 |
| 30 Mos. | 6 Mos. | $647.00 | $87.50 | $642.50 | $88.00 | $632.00 | $86.50 |
| 36 Mos. | 6 Mos. | $749.00 | $102.00 | $745.50 | $103.00 | $733.00 | $101.00 |
| 42 Mos. | 6 Mos. | $866.00 | $117.00 | $864.00 | $118.50 | $849.50 | $116.50 |
| 48 Mos. (Maximum) | | $1,001.50 | $135.50 | $1,001.50 | $137.50 | $986.00 | $136.50 |
| **PENSION BAND** | | **114** | | **114** | | **114** | |

**TABLE 31**                                                                 **EFFECTIVE AUGUST 01, 2004**

CHAUFFEUR B

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $310.50 | | $304.00 | | $298.50 | |
| 6 Mos. | 6 Mos. | $359.50 | $49.00 | $353.00 | $49.00 | $346.00 | $47.50 |
| 12 Mos. | 6 Mos. | $415.50 | $56.00 | $408.00 | $55.00 | $401.00 | $55.00 |
| 18 Mos. | 6 Mos. | $480.00 | $64.50 | $474.00 | $66.00 | $464.00 | $63.00 |
| 24 Mos. | 6 Mos. | $555.50 | $75.50 | $549.50 | $75.50 | $538.50 | $74.50 |
| 30 Mos. | 6 Mos. | $642.00 | $86.50 | $637.50 | $88.00 | $625.00 | $86.50 |
| 36 Mos. | 6 Mos. | $742.00 | $100.00 | $739.00 | $101.50 | $723.50 | $98.50 |
| 42 Mos. | 6 Mos. | $859.00 | $117.00 | $857.00 | $118.00 | $839.50 | $116.00 |
| 48 Mos. (Maximum) | | $993.00 | $134.00 | $993.00 | $136.00 | $973.00 | $133.50 |
| **PENSION BAND** | | **114** | | **114** | | **113** | |

**W86**

**TABLE  32**                                                                                    **EFFECTIVE AUGUST 01, 2004**

CHAUFFEUR A

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $317.50 | | $311.00 | | $302.50 | |
| 6 Mos. | 6 Mos. | $367.50 | $50.00 | $361.00 | $50.00 | $352.50 | $50.00 |
| 12 Mos. | 6 Mos. | $426.00 | $58.50 | $418.00 | $57.00 | $409.50 | $57.00 |
| 18 Mos. | 6 Mos. | $492.00 | $66.00 | $485.00 | $67.00 | $476.00 | $66.50 |
| 24 Mos. | 6 Mos. | $569.00 | $77.00 | $563.50 | $78.50 | $554.00 | $78.00 |
| 30 Mos. | 6 Mos. | $659.00 | $90.00 | $654.00 | $90.50 | $643.50 | $89.50 |
| 36 Mos. | 6 Mos. | $761.50 | $102.50 | $758.00 | $104.00 | $748.00 | $104.50 |
| 42 Mos. | 6 Mos. | $881.50 | $120.00 | $879.00 | $121.00 | $869.50 | $121.50 |
| 48 Mos. (Maximum) | | $1,019.50 | $138.00 | $1,019.50 | $140.50 | $1,011.50 | $142.00 |
| **PENSION BAND** | | **115** | | **115** | | **115** | |

**TABLE 33**

BUILDING SERVICE ATTENDANT (35 HRS)

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $208.00 | | $206.50 | | $204.00 | |
| 6 Mos. | 6 Mos. | $239.50 | $31.50 | $238.50 | $32.00 | $235.50 | $31.50 |
| 12 Mos. | 6 Mos. | $276.50 | $37.00 | $275.50 | $37.00 | $272.00 | $36.50 |
| 18 Mos. | 6 Mos. | $318.00 | $41.50 | $317.00 | $41.50 | $313.50 | $41.50 |
| 24 Mos. | 6 Mos. | $366.50 | $48.50 | $365.00 | $48.00 | $362.00 | $48.50 |
| 30 Mos. | 6 Mos. | $422.00 | $55.50 | $421.00 | $56.00 | $417.00 | $55.00 |
| 36 Mos. | 6 Mos. | $485.50 | $63.50 | $485.00 | $64.00 | $481.50 | $64.50 |
| 42 Mos. | 6 Mos. | $559.50 | $74.00 | $559.00 | $74.00 | $555.50 | $74.00 |
| 48 Mos. (Maximum) | | $644.50 | $85.00 | $644.50 | $85.50 | $641.00 | $85.50 |
| **PENSION BAND** | | **101** | | **101** | | **101** | |

**W88**

TABLE 34                                                     EFFECTIVE AUGUST 01, 2004

BLDG. SVC. ATTENDANT LEADER (35 HRS)* (*ZONE 2 ONLY), BUILDING SERVICE ATTENDANT (40 HRS)

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $233.00 | | $231.00 | | $228.00 | |
| 6 Mos. | 6 Mos. | $265.50 | $32.50 | $263.00 | $32.00 | $260.00 | $32.00 |
| 12 Mos. | 6 Mos. | $302.50 | $37.00 | $300.50 | $37.50 | $297.50 | $37.50 |
| 18 Mos. | 6 Mos. | $346.00 | $43.50 | $343.50 | $43.00 | $339.00 | $41.50 |
| 24 Mos. | 6 Mos. | $393.50 | $47.50 | $392.00 | $48.50 | $387.00 | $48.00 |
| 30 Mos. | 6 Mos. | $449.50 | $56.00 | $448.00 | $56.00 | $441.50 | $54.50 |
| 36 Mos. | 6 Mos. | $513.50 | $64.00 | $512.00 | $64.00 | $504.00 | $62.50 |
| 42 Mos. | 6 Mos. | $585.50 | $72.00 | $585.00 | $73.00 | $575.50 | $71.50 |
| 48 Mos. (Maximum) | | $667.50 | $82.00 | $667.50 | $82.50 | $656.50 | $81.00 |
| **PENSION BAND** | | **102** | | **102** | | **101** | |

**TABLE  35**                                                                                                      **EFFECTIVE AUGUST 01, 2004**

BUILDING SERVICER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $274.00 | | $270.50 | | $263.50 | |
| 6 Mos. | 6 Mos. | $311.50 | $37.50 | $308.00 | $37.50 | $301.00 | $37.50 |
| 12 Mos. | 6 Mos. | $355.00 | $43.50 | $352.00 | $44.00 | $344.50 | $43.50 |
| 18 Mos. | 6 Mos. | $404.50 | $49.50 | $401.00 | $49.00 | $393.00 | $48.50 |
| 24 Mos. | 6 Mos. | $460.50 | $56.00 | $458.00 | $57.00 | $449.00 | $56.00 |
| 30 Mos. | 6 Mos. | $525.50 | $65.00 | $521.50 | $63.50 | $513.00 | $64.00 |
| 36 Mos. | 6 Mos. | $598.00 | $72.50 | $596.00 | $74.50 | $586.50 | $73.50 |
| 42 Mos. | 6 Mos. | $681.00 | $83.00 | $679.50 | $83.50 | $669.50 | $83.00 |
| 48 Mos. (Maximum) | | $775.00 | $94.00 | $775.00 | $95.50 | $764.50 | $95.00 |
| **PENSION BAND** | | **106** | | **106** | | **105** | |

**W90**

**TABLE 36**

APPARATUS SERVICER, BUILDING MECHANIC'S HELPER,
GARAGE ATTENDANT, HOUSE SERVICE ATTENDANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $278.50 | | $274.50 | | $267.00 | |
| 6 Mos. | 6 Mos. | $317.50 | $39.00 | $313.00 | $38.50 | $305.50 | $38.50 |
| 12 Mos. | 6 Mos. | $362.50 | $45.00 | $357.50 | $44.50 | $349.00 | $43.50 |
| 18 Mos. | 6 Mos. | $413.00 | $50.50 | $409.00 | $51.50 | $399.00 | $50.00 |
| 24 Mos. | 6 Mos. | $471.00 | $58.00 | $467.50 | $58.50 | $456.50 | $57.50 |
| 30 Mos. | 6 Mos. | $536.50 | $65.50 | $534.00 | $66.50 | $521.00 | $64.50 |
| 36 Mos. | 6 Mos. | $612.50 | $76.00 | $610.00 | $76.00 | $596.00 | $75.00 |
| 42 Mos. | 6 Mos. | $698.00 | $85.50 | $697.00 | $87.00 | $682.00 | $86.00 |
| 48 Mos. (Maximum) | | $796.00 | $98.00 | $796.00 | $99.00 | $779.00 | $97.00 |
| **PENSION BAND** | | **107** | | **107** | | **106** | |

**TABLE 37**                                                                                 **EFFECTIVE AUGUST 01, 2004**

SUB-SUPERVISOR-BUILDING

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $281.50 | | $277.00 | |
| 6 Mos. | 6 Mos. | $323.50 | $42.00 | $318.00 | $41.00 |
| 12 Mos. | 6 Mos. | $370.50 | $47.00 | $365.00 | $47.00 |
| 18 Mos. | 6 Mos. | $424.00 | $53.50 | $419.00 | $54.00 |
| 24 Mos. | 6 Mos. | $485.00 | $61.00 | $481.50 | $62.50 |
| 30 Mos. | 6 Mos. | $556.00 | $71.00 | $553.00 | $71.50 |
| 36 Mos. | 6 Mos. | $637.50 | $81.50 | $634.50 | $81.50 |
| 42 Mos. | 6 Mos. | $730.50 | $93.00 | $729.00 | $94.50 |
| 48 Mos. (Maximum) | | $836.00 | $105.50 | $836.00 | $107.00 |
| **PENSION BAND** | | **108** | | **108** | |

**W92**

**TABLE 38**                                                           **EFFECTIVE AUGUST 01, 2004**

BUILDING MECHANIC, GARAGE MECHANIC

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $335.00 | | $328.50 | | $318.00 | |
| 6 Mos. | 6 Mos. | $390.00 | $55.00 | $383.50 | $55.00 | $372.50 | $54.50 |
| 12 Mos. | 6 Mos. | $455.50 | $65.50 | $447.50 | $64.00 | $435.50 | $63.00 |
| 18 Mos. | 6 Mos. | $530.50 | $75.00 | $522.00 | $74.50 | $510.00 | $74.50 |
| 24 Mos. | 6 Mos. | $617.00 | $86.50 | $610.00 | $88.00 | $595.50 | $85.50 |
| 30 Mos. | 6 Mos. | $718.00 | $101.00 | $713.00 | $103.00 | $697.00 | $101.50 |
| 36 Mos. | 6 Mos. | $836.00 | $118.00 | $832.00 | $119.00 | $814.50 | $117.50 |
| 42 Mos. | 6 Mos. | $974.00 | $138.00 | $971.50 | $139.50 | $952.50 | $138.00 |
| 48 Mos. (Maximum) | | $1,134.00 | $160.00 | $1,134.00 | $162.50 | $1,115.00 | $162.50 |
| **PENSION BAND** | | **119** | | **119** | | **119** | |

**TABLE 39**                                                                              **EFFECTIVE AUGUST 01, 2004**

SUB-SUPERVISOR-GARAGE

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $345.50 | | $343.50 | | $318.00 | |
| 6 Mos. | 6 Mos. | $402.00 | $56.50 | $400.00 | $56.50 | $373.00 | $55.00 |
| 12 Mos. | 6 Mos. | $467.00 | $65.00 | $464.50 | $64.50 | $437.00 | $64.00 |
| 18 Mos. | 6 Mos. | $543.00 | $76.00 | $541.00 | $76.50 | $512.00 | $75.00 |
| 24 Mos. | 6 Mos. | $630.50 | $87.50 | $629.50 | $88.50 | $600.00 | $88.00 |
| 30 Mos. | 6 Mos. | $733.00 | $102.50 | $732.00 | $102.50 | $702.50 | $102.50 |
| 36 Mos. | 6 Mos. | $852.00 | $119.00 | $850.50 | $118.50 | $822.50 | $120.00 |
| 42 Mos. | 6 Mos. | $991.00 | $139.00 | $990.00 | $139.50 | $963.00 | $140.50 |
| 48 Mos. (Maximum) | | $1,152.00 | $161.00 | $1,152.00 | $162.00 | $1,128.00 | $165.00 |
| **PENSION BAND** | | **120** | | **120** | | **119** | |

**W94**

**TABLE  41**                                                                                               **EFFECTIVE AUGUST 01, 2004**

WATCH ENGINEER'S HELPER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $283.00 | | $277.00 | | $271.00 | |
| 6 Mos. | 6 Mos. | $324.50 | $41.50 | $317.50 | $40.50 | $311.00 | $40.00 |
| 12 Mos. | 6 Mos. | $371.50 | $47.00 | $364.50 | $47.00 | $357.00 | $46.00 |
| 18 Mos. | 6 Mos. | $425.50 | $54.00 | $419.00 | $54.50 | $410.50 | $53.50 |
| 24 Mos. | 6 Mos. | $486.00 | $60.50 | $481.50 | $62.50 | $472.00 | $61.50 |
| 30 Mos. | 6 Mos. | $557.00 | $71.00 | $553.00 | $71.50 | $541.50 | $69.50 |
| 36 Mos. | 6 Mos. | $637.50 | $80.50 | $633.50 | $80.50 | $622.00 | $80.50 |
| 42 Mos. | 6 Mos. | $730.00 | $92.50 | $728.00 | $94.50 | $715.50 | $93.50 |
| 48 Mos. (Maximum) | | $835.00 | $105.00 | $835.00 | $107.00 | $821.50 | $106.00 |
| **PENSION BAND** | | **108** | | **108** | | **107** | |

ELEVATOR MECHANIC (ZONE 1 ONLY), WATCH ENGINEER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $335.00 | | $328.50 | | $318.00 | |
| 6 Mos. | 6 Mos. | $383.00 | $48.00 | $374.50 | $46.00 | $364.00 | $46.00 |
| 12 Mos. | 6 Mos. | $436.00 | $53.00 | $428.00 | $53.50 | $416.50 | $52.50 |
| 18 Mos. | 6 Mos. | $496.50 | $60.50 | $489.50 | $61.50 | $476.00 | $59.50 |
| 24 Mos. | 6 Mos. | $566.00 | $69.50 | $558.50 | $69.00 | $544.50 | $68.50 |
| 30 Mos. | 6 Mos. | $645.00 | $79.00 | $639.00 | $80.50 | $622.00 | $77.50 |
| 36 Mos. | 6 Mos. | $736.00 | $91.00 | $729.50 | $90.50 | $711.50 | $89.50 |
| 42 Mos. | 6 Mos. | $838.50 | $102.50 | $833.00 | $103.50 | $813.50 | $102.00 |
| 48 Mos. | 6 Mos. | $955.50 | $117.00 | $951.50 | $118.50 | $931.00 | $117.50 |
| 54 Mos. | 6 Mos. | $1,089.50 | $134.00 | $1,087.50 | $136.00 | $1,063.50 | $132.50 |
| 60 Mos. (Maximum) | | $1,242.50 | $153.00 | $1,242.50 | $155.00 | $1,216.50 | $153.00 |
| **PENSION BAND** | | **124** | | **124** | | **123** | |

**W96**

**TABLE  43**                                                      **EFFECTIVE AUGUST 01, 2004**

ESCORT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $236.00 | |
| 6 Mos. | 6 Mos. | $282.00 | $46.00 |
| 12 Mos. | 6 Mos. | $342.50 | $60.50 |
| 18 Mos. (Maximum) | | $415.50 | $73.00 |
| **PENSION BAND** | | **0** | |

# CWA PLANT
# EFFECTIVE AUGUST 7, 2005
# WAGES

2% Wage increase applied to all steps

**WAGE RATES AND PROGRESSIONS**
**PART II - TOP BASIC WEEKLY WAGE RATES**

VERIZON NEW YORK AND TELESECTOR RESOURCES GROUP, INC

| CRAFT GROUP | Table No. | Wage Zone 1 | Wage Zone 2 |
|---|---|---|---|
| Apparatus Servicer | 36 | 812.00 | 794.50 |
| Cable Splicing Tech Helper | 4 | 903.50 | 896.00 |
| Central Office Technician | 1 | 1,267.50 | 1,241.00 |
| Escort | 43# | 424.00 | 0.00 |
| Field Dispatcher | 1* | 1,267.50 | 1,241.00 |
| Field Technician | 1 | 1,267.50 | 1,241.00 |
| Frame Specialist | 5 | 1,182.50 | 1,158.00 |
| Technical Assistant | 3 | 689.50 | 675.00 |
| Telecommunication Tech Assoc | 2 | 1,342.00 | 1,310.50 |

\* The rates of this occupational classifiaction shall be $15.00 above the rate shown at each
   step of Table 1.

\# 4 Boros

**W99**

**PART II - TOP BASIC WEEKLY WAGE RATES**

VERIZON NEW YORK AND TELESECTOR RESOURCES GROUP, INC

| BUILDING & SUPPLIES GROUP | Table No. | Wage Zone 1 | Wage Zone 2 |
|---|---|---|---|
| Building Mechanic | 38 | 1,156.50 | 1,137.50 |
| Building Mechanic Helper | 36 | 812.00 | 794.50 |
| Building Serv Att'd (35 hrs) | 33 | 657.50 | 654.00 |
| Building Serv Att'd (40 hrs) | 34 | 681.00 | 669.50 |
| Building Att'd Ldr (35 hrs) | 34 | 0.00 | 669.50 |
| Building Servicer | 35 | 790.50 | 780.00 |
| Chauffeur A | 32 | 1,040.00 | 1,031.50 |
| Chauffeur B | 31 | 1,013.00 | 992.50 |
| Chauffeur C | 29 | 994.00 | 973.50 |
| Chauffeur's Helper | 28 | 849.50 | 0.00 |
| Elevator Mechanic | 42 | 1,267.50 | 0.00 |
| Garage Attendant | 36 | 812.00 | 794.50 |
| Garage Mechanic | 38 | 1,156.50 | 1,137.50 |
| House Service Attendant | 36 | 812.00 | 794.50 |
| Storekeeper | 30 | 1,021.50 | 1,005.50 |
| Storeroom Attendant | 29 | 994.00 | 973.50 |
| Sub-'s Supervisor-Garage | 39 | 1,175.00 | 1,150.50 |
| Sub-Supervisor-Building | 37 | 852.50 | 0.00 |
| Watch Engineer | 42 | 1,267.50 | 1,241.00 |
| Watch Engineer's Helper | 41 | 851.50 | 838.00 |

**WAGE RATES AND PROGRESSIONS**
**PART II - TOP BASIC WEEKLY WAGE RATES**

VERIZON NEW YORK AND TELESECTOR RESOURCES GROUP, INC

| CLERICAL GROUP | Table No. | Wage Zone 1 | Wage Zone 2 |
|---|---|---|---|
| Office Assistant | 23 | 839.50 | 818.50 |
| Administrative Assistant | 24 | 867.50 | 844.50 |
| Senior Administrative Assistant | 25 | 897.50 | 892.50 |
| Special Assistant | 26 | 923.50 | 918.00 |
| Senior Special Assistant | 27 | 951.50 | 946.00 |

## WAGE RATES AND PROGRESSIONS
## PART II - TOP BASIC WEEKLY WAGE RATES

VERIZON NEW YORK AND TELESECTOR RESOURCES GROUP, INC

| MISCELLANEOUS GROUP | Table No. | Wage Zone 1 | Wage Zone 2 |
|---|---|---|---|
| Back Tap Assignor | 9 | 1,052.00 | 1,031.50 |
| Construction Coordinator | 8 | 982.00 | 969.50 |
| Customer Svc. Administrator | 12 | 1,091.00 | 1,072.50 |
| Drafter | 7 | 960.00 | 936.50 |
| Facilities Assistant | 6 | 1,158.50 | 1,134.00 |
| Facilities Specialist | 11 | 1,244.00 | 1,224.00 |
| Maintenance Administrator | 12 | 1,091.00 | 1,072.50 |
| Supplies Coordinator | 8 | 982.00 | 969.50 |
| Translator Administrator | 6 | 1,158.50 | 1,134.00 |
| Trunk Assignor | 11 | 1,244.00 | 1,224.00 |

**W102**

**WAGE RATES AND PROGRESSIONS**
**PART II - TOP BASIC WEEKLY WAGE RATES**

EMPIRE CITY SUBWAY COMPANY

| CRAFT GROUP | Table No. | Top Rate |
|-------------|-----------|----------|
| Blacksmith | 22 | 1,267.50 |
| Conduit Worker | 15 | 1,011.00 |
| Construction Eqpt. Operator | 20 | 1,213.50 |
| Field Coordinator | 21 | 1,219.00 |
| Mechanic | 19 | 1,113.00 |
| Plant Inspector | 16 | 1,029.50 |
| Senior Conduit Worker | 17 | 1,080.50 |
| Utility Worker | 18 | 1,124.50 |

| MOTOR VEHICLE GROUP | Table No. | Top Rate |
|---------------------|-----------|----------|
| Chauffer A | 32 | 1,040.00 |
| Chauffer B | 31 | 1,013.00 |
| Garage Mechanic | 38 | 1,156.50 |

Defintion of Field Employees - All employees in the bargaining unit in occupational
classifications for which the length of the day tour is eight hours

**W103**

**WAGE RATES AND PROGRESSIONS**
**PART II - TOP BASIC WEEKLY WAGE RATES**

EMPIRE CITY SUBWAY COMPANY

| CLERICAL GROUP | Table No. | Top Rate |
|---|---|---|
| Office Assistant | 23 | 839.50 |
| Administrative Assistant | 24 | 867.00 |
| Special Assistant | 26 | 923.50 |

| MISCELLANEOUS GROUP | Table No. | Top Rate |
|---|---|---|
| Construction Coordinator | 8 | 982.00 |
| Drafter | 7 | 960.00 |
| Engineering Drafter | 13 | 1,011.00 |
| Senior Engineering Drafter | 14 | 1,110.50 |

Defintion of Field Employees - All employees in the bargaining unit in occupational classifications for which the length of the day tour is eight hours

**W104**

**TABLE 1**                                                                 **EFFECTIVE AUGUST 07, 2005**

CENTRAL OFFICE TECHNICIAN, FIELD TECHNICIAN

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $341.50 | | $335.00 | | $324.50 | |
| 6 Mos. | 6 Mos. | $390.50 | $49.00 | $382.00 | $47.00 | $371.50 | $47.00 |
| 12 Mos. | 6 Mos. | $444.50 | $54.00 | $436.50 | $54.50 | $425.00 | $53.50 |
| 18 Mos. | 6 Mos. | $506.50 | $62.00 | $499.50 | $63.00 | $485.50 | $60.50 |
| 24 Mos. | 6 Mos. | $577.50 | $71.00 | $569.50 | $70.00 | $555.50 | $70.00 |
| 30 Mos. | 6 Mos. | $658.00 | $80.50 | $652.00 | $82.50 | $634.50 | $79.00 |
| 36 Mos. | 6 Mos. | $750.50 | $92.50 | $744.00 | $92.00 | $725.50 | $91.00 |
| 42 Mos. | 6 Mos. | $855.50 | $105.00 | $849.50 | $105.50 | $830.00 | $104.50 |
| 48 Mos. | 6 Mos. | $974.50 | $119.00 | $970.50 | $121.00 | $949.50 | $119.50 |
| 54 Mos. | 6 Mos. | $1,111.50 | $137.00 | $1,109.50 | $139.00 | $1,085.00 | $135.50 |
| 60 Mos. (Maximum) | | $1,267.50 | $156.00 | $1,267.50 | $158.00 | $1,241.00 | $156.00 |
| **PENSION BAND** | | **124** | | **124** | | **123** | |

**W105**

TABLE  2

TELECOMMUNICATIONS TECHNICAL ASSOCIATE

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $1,267.50 | | $1,267.50 | | $1,241.00 | |
| 6 Mo. | 6 Mos. | $1,304.75 | $37.25 | $1,304.75 | $37.25 | $1,275.75 | $34.75 |
| Top (Maximum) | | $1,342.00 | $37.25 | $1,342.00 | $37.25 | $1,310.50 | $35.75 |
| **PENSION BAND** | | **126** | | **126** | | **125** | |

**W106**

**TABLE  3**                                                                 **EFFECTIVE AUGUST 07, 2005**

TECHNICAL ASSISTANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $349.50 | | $345.50 | | $339.50 | |
| 6 Mos. | 6 Mos. | $380.50 | $31.00 | $376.00 | $30.50 | $370.50 | $31.00 |
| 12 Mos. | 6 Mos. | $414.00 | $33.50 | $410.50 | $34.50 | $404.50 | $34.00 |
| 18 Mos. | 6 Mos. | $450.50 | $36.50 | $448.00 | $37.50 | $439.50 | $35.00 |
| 24 Mos. | 6 Mos. | $491.00 | $40.50 | $488.00 | $40.00 | $479.50 | $40.00 |
| 30 Mos. | 6 Mos. | $535.00 | $44.00 | $531.50 | $43.50 | $522.00 | $42.50 |
| 36 Mos. | 6 Mos. | $581.50 | $46.50 | $580.00 | $48.50 | $568.50 | $46.50 |
| 42 Mos. | 6 Mos. | $633.00 | $51.50 | $632.00 | $52.00 | $619.50 | $51.00 |
| 48 Mos. (Maximum) | | $689.50 | $56.50 | $689.50 | $57.50 | $675.00 | $55.50 |
| **PENSION BAND** | | **102** | | **102** | | **102** | |

**TABLE 4**                                                                                               **EFFECTIVE AUGUST 07, 2005**

CABLE SPLICING TECHNICIAN'S HELPER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $299.50 | | $295.00 | | $291.00 | |
| 6 Mos. | 6 Mos. | $344.50 | $45.00 | $339.00 | $44.00 | $335.00 | $44.00 |
| 12 Mos. | 6 Mos. | $394.50 | $50.00 | $390.50 | $51.50 | $385.50 | $50.50 |
| 18 Mos. | 6 Mos. | $453.50 | $59.00 | $449.00 | $58.50 | $443.50 | $58.00 |
| 24 Mos. | 6 Mos. | $520.50 | $67.00 | $516.00 | $67.00 | $511.00 | $67.50 |
| 30 Mos. | 6 Mos. | $597.50 | $77.00 | $594.00 | $78.00 | $587.50 | $76.50 |
| 36 Mos. | 6 Mos. | $686.00 | $88.50 | $683.00 | $89.00 | $676.50 | $89.00 |
| 42 Mos. | 6 Mos. | $787.00 | $101.00 | $785.50 | $102.50 | $779.00 | $102.50 |
| 48 Mos. (Maximum) | | $903.50 | $116.50 | $903.50 | $118.00 | $896.00 | $117.00 |
| **PENSION BAND** | | **110** | | **110** | | **110** | |

**W108**

TABLE 5

FRAME SPECIALIST

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $341.50 | | $335.00 | | $324.50 | |
| 6 Mos. | 6 Mos. | $399.50 | $58.00 | $392.00 | $57.00 | $381.00 | $56.50 |
| 12 Mos. | 6 Mos. | $467.00 | $67.50 | $458.50 | $66.50 | $447.00 | $66.00 |
| 18 Mos. | 6 Mos. | $544.50 | $77.50 | $537.50 | $79.00 | $523.50 | $76.50 |
| 24 Mos. | 6 Mos. | $636.50 | $92.00 | $629.50 | $92.00 | $613.50 | $90.00 |
| 30 Mos. | 6 Mos. | $743.50 | $107.00 | $736.00 | $106.50 | $719.00 | $105.50 |
| 36 Mos. | 6 Mos. | $867.00 | $123.50 | $863.00 | $127.00 | $842.50 | $123.50 |
| 42 Mos. | 6 Mos. | $1,013.50 | $146.50 | $1,011.00 | $148.00 | $988.00 | $145.50 |
| 48 Mos. (Maximum) | | $1,182.50 | $169.00 | $1,182.50 | $171.50 | $1,158.00 | $170.00 |
| PENSION BAND | | 120 | | 120 | | 119 | |

TABLE 6

FACILITIES ASSISTANT, TRANSLATIONS ADMINISTRATOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $289.50 | | $283.50 | | $281.50 | |
| 6 Mos. | 6 Mos. | $345.00 | $55.50 | $338.00 | $54.50 | $335.50 | $54.00 |
| 12 Mos. | 6 Mos. | $410.00 | $65.00 | $404.00 | $66.00 | $398.00 | $62.50 |
| 18 Mos. | 6 Mos. | $487.00 | $77.00 | $481.50 | $77.50 | $474.00 | $76.00 |
| 24 Mos. | 6 Mos. | $579.50 | $92.50 | $574.00 | $92.50 | $565.00 | $91.00 |
| 30 Mos. | 6 Mos. | $688.50 | $109.00 | $683.50 | $109.50 | $672.50 | $107.50 |
| 36 Mos. | 6 Mos. | $819.50 | $131.00 | $815.00 | $131.50 | $800.50 | $128.00 |
| 42 Mos. | 6 Mos. | $974.00 | $154.50 | $971.50 | $156.50 | $952.50 | $152.00 |
| 48 Mos. (Maximum) | | $1,158.50 | $184.50 | $1,158.50 | $187.00 | $1,134.00 | $181.50 |
| PENSION BAND | | 119 | | 119 | | 119 | |

**W110**

**TABLE 7**                                                                    **EFFECTIVE AUGUST 07, 2005**

DRAFTER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $296.50 | | $294.50 | | $282.50 | |
| 6 Mos. | 6 Mos. | $334.00 | $37.50 | $331.50 | $37.00 | $318.00 | $35.50 |
| 12 Mos. | 6 Mos. | $375.00 | $41.00 | $372.50 | $41.00 | $359.50 | $41.50 |
| 18 Mos. | 6 Mos. | $422.50 | $47.50 | $419.00 | $46.50 | $405.50 | $46.00 |
| 24 Mos. | 6 Mos. | $474.00 | $51.50 | $472.00 | $53.00 | $456.50 | $51.00 |
| 30 Mos. | 6 Mos. | $533.50 | $59.50 | $531.00 | $59.00 | $514.00 | $57.50 |
| 36 Mos. | 6 Mos. | $600.00 | $66.50 | $598.00 | $67.00 | $580.00 | $66.00 |
| 42 Mos. | 6 Mos. | $674.50 | $74.50 | $673.00 | $75.00 | $654.00 | $74.00 |
| 48 Mos. | 6 Mos. | $758.50 | $84.00 | $757.50 | $84.50 | $736.00 | $82.00 |
| 54 Mos. | 6 Mos. | $852.50 | $94.00 | $852.00 | $94.50 | $830.50 | $94.50 |
| 60 Mos. (Maximum) | | $960.00 | $107.50 | $960.00 | $108.00 | $936.50 | $106.00 |
| **PENSION BAND** | | **112** | | **112** | | **111** | |

**W111**

**TABLE  8**                                                                                           **EFFECTIVE AUGUST 07, 2005**

CONSTRUCTION COORDINATOR, SUPPLIES COORDINATOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $290.00 | | $284.00 | | $282.00 | |
| 6 Mos. | 6 Mos. | $327.50 | $37.50 | $321.50 | $37.50 | $319.00 | $37.00 |
| 12 Mos. | 6 Mos. | $370.50 | $43.00 | $364.00 | $42.50 | $361.00 | $42.00 |
| 18 Mos. | 6 Mos. | $418.00 | $47.50 | $412.50 | $48.50 | $408.50 | $47.50 |
| 24 Mos. | 6 Mos. | $472.50 | $54.50 | $467.00 | $54.50 | $462.50 | $54.00 |
| 30 Mos. | 6 Mos. | $533.50 | $61.00 | $528.00 | $61.00 | $523.50 | $61.00 |
| 36 Mos. | 6 Mos. | $603.00 | $69.50 | $598.00 | $70.00 | $591.50 | $68.00 |
| 42 Mos. | 6 Mos. | $681.00 | $78.00 | $677.00 | $79.00 | $669.50 | $78.00 |
| 48 Mos. | 6 Mos. | $769.50 | $88.50 | $766.00 | $89.00 | $757.00 | $87.50 |
| 54 Mos. | 6 Mos. | $868.50 | $99.00 | $866.50 | $100.50 | $858.00 | $101.00 |
| 60 Mos. (Maximum) | | $982.00 | $113.50 | $982.00 | $115.50 | $969.50 | $111.50 |
| **PENSION BAND** | | **113** | | **113** | | **112** | |

**W112**

TABLE 9
EFFECTIVE AUGUST 07, 2005

BACK TAP ASSIGNOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $292.00 | | $288.50 | | $276.50 | |
| 6 Mos. | 6 Mos. | $332.00 | $40.00 | $329.00 | $40.50 | $315.00 | $38.50 |
| 12 Mos. | 6 Mos. | $378.00 | $46.00 | $374.50 | $45.50 | $359.50 | $44.50 |
| 18 Mos. | 6 Mos. | $428.50 | $50.50 | $426.00 | $51.50 | $410.50 | $51.00 |
| 24 Mos. | 6 Mos. | $487.50 | $59.00 | $484.50 | $58.50 | $468.00 | $57.50 |
| 30 Mos. | 6 Mos. | $554.50 | $67.00 | $552.00 | $67.50 | $533.50 | $65.50 |
| 36 Mos. | 6 Mos. | $630.50 | $76.00 | $627.50 | $75.50 | $609.00 | $75.50 |
| 42 Mos. | 6 Mos. | $716.50 | $86.00 | $714.00 | $86.50 | $694.50 | $85.50 |
| 48 Mos. | 6 Mos. | $814.50 | $98.00 | $812.50 | $98.50 | $792.50 | $98.00 |
| 54 Mos. | 6 Mos. | $925.50 | $111.00 | $925.00 | $112.50 | $904.00 | $111.50 |
| 60 Mos. (Maximum) | | $1,052.00 | $126.50 | $1,052.00 | $127.00 | $1,031.50 | $127.50 |
| PENSION BAND | | 115 | | 115 | | 115 | |

TABLE 11

FACILITIES SPECIALIST, TRUNK ASSIGNOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $345.00 | | $338.00 | | $335.50 | |
| 6 Mos. | 6 Mos. | $392.00 | $47.00 | $385.00 | $47.00 | $381.50 | $46.00 |
| 12 Mos. | 6 Mos. | $445.00 | $53.00 | $438.50 | $53.50 | $434.50 | $53.00 |
| 18 Mos. | 6 Mos. | $506.50 | $61.50 | $500.00 | $61.50 | $494.00 | $59.50 |
| 24 Mos. | 6 Mos. | $576.00 | $69.50 | $569.00 | $69.00 | $563.00 | $69.00 |
| 30 Mos. | 6 Mos. | $655.00 | $79.00 | $648.50 | $79.50 | $641.00 | $78.00 |
| 36 Mos. | 6 Mos. | $744.50 | $89.50 | $739.00 | $90.50 | $729.50 | $88.50 |
| 42 Mos. | 6 Mos. | $847.00 | $102.50 | $841.50 | $102.50 | $830.50 | $101.00 |
| 48 Mos. | 6 Mos. | $962.50 | $115.50 | $959.00 | $117.50 | $945.00 | $114.50 |
| 54 Mos. | 6 Mos. | $1,094.00 | $131.50 | $1,092.00 | $133.00 | $1,075.00 | $130.00 |
| 60 Mos. (Maximum) | | $1,244.00 | $150.00 | $1,244.00 | $152.00 | $1,224.00 | $149.00 |
| PENSION BAND | | 123 | | 123 | | 122 | |

**W114**

**TABLE  12**                                                                          **EFFECTIVE AUGUST 07, 2005**

CUSTOMER SERVICE ADMINISTRATOR,
MAINTENANCE ADMINISTRATOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $327.50 | | $323.00 | | $320.00 | |
| 6 Mos. | 6 Mos. | $381.00 | $53.50 | $376.00 | $53.00 | $372.00 | $52.00 |
| 12 Mos. | 6 Mos. | $442.50 | $61.50 | $437.50 | $61.50 | $433.50 | $61.50 |
| 18 Mos. | 6 Mos. | $514.00 | $71.50 | $510.00 | $72.50 | $503.50 | $70.00 |
| 24 Mos. | 6 Mos. | $598.00 | $84.00 | $593.50 | $83.50 | $586.50 | $83.00 |
| 30 Mos. | 6 Mos. | $694.50 | $96.50 | $691.00 | $97.50 | $681.50 | $95.00 |
| 36 Mos. | 6 Mos. | $807.50 | $113.00 | $805.00 | $114.00 | $792.50 | $111.00 |
| 42 Mos. | 6 Mos. | $938.50 | $131.00 | $937.00 | $132.00 | $922.00 | $129.50 |
| 48 Mos. (Maximum) | | $1,091.00 | $152.50 | $1,091.00 | $154.00 | $1,072.50 | $150.50 |
| **PENSION BAND** | | **117** | | **117** | | **116** | |

ENGINEERING DRAFTER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $307.50 | |
| 6 Mos. | 6 Mos. | $346.50 | $39.00 |
| 12 Mos. | 6 Mos. | $390.50 | $44.00 |
| 18 Mos. | 6 Mos. | $439.00 | $48.50 |
| 24 Mos. | 6 Mos. | $494.50 | $55.50 |
| 30 Mos. | 6 Mos. | $557.50 | $63.00 |
| 36 Mos. | 6 Mos. | $627.50 | $70.00 |
| 42 Mos. | 6 Mos. | $707.50 | $80.00 |
| 48 Mos. | 6 Mos. | $796.50 | $89.00 |
| 54 Mos. | 6 Mos. | $896.50 | $100.00 |
| 60 Mos. (Maximum) | | $1,011.00 | $114.50 |
| **PENSION BAND** | | **114** | |

**W116**

SENIOR ENGINEERING DRAFTER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $307.50 | |
| 6 Mos. | 6 Mos. | $350.00 | $42.50 |
| 12 Mos. | 6 Mos. | $397.50 | $47.50 |
| 18 Mos. | 6 Mos. | $452.00 | $54.50 |
| 24 Mos. | 6 Mos. | $514.00 | $62.00 |
| 30 Mos. | 6 Mos. | $584.50 | $70.50 |
| 36 Mos. | 6 Mos. | $664.50 | $80.00 |
| 42 Mos. | 6 Mos. | $755.50 | $91.00 |
| 48 Mos. | 6 Mos. | $859.50 | $104.00 |
| 54 Mos. | 6 Mos. | $976.50 | $117.00 |
| 60 Mos. (Maximum) | | $1,110.50 | $134.00 |
| **PENSION BAND** | | **118** | |

**W117**

**TABLE 15**                                                                 **EFFECTIVE AUGUST 07, 2005**

CONDUIT WORKER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $296.00 | |
| 6 Mos. | 6 Mos. | $345.50 | $49.50 |
| 12 Mos. | 6 Mos. | $402.50 | $57.00 |
| 18 Mos. | 6 Mos. | $469.00 | $66.50 |
| 24 Mos. | 6 Mos. | $546.50 | $77.50 |
| 30 Mos. | 6 Mos. | $638.00 | $91.50 |
| 36 Mos. | 6 Mos. | $744.00 | $106.00 |
| 42 Mos. | 6 Mos. | $866.00 | $122.00 |
| 48 Mos. (Maximum) | | $1,011.00 | $145.00 |
| **PENSION BAND** | | **114** | |

**W118**

**TABLE 16**                                                        **EFFECTIVE AUGUST 07, 2005**

PLANT INSPECTOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $306.00 | |
| 6 Mos. | 6 Mos. | $356.50 | $50.50 |
| 12 Mos. | 6 Mos. | $414.00 | $57.50 |
| 18 Mos. | 6 Mos. | $482.50 | $68.50 |
| 24 Mos. | 6 Mos. | $561.00 | $78.50 |
| 30 Mos. | 6 Mos. | $654.00 | $93.00 |
| 36 Mos. | 6 Mos. | $760.50 | $106.50 |
| 42 Mos. | 6 Mos. | $884.50 | $124.00 |
| 48 Mos. (Maximum) | | $1,029.50 | $145.00 |
| **PENSION BAND** | | **115** | |

**TABLE 17**                                                                                                      **EFFECTIVE AUGUST 07, 2005**

SENIOR CONDUIT WORKER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $307.50 | |
| 6 Mos. | 6 Mos. | $360.00 | $52.50 |
| 12 Mos. | 6 Mos. | $421.50 | $61.50 |
| 18 Mos. | 6 Mos. | $492.50 | $71.00 |
| 24 Mos. | 6 Mos. | $576.50 | $84.00 |
| 30 Mos. | 6 Mos. | $674.50 | $98.00 |
| 36 Mos. | 6 Mos. | $789.00 | $114.50 |
| 42 Mos. | 6 Mos. | $923.50 | $134.50 |
| 48 Mos. (Maximum) | | $1,080.50 | $157.00 |
| **PENSION BAND** | | **117** | |

**W120**

**TABLE 18**                                                                                   **EFFECTIVE AUGUST 07, 2005**

UTILITY WORKER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $317.50 | |
| 6 Mos. | 6 Mos. | $372.00 | $54.50 |
| 12 Mos. | 6 Mos. | $436.00 | $64.00 |
| 18 Mos. | 6 Mos. | $510.50 | $74.50 |
| 24 Mos. | 6 Mos. | $598.00 | $87.50 |
| 30 Mos. | 6 Mos. | $699.50 | $101.50 |
| 36 Mos. | 6 Mos. | $820.00 | $120.50 |
| 42 Mos. | 6 Mos. | $960.50 | $140.50 |
| 48 Mos. (Maximum) | | $1,124.50 | $164.00 |
| **PENSION BAND** | | **118** | |

**TABLE 19**                                                    **EFFECTIVE AUGUST 07, 2005**

MECHANIC

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $325.50 | |
| 6 Mos. | 6 Mos. | $379.50 | $54.00 |
| 12 Mos. | 6 Mos. | $442.50 | $63.00 |
| 18 Mos. | 6 Mos. | $516.00 | $73.50 |
| 24 Mos. | 6 Mos. | $601.50 | $85.50 |
| 30 Mos. | 6 Mos. | $701.50 | $100.00 |
| 36 Mos. | 6 Mos. | $818.50 | $117.00 |
| 42 Mos. | 6 Mos. | $954.00 | $135.50 |
| 48 Mos. (Maximum) | | $1,113.00 | $159.00 |
| **PENSION BAND** | | **118** | |

**W122**

**TABLE 20**                                             **EFFECTIVE AUGUST 07, 2005**

CONSTRUCTION EQUIPMENT OPERATOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $317.50 | |
| 6 Mos. | 6 Mos. | $375.50 | $58.00 |
| 12 Mos. | 6 Mos. | $444.00 | $68.50 |
| 18 Mos. | 6 Mos. | $525.00 | $81.00 |
| 24 Mos. | 6 Mos. | $620.50 | $95.50 |
| 30 Mos. | 6 Mos. | $733.50 | $113.00 |
| 36 Mos. | 6 Mos. | $867.00 | $133.50 |
| 42 Mos. | 6 Mos. | $1,025.50 | $158.50 |
| 48 Mos. (Maximum) | | $1,213.50 | $188.00 |
| **PENSION BAND** | | **121** | |

**W123**

**TABLE 21**                                                    **EFFECTIVE AUGUST 07, 2005**

FIELD COORDINATOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $325.50 | |
| 6 Mos. | 6 Mos. | $383.50 | $58.00 |
| 12 Mos. | 6 Mos. | $452.50 | $69.00 |
| 18 Mos. | 6 Mos. | $533.50 | $81.00 |
| 24 Mos. | 6 Mos. | $630.00 | $96.50 |
| 30 Mos. | 6 Mos. | $743.00 | $113.00 |
| 36 Mos. | 6 Mos. | $876.00 | $133.00 |
| 42 Mos. | 6 Mos. | $1,034.00 | $158.00 |
| 48 Mos. (Maximum) | | $1,219.00 | $185.00 |
| **PENSION BAND** | | **122** | |

**W124**

TABLE 22

BLACKSMITH

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $341.50 | |
| 6 Mos. | 6 Mos. | $404.00 | $62.50 |
| 12 Mos. | 6 Mos. | $474.00 | $70.00 |
| 18 Mos. | 6 Mos. | $559.50 | $85.50 |
| 24 Mos. | 6 Mos. | $658.00 | $98.50 |
| 30 Mos. | 6 Mos. | $775.00 | $117.00 |
| 36 Mos. | 6 Mos. | $913.50 | $138.50 |
| 42 Mos. | 6 Mos. | $1,075.00 | $161.50 |
| 48 Mos. (Maximum) | | $1,267.50 | $192.50 |
| **PENSION BAND** | | **124** | |

**W125**

TABLE 23

OFFICE ASSISTANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $289.50 | | $283.50 | | $278.00 | |
| 6 Mos. | 6 Mos. | $331.00 | $41.50 | $324.50 | $41.00 | $318.00 | $40.00 |
| 12 Mos. | 6 Mos. | $378.50 | $47.50 | $372.00 | $47.50 | $363.50 | $45.50 |
| 18 Mos. | 6 Mos. | $432.50 | $54.00 | $426.00 | $54.00 | $416.00 | $52.50 |
| 24 Mos. | 6 Mos. | $493.00 | $60.50 | $488.00 | $62.00 | $477.00 | $61.00 |
| 30 Mos. | 6 Mos. | $564.00 | $71.00 | $558.50 | $70.50 | $545.50 | $68.50 |
| 36 Mos. | 6 Mos. | $643.50 | $79.50 | $640.50 | $82.00 | $625.00 | $79.50 |
| 42 Mos. | 6 Mos. | $734.50 | $91.00 | $733.00 | $92.50 | $714.50 | $89.50 |
| 48 Mos. (Maximum) | | $839.50 | $105.00 | $839.50 | $106.50 | $818.50 | $104.00 |
| **PENSION BAND** | | **108** | | **108** | | **107** | |

**W126**

TABLE  24

ADMINISTRATIVE ASSISTANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $289.50 | | $283.50 | | $279.00 | |
| 6 Mos. | 6 Mos. | $332.50 | $43.00 | $326.50 | $43.00 | $320.00 | $41.00 |
| 12 Mos. | 6 Mos. | $381.00 | $48.50 | $375.00 | $48.50 | $367.50 | $47.50 |
| 18 Mos. | 6 Mos. | $437.00 | $56.00 | $432.50 | $57.50 | $423.00 | $55.50 |
| 24 Mos. | 6 Mos. | $501.50 | $64.50 | $495.50 | $63.00 | $485.00 | $62.00 |
| 30 Mos. | 6 Mos. | $575.50 | $74.00 | $570.00 | $74.50 | $557.00 | $72.00 |
| 36 Mos. | 6 Mos. | $659.00 | $83.50 | $656.00 | $86.00 | $640.50 | $83.50 |
| 42 Mos. | 6 Mos. | $756.50 | $97.50 | $755.00 | $99.00 | $735.00 | $94.50 |
| 48 Mos. (Maximum) | | $867.00 | $110.50 | $867.00 | $112.00 | $844.50 | $109.50 |
| **PENSION BAND** | | **109** | | **109** | | **108** | |

TABLE 25

## SENIOR ADMINISTRATIVE ASSISTANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $290.00 | | $284.00 | | $281.50 | |
| 6 Mos. | 6 Mos. | $334.50 | $44.50 | $328.00 | $44.00 | $325.50 | $44.00 |
| 12 Mos. | 6 Mos. | $385.00 | $50.50 | $379.50 | $51.50 | $375.50 | $50.00 |
| 18 Mos. | 6 Mos. | $443.00 | $58.00 | $437.50 | $58.00 | $434.00 | $58.50 |
| 24 Mos. | 6 Mos. | $510.50 | $67.50 | $505.00 | $67.50 | $501.00 | $67.00 |
| 30 Mos. | 6 Mos. | $587.50 | $77.00 | $583.00 | $78.00 | $579.00 | $78.00 |
| 36 Mos. | 6 Mos. | $677.00 | $89.50 | $673.50 | $90.50 | $669.00 | $90.00 |
| 42 Mos. | 6 Mos. | $779.50 | $102.50 | $777.00 | $103.50 | $772.50 | $103.50 |
| 48 Mos. (Maximum) | | $897.50 | $118.00 | $897.50 | $120.50 | $892.50 | $120.00 |
| **PENSION BAND** | | 110 | | 110 | | 110 | |

**W128**

TABLE 26

SPECIAL ASSISTANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $289.50 | | $283.50 | | $281.50 | |
| 6 Mos. | 6 Mos. | $335.00 | $45.50 | $329.00 | $45.50 | $326.50 | $45.00 |
| 12 Mos. | 6 Mos. | $386.50 | $51.50 | $381.00 | $52.00 | $378.50 | $52.00 |
| 18 Mos. | 6 Mos. | $448.00 | $61.50 | $441.50 | $60.50 | $438.00 | $59.50 |
| 24 Mos. | 6 Mos. | $517.00 | $69.00 | $512.00 | $70.50 | $509.00 | $71.00 |
| 30 Mos. | 6 Mos. | $598.00 | $81.00 | $593.50 | $81.50 | $589.00 | $80.00 |
| 36 Mos. | 6 Mos. | $691.00 | $93.00 | $687.50 | $94.00 | $683.00 | $94.00 |
| 42 Mos. | 6 Mos. | $799.00 | $108.00 | $796.50 | $109.00 | $791.00 | $108.00 |
| 48 Mos. (Maximum) | | $923.50 | $124.50 | $923.50 | $127.00 | $918.00 | $127.00 |
| **PENSION BAND** | | **111** | | **111** | | **111** | |

**W129**

**TABLE 27**                                                                                    **EFFECTIVE AUGUST 07, 2005**

SENIOR SPECIAL ASSISTANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $289.50 | | $283.50 | | $282.00 | |
| 6 Mos. | 6 Mos. | $336.00 | $46.50 | $330.50 | $47.00 | $328.00 | $46.00 |
| 12 Mos. | 6 Mos. | $390.00 | $54.00 | $383.50 | $53.00 | $381.50 | $53.50 |
| 18 Mos. | 6 Mos. | $452.00 | $62.00 | $447.00 | $63.50 | $444.00 | $62.50 |
| 24 Mos. | 6 Mos. | $525.00 | $73.00 | $520.00 | $73.00 | $516.50 | $72.50 |
| 30 Mos. | 6 Mos. | $609.00 | $84.00 | $604.00 | $84.00 | $601.00 | $84.50 |
| 36 Mos. | 6 Mos. | $707.00 | $98.00 | $703.50 | $99.50 | $699.00 | $98.00 |
| 42 Mos. | 6 Mos. | $820.00 | $113.00 | $818.00 | $114.50 | $813.00 | $114.00 |
| 48 Mos. (Maximum) | | $951.50 | $131.50 | $951.50 | $133.50 | $946.00 | $133.00 |
| **PENSION BAND** | | **112** | | **112** | | **112** | |

**W130**

**TABLE 28**                                              **EFFECTIVE AUGUST 07, 2005**

CHAUFFEUR'S HELPER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $284.00 | | $280.00 | |
| 6 Mos. | 6 Mos. | $326.00 | $42.00 | $321.00 | $41.00 |
| 12 Mos. | 6 Mos. | $374.00 | $48.00 | $369.00 | $48.00 |
| 18 Mos. | 6 Mos. | $428.50 | $54.50 | $424.50 | $55.50 |
| 24 Mos. | 6 Mos. | $491.50 | $63.00 | $487.50 | $63.00 |
| 30 Mos. | 6 Mos. | $564.00 | $72.50 | $560.00 | $72.50 |
| 36 Mos. | 6 Mos. | $645.50 | $81.50 | $643.50 | $83.50 |
| 42 Mos. | 6 Mos. | $741.50 | $96.00 | $739.50 | $96.00 |
| 48 Mos. (Maximum) | | $849.50 | $108.00 | $849.50 | $110.00 |
| **PENSION BAND** | | **108** | | **108** | |

**W131**

TABLE  29                                                                                                              EFFECTIVE AUGUST 07, 2005

CHAUFFEUR C, STOREROOM ATTENDANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $310.50 | | $305.50 | | $299.50 | |
| 6 Mos. | 6 Mos. | $359.50 | $49.00 | $354.00 | $48.50 | $347.50 | $48.00 |
| 12 Mos. | 6 Mos. | $415.00 | $55.50 | $410.50 | $56.50 | $401.50 | $54.00 |
| 18 Mos. | 6 Mos. | $480.50 | $65.50 | $476.00 | $65.50 | $466.50 | $65.00 |
| 24 Mos. | 6 Mos. | $556.00 | $75.50 | $551.00 | $75.00 | $540.00 | $73.50 |
| 30 Mos. | 6 Mos. | $642.50 | $86.50 | $638.50 | $87.50 | $626.00 | $86.00 |
| 36 Mos. | 6 Mos. | $743.50 | $101.00 | $740.00 | $101.50 | $725.00 | $99.00 |
| 42 Mos. | 6 Mos. | $860.00 | $116.50 | $858.50 | $118.50 | $840.00 | $115.00 |
| 48 Mos. (Maximum) | | $994.00 | $134.00 | $994.00 | $135.50 | $973.50 | $133.50 |
| **PENSION BAND** | | **113** | | **113** | | **113** | |

**W132**

**TABLE 30**                                                      **EFFECTIVE AUGUST 07, 2005**

STOREKEEPER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $319.50 | | $313.00 | | $307.50 | |
| 6 Mos. | 6 Mos. | $369.00 | $49.50 | $362.50 | $49.50 | $357.00 | $49.50 |
| 12 Mos. | 6 Mos. | $427.00 | $58.00 | $421.00 | $58.50 | $413.50 | $56.50 |
| 18 Mos. | 6 Mos. | $493.50 | $66.50 | $488.00 | $67.00 | $480.00 | $66.50 |
| 24 Mos. | 6 Mos. | $570.50 | $77.00 | $565.50 | $77.50 | $556.50 | $76.50 |
| 30 Mos. | 6 Mos. | $660.00 | $89.50 | $655.50 | $90.00 | $644.50 | $88.00 |
| 36 Mos. | 6 Mos. | $764.00 | $104.00 | $760.50 | $105.00 | $747.50 | $103.00 |
| 42 Mos. | 6 Mos. | $883.50 | $119.50 | $881.50 | $121.00 | $866.50 | $119.00 |
| 48 Mos. (Maximum) | | $1,021.50 | $138.00 | $1,021.50 | $140.00 | $1,005.50 | $139.00 |
| **PENSION BAND** | | **114** | | **114** | | **114** | |

CHAUFFEUR B

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $316.50 | | $310.00 | | $304.50 | |
| 6 Mos. | 6 Mos. | $366.50 | $50.00 | $360.00 | $50.00 | $353.00 | $48.50 |
| 12 Mos. | 6 Mos. | $424.00 | $57.50 | $416.00 | $56.00 | $409.00 | $56.00 |
| 18 Mos. | 6 Mos. | $489.50 | $65.50 | $483.50 | $67.50 | $473.50 | $64.50 |
| 24 Mos. | 6 Mos. | $566.50 | $77.00 | $560.50 | $77.00 | $549.50 | $76.00 |
| 30 Mos. | 6 Mos. | $655.00 | $88.50 | $650.50 | $90.00 | $637.50 | $88.00 |
| 36 Mos. | 6 Mos. | $757.00 | $102.00 | $754.00 | $103.50 | $738.00 | $100.50 |
| 42 Mos. | 6 Mos. | $876.00 | $119.00 | $874.00 | $120.00 | $856.50 | $118.50 |
| 48 Mos. (Maximum) | | $1,013.00 | $137.00 | $1,013.00 | $139.00 | $992.50 | $136.00 |
| PENSION BAND | | 114 | | 114 | | 113 | |

**W134**

**TABLE 32**                                                                 **EFFECTIVE AUGUST 07, 2005**

CHAUFFEUR A

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $324.00 | | $317.00 | | $308.50 | |
| 6 Mos. | 6 Mos. | $375.00 | $51.00 | $368.00 | $51.00 | $359.50 | $51.00 |
| 12 Mos. | 6 Mos. | $434.50 | $59.50 | $426.50 | $58.50 | $417.50 | $58.00 |
| 18 Mos. | 6 Mos. | $502.00 | $67.50 | $494.50 | $68.00 | $485.50 | $68.00 |
| 24 Mos. | 6 Mos. | $580.50 | $78.50 | $575.00 | $80.50 | $565.00 | $79.50 |
| 30 Mos. | 6 Mos. | $672.00 | $91.50 | $667.00 | $92.00 | $656.50 | $91.50 |
| 36 Mos. | 6 Mos. | $776.50 | $104.50 | $773.00 | $106.00 | $763.00 | $106.50 |
| 42 Mos. | 6 Mos. | $899.00 | $122.50 | $896.50 | $123.50 | $887.00 | $124.00 |
| 48 Mos. (Maximum) | | $1,040.00 | $141.00 | $1,040.00 | $143.50 | $1,031.50 | $144.50 |
| **PENSION BAND** | | **115** | | **115** | | **115** | |

**TABLE 33**　　　　　　　　　　　　　　　　　　　　　　　　**EFFECTIVE AUGUST 07, 2005**

BUILDING SERVICE ATTENDANT (35 HRS)

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $212.00 | | $210.50 | | $208.00 | |
| 6 Mos. | 6 Mos. | $244.50 | $32.50 | $243.50 | $33.00 | $240.00 | $32.00 |
| 12 Mos. | 6 Mos. | $282.00 | $37.50 | $281.00 | $37.50 | $277.50 | $37.50 |
| 18 Mos. | 6 Mos. | $324.50 | $42.50 | $323.50 | $42.50 | $320.00 | $42.50 |
| 24 Mos. | 6 Mos. | $374.00 | $49.50 | $372.50 | $49.00 | $369.00 | $49.00 |
| 30 Mos. | 6 Mos. | $430.50 | $56.50 | $429.50 | $57.00 | $425.50 | $56.50 |
| 36 Mos. | 6 Mos. | $495.00 | $64.50 | $494.50 | $65.00 | $491.00 | $65.50 |
| 42 Mos. | 6 Mos. | $570.50 | $75.50 | $570.00 | $75.50 | $566.50 | $75.50 |
| 48 Mos. (Maximum) | | $657.50 | $87.00 | $657.50 | $87.50 | $654.00 | $87.50 |
| **PENSION BAND** | | **101** | | **101** | | **101** | |

**W136**

**TABLE 34**                                                                                                 **EFFECTIVE AUGUST 07, 2005**

BLDG. SVC. ATTENDANT LEADER (35 HRS)* (*ZONE 2 ONLY), BUILDING SERVICE ATTENDANT (40 HRS)

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $237.50 | | $235.50 | | $232.50 | |
| 6 Mos. | 6 Mos. | $271.00 | $33.50 | $268.50 | $33.00 | $265.00 | $32.50 |
| 12 Mos. | 6 Mos. | $308.50 | $37.50 | $306.50 | $38.00 | $303.50 | $38.50 |
| 18 Mos. | 6 Mos. | $353.00 | $44.50 | $350.50 | $44.00 | $346.00 | $42.50 |
| 24 Mos. | 6 Mos. | $401.50 | $48.50 | $400.00 | $49.50 | $394.50 | $48.50 |
| 30 Mos. | 6 Mos. | $458.50 | $57.00 | $457.00 | $57.00 | $450.50 | $56.00 |
| 36 Mos. | 6 Mos. | $524.00 | $65.50 | $522.00 | $65.00 | $514.00 | $63.50 |
| 42 Mos. | 6 Mos. | $597.00 | $73.00 | $596.50 | $74.50 | $587.00 | $73.00 |
| 48 Mos. (Maximum) | | $681.00 | $84.00 | $681.00 | $84.50 | $669.50 | $82.50 |
| **PENSION BAND** | | **102** | | **102** | | **101** | |

**W137**

**TABLE  35**                                                                 **EFFECTIVE AUGUST 07, 2005**

BUILDING SERVICER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $279.50 | | $276.00 | | $269.00 | |
| 6 Mos. | 6 Mos. | $317.50 | $38.00 | $314.00 | $38.00 | $307.00 | $38.00 |
| 12 Mos. | 6 Mos. | $362.00 | $44.50 | $359.00 | $45.00 | $351.50 | $44.50 |
| 18 Mos. | 6 Mos. | $412.50 | $50.50 | $409.00 | $50.00 | $401.00 | $49.50 |
| 24 Mos. | 6 Mos. | $469.50 | $57.00 | $467.00 | $58.00 | $458.00 | $57.00 |
| 30 Mos. | 6 Mos. | $536.00 | $66.50 | $532.00 | $65.00 | $523.50 | $65.50 |
| 36 Mos. | 6 Mos. | $610.00 | $74.00 | $608.00 | $76.00 | $598.00 | $74.50 |
| 42 Mos. | 6 Mos. | $694.50 | $84.50 | $693.00 | $85.00 | $683.00 | $85.00 |
| 48 Mos. (Maximum) | | $790.50 | $96.00 | $790.50 | $97.50 | $780.00 | $97.00 |
| **PENSION BAND** | | **106** | | **106** | | **105** | |

**W138**

**TABLE 36**

APPARATUS SERVICER, BUILDING MECHANIC'S HELPER,
GARAGE ATTENDANT, HOUSE SERVICE ATTENDANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $284.00 | | $280.00 | | $272.50 | |
| 6 Mos. | 6 Mos. | $324.00 | $40.00 | $319.50 | $39.50 | $311.50 | $39.00 |
| 12 Mos. | 6 Mos. | $370.00 | $46.00 | $364.50 | $45.00 | $356.00 | $44.50 |
| 18 Mos. | 6 Mos. | $421.50 | $51.50 | $417.00 | $52.50 | $407.00 | $51.00 |
| 24 Mos. | 6 Mos. | $480.50 | $59.00 | $477.00 | $60.00 | $465.50 | $58.50 |
| 30 Mos. | 6 Mos. | $547.00 | $66.50 | $544.50 | $67.50 | $531.50 | $66.00 |
| 36 Mos. | 6 Mos. | $625.00 | $78.00 | $622.00 | $77.50 | $608.00 | $76.50 |
| 42 Mos. | 6 Mos. | $712.00 | $87.00 | $711.00 | $89.00 | $695.50 | $87.50 |
| 48 Mos. (Maximum) | | $812.00 | $100.00 | $812.00 | $101.00 | $794.50 | $99.00 |
| **PENSION BAND** | | **107** | | **107** | | **106** | |

**TABLE 37**                                                                                              **EFFECTIVE AUGUST 07, 2005**

SUB-SUPERVISOR-BUILDING

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $287.00 | | $282.50 | |
| 6 Mos. | 6 Mos. | $330.00 | $43.00 | $324.50 | $42.00 |
| 12 Mos. | 6 Mos. | $378.00 | $48.00 | $372.50 | $48.00 |
| 18 Mos. | 6 Mos. | $432.50 | $54.50 | $427.50 | $55.00 |
| 24 Mos. | 6 Mos. | $494.50 | $62.00 | $491.00 | $63.50 |
| 30 Mos. | 6 Mos. | $567.00 | $72.50 | $564.00 | $73.00 |
| 36 Mos. | 6 Mos. | $650.50 | $83.50 | $647.00 | $83.00 |
| 42 Mos. | 6 Mos. | $745.00 | $94.50 | $743.50 | $96.50 |
| 48 Mos. (Maximum) | | $852.50 | $107.50 | $852.50 | $109.00 |
| **PENSION BAND** | | **108** | | **108** | |

**W140**

BUILDING MECHANIC, GARAGE MECHANIC

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $341.50 | | $335.00 | | $324.50 | |
| 6 Mos. | 6 Mos. | $398.00 | $56.50 | $391.00 | $56.00 | $380.00 | $55.50 |
| 12 Mos. | 6 Mos. | $464.50 | $66.50 | $456.50 | $65.50 | $444.00 | $64.00 |
| 18 Mos. | 6 Mos. | $541.00 | $76.50 | $532.50 | $76.00 | $520.00 | $76.00 |
| 24 Mos. | 6 Mos. | $629.50 | $88.50 | $622.00 | $89.50 | $607.50 | $87.50 |
| 30 Mos. | 6 Mos. | $732.50 | $103.00 | $727.50 | $105.50 | $711.00 | $103.50 |
| 36 Mos. | 6 Mos. | $852.50 | $120.00 | $848.50 | $121.00 | $831.00 | $120.00 |
| 42 Mos. | 6 Mos. | $993.50 | $141.00 | $991.00 | $142.50 | $971.50 | $140.50 |
| 48 Mos. (Maximum) | | $1,156.50 | $163.00 | $1,156.50 | $165.50 | $1,137.50 | $166.00 |
| **PENSION BAND** | | **119** | | **119** | | **119** | |

**TABLE 39**                                                                                          **EFFECTIVE AUGUST 07, 2005**

SUB-SUPERVISOR-GARAGE

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $352.50 | | $350.50 | | $324.50 | |
| 6 Mos. | 6 Mos. | $410.00 | $57.50 | $408.00 | $57.50 | $380.50 | $56.00 |
| 12 Mos. | 6 Mos. | $476.50 | $66.50 | $474.00 | $66.00 | $445.50 | $65.00 |
| 18 Mos. | 6 Mos. | $554.00 | $77.50 | $552.00 | $78.00 | $522.00 | $76.50 |
| 24 Mos. | 6 Mos. | $643.00 | $89.00 | $642.00 | $90.00 | $612.00 | $90.00 |
| 30 Mos. | 6 Mos. | $747.50 | $104.50 | $746.50 | $104.50 | $716.50 | $104.50 |
| 36 Mos. | 6 Mos. | $869.00 | $121.50 | $867.50 | $121.00 | $839.00 | $122.50 |
| 42 Mos. | 6 Mos. | $1,011.00 | $142.00 | $1,010.00 | $142.50 | $982.50 | $143.50 |
| 48 Mos. (Maximum) | | $1,175.00 | $164.00 | $1,175.00 | $165.00 | $1,150.50 | $168.00 |
| **PENSION BAND** | | **120** | | **120** | | **119** | |

**W142**

**TABLE  41**                                                      **EFFECTIVE AUGUST 07, 2005**

WATCH ENGINEER'S HELPER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $288.50 | | $282.50 | | $276.50 | |
| 6 Mos. | 6 Mos. | $331.00 | $42.50 | $324.00 | $41.50 | $317.00 | $40.50 |
| 12 Mos. | 6 Mos. | $379.00 | $48.00 | $372.00 | $48.00 | $364.00 | $47.00 |
| 18 Mos. | 6 Mos. | $434.00 | $55.00 | $427.50 | $55.50 | $418.50 | $54.50 |
| 24 Mos. | 6 Mos. | $495.50 | $61.50 | $491.00 | $63.50 | $481.50 | $63.00 |
| 30 Mos. | 6 Mos. | $568.00 | $72.50 | $564.00 | $73.00 | $552.50 | $71.00 |
| 36 Mos. | 6 Mos. | $650.50 | $82.50 | $646.00 | $82.00 | $634.50 | $82.00 |
| 42 Mos. | 6 Mos. | $744.50 | $94.00 | $742.50 | $96.50 | $730.00 | $95.50 |
| 48 Mos. (Maximum) | | $851.50 | $107.00 | $851.50 | $109.00 | $838.00 | $108.00 |
| **PENSION BAND** | | **108** | | **108** | | **107** | |

ELEVATOR MECHANIC (ZONE 1 ONLY), WATCH ENGINEER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT | ZONE Rem Zone 1 | INCREASE AMOUNT | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $341.50 | | $335.00 | | $324.50 | |
| 6 Mos. | 6 Mos. | $390.50 | $49.00 | $382.00 | $47.00 | $371.50 | $47.00 |
| 12 Mos. | 6 Mos. | $444.50 | $54.00 | $436.50 | $54.50 | $425.00 | $53.50 |
| 18 Mos. | 6 Mos. | $506.50 | $62.00 | $499.50 | $63.00 | $485.50 | $60.50 |
| 24 Mos. | 6 Mos. | $577.50 | $71.00 | $569.50 | $70.00 | $555.50 | $70.00 |
| 30 Mos. | 6 Mos. | $658.00 | $80.50 | $652.00 | $82.50 | $634.50 | $79.00 |
| 36 Mos. | 6 Mos. | $750.50 | $92.50 | $744.00 | $92.00 | $725.50 | $91.00 |
| 42 Mos. | 6 Mos. | $855.50 | $105.00 | $849.50 | $105.50 | $830.00 | $104.50 |
| 48 Mos. | 6 Mos. | $974.50 | $119.00 | $970.50 | $121.00 | $949.50 | $119.50 |
| 54 Mos. | 6 Mos. | $1,111.50 | $137.00 | $1,109.50 | $139.00 | $1,085.00 | $135.50 |
| 60 Mos. (Maximum) | | $1,267.50 | $156.00 | $1,267.50 | $158.00 | $1,241.00 | $156.00 |
| **PENSION BAND** | | **124** | | **124** | | **123** | |

**W144**

**TABLE  43**                                                    **EFFECTIVE AUGUST 07, 2005**

ESCORT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 4 Boroughs (BX, B, M, Q) | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $240.50 | |
| 6 Mos. | 6 Mos. | $287.50 | $47.00 |
| 12 Mos. | 6 Mos. | $349.50 | $62.00 |
| 18 Mos. (Maximum) | | $424.00 | $74.50 |
| **PENSION BAND** | | **0** | |

This page left blank intentionally

# ARTICLE 31 –
## PART IV - PENSION BANDS

The Pension benefit for employees retiring on or after December 4, 1989 depends upon the employee's length of service and the pension band assigned to the employee's occupational classification. The following list shows the pension band for each occupational classification in the bargaining unit:

New York Telephone Co. and Telesector Resources Group, Inc.

| CRAFT GROUP | Table No. | Wage Zone 1 Pension Band | Wage Zone 2 Pension Band |
|---|---|---|---|
| Apparatus Servicer | 36 | 107 | 106 |
| Cable Splicing Tech Helper | 04 | 110 | 110 |
| Central Office Technician | 01 | 124 | 123 |
| *Formerly:* | | | |
| *Cable Testing Technician* | | | |
| *Power Technician* | | | |
| *Switching Equipment Technician* | | | |
| *Test Desk Technician* | | | |
| Combination Technician | — | — | — |
| Field Dispatcher | — | * | * |
| Field Technician | 01 | 124 | 123 |
| *Formerly:* | | | |
| *Cable Splicing Technician* | | | |
| *Outside Plant Technician* | | | |
| *Services Technician* | | | |
| *Systems Technician* | | | |
| *Systems Technician-Radio* | | | |
| Frame Administrator | 05 | 117 | 116 |
| Frame Specialist | 05 | 120 | 119 |
| *Formerly:* | | | |
| *Frame Administrator* | | | |
| Senior Frame Administrator | 06 | 119 | 118 |
| Technical Assistant | 03 | 102 | 102 |
| Telecommunications Technical Assoc. | 02 | 126 | 125 |

* Employees in the occupational classification Field Dispatcher shall be assigned the Pension Band of their permanent occupational classification and the difference in maximum wage for their permanent occupational classification and the maximum wage for Field Dispatcher shall be considered a differential for pension purposes.

|  | Table # | Wage Zone 1 Pension Band | Wage Zone 2 Pension Band |
|---|---|---|---|
| BUILDING AND SUPPLIES GROUP |  |  |  |
| Building Mechanic | 38 | 119 | 119 |
| Building Mechanic's Helper | 36 | 107 | 106 |
| Building Svc. Att'd (35 Hrs) | 33 | 101 | 101 |
| Building Svc. Att'd (40 Hrs) | 34 | 102 | 101 |
| Building Svc. Att'd Ldr (35 Hrs) | 34 | — | 101 |
| Building Servicer | 35 | 106 | 105 |
| Chauffeur A | 32 | 115 | 115 |
| Chauffeur B | 31 | 114 | 113 |
| Chauffeur C | 29 | 113 | 113 |
| Chauffeur's Helper | 28 | 108 | — |
| Elevator Mechanic | 42 | 122 | — |
| Elevator Operator | 40 | 104 | 103 |
| Garage Attendant | 36 | 107 | 106 |
| Garage Mechanic | 38 | 119 | 119 |
| House Service Attendant | 36 | 107 | 106 |
| Storekeeper | 30 | 114 | 114 |
| Storeroom Attendant | 29 | 113 | 113 |
| Sub-Supervisor-Building | 37 | 108 | — |
| Sub-Supervisor-Garage | 39 | 120 | 119 |
| Watch Engineer | 42 | 124 | 123 |
| Watch Engineer's Helper | 41 | 108 | 107 |

| CLERICAL GROUP | Table No. | Wage Zone 1 Pension Band | Wage Zone 2 Pension Band |
|---|---|---|---|
| Administrative Assistant | 24 | 109 | 108 |
| *Formerly:* | | | |
| *Administrative Clerk* | | | |
| *Switching Administration Clerk* | | | |
| *Stenographer* | | | |
| Office Assistant | 23 | 108 | 107 |
| *Formerly:* | | | |
| *Central Office Clerk* | | | |
| *Engineering Clerk* | | | |
| *Office Clerical Assistant* | | | |
| *Record Clerk* | | | |
| *Service Clerk* | | | |
| *Staff Clerk* | | | |
| *Typist* | | | |
| Senior Administrative Assistant | 25 | 110 | 110 |
| *Formerly:* | | | |
| *Assignment Clerk* | | | |
| *Engineering Studies Clerk* | | | |
| *Plant Results Clerk* | | | |
| Senior Special Assistant | 27 | 112 | 112 |
| *Formerly:* | | | |
| *Advanced Assignment Clerk* | | | |
| *Facilities Clerk* | | | |
| *Trunk Order Clark* | | | |
| Special Assistant* | 26 | 111 | 111 |
| *Formerly:* | | | |
| *Repair Service Attendant* | | | |

* Effective May 22, 1994—See Miscellaneous Group, Maintenance Administrator

| MISCELLANEOUS GROUP | Table No. | Wage Zone 1 Pension Band | Wage Zone 2 Pension Band |
|---|---|---|---|
| Back Tap Assignor | 09 | 115 | 115 |
| Construction Coordinator | 08 | 113 | 112 |
| Customer Service Administrator* | 12 | 117 | 116 |
| Drafter | 07 | 112 | 111 |
| Facilities Assistant | 06 | 119 | 119 |
| Facilities Specialist | 11 | 123 | 122 |
| Maintenance Administrator* | 12 | 117 | 116 |
| Supplies Coordinator | 08 | 113 | 112 |
| Translations Administrator | 06 | 119 | 119 |
| Trunk Assignor** | 11 | 123 | — |

*Effective May 22, 1994
**Effective November 6, 1994

## EMPIRE CITY SUBWAY COMPANY

| CRAFT GROUP | Table No | Pension Band |
|---|---|---|
| Blacksmith | 22 | 124 |
| Conduit Worker | 15 | 114 |
| Construction Equipment Operator | 20 | 121 |
| Field Coordinator | 21 | 122 |
| Mechanic | 19 | 118 |
| Plant Inspector | 16 | 115 |
| Senior Conduit Worker | 17 | 117 |
| Utility Worker | 18 | 118 |
| MOTOR VEHICLE GROUP | | |
| Chauffeur A | 32 | 115 |
| Chauffeur B | 31 | 114 |
| Garage Mechanic | 38 | 119 |
| CLERICAL GROUP | | |
| Administrative Assistant | 24 | 109 |
| *Formerly:* | | |
| *Accounting Records and* | | |
| *Reports Clerk* | | |
| Office Assistant | 23 | 108 |
| *Formerly:* | | |
| *Office Clerical Assistant* | | |
| *Records Clark* | | |
| *Typist* | | |
| Special Assistant | 26 | 111 |
| *Formerly:* | | |
| *General Books Clerk* | | |
| MISCELLANEOUS GROUP | | |
| Construction Coordinator | 08 | 113 |
| Drafter | 07 | 112 |
| Engineering Drafter | 13 | 114 |
| Senior Engineering Drafter | 14 | 118 |

# ARTICLE 31
## PART V—CALCULATION OF PENSION

The dollar amount for the appropriate pension band, according to the time of retirement during the contract period, is multiplied by the employee's years and months of service. When multiplied further by 12, the calculated monthly total results in the annual pension benefit amount..

## MONTHLY BENEFIT TABLE FOR RETIREMENT

| PB | Current | Temporary Q4 2003 | 1/1/2004 - 10/31/04 | November 1 2004 | October 1 2005 | October 1 2006 | October 1 2007 |
|-----|---------|---------|---------|---------|---------|---------|---------|
| 101 | $34.37 | $36.09 | $34.37 | $35.06 | $36.11 | $37.19 | $38.31 |
| 102 | $35.83 | $37.62 | $35.83 | $36.55 | $37.65 | $38.78 | $39.94 |
| 103 | $37.33 | $39.20 | $37.33 | $38.08 | $39.22 | $40.40 | $41.61 |
| 104 | $38.74 | $40.68 | $38.74 | $39.51 | $40.70 | $41.92 | $43.18 |
| 105 | $40.19 | $42.20 | $40.19 | $40.99 | $42.22 | $43.49 | $44.79 |
| 106 | $41.64 | $43.72 | $41.64 | $42.47 | $43.74 | $45.05 | $46.40 |
| 107 | $43.12 | $45.28 | $43.12 | $43.98 | $45.30 | $46.66 | $48.06 |
| 108 | $44.57 | $46.80 | $44.57 | $45.46 | $46.82 | $48.22 | $49.67 |
| 109 | $46.04 | $48.34 | $46.04 | $46.96 | $48.37 | $49.82 | $51.31 |
| 110 | $47.46 | $49.83 | $47.46 | $48.41 | $49.86 | $51.36 | $52.90 |
| 111 | $48.92 | $51.37 | $48.92 | $49.90 | $51.40 | $52.94 | $54.53 |
| 112 | $50.39 | $52.91 | $50.39 | $51.40 | $52.94 | $54.53 | $56.17 |
| 113 | $51.82 | $54.41 | $51.82 | $52.86 | $54.45 | $56.08 | $57.76 |
| 114 | $53.27 | $55.93 | $53.27 | $54.34 | $55.97 | $57.65 | $59.38 |
| 115 | $54.71 | $57.45 | $54.71 | $55.80 | $57.47 | $59.19 | $60.97 |
| 116 | $56.18 | $58.99 | $56.18 | $57.30 | $59.02 | $60.79 | $62.61 |
| 117 | $57.63 | $60.51 | $57.63 | $58.78 | $60.54 | $62.36 | $64.23 |
| 118 | $59.08 | $62.03 | $59.08 | $60.26 | $62.07 | $63.93 | $65.85 |
| 119 | $60.53 | $63.56 | $60.53 | $61.74 | $63.59 | $65.50 | $67.47 |
| 120 | $61.98 | $65.08 | $61.98 | $63.22 | $65.12 | $67.07 | $69.08 |
| 121 | $63.41 | $66.58 | $63.41 | $64.68 | $66.62 | $68.62 | $70.68 |
| 122 | $64.89 | $68.13 | $64.89 | $66.19 | $68.18 | $70.23 | $72.34 |
| 123 | $66.33 | $69.65 | $66.33 | $67.66 | $69.69 | $71.78 | $73.93 |
| 124 | $67.77 | $71.16 | $67.77 | $69.13 | $71.20 | $73.34 | $75.54 |
| 125 | $69.23 | $72.69 | $69.23 | $70.61 | $72.73 | $74.91 | $77.16 |
| 126 | $70.68 | $74.21 | $70.68 | $72.09 | $74.25 | $76.48 | $78.77 |
| 127 | $72.14 | $75.75 | $72.14 | $73.58 | $75.79 | $78.06 | $80.40 |
| 128 | $73.59 | $77.27 | $73.59 | $75.06 | $77.31 | $79.63 | $82.02 |
| 129 | $75.04 | $78.79 | $75.04 | $76.54 | $78.84 | $81.21 | $83.65 |
| 130 | $76.48 | $80.30 | $76.48 | $78.01 | $80.35 | $82.76 | $85.24 |
| 131 | $77.97 | $81.87 | $77.97 | $79.53 | $81.92 | $84.38 | $86.91 |
| 132 | $79.39 | $83.36 | $79.39 | $80.98 | $83.41 | $85.91 | $88.49 |
| 133 | $80.85 | $84.89 | $80.85 | $82.47 | $84.94 | $87.49 | $90.11 |
| 134 | $82.31 | $86.43 | $82.31 | $83.96 | $86.48 | $89.07 | $91.74 |
| 135 | $83.71 | $87.90 | $83.71 | $85.38 | $87.94 | $90.58 | $93.30 |

# ARTICLE 32
## PROVISION FOR LUNCHES
## UPSTATE ONLY

Except as otherwise provided below, an employee will provide his own lunch.

## LUNCHES DURING BOARD AND LODGING ASSIGNMENTS

**32.01**     An employee's lunch will be paid for by the Company on his working days during a board and lodging assignment.

**32.02**     During the cold months, i.e., from October 15 to April 15, an employee will be allowed to go to Company provided facilities or to other places as supervision may designate.

**32.03**     During moderate weather, i.e., during the period from April 16 to October 14, the employee on a board and lodging assignment will carry his lunch when working more than 15 minutes travel time away from the Company provided facilities.  Lunches may be purchased at places other than at Company provided facilities to save travel time provided there is no charge to the Company at the Company provided facilities for the meal omitted.

# ARTICLE 33
## AGENCY SHOP
(where permitted by law)

**33.01**     Each employee who is a member of the Union or who is obligated to tender to the Union amounts equal to periodic dues on the effective date of this Agreement, or who later becomes a member, and all employees entering into the bargaining unit on or after the effective date of this Agreement, shall as a condition of employment, pay or tender to the Union amounts equal to the periodic dues applicable to members, for the period from such effective date or, in the case of employees entering into the bargaining unit after the effective date, on or after the thirtieth day after such entrance, whichever of these dates is later, until the termination of this Agreement.  For the purpose of this Article, "employee" shall mean any person entering into the bargaining unit, except an occasional employee.

Each employee who is a member of the bargaining unit on or before the effective date of this Agreement and who on the effective date of this Agreement was not required as a condition of employment to pay or tender to the Union amounts equal to the periodic dues applicable to members, shall, as a condition of employment, pay or tender to the Union amounts equal to the periodic dues applicable to members for the period beginning 30 days after the effective date of this Agreement, until the termination of this Agreement.

**33.02**     The condition of employment specified above shall not apply during periods of formal separation* from the bargaining unit by any such employee but shall reapply to such employee on the thirtieth day following his return to the bargaining unit.

*The term "formal separation" includes transfers out of the bargaining unit, removal from the payroll of the Company, and leaves of absence of more than one month duration.

# ARTICLE 34
## TERMINATIONS

**34.01**     The Local Union shall be notified verbally as soon as possible, but not later than ten (10) calendar days after the Company terminates the employment (other than by retirement with pension) of an employee with more than one (1) year of net credited service following the expiration of the maximum benefits for his length of service provided for in the "NYNEX Pension Plan" and "Sickness and Accident Disability Benefit Plan."

**34.02**     Failure to give notice in accordance with the provisions of the preceding paragraph shall not constitute the basis for sustaining a grievance with respect to a termination of employment.

**34.03**     The Local Union shall be notified in writing at least thirty (30) days prior to the expiration of an employees maximum period of sickness disability benefits under the Sickness and Accident Disability Benefit Plan. Failure to give such notice shall not, however, affect the expiration of such benefits.

# ARTICLE 35
## INSPECTION OF EMPLOYEE RECORDS

**35.01**     Once each year an employee may inspect the appraisals of his performance as an employee, or entries in his personnel record with respect to absence or tardiness. Also on reasonable notice and at reasonable intervals, a Local Union Officer or International Union Representative may inspect the items in an employee's record referred to above if such Local Union Officer or International Union Representative has the employee's written consent to do so.

# ARTICLE 36
## INTERAREA TRANSFER REQUESTS

**36.01**        The Company will fill one out of three job vacancies in a particular occupational classification in an area from employees in the same occupational classification who have applied for a Specific Published Vacancy (SPV) in the area in which the vacancy exists, in order of seniority based on net credited service date.

**36.02**        For purposes of this Article, the following are the areas:

       Manhattan
       Bronx
       Brooklyn/Staten Island
       Queens
       Nassau
       Westchester and Greenwich, Conn. (including Putnam County)
       Suffolk
       Rockland (including Greenwood Lake and Tuxedo)
       Each of the geographic areas of Units 11 through 18 in Section 8.02

       No employee will be transferred within a Top Craft or Second Craft occupational classification who has not achieved the requisite time in title as provided in the Upgrade and Transfer Plan. No employee will be transferred who, in the opinion of the Company, is not qualified to perform the work involved in the vacant position or is otherwise unacceptable.

**36.03**        Transfers from any area should be limited to 5% of the employees in a particular occupational classification in that area on October 1. In the event any area attains a level of 5% of transfer for a particular occupational classification, there shall be no further transfer from such occupational classification until the following October 1.

**36.04**        If any employee requests a transfer for reasons of compelling personal hardship and the request is granted, such transfer shall not be treated as though it were made as provided above, and shall not be counted in filling the one out-of-three job vacancies as provided in Section 36.01.

**36.05**        A vacancy is created whenever: (a) in the Company's judgment, a replacement is required in an occupational classification in an area as the result of promotions. retirements, deaths, terminations or transfers.

However, a vacancy will not be considered to exist if it is the result of a transfer or promotion made to replace an employee who was also transferred or promoted to fill a vacancy; (b) a placement is required in an occupational classification in an area as the result of a decision to increase permanently the number of employees in that occupational classification.

## ARTICLE 37 - NON-DISCRIMINATION

**37.01**    In a desire to restate their respective policies, neither the Company nor the Union shall unlawfully discriminate against any employee because of such employee's race, color, religion, sex, age or national origin or because he or she is handicapped, a disabled veteran or a veteran of the Vietnam Era.

## ARTICLE 38
## SPECIAL CITY ALLOWANCE

**38.01**     An employee whose assigned reporting location* on a particular day is within New York City will be paid a Special City Allowance of $4.40 for each day he works after reporting at such assigned reporting location**.**

          The Special City Allowance will enter into computations of overtime pay required by law but will not be part of the basic rate or basic weekly wages for any other purposes nor enter into the computation of any payments under the "NYNEX Pension Plan" and "Sickness and Accident Disability Benefit Plan" or any other fringe benefits or differentials.  Effective November 1, 1991, the Special City Allowance will enter into the computation of payments under the "NYNEX Pension Plan."

          An employee must work more than 50% of a full time daily tour after reporting to a qualified location to receive a full daily allowance for that day. An employee who reports to work at a qualified location, but who works 50% or less of a full time daily tour will be paid one-half of a full daily allowance.

          Not more than one  full daily allowance will be paid to an employee on any one day regardless of the number of times the employee reports to a qualified location during the day.

* For the purpose of this Article "assigned reporting location" is not necessarily synonymous with "reporting point" or "reporting locality" as defined in Article 21.


## ARTICLE 39
## COPIES OF CONTRACT

**39.01**     Effective with this Agreement the Company shall be responsible for providing a copy of the contract to each Union eligible employee.

## ARTICLE 40 - SAFETY

**40.01**     Safety is a concern to the Company and the Union. The Company and the Union mutually recognize the need for a work environment in which safe operations can be achieved in accomplishing all phases of work, and the need to promote better understanding and acceptance of the principles of safety on the part of all employees to provide for their own safety and that of their fellow employees, customers and the general public. The Company agrees to maintain a safe and healthful workplace for all employees.

**40.02     To achieve the above principles, the Company and Union agree to establish an advisory committee on health and safety principles at the Company headquarters level. The Committee shall be statewide and shall consist of not more than eight (8) representatives of the Company and not more than eight (8) Union representatives designated by the CWA International. This committee shall meet from time to time as required but at least six (6) times per year. The Committee shall be co-chaired by one representative selected by the Company and one by the Union. In addition, the Company and the Union shall confer as needed on health and safety principles.**

**Where mutually agreed to by the parties to this Agreement, the Company and the Union may establish additional safety committees below the headquarters level, as needed, to discuss health and safety issues at a more local level. The number of representatives serving on these committees will be determined by the Company and the Union and will be comprised of an equal number of representatives from each party.**

**40.03**     In connection with any safety activities, the Company agrees to reimburse only for the time spent by active employees during the employee's scheduled tour for attendance at such committee meetings and for traveling to and from such committee meetings at his regular straight time rate of pay.

**40.04     In the event that an employee is involved in a serious accident or is seriously injured as defined by the Company's Compliance Center ("the Center"), the Center will notify each local Union as soon as practicable after the Center notifies Corporate Safety. The Center will provide each local with the name of the employee, the location of the accident, the employee's primary work location, and a brief description of the accident. The Center will take all reasonable steps necessary to provide this notice to the**

**locals; however, failure to provide this notice will not serve as the basis for any arbitration. Nothing in this paragraph shall preclude the Union from filing a grievance if the Company fails to provide notification on multiple occasions or violates some other provision of the collective bargaining agreement.**

## ARTICLE 41 - EXCUSED WORK DAYS

**41.01**     Each Regular employee who has at least six months of net credited service on January 1 of any year shall be eligible for four Excused Work Days with pay and one Excused Work Day without pay during that year.

**41.02**     Employees who do not work on their paid Excused Work Day shall be paid for the day as if for a normal or standard day worked (excluding any wage incentive or productivity payments) provided they are on the active payroll of the Company on that Excused Work Day.

**41.03**     One paid Excused Work Day in each calendar year may be designated by the Company for employees in an administrative work group (as designated by the Company) or in any large group, including the entire Company. Employees (except occasional employees) in any such group for which an Excused Work Day is designated by the Company and who are not otherwise eligible for a paid Excused Work Day shall be excused and paid for such designated day as set forth in Section 41.01, provided they are on the active payroll of the Company on the designated Excused Work Day.

**41.04**     Employees who are on vacation or absent with pay on their paid Excused Work Day for reasons other than having observed it as an Excused Work Day shall have their paid Excused Work Day rescheduled if a vacation day would have been rescheduled under the same circumstances.

**41.05**     If employees agree to work on their paid Excused Work Day and the Company determines that the day cannot be rescheduled, they shall be paid as applicable in accordance with the following subparagraphs:

　　　　　　(i)  Employees who agree to work before the work schedule becomes fixed shall receive one day's pay as set forth in Section 41.02 in lieu of their Excused Work Day and shall in addition be paid in accordance with the provisions of the Collective Bargaining Agreement covering work on a scheduled day of work.

(ii) Employees who agree to work after the work schedule becomes fixed shall receive one day's pay as set forth in Section 41.02 in lieu of their Excused Work Day and shall in addition be paid in accordance with the provisions of the Collective Bargaining Agreement covering work on a nonscheduled day.

(iii) Time worked by an employee on his or her Excused Work Day shall be considered time worked on a regularly scheduled day of work for all purposes, except as is otherwise expressly provided in this Article.

**41.06**     In each calendar year, the Company shall grant an employee's request, made on short notice *, to take one or two of the employee's paid or unpaid Excused Work Days, either as a full days or as half days, or combination thereof.

**41.07**     In addition to the short notice Excused Work Day in Section 41.06, the Company shall grant an employee's request, made on short notice *, to take one of the employee's paid or unpaid Excused Work Days, either as a full day or as two (2) half days, or a combination thereof, for family commitments.

* Short notice means that an employee will give their Supervisor as much notice as possible under the circumstances.  In all cases the notice must be given before the start of the day or half day from which the employee wishes to be excused.

# ARTICLE 42
# INCOME PROTECTION PLAN

**42.01**     If during the term of this Agreement, the Company notifies the Union in writing that technological change (defined as changes in equipment or methods of operation) has or will create a surplus in any occupational classification in a work location which will necessitate layoffs or involuntary permanent reassignments of regular employees to different occupational classifications involving a reduction in pay or to work locations requiring a change of residence, or if a force surplus necessitating any of the above actions exists for reasons other than technological change and the Company deems it appropriate, regular employees in the affected occupational classifications and work locations may elect in the order of seniority, and to the extent necessary to relieve the surplus, to leave the service of the Company and receive Income Protection payments described in this Article subject to the following conditions:

(a) The Company shall determine the occupational classifications and work locations in which a surplus exists, the number of employees in such occupational classifications and locations who are considered to be surplus, and the period during which the employee may, if he or she so elects, leave the service of the Company pursuant to this Article. Neither such determinations by the Company nor any other part of this Article shall be subject to arbitration.

(b) If the Company deems it appropriate, it may offer to regular employees, in occupational classifications in which a surplus does not exist, the opportunity to leave the service of the Company pursuant to this Article. The occupational classifications, job locations and the number of employees to receive the offer will be determined by the Company. Such offer to each employee shall be conditioned on the Company's obtaining a qualified replacement acceptable to the Company for that employee from the employees in surplus occupational classifications. Employees who accept voluntary downgrades will have their pay reduced over a period of time, as provided for in Article 43, Reassignment Pay Protection Plan.

The provisions of this paragraph (b) will not be implemented by the Company unless and until regular employees in the surplus occupational classifications and work locations have had an opportunity to elect to leave the service of the Company pursuant to paragraph (a) above. The transfer provisions of this paragraph are separate from and not governed by the transfer and vacancy provisions of this Agreement.

(c) The total number of employees who may make such election under paragraphs (a) and (b) combined shall not exceed the number of employees determined by the Company to be surplus.

(d) An employee's election to leave the service of the Company and receive Income Protection benefits must be in writing and transmitted to the Company within thirty (30) days from the date of the Company's offer in order to be effective and it may not be revoked after such thirty (30) day period.

**42.02**     The Company will pay Income Protection payments in amounts specified in the Income Protection tables to employees who elect to either leave the service of the Company in accordance with the provisions of Section 42.01 above, or be separated from the payroll in accordance with the provisions of Article 55, Force Adjustment Plan. Payments will be based on the employee's pension band and full years of net credited service as of the effective date of termination of employment (pro rated for any period of time during which the employee was employed on a part-time basis).

**42.03**     Monthly Income Protection payments for an employee who so elects in accordance with Section 42.01 shall begin within one month after such employee has left the service of the Company as specified in the Income Protection tables. In addition to the monthly payments, if any, the Company will pay a lump sum payment in amounts specified in the tables. Such lump sum payments will be made within sixty (60) days after the employee leaves the service of the Company.

**42.04**     In no event shall the Income Protection payments (including any lump sum payment) exceed the equivalent of twice the employee's annual compensation at the basic weekly wage rate (or its equivalent) received during the year immediately preceding the termination of service. To the extent necessary, Income Protection payments shall be reduced so that total payments do not exceed the equivalent of twice the employee's annual compensation at the basic weekly wage rate (or its equivalent) for the year immediately preceding the termination of service.

**42.05**     As used in this Article, "annual compensation at the basic weekly rate (or its equivalent)" or "basic weekly wage rate (or its equivalent)" do not include tour or temporary differentials, overtime pay, or other extra payments.

**42.06**     Any payments to a recipient hereunder will cease permanently upon the happening of any of the following:

    (a)  reemployment of the recipient by the Company;

    (b)  employment of the recipient by a NYNEX affiliate or subsidiary company;

    (c)  engagement by or employment of the recipient in a business or enterprise which competes directly with a NYNEX affiliate or subsidiary company.

**42.07**     No termination, separation, layoff or similar allowances shall be paid to any employee who elects to leave the service of the Company or be separated from the payroll and receive Income Protection payments pursuant to this Article.

**42.08**     Prior to proceeding to a layoff resulting from a surplus in any particular job title and layoff area the Company will offer Enhanced IPP payments, and in lieu of regular IPP payments the Company may, in its discretion, offer Enhanced IPP payments. Enhanced IPP payments shall be equal to two times the applicable regular IPP payment. Both the monthly payments and the lump sum payment shall be doubled. All other provisions of this Article shall apply to Enhanced IPP payments.

**42.09**     In addition to the IPP payment, for an employee who so elects to leave the service of the Company in accordance with Section 1 above, the Company, as an IPP Expense Allowance, will reimburse the employee for the actual expenses incurred for relocation costs, tuition or training costs, or job placement expenses related to seeking other employment, or any combination thereof, up to an amount not to exceed Seven Hundred Fifty Dollars ($750.00) for each year of net credited service (prorated for any partial year of service) to a maximum of Three Thousand Seven Hundred Fifty Dollars ($3,750.00). Any such expenses for which reimbursement will be made must be approved by the Company prior to being incurred and must be incurred within one (1) year from the date of termination of employment except that reimbursement for tuition or training costs will be made for such expenses incurred within two (2) years from the date of termination of employment.

## INCOME PROTECTION TABLE
## PENSION BANDS 101 - 110

| Full Years of Net Credited Service | Number of Monthly Payments | Monthly Amount | Lump Sum Payment |
|---|---|---|---|
| Less than 3 years | 0 | 0 | 3680 |
| 3 | 0 | 0 | 4890 |
| 4 | 0 | 0 | 6095 |
| 5 | 0 | 0 | 7300 |
| 6 | 0 | 0 | 8505 |
| 7 | 8 | 103 | 8885 |
| 8 | 12 | 169 | 8885 |
| 9 | 16 | 202 | 8885 |
| 10 | 20 | 223 | 8885 |
| 11 | 24 | 235 | 8885 |
| 12 | 30 | 229 | 8885 |
| 13 | 36 | 224 | 8885 |
| 14 | 42 | 221 | 8885 |
| 15 | 48 | 219 | 8885 |
| 16 | 48 | 244 | 8885 |
| 17 | 48 | 268 | 8885 |
| 18 | 48 | 294 | 8885 |
| 19 | 48 | 323 | 8885 |
| 20 | 48 | 354 | 8885 |
| 21 | 48 | 360 | 8885 |
| 22 | 48 | 366 | 8885 |
| 23 | 48 | 371 | 8885 |
| 24 | 48 | 376 | 8885 |
| 25 | 48 | 381 | 8885 |
| 26 | 48 | 386 | 8885 |
| 27 | 48 | 391 | 8885 |
| 28 | 48 | 398 | 8885 |
| 29 | 48 | 403 | 8885 |
| 30 and over | 48 | 408 | 8885 |

Note: To insure that we remain in complete compliance with ERISA regulations.
For employees who, on the effective date of termination of employment, are age
63 or over and whose number of monthly payments are thirty (30) or more:
-Divide the number of monthly payments by two (2) to determine the new
 number of monthly payments.
-Multiply the monthly amount by two (2) to determine the new monthly amount.
-Lump sum payment remains unchanged.

## INCOME PROTECTION TABLE
## PENSION BANDS 111 - 117

| Full Years of Net Credited Service | Number of Monthly Payments | Monthly Amount | Lump Sum Payment |
|---|---|---|---|
| Less than 3 years | 0 | 0 | 4445 |
| 3 | 0 | 0 | 5710 |
| 4 | 0 | 0 | 6980 |
| 5 | 0 | 0 | 8250 |
| 6 | 4 | 159 | 8885 |
| 7 | 8 | 239 | 8885 |
| 8 | 12 | 264 | 8885 |
| 9 | 16 | 278 | 8885 |
| 10 | 20 | 286 | 8885 |
| 11 | 24 | 291 | 8885 |
| 12 | 30 | 276 | 8885 |
| 13 | 36 | 282 | 8885 |
| 14 | 42 | 291 | 8885 |
| 15 | 48 | 299 | 8885 |
| 16 | 48 | 344 | 8885 |
| 17 | 48 | 384 | 8885 |
| 18 | 48 | 386 | 8885 |
| 19 | 48 | 391 | 8885 |
| 20 | 48 | 396 | 8885 |
| 21 | 48 | 403 | 8885 |
| 22 | 48 | 408 | 8885 |
| 23 | 48 | 413 | 8885 |
| 24 | 48 | 418 | 8885 |
| 25 | 48 | 423 | 8885 |
| 26 | 48 | 429 | 8885 |
| 27 | 48 | 434 | 8885 |
| 28 | 48 | 440 | 8885 |
| 29 | 48 | 445 | 8885 |
| 30 and over | 48 | 450 | 8885 |

Note: To insure that we remain in complete compliance with ERISA regulations.

For employees who, on the effective date of termination of employment, are age 63 or over and whose number of monthly payments are thirty (30) or more:

-Divide the number of monthly payments by two (2) to determine the new number of monthly payments.

-Multiply the monthly amount by two (2) to determine the new monthly amount.

-Lump sum payment remains unchanged.

## INCOME PROTECTION TABLE
## PENSION BANDS 118 and OVER

| Full Years of Net Credited Service | Number of Monthly Payments | Monthly Amount | Lump Sum Payment |
|---|---|---|---|
| Less than 3 years | 0 | 0 | 5080 |
| 3 | 0 | 0 | 6345 |
| 4 | 0 | 0 | 7615 |
| 5 | 0 | 0 | 8250 |
| 6 | 4 | 318 | 8885 |
| 7 | 8 | 318 | 8885 |
| 8 | 12 | 318 | 8885 |
| 9 | 16 | 318 | 8885 |
| 10 | 20 | 318 | 8885 |
| 11 | 24 | 349 | 8885 |
| 12 | 30 | 360 | 8885 |
| 13 | 36 | 368 | 8885 |
| 14 | 42 | 375 | 8885 |
| 15 | 48 | 381 | 8885 |
| 16 | 48 | 429 | 8885 |
| 17 | 48 | 434 | 8885 |
| 18 | 48 | 440 | 8885 |
| 19 | 48 | 445 | 8885 |
| 20 | 48 | 450 | 8885 |
| 21 | 48 | 455 | 8885 |
| 22 | 48 | 461 | 8885 |
| 23 | 48 | 466 | 8885 |
| 24 | 48 | 471 | 8885 |
| 25 | 48 | 476 | 8885 |
| 26 | 48 | 481 | 8885 |
| 27 | 48 | 486 | 8885 |
| 28 | 48 | 493 | 8885 |
| 29 | 48 | 498 | 8885 |
| 30 and over | 48 | 503 | 8885 |

Note: To insure that we remain in complete compliance with ERISA regulations.
For employees who, on the effective date of termination of employment, are age 63 or over and whose number of monthly payments are thirty (30) or more:
-Divide the number of monthly payments by two (2) to determine the new number of monthly payments.
-Multiply the monthly amount by two (2) to determine the new monthly amount.
-Lump sum payment remains unchanged.

# ARTICLE 43
## REASSIGNMENT PAY PROTECTION PLAN

**43.01**   If, because of force surplus adjustment, employees are assigned to vacancies where the rate of pay of the new job is less than the current rate of the employee's regular job, the rate of pay will be reduced over a period of time based on the employee's length of service.  The reductions in pay are effective at periods following reassignment as shown below and are based on the difference in rates for the old and new job.

### 0 - 5 YEARS

| | |
|---|---|
| Weeks  1 through 30 | - No Reduction |
| Weeks 31 through 34 | - 1/3 Reduction |
| Weeks 35 through 38 | - 2/3 Reduction |
| Weeks 39 & thereafter | - Full Reduction |

### 5 - 12 YEARS

| | |
|---|---|
| Weeks  1 through 56 | - No Reduction |
| Weeks 57 through 60 | - 1/3 Reduction |
| Weeks 61 through 64 | - 2/3 Reduction |
| Weeks 65 & thereafter | - Full Reduction |

### 12 + YEARS

| | |
|---|---|
| First Three (3) Years * | - No Reduction |
| Fourth Year Schedule: | |
| Weeks 1 through 4 | - No Reduction |
| Weeks 5 through 8 | - 1/3 Reduction |
| Weeks 9 through 12 | - 2/3 Reduction |
| Week 13 & thereafter | - Full Reduction |

* During the three year period following the effective date of the assignment the employee shall continue to be paid while in the lower paid job, an amount equivalent to the rate of pay of the higher paid job in effect at the time of the assignment. Such employee, however, shall receive any increases in pay in amounts which are applicable for a comparable employee in the lower rated job to which assigned.

# ARTICLE 44
## EMPLOYEE STAFFING

**GENERAL PROVISIONS**

**44.01**

(a) It is the policy of the Company to select well-qualified people to perform the many tasks necessary to provide high quality telephone service at reasonable costs. The Company and the Union agree that an essential element of this policy is the good faith effort of the Company and the Union to advance equal employment opportunity to all employees.

(b) To ensure that all employees will be provided with an equal opportunity to progress consistent with their qualifications, skills and interests as job vacancies arise, the Company has developed and will continue to implement an Upgrade and Transfer Plan (UTP) and a Specific Published Vacancy (SPV) process that specify the procedures to be followed in the handling of promotions, laterals, and downgrades to non-management jobs within the Company whether or not in the same department or bargaining unit. A promotion is considered to be a move to a different job title with a higher maximum weekly basic rate of pay than the employees present job. A lateral move is a move to the same job in a new location or a different job title with the same maximum weekly basic rate of pay. A downgrade is a move to a different job title with a lower maximum weekly basic rate of pay. Increases or decreases in the maximum weekly basic rate of pay attributed solely to differentials between wage zones will not be considered as higher or lower maximum weekly basic rates of pay for purposes of the definitions above.

(c) The purpose of UTP/SPV is to provide a standardized and systematic selection process for filling non-management jobs. Included within this process are 1) the means by which

employees may be considered for other jobs they may desire by specifying how their requests may be given consideration, 2) the means for management to identify and determine the qualifications of the current work force and, 3) the means to assist the Company in meeting its Affirmative Action Compliance Program objectives to provide equal employment opportunity without discrimination.

(d) Grievance procedures and arbitration procedures where applicable relating to lateral moves, promotions and downgrades within the bargaining unit shall be in accordance with such procedures in effect in the Collective Bargaining Agreement. At the final step of the grievance procedure, a representative from the Placement Bureau (or where the Placement Bureau did not make the selection, the supervisor who made the selection) will attempt to be in attendance if the union requests a representative and will outline the reasons for the decision made by the Placement Bureau (or the supervisor) which caused the grievance to be initiated. If such personal attendance is not practicable (in the Company's judgment) the placement bureau representative (or the supervisor) will be available by telephone for the meeting.

(e) The Promotion Pay Plan for non-management employees as set forth in the January 18, 1973 Consent Decree entered into between the Equal Employment Opportunity Commission, the Department of Labor, the United States of America     a n d the American Telephone and Telegraph Company and the NYNEX Operating Companies will be applied to employees.

(f) The application procedures contained in the UTP shall apply only to transfers under Article 8.02 of the Plant Agreement. The SPV process, described below, shall apply to all other promotions, laterals and downgrades which UTP previously covered.

(g) Employees of Verizon Yellow Pages Company in the IBEW Local 2213 Directory Clerical bargaining unit will be permitted to submit SPV applications for vacancies published under this Article, and shall be considered concurrently with employees of Verizon New York, TRG, and Empire City Subway Company.

## ADMINISTRATIVE PROCEDURES
## 44.02

(a) The Company shall announce an SPV in a weekly Company publication. The announcement shall indicate the occupational classification (job title), department, work location, qualifications, tours and assignments, and closing date for receipt of the SPV application. All bargaining unit employees shall be permitted to submit applications for any SPV.

    (1) The Company will not initiate a job search for two weeks after the publication of the SPV. During that period, an employee who has not previously been qualified for the SPV may take any training modules for the required test(s).

    (2) Both SPV and Job Bank vacancies will be posted concurrently and held open for application by employees for a period of two weeks.

(b) A surplus employee who is declared unqualified for a vacancy in a specific occupational classification (job title) as a result of failing the specified qualifying test, may apply for a vacancy in the same occupational classification (job title) after a period of three (3) months.

(c) The Company will eliminate the use of additional factors in selecting employees to fill SPVs. An employee shall be considered qualified for the vacancy if he or she possesses all

required qualifications, including passing the qualifying test or tests for the SPV, having a drivers license if one is required, meeting the medical requirements, and possessing any required licenses or certifications.

(d) Time-in-title requirements will be waived for surplus employees.

(e) Employees with an overall evaluation rating of satisfactory on their appraisal and who are satisfactory in attendance and punctuality at the time of job award will be eligible to apply for placement.

(f) SPVs will be filled in the following sequence, subject to the requirements of Article 36 of the Plant Agreement, if applicable:

   (1) By transferring employees declared surplus from jobs having the same or higher basic weekly wage rate in accordance with the terms of the Force Adjustment Plan Article.

   (2) By transferring health impaired employees who cannot, with reasonable accommodation, perform their current jobs, to lateral or downgrade positions.

   (3) By full restoration of downgraded employees.

   (4) By partial restoration of downgraded employees.

   (5) By exhausting the list in the Leave of Absence Priority File.

   (6) From within an area where the job vacancy exists: Concurrent consideration of upgrade, lateral transfer, and downgrade requests in order of seniority from among all

qualified candidates.

    (7)   From all other areas: Concurrent consideration of upgrade, lateral transfer, and downgrade requests in order of seniority from among all qualified candidates.

(g)  SPV applicants who are selected and offered positions for which they have applied may not refuse the assignments. Employees who fail to report to an awarded position will not be permitted to submit any SPV applications for a period of one year from the scheduled reporting date.

(h)  An employee who is placed pursuant to an SPV request and who retreats at his or her request will be precluded from any SPV consideration for one year from the retreat date. An employee who is placed pursuant to an SPV request and who is retreated at the Company's initiative will be precluded for six months from SPV consideration for the same job with the same qualifications. After the second and subsequent retreats at the Company's initiative, normal SPV rules will apply.

(i)  If no qualified employee has submitted an SPV application, and the Company decides to fill the vacancy by hiring, it shall first offer reemployment to employees of the Company who were laid off from the same occupational classification (job title) by inverse order of layoff and within the applicable bargaining units layoff area; provided, however, that a) the employees were laid off during the previous two years (three years for Downstate Commercial bargaining unit), b) the employees have not previously declined such an offer, and c) they are qualified to perform the duties of the position except that they will not be required to pass the written qualification test. Any collective bargaining agreement provisions covering recall from layoff that are inconsistent with this paragraph are superseded, and this paragraph shall govern.

(j) The Company will fill at least 50% of job vacancies through SPV job searches (exclusive of Article 36 requirements in the Plant Contract), provided there are sufficient qualified SPV candidates for such positions. However, during each quarter from the 4th Quarter of 2000 through the 3rd Quarter of 2001, the Company will not hire any regular employees into the Field Technician (FT), Central Office Technician (COT) or Customer Service Administrator (CSA) titles until it has posted 90 positions in those titles (combined) which will be filled through SPV job searches, provided there are sufficient qualified candidates for such positions. Thereafter in each of the four Quarters, and outside the period from the 4th Quarter of 2000 through the 3rd Quarter of 2001, with respect to FTs, COTs, and CSAs, the Company will fill at least 50% of job vacancies through SPV job searches, provided there are sufficient qualified SPV candidates for such positions.

# ARTICLE 45
# EXPEDITED ARBITRATION

**45.01**      In lieu of the procedures specified in Article 12 of this Agreement, any grievance involving the suspension of an individual employee, except those which also involve an issue of arbitrability, contract interpretation, or work stoppage (strike) activity and those which are also the subject of an administrative charge or court action shall be submitted to arbitration under the expedited arbitration procedure hereinafter provided within fifteen (15) calendar days after the filing of a request for arbitration. In all other grievances involving disciplinary action which are specifically subject to arbitration under Article 12 of this Agreement, both parties may, within fifteen (15) calendar days after the filing of the request for arbitration, elect to use the expedited arbitration procedure hereinafter provided.  The election shall be in writing and, when signed by authorized representatives of the parties, shall be irrevocable.  If no such election is made within the foregoing time period, the arbitration procedure in Article 12 shall be followed.

**45.02**      As soon as possible after this Agreement becomes final and binding, a panel of three umpires shall be selected by the parties.  Each umpire shall serve until the termination of this Agreement unless his or her services are terminated earlier by written notice from either party to the other.  The umpire shall be notified of his or her termination by a joint letter from the parties. The umpire shall conclude his or her services by settling any grievance previously heard. A successor umpire shall be selected by the parties.  Umpires shall be assigned cases in rotating order designated by the parties.  If an umpire is not available for a hearing within ten (10) working days after receiving an assignment, the case will be passed to the next umpire.  If no one can hear the case within ten (10) working days, the case will be assigned to the umpire who can hear the case on the earliest date.

**45.03**      The procedure for expedited arbitration shall be as follows:

> (a)  The parties shall notify the umpire in writing on the day of agreement or date of arbitration demands in suspension cases to settle a grievance by expedited arbitration.  The umpire shall notify the parties in writing of the hearing date.

> (b)  The parties may submit to the umpire prior to the hearing a written stipulation of all facts not in dispute.

> (c)  The hearing shall be informal without formal rules of

evidence and without a transcript. However, the umpire shall be satisfied himself or herself that the evidence submitted is of a type on which he or she can rely, that the hearing is in all respects a fair one, and that all facts necessary to a fair settlement and reasonably obtainable are brought before the umpire.

(d) Within five (5) working days after the hearing, each party may submit a brief written summary of the issues raised at the hearing and arguments supporting its position. The umpire shall give his or her settlement within five (5) working days after receiving the briefs. He or she shall provide the parties a brief written statement of the reasons supporting his or her settlement.

(e) The umpire's settlement shall apply only to the instant grievance, which shall be settled thereby. It shall not constitute a precedent for other cases or grievances and may not be cited or used as a precedent in other arbitration matters between the parties unless the settlement or a modification thereof is adopted by the written concurrence of the representatives of each party at the third step of the grievance procedure.

(f) The time limits in (a) and (d) of this Section may be extended by agreement of the parties or at the umpire's request, in either case only in emergency situations. Such extensions shall not circumvent the purpose of this procedure.

(g) In any grievance arbitrated under the provisions of this Section, the Company shall under no circumstances be liable for back pay for more than six (6) months (plus any time that the processing of the grievance or arbitration was delayed at the specific request of the Company) after the date of the disciplinary action. Delays requested by the Union in which the Company concurs shall not be included in such additional time.

(h) The umpire shall have no authority to add to, subtract from or modify any provisions of this Agreement.

(i) The decision of the umpire will settle the grievance, and the

Company and the Union agree to abide by such decision. The compensation and expenses of the umpire and the general expenses of the arbitration shall be borne by the Company and the Union in equal parts. Each party shall bear the expense of its representatives and witnesses.

(j) The time limit for requesting arbitration under this provision shall be the same as in existing procedures.

## ARTICLE 46
## JOB BANK

Each Company will submit vacancies to a centrally administered Job Bank. These vacancies will be published and held open for applications by employees in any other Company for the same two week period as SPVs are held open for such jobs. Each Company will first attempt to fill any vacancies from within that Company, using existing provisions and procedures, including those governed by collective bargaining agreements, if any.

Using qualifications to evaluate applicants that are in all respects identical to qualifications used to evaluate applicants from outside the Company, vacancies shall be filled in the following order: (1) surplus employees who submitted applications during the two-week period in order of net credited service, (2) other employees who submitted applications during the two-week period in order of net credited service, and (3) applicants from outside the Company.

# ARTICLE 47
## FOUR DAY WORKWEEK

**47.01**    The Union and Company recognize that in certain administrative work units or work groups it may be beneficial to the employees and in the best interest of the business to establish a four-day schedule as a normal workweek.  Accordingly, where the parties agree, the number of hours which presently constitute a normal five day workweek schedule may be scheduled in equal amounts over four consecutive or non-consecutive days.

**47.02**    No daily overtime payment shall be made for any of the hours worked which constitute the normal workweek even though scheduled over four days.  No differential. payments for evening and night work shall be made unless some or all of the hours which would otherwise constitute a normal workday if scheduled over five days fall within the period of time for which such differential is paid, in which event differential payments shall be made in accordance with the agreement.

**47.03**    Subject to the above, and before implementing a four-day schedule in any work group, Management and the Union will establish the parameters and implementation procedures for such four-day workweek.

# ARTICLE 48
## TRAINING AND RETRAINING PROGRAMS

### GENERAL

**48.01**    In the present environment of fast paced technological developments and structural changes, the parties recognize the benefits in offering to employees training and retraining for personal or career development or in the event their existing jobs are displaced. The Company will offer, at Company expense, training and retraining programs to its employees for personal or career development and to employees being displaced to qualify for job vacancies as anticipated by the Company.

**48.02**    The personal or career development training and the job displacement retraining programs contemplated by this provision will be generic in nature and separate and distinguished from the current job specific training instruction.

    A Training Advisory Board comprised as set forth below will be established to assist and advise in the training efforts encompassed by these programs.

### PERSONAL OR CAREER DEVELOPMENT TRAINING

**48.03**    Personal or Career development training programs will be designed as an educational self-development aid to assist regular employees in their personal development or preparing themselves for career progression opportunities or job changes within the Company.

**48.04**    Training under such program will be generic in nature as opposed to job specific and will cover:

    (a)  Technical skills (basic electronics, transmission theory, computer concepts, electronic logic, fiber optics, etc.).

    (b)  Sales skills (interpersonal relationships, oral com munications, effective writing, marketing concepts, sales techniques, etc.).

    (c)  Clerical, skills (typing, VDT operation, data entry, computer literacy and operation, etc.).

    (d)  Other fundamental skills (basic mathematics, skillful reading,

vocabulary development, grammar and usage, etc.).

**48.05**     The Company will provide a sufficient number of
Training/Retraining Manuals for use by employees who participate
in the program.  Manuals will include:

> (a)  A basic explanation of qualifying tests (how to prepare for,
> typical contents, sample questions, etc.).

> (b)  Home study and developmental study program outlines.

> (c)  List of approved courses and facilities offering such courses.

> (d)  Educational counseling availability.

**48.06**     Any regular employee with at least one (1) year of net credited
service will be eligible to participate in such training program
under the terms of such program.

**48.07**     Participation by employees in the Personal or Career development
training program will be voluntary, and time spent by employees in
such training will be outside scheduled working hours and not paid or considered
as time worked for any purpose.

**48.08**     Successful completion by an employee of any training or courses
offered pursuant to such program will be taken into account by the
Company when considering the employee for an upgrade or transfer.

## JOB DISPLACEMENT TRAINING

**48.09**     Job Displacement training programs will be designed and will be
offered to regular employees whose jobs are being displaced or
whose jobs are being restructured to a wage schedule with a lower maximum
wage rate in order to enhance the ability of such employees to qualify for
anticipated non-management job vacancies within the Company.

**48.10**     Participation in the Job Displacement training program will be
voluntary.  The program will consist of three parts:

> (a)  Skills and Interests Inventory.  A means of identifying
> employee's skills and interests.  Employees will complete and
> submit a skills and interests inventory form to the Company.

The inventory will be evaluated and, where appropriate, enhancement training will be recommended.

(b) Enhancement Training. Generic training (mathematics, English, reading comprehension, basic electricity/electronics, typing, computer concepts, etc.) intended to strengthen employees' skills so as to enhance their ability to qualify for anticipated non-management job openings within the Company. Employees will be advised of approved courses, including home study courses and approved training facilities. Time spent by employees in such training will be outside of scheduled working hours and not paid or considered as time worked for any purpose unless the Company determines it appropriate in specific instances to permit the employees to receive such training during working hours.

(c) Job Displacement Training Seminar. Those employees who participate in the Skills and Interests Inventory will be given the opportunity to attend a seminar. Time spent by employees at the seminar will be during scheduled working hours. The Seminar will generally include one or more of the following:

   (1) Job exhibits which will provide information and basic requirements, including physical requirements, for anticipated job vacancies within the Company.

   (2) An overview of the various procedures available to employees who wish to apply for job vacancies.

   (3) A basic explanation of qualifying tests (how to prepare for, typical contents, sample questions, etc.).

   (4) Home study and developmental study program outlines.

   (5) List of approved courses and facilities offering such courses.

   (6) An overview of additional educational self development opportunities available to employees, through technical school and community college programs, etc.

   (7) When the Company determines it appropriate, field visits and/or follow up individual or group counseling.

## TRAINING ADVISORY BOARD

**48.11**     The Training Advisory Board will be statewide and will consist of seven union representatives [two of whom will be representatives of the bargaining unit herein (one from Downstate and one from Upstate) and one of whom will be a representative designated by the CWA International] and up to seven management representatives (one of whom will be the person in the Company responsible for training) who will meet periodically and have responsibility for:

> (a) Furnishing advice to the Company on personal or career development and job displacement training courses and curricula;

> (b) Reviewing and making recommendations regarding training delivery systems (e.g., technical schools, community colleges, home study and developmental study program, etc.) available to be used by the Company;

> (c) Evaluating the effectiveness of such training programs and courses and the delivery systems utilized;

> (d) Encouraging employees to participate in and successfully complete the available training courses.

**48.12**     The Union and the Company will share equally in the joint costs and expenses incurred by the Board. The Company shall pay, at their basic weekly wage rates, the three Union representatives, who are not on leave of absence, for time within their scheduled tours which is not worked but which is spent in attendance at meetings of the Training Advisory Board. No payments shall be made for travel time or expense.

## CONCLUSION

**48.13**     Personal or Career development training programs, Training/Retraining manuals and Job Displacement training programs offered under the provisions of this Article may be revised at the sole discretion of the Company.

**48.14**     Nothing in these programs will supersede the applicable promotion or transfer provisions of this Agreement.

# ARTICLE 49
## MOTOR VEHICLE USAGE PROGRAM

**49.01**     If the Union agrees, a Motor Vehicle Usage Program will be established to provide, in those administrative work units where implemented, that employees who participate will be assigned a motor vehicle for use in their work and for traveling between their work locations and places of residence or other designated places for the vehicle storage.

**49.02**     The Motor Vehicle Usage Program will be implemented only within administrative work units where some or all of the employees normally use a Company- provided motor vehicle in order to perform their work. The decision to implement the program within any such administrative work unit will be within management's discretion.

**49.03**     When the Motor Vehicle Usage Program is introduced within an administrative work unit all employees within that unit who normally use a Company-provided motor vehicle in the performance of their work assignment will be eligible to participate. Participation by any such employees will be on a voluntary basis. If an employee elects not to participate, management will determine where the motor vehicle assigned to that employee is to be stored and that location will become the employee's work reporting location.

**49.04**     Employees who participate in the program will be expected to provide normally secure and legal storage for the vehicle at their places of residence. If the vehicle cannot be properly stored at an employee's place of residence, the Company may arrange for appropriate storage at its expense.

**49.05**     Operating and maintenance costs will be at the Company's expense. The Company will make arrangements for maintenance of the vehicle; however, it will be the responsibility of the employee to whom the vehicle is assigned to assure that the vehicle is properly maintained.

**49.06**     For employees who participate in the Motor Vehicle Usage Program, a work reporting area will be established on a local basis before implementation. Such work reporting area will be designed so as to serve the interests of the customer, reasonably accommodate the employee, and be satisfactory to management and the union. The work reporting area normally will be a circle. in large congested metropolitan locations or where natural barriers render a circular work reporting area impractical, other suitable parameters will be established.

**49.07**     Each participating employee will be expected to begin and end the work tour at any assigned location within the established work reporting area.  Prior to implementation of the program, the Company and Union will determine a method of compensation for employees who begin or end a work tour outside an established work reporting area.

# ARTICLE 50
# NEW BUSINESSES

**50.01**     "New Businesses" are defined as companies or new operations hereinafter started up or acquired by VZ in a telecommunications line of business. They would include, among others, the construction, installation, maintenance, marketing and sales of cable television, video, information and interactive media services, and new and traditional voice and data telephone services. As applied here, such New Businesses are those in which VZ has a majority stock or equity interest and management control, and which do business in the former BA North Footprint. They do not include new operations which, by agreement of the parties or by operation of law, are covered by an existing CWA or IBEW collective bargaining agreement. VZ shall mean the Bell Atlantic Corporation d/b/a Verizon Corporation and the "Company" parties to the Memorandum of Agreement to which this Article is attached. The former BA North Footprint shall mean the former operating area of BA within Maine, New Hampshire, Vermont, Rhode Island, Massachusetts, New York and the areas of Connecticut covered by the Byram and Greenwich exchanges.

**50.02**     "New Business Employees" (NBEs) are employees of New Businesses who perform telecommunications work in the former BA North Footprint that is the same or equivalent to traditional telephone work currently performed as part of their regular duties by bargaining unit members of CWA and IBEW. For example, the work would include the installation and maintenance of inside wire and converter boxes for cable television, and the associated customer representative and accounting work for the services provided. The work does not include non-telecommunications work such as the work performed by janitors, elevator mechanics, elevator operators, watch engineers, or garage mechanics.

**50.03**     For New Businesses that are acquired by VZ with an existing complement of employees in the NBE positions, and where those employees are not represented by a union, additional NBE vacancies shall be offered to qualified VZ former BA North Footprint employees from an existing CWA or IBEW bargaining unit pursuant to paragraph 7 and Appendix A of this Article. In such situations, union representation procedures shall be governed by the neutrality and card check provisions set forth in the Neutrality and Card Check Agreement between the parties executed this date. If this process results in card check recognition, collective bargaining shall be governed by Appendix B.

**50.04**     For New Businesses that are start-up companies or operations (ie., those without an existing complement of employees), VZ shall offer to hire the initial complement of NBE positions from qualified former BA North Footprint employees in existing CWA or IBEW bargaining unit(s) pursuant to paragraph 7 and Appendix A of this Article, and, in turn, shall recognize CWA or IBEW as the bargaining representative for the new unit(s) so long as the majority of the initial complement of NBEs are hired from existing CWA or IBEW bargaining units. The initial complement of employees is defined as the number of employees required to get the new business up and running.  In such situations, the collective bargaining process shall be governed by Appendix B. If the initial complement of employees cannot be filled with a majority of employees from existing bargaining units, then the neutrality and card check provisions set forth in the Neutrality and Card Check Agreement executed on this date shall apply.

**50.05**     For New Businesses that are acquired by VZ with an existing complement of non-union employees in the NBE positions, and where VZ increases the size of the NBE work force, VZ shall abide by the terms of paragraph 4 and not paragraph 3 if, within one year of acquisition, employees from existing CWA or IBEW bargaining units constitute the majority of the NBEs

**50.06**     For a New Business where VZ does not have a majority stock or equity interest and management control, VZ shall abide by the terms of this Article if a partner in that business is bound by the same, or substantially the same, agreement with CWA or IBEW, and together they have majority stock or equity interest and management control of that business.

**50.07**     VZ shall first offer NBE positions to qualified volunteers from existing bargaining unit(s) of the appropriate union.  For New Businesses that are acquired by VZ with an existing complement of employees in the NBE positions, bargaining unit employees shall be notified of all additional NBE positions and shall have ten (10) working days to apply for those positions before VZ may hire off the street.  For New Business that are start-up companies or operations, VZ may hire off the street after thirty (30) days if qualified volunteers cannot be found from existing bargaining units to make up the initial complement of NBE positions.  The hiring of volunteers from CWA or IBEW bargaining units shall be a priority, and qualifications for union applicants shall in all respects be identical to qualifications established for non-union applicants. Former BA North Footprint employees who have been declared surplus shall be given first consideration for NBE positions and employees hired from existing CWA or IBEW bargaining units shall bring their net credited service to the New Business.

**50.08**   If the validity of one or more of the provisions of this Article is challenged in a court of law or before the NLRB, the New Business, VZ and the Union shall cooperate and take all necessary steps to defend the validity of the Article.  If one or more of the provisions of this Article is declared void, the parties agree to modify the Article, if possible, in a manner consistent with the law and the parties' original intent.

**50.09**   The exclusive means of resolving any alleged violation or dispute arising under this Article, except those governed by Appendix B, shall be the disagreement resolution process set forth in Appendix C of this Article.

# APPENDIX A

VZ shall offer NBE positions described in paragraph 3 and 4 of this Article to the following bargaining unit employees in the following locations:

| Location of New Business | Positions | Bargaining Unit** *** |
|---|---|---|
| New York and Connecticut* | Plant | CWA |
| Upstate New York | Commercial | IBEW Local 2213 |
| Downstate New York | Commercial | CWA |
| New York | Traffic | CWA |
| New York | Accounting | CWA |
| New Hampshire | Commercial | CWA |
| Maine, Massachusetts, Vermont | Residence, Commission Advertising Directory Sales | CWA |
| Rhode Island | Residence | IBEW |
| Maine, Massachusetts, New Hampshire, Rhode Island, Vermont | Commission Advertising, Directory Sales | CWA |
| Maine, Massachusetts, New Hampshire, Rhode Island, Vermont | Plant Traffic and Accounting | Not Applicable |

\* As defined in paragraph 1 of this Article.

\*\* If a dispute arises between CWA and IBEW over which unions shall be offered NBE positions, the unions shall have ten (10) working days to resolve the matter and so notify the Company. If the dispute is not resolved within ten (10) working days, then the provisions of paragraphs 4 and 7 shall not apply to the New Business in which the dispute exists and VZ may then fill the NBE positions by hiring off the street.

\*\*\* The Chart set out above may change over time with changes in CWA or IBEW jurisdiction.

# APPENDIX B

To insure the success and stability of a New Business, the parties shall negotiate the first collective bargaining agreement for that New Business for a term of three (3) years according to the following procedures.

(1) Prior to starting a New Business, VZ shall review with the union its staffing needs in that business. VZ and the union shall also engage an independent consultant to provide a study of wages, benefits, time off, hours of work, differentials, allowances, work rules, scheduling, staffing, productivity levels and other relevant information regarding VZ competitors in the specific line of business and area where VZ plans to operate. If competitors in the geographic area do not exist, the study shall focus upon employers in the same line of business in adjacent or comparable areas. The study shall be used by the parties as a guide to negotiating a fair contract for both the Company and the employees. If the parties cannot agree upon a single independent consultant, they may each select their own consultant to develop separate studies to be used by the parties in their negotiations.

(2) If negotiations reach and impasse, either party may invoke binding Arbitration of the unsettled items for final resolution. The arbitration award on the economic issues in dispute shall be confined to choice between (a) the last offer of the employer on such issues as a single package and (b) the union's last offer, on such issues, as a single package; and, on the non-economic issues in dispute, the award shall be confined to a choice between (a) the last offer of the employer on each issue in dispute and (b) the union's last offer on such issue.

(3) The arbitration shall be governed by Article 12.02 of the VZ-NY/CWA Plant contract.

(4) Prior to the start of the arbitration hearings, the parties shall submit to the arbitrator their final offers in two separate parts: (a) single package containing all the economic issues in dispute and (b) the individual issues in dispute not included in the economic package, each set forth separately by issue.

(5) In the event of a dispute, the arbitrator shall have the power to decide which issues are economic issues. Economic issues include those items which have a direct relation to employee income including wages, salaries, hours in relation to earnings, and other forms of compensation such as paid vacation, paid holidays, health and medical insurance, pensions, and other economic benefits to employees.

(6) In deciding the issues in dispute, the arbitrator's decision shall be governed by the prevailing practice of competitors in the area, and/or employers in the same line of business in adjacent or comparable areas.

# APPENDIX C
# DISAGREEMENT RESOLUTION PROCESS

The following process shall govern the resolution of all alleged violations of or disputes arising under this New Businesses Article except those matters governed by Appendix B of this Article.

(1) If either party submits an alleged violation or dispute for resolution through this process, the parties, including, if necessary, the Vice President, District One of the CWA and the Executive Vice President Human Resources of VZ, shall meet to discuss and resolve it.

(2) If the parties are unable to resolve an alleged violation or dispute themselves, they will seek the assistance of a mediator agreed upon by both parties. Once selected, that mediator or an agreed upon replacement shall be the permanent mediator for resolving alleged violations and disputes under this Appendix for the remainder of this Agreement. If a mediator cannot be mutually selected by the parties within a reasonable period of time, each party shall promptly appoint a mediator of its choosing, and those two mediators, using the process they agree upon, shall promptly appoint the mediator to resolve the dispute under this Appendix.

(3) If the parties are unable to reach agreement with the assistance of the mediator, the mediator shall issue a binding decision on those unresolved issues.

(4) The procedure the mediator shall use in assisting the parties to reach agreement or in gathering information and deliberating in order to issue a binding decision shall be determined by the mediator under the following guidelines:

(a) With respect to disputes in which there are no important factual issues in dispute, there shall

be no formal hearings or taking of evidence. Instead, the parties, without the assistance of counsel, shall present their information and positions to the mediator through discussion, rather than a legal or quasi-legal proceeding. In presiding over this process, the mediator shall make every effort to resolve the differences before having to issue a binding decision.

(b) With respect to disputes in which there are important factual issues in dispute, either party may request that the mediator use expedited arbitration in lieu of (a) above, and the mediator may do so if he believes it will help to resolve the dispute. However, the arbitration shall be informal in nature, without formal rules of evidence and without a transcript. The mediator shall be satisfied that the information submitted is of a type on which he or she can rely, that the proceeding is in all respects a fair one, and that all facts necessary to a fair decision are presented.

# ARTICLE 51
## EMPLOYEE DEVELOPMENT PROGRAMS

**51.01**      In order to raise the level of education, including technical knowledge and customer focus, the Companies and the Unions will form an Employee Development Board consisting of the President and Vice President of the CWA, the President of the IBEW, the President of New England Telephone, and the President of New York Telephone or their designees. The Board will meet periodically and may be convened at the option of any party at mutually agreeable times. All actions taken by the Board shall be by unanimous agreement.

**51.02**      The Employee Development Board will appoint a team consisting of a CWA, an IBEW and a NYNEX representative. All actions taken by the team shall be by unanimous agreement. With oversight from the Board, the team will recommend which universities to work with to develop, implement, and monitor formal education programs selected by the Board and paid for by the Company.

(a) Although the parties may choose to offer additional programs, the parties agree that NYNEX will initially fund and offer one degree program in telecommunications technology which will include courses involving computers and electronics. The program will address the subject of customer relations.

(b) The NYNEX/CWA/IBEW team may propose entrance criteria to the universities; however, the universities will determine the entrance criteria, academic standards, test criteria for exempting from courses, and requirements for granting a degree. Classes will be scheduled one work day per week.

(c) In addition to paying for the courses and programs, the Company will provide time off the job and pay employees one day's pay per week for attending such courses and programs.

(d) All regular full time employees in the bargaining unit are eligible to attend the formal education programs if they otherwise meet the entrance criteria. Seniority will determine priority of attendance.

**51.03**      As agreed by the parties and with assistance from educators and/or qualified consultants, the Company and the Union will develop the

courses and the Company will offer courses during working hours. Courses, such as, but not limited to, concepts of customer focused teams, team building, advanced team training, how to run effective meetings, interpersonal skills, diversity, stress management, customer service, goal setting, conflict resolution and problem solving light be offered.

**51.04**     The Company will develop and offer during working hours courses designed to assist employees to prepare for the following current tests or their replacements, if any, which are required in order to qualify for some bargaining unit positions: General Test Taking, Service Representative Telephone Ability Battery "REP TAB"), Technical Telephone Ability Battery ("TECH TAB"), Operator Telephone Ability Battery ("OPERATOR TAB"), Clerical Telephone Ability Battery ("CLERICAL TAB"), Electronic Systems Mini-Course ("ESM"), Digital Cable Technologies Mini-Course ("DCT-MC"), Special Service Center Mini-Course ("SSC-MC"), Facilities Assignment and Control System Loop Assignment Center Mini-Course ("FACS-LAC, MC"), Maintenance Administrator Mini-Course ("MA-MC"), Basic Skills Qualification Test-V ("BSQT-V"), Sales Orientation Interview ("SOI"), Special Representative Assessment, Customer Contact Evaluation ("CCE"), Premise Sales Battery, Telephone Sales Battery and other such qualifying tests as may be developed in the future. All regular employees in the bargaining unit are eligible to attend these courses. Seniority will determine priority of attendance.

**51.05**     The Company will give all regular full time employees an opportunity to be tested for an assessment of their employment skills and abilities. These tests shall be strictly voluntary; the results shall be kept confidential. In addition, the Company will pay for courses related to the development of employable skills and abilities which employees take during non-working hours. These include home correspondence courses. Such courses may be covered by the Tuition Aid Program, but reimbursement may not be limited to courses covered by that program.

**51.06**     Employees will be allowed to take educational leaves in accordance with the provisions of Article 54.

# ARTICLE 52
## COMMON COMMITTEE

In order to improve the effectiveness of the functions of the Joint Workforce Profile Committee, the Technology Change Committee, the Upgrade and Transfer Plan Committee and the Contracting Committee, a single new committee, the Common Committee, is established to replace them.

The Common Committee will be comprised of ten members, five from the Union and five from the Company. The Committee will be co-chaired by the Managing Director-Labor Relations and the Vice President District One, or their designees. The other eight members will be chosen, four each, respectively, by the co-chairs. The primary staff of the Committee will be two full time employees, one selected by the Union, one by the Company, who shall also serve as the Employee Placement Team under the FAP. The Company will fund these positions as well as the office and systems costs of this staff. The Common Committee shall also direct and guide a subcommittee on contracting, which shall continue to address and implement the provisions of the September 14, 1991 letter of agreement concerning contracting.

The Company will notify the Union at least six months in advance of planned major technological changes (including changes in equipment, organization, or methods of operation) which may affect employees represented by the Union, unless it has done so prior to the date of this agreement. Meetings about the planned changes will be held as soon thereafter as can be mutually arranged. At such meetings, the Company will advise the Union of its plans with respect to the introduction of such changes and will familiarize the Union with the progress being made. Although the Company is required to notify the Union at least six months in advance of the introduction of any planned major technological change, it will make a good faith effort to advise the Union as soon as it decides to introduce such changes in order to give the Union the opportunity to discuss the impact of these changes upon the various bargaining units and the Company's customers.

The Common Committee will serve as a clearinghouse for the exchange of information between the Company and the Union regarding those and other significant planned actions or changes and their effects on represented employees, and as a forum to seek mutually acceptable ways to minimize any significant negative impact on represented employees, while enhancing the Company's ability to grow, improve customer service, and improve its competitiveness.

The Committee's staff will, at the direction of the Committee, develop methods to efficiently place surplus employees in job vacancies using UTP or FAP, as applicable, administer New York Telephone's FAP as well as the NYNEX Job Bank in accordance with the provisions of the collective bargaining agreement, and recommend to the Committee appropriate focus points for employee test taking and other training as detailed in the Employee Development Programs. The staff will also seek mutually acceptable resolutions of issues involving medical testing, non-management testing and delayed releases. They will also evaluate planned Company actions or changes referred to in the preceding paragraph, and provide input to the Committee regarding alternatives to mitigate employee impact.

After consideration of any staff input, the Committee may make recommendations to the Company regarding alternatives to the planned major technological changes, and the Company members of the Committee will work to facilitate these recommendations as appropriate. Nothing in this Common Committee process, however, will prevent the Company, after the end of the six month period, from implementing proposed major technological changes that do not otherwise violate the collective bargaining agreement.

# ARTICLE 53
# NYNEX/CWA BROADBAND AGREEMENT

In the event NYNEX or any of its subsidiaries decides to invest in a broadband network, the parties agree that CWA represented employees of New York Telephone Company will perform the plant type work in New York State and areas of Connecticut presently served by New York Telephone Company. The terms and conditions shall be as follows:

**53.01**    The work shall be performed by Field Technicians and Technical Assistants.

    (a)  Positions for Field Technicians doing Broadband work will be staffed in the following order:

        (1)  Transferring/assigning existing Field Technicians in the Article 8 unit in which the broadband work is located to the extent that force requirements allow, following the provisions of Article 8 of this agreement.

        (2)  Transferring/assigning Field Technicians outside the Article 8 unit to the extent that force requirements allow, following the provisions of Article 8 of this agreement.

        (3)  Selecting in order of seniority qualified surplus volunteers currently working in the Article 8 Unit involved to the extent that force requirements allow, and then, if there are additional force needs, selecting in order of seniority qualified surplus volunteers currently working outside the Article 8 Unit involved to the extent that force requirements allow.

        (4)  Filling additional force requirements through the UTP or by hiring temporary employees.

    (b)  Positions for Technical Assistants performing broadband work in the Article 8 unit in which the broadband work is located shall be staffed by temporary employees except that prior to hiring such temporary employees the Company will fill positions by selecting in order of seniority qualified surplus volunteers currently working in the Article 8 Unit to the extent that force requirements allow and, if there are additional force

needs, selecting in order of seniority qualified surplus volunteers working outside the Article 8 unit to the extent that force requirements allow.

(c) The Broadband Network work group shall be independent of other co-located work groups for administrative purposes including overtime, vacation, and work schedules.

(d) Upon completion of a project regular Field Technicians shall be returned to their original work location and if that location does not exist, the nearest work location. Technical Assistants, who have been selected from qualified surplus volunteers will be asked to transfer to another work location where work is available as a Technical Assistant, but if they choose not to volunteer for such assignment, or if no work is available as a Technical Assistant, they will be transferred to their previous job title and work location. If that location does not exist they will be returned to the nearest location.

(e) In addition to the rights existing in Article 2.07 of the Agreement, the parties also agree that the Company shall be permitted to employ temporary employees in the occupational classification Technical Assistant for a period of no more than three years ("Three Year Temps") under the following conditions:

   (1) Three Year Temp shall mean one who is engaged for a limited period which is expected to continue for more than three (3) weeks but not more than three (3) years, with the definite understanding that his/her employment is to terminate by the end of such period. A Three Year Temp shall be entitled to all of the benefits to which a regular employee is entitled, except that the provisions of Article 14 (Layoffs, Part Timing and Downgrades) shall not be applicable.

   (2) All temporary employees to be employed as Technical Assistants shall be advised of their status and expected employment duration at the time that they are hired.

(f) Temporary Technical Assistants performing broadband work shall be work completed at the conclusion of a project. When

a temporary employee is work completed, management may offer the employee an opportunity to accept a new temporary job assignment at a different reporting point. No expense or travel treatment will be paid. The combined job assignments of a Technical Assistant shall not exceed three (3) years.

(g) If a Technical Assistant resumes employment as a Technical Assistant after an assignment has ended, upon resumption of employment, he or she will be treated as a regular employee for purposes of bridging service under all employee benefit plans and programs in which he or she is otherwise entitled to participate. In all cases, if the period between assignments is less than 60 days, the employee's prior service shall be immediately bridged.

(h) The Company shall not add any Technical Assistants or qualified surplus employees volunteering to become Technical Assistants to work on the broadband network if such addition would increase the ratio of Technical Assistants to Field Technicians working in the broadband network above one to four. For purposes of this paragraph such ratio shall be calculated separately for each of two geographic areas, the first area consisting of the Downstate area as defined in Article 2 of this agreement and a second area consisting of the Upstate area as defined in Article 2 of this agreement.

**53.02**  The following expense treatment will apply:

(a) Reporting Locality
All provisions of this agreement will apply.

(b) Board and Lodging on Temporary Transfer
All provisions of this agreement will apply.

# ARTICLE 54
## ENHANCED EDUCATIONAL LEAVE

Effective July 1, 1994, NYNEX will provide an Enhanced Educational Leave for Eligible employees.

**54.01**     The Enhanced Leave is designed to encourage eligible employees to pursue educational goals and to allow NYNEX to alleviate force imbalances, while at the same time maintaining ties between NYNEX and the employee.

**54.02**     To be eligible for an Enhanced Leave, an employee must meet the following requirements:

be a regular full-time employee;

have at least five (5) years of net credited service;

be enrolled on a full-time basis in an educational program which would qualify for Tuition Assistance under the Tuition Assistance Program applicable to the employee.

**54.03**     An Enhanced Leave is without pay and shall be administered by and subject to the approval of the applicable benefit committee. Such leaves shall be for a period of not less than six (6) consecutive months, but in no case may the Enhanced Leave be for more than twenty-four (24) consecutive months.   Subject to applicable benefit committee approval, an Enhanced Leave may be extended beyond its original termination date, provided it did not previously exceed twenty-four (24) months in duration, in increments of six (6) consecutive months, but in no event beyond twenty-four (24) months.

**54.04**     Employees granted an Enhanced Leave shall be entitled to guaranteed reinstatement to the same job or one of similar status and pay at the end of the Enhanced Leave, subject to contract provisions which cover adjustments to the work force that may have occurred during the Enhanced Leave.

**54.05** Service credit will be granted for the period of the Enhanced Leave.

**54.06** There shall be no limit to the number of employees who may take an Enhanced leave and all eligible employees who apply will be granted such leave.

**54.07** Employees who become disabled while they are on this Enhanced Educational Leave shall be entitled to coverage in accordance with the provisions of the NYNEX Sickness and Accident Disability Plan as of the date that the employee was scheduled to return to work from his or her leave.

**54.08** The only dispute that can be arbitrated in connection with the provisions of this Enhanced Educational Leave is the dismissal of an employee while the employee is on an Enhanced Leave of Absence or failure to reinstate an employee upon completion of his or her leave.

**54.09** Except as indicated below, while on an Enhanced Leave, an employee shall be covered by the following benefit plans and programs, pursuant to the same conditions and to the same extent as comparable active employees:

| | |
|---|---|
| Medical<br>Dental<br>Vision<br>Basic Group Life Insurance<br>Death Benefits | Company provides coverage<br>for the period of the Enhanced Leave |
| VDT Vision Plan | Will not be available during the<br>Enhanced Leave |
| HMO | Company pays premium to the<br>same amount It pays for active<br>employees |
| Dependent Care Spending<br>Account | Deposits remaining after the leave<br>begins may be used in accordance with<br>the provisions of the Dependent Care<br>Spending Account Plan |
| Supplementary Group Life<br>Insurance<br>Dependent Group Life Insurance | Available at employee's expense |
| Long Term Care Insurance<br>(IBEW only) | Available at employee's<br>expense, plus an administrative charge,<br>if any, by third party plan administrator |
| Savings Plan | Payroll allotments will be<br>suspended during the period of the<br>Enhanced Leave and all other Plan<br>provisions applicable to employees on<br>a leave of absence will apply |
| Tuition Assistance | Continues under the same guidelines<br>that apply to active employees with an<br>annual ceiling of $10,000 |

**54.10**    If an employee ceases to be enrolled in an education program on a
full-time basis, the Enhanced Leave shall terminate.

# ARTICLE 55
# FORCE ADJUSTMENT PLAN

A surplus condition may be declared by the Company in a title and Force Adjustment Area. The Company shall notify the Union in writing of any declared surplus condition and shall provide the Union with the title and Force Adjustment Area affected, together with the names, titles, net credited service dates, and work locations of all employees in the affected title. If the surplus condition is confined to a particular Involuntary Transfer Area, the Company shall so advise the Union. The Company shall also notify the Union in writing whether the surplus condition is caused by Process Change or by an External Event as those terms are defined in the letter of agreement dated April 3, 1994. If the surplus condition is caused by Process Change, the provisions of paragraphs 8 (b) and 10 shall not be implemented. If the surplus is caused by an External Event, the Company may implement paragraphs 8 (b) and 10. Thereafter, the Company shall take the following steps, in the order indicated below, in each case to the extent necessary to eliminate the surplus condition.

(1) The Company shall offer to regular employees in the surplus title and Force Adjustment Area (as determined in paragraph 11 of this Article) the opportunity to fill vacancies in jobs in any Company bargaining unit, having the same or a lower basic weekly wage rate, within any Force Adjustment Area that encompasses the location of their present job. Employees will have seven days to volunteer for such vacancies. Volunteers who are qualified, test qualified, or become test qualified during the seven day period will be accepted in order of their net credited service to the extent necessary to eliminate the surplus condition. In addition, such surplus employees will, for the duration of the Force Adjustment Plan process, be given priority consideration for vacancies they apply for in accordance with the NYNEX Job Bank provisions.

(2) (DELETED)

(3) (a) If the implementation of the above steps does not relieve the surplus, the Company shall offer to regular employees in the surplus title within the Force Adjustment Area in which the surplus has been declared the opportunity to leave the service of the Company and receive Income Protection payments in amounts set forth in the collective bargaining agreement, unless the

surplus condition is confined to a particular Involuntary Transfer Area, in which case such opportunity will be offered only to such employees within such area. Volunteers will be accepted in order of their net credited service to the extent necessary to eliminate the surplus condition.

(b) An employee's election to leave the service of the Company and receive Income Protection payments must be in writing and transmitted to the Company within fifteen (15) days from the date of the Company's offer in order to be effective and it may not be revoked after such fifteen (15) day period.

(4) (DELETED)

(5) (a) If the implementation of the above steps does not eliminate the surplus condition, the Company shall offer to regular employees in non-surplus titles the opportunity to leave the service of the Company and receive Income Protection payments in amounts set forth in the collective bargaining agreement. The titles, work locations and number of employees to receive the offer will be determined by the Company after taking into consideration input from the Employee Placement Team. Such offer to each employee shall be conditioned on the Company's obtaining a qualified voluntary replacement from surplus employees in the surplus title within the Force Adjustment Area. If the Company cannot obtain a qualified replacement for an employee outside the Force Adjustment Area or in a non-surplus title, it will seek a replacement who is test qualified, and failing that, one who becomes test qualified by the end of the election period. Volunteers will be accepted in order of their net credited service to the extent necessary to eliminate the surplus condition.

(b) An employee's election to leave the service of the Company and receive Income Protection payments must be in writing and transmitted to the Company within fifteen (15) days from the date of the Company's offer in order to be effective and it may not be revoked after such

fifteen (15) day period.

(c) The Company may, at its option, offer Income Protection payments under paragraphs 3 (a) and (b) and 5 (a) and (b), above, simultaneously. If it does, it shall first accept volunteers from within the surplus title and Force Adjustment Area to the extent necessary to eliminate the surplus condition.

(6) If the implementation of the above steps does not eliminate the surplus condition, the Company shall offer job sharing to regular employees in the surplus title and Force Adjustment Area in accordance with the following:

(a) The Company will seek volunteers among the regular full-time employees in the surplus occupational classification (job title) and Force Adjustment Area to engage in job sharing. Volunteers will be selected in order of net credited service and to the extent necessary to eliminate the surplus.

(b) An employee may participate in job sharing if he or she is available to work on a weekly basis at least 40% of the number of hours that constitute a normal scheduled work week for a regular full-time employee.

(c) If an employee participates in job sharing by working a scheduled work week equivalent to at least 40% of the hours of a regular full-time employee, he or she shall

(i) receive credit for years of service for pension benefit purposes as if he or she was a full-time employee;

(ii) be considered a full-time employee for purposes of medical, dental and vision benefits and layoff; and

(iii) receive wages and all other
benefits on a pro-rated basis.

(d) When the Company declares a vacancy in an
occupational classification (job title) and
Force Adjustment Area in which (i) employees
are job sharing and (ii) there is no declared
surplus pursuant to this Article, the Employee
Placement Team will determine the number of
employees that will cease job sharing and
return to full-time status.

(7) (a) If the implementation of the above steps does not
eliminate the surplus condition, the Company shall
establish a list of jobs ("job list") comprised of all job
openings that would exist if the Company

(1) terminated all temporary and occasional
employees (except that the Company is not
required to terminate temporary
employees who in the Company's judgment
have less than 2 months remaining in their
term of employment, provided that these
employees shall be terminated within two
months unless the parties agree
otherwise); and

(2) eliminated the contracting out of all traditional
telephone work within the title and Force Adjustment
Area in which the surplus condition exists and which
the Company is equipped to perform.

(b) The Company shall offer the opportunity to volunteer for
the openings on the job list to all employees who are in
the surplus title within the Force Adjustment Area in
which the surplus condition exists. Employees shall have
seven days to volunteer, and may volunteer for as many
openings on the job list as they choose.

(c) Volunteers will be assigned by seniority to an opening for
which they have volunteered and are qualified, test
qualified, or become test qualified within the seven day

**141**

period, and, in the case of an opening to be created by the elimination of contracting out, for which they are already trained or can be trained within a limited training period not to exceed one month.

(d) The Company, to the extent necessary to eliminate the surplus condition, shall terminate temporary employees as provided in paragraph 7 (a) (1) and eliminate contracting out as provided in paragraph 7 (a) (2) to provide the job openings to be filled by volunteers as provided in paragraph 7 (c).

(8) (a) If the implementation of the above steps does not eliminate a surplus condition resulting from Process Change, the Company will transfer employees in the surplus title and Force Adjustment Area, in inverse order of their net credited service and to the extent necessary to eliminate the surplus condition, to jobs within their Involuntary Transfer Area and the provisions of paragraphs 8 (b) and 10 shall not be implemented.

(b) If the implementation of the above steps does not eliminate a surplus condition resulting from an External Event, the Company shall transfer employees in the surplus title and Force Adjustment Area, in inverse order of their net credited service and to the extent necessary to eliminate the surplus condition, to vacancies in any Company bargaining unit, for which they are qualified, test qualified, or become test qualified within seven days, first within the employees' Involuntary Transfer Area (as set forth in paragraph 12), and then, if the surplus condition has not been eliminated, outside the employees' Involuntary Transfer Area.

(c) Any such employee who is to be transferred as provided in 8 (a) or (b), may elect to terminate his employment prior to such transfer pursuant to the following:

(1) If any employee elects not to accept such transfer, the Company shall offer to such regular employees Income Protection payments as provided for in amounts set forth in the collective bargaining

agreement for a period of seven days. An employee's election to leave the service of the Company and receive Income Protection Payments must be in writing and transmitted to the Company within seven (7) day period and it may not be revoked after that period. Such employees who elect to accept the Income Protection Payments shall terminate their service and leave the payroll of the Company at the close of that seven (7) day period. All employees who volunteer during such period will be accepted.

    (2)  (DELETED)

(9) For purposes of this Article, the wages of any employees who are transferred, voluntarily or involuntarily, to jobs having lower basic weekly wage rates shall be green circled, that is, they will receive the wage rate applicable to their previous jobs, together with any negotiated wage increases, until the expiration of the agreement.

(10) If the implementation of the above steps does not eliminate the surplus, and if at least 45 days has elapsed from the notification of a surplus condition pursuant to this Article, the Company shall lay off employees in the job titles, layoff areas, and order provided for in the layoff provisions of this Agreement.

(11) For purposes of this Article, the following Force Adjustment Areas are established:

    (1)  New York City

    (2)  Long Island

    (3)  Mid-State

    (4)  Notheast Area

    (5)  Central Area

    (6)  Western Area

(12) For purposes of this Article, the following Involuntary Transfer Areas are established:

(1) Long Island

(2) New York City

(3) Westchester, Rockland and Putnam Counties, parts of Dutchess County (including Patterson, N.Y.) and parts of Orange County (including Greenwood Lake, Tuxedo and West Point) and Greenwich, Connecticut.

(4) Mid-State Area (excluding the counties of Westchester, Rockland and Putnam, and parts of Dutchess County (including Patterson, N.Y.) and parts of Orange County (including Greenwood Lake, Tuxedo and West Point) and Greenwich, Connecticut

(5) Capital Area (the boundaries of Locals 1116 and 1118 and the portion of Local 1127 north to, and including, Warrensburg)

(6) Northern Area (the portion of Local 1127 north of Warrensburg, the portion of Local 1128 in the Northeast Area, and the boundaries of Local 1129)

(7) North Central Area (the boundaries of Local 1124 and the portion of Local 1128 in the Central Area)

(8) Mid-Central Area (the boundaries of Locals 1114, 1123, and 1126)

(9) South Central Area (the boundaries of Local 1111)

(10) Western Area

The geographic boundaries of the Local Union listed above shall be those that exist on the effective date of this Agreement.

Verizon employees who work in Oneonta and Olean shall not be transferred involuntarily if the transfer would require a change in residence.

(13) If the Company notifies the Union, pursuant to this Article, of a surplus condition caused by an External Event, either party may, within 14 days of such notice, initiate discussions regarding possible mandatory job sharing, mandatory furloughs, transitional leaves of absence, and other possible means of avoiding layoffs if the

steps of this fail to eliminate the surplus. Such discussions must be completed within 30 days of the date of their initiation.

# ARTICLE 56
# MEDIATION

**56.01** For grievances involving disciplinary action which are subject to arbitration under Article 12 of this Agreement, the parties may, jointly, within thirty (30) calendar days after the filing of the request for arbitration, elect to use the mediation procedures hereinafter provided. The election shall be in writing and signed by authorized representatives of the parties. If no such election is made within the foregoing time period, the arbitration procedures set forth in this collective bargaining agreement shall be followed. A party may choose to terminate the mediation process at any time.

**56.02** A panel of five mediators shall be selected by the parties. Each mediator shall serve until his or her services are terminated by written notice from either party to the other. The mediator shall be notified of his or her termination by joint letter from the parties. Mediators shall be assigned cases in rotating order designated by the parties. If a mediator is not available for conference within thirty (30) days after receiving an assignment, the case will be passed to the next mediator. If a case cannot be scheduled within thirty (30) days, the case will be assigned to the mediator who can conference the case on the earliest date.

**56.03** The procedures for mediation shall be as follows:

(a) The parties shall notify the assigned mediator in writing of their decision to use mediation and the location of the conference.

(b) The Mediation Conferences will normally be held in one of the following locations:

New York City

Albany

Syracuse

Buffalo

(c)  The spokesperson for the Company will be a Director-Labor Relations or his or her designee.  The spokesperson for the Union will be a representative of the International Union or his or her designee.  No individual who has been a practicing attorney within the past five (5) years will attend the Mediation Conference.

(d)  In addition to the individuals identified above, the Union may determine to have present at the mediation conference the grievant, and a Local Union representative, and the Company may determine to have present at the mediation conference the grievant's supervisor and district level manager or designee.  Attendance by others at the Mediation Conference shall be only upon mutual consent of the parties.

(e)  All written material that is presented to the mediator or to the other party shall be returned to the party presenting the material at the termination of the Mediation Conference.

(f)  Proceedings before the mediator shall be informal in nature. The issue mediated will be the same as the issue the parties have failed to resolve through the grievance process.  The rules of evidence will not apply, and no transcript of the Mediation Conference shall be made.  The presentation of evidence is not limited to that presented at Step 2 or Step 3 of the grievance procedure.

(g)  The mediator may meet separately with the parties during the Mediation Conference for the purpose of resolving the grievance.  However, the mediator does not have the authority to compel the resolution of the grievance.

(h)  If the Company and Union agree to settle the grievance such settlement resulting from the conference shall not be precedent-setting.

(i)  If no settlement is reached during the Mediation Conference, the mediator shall provide the parties with an immediate oral advisory opinion, unless both parties agree that no opinion shall be provided.  The mediator shall state the basis for his or her advisory opinion.

(j)  If no settlement is reached as a result of the Mediation Conference, the grievance may be scheduled for arbitration in accordance with the Collective Bargaining Agreement.

(k)  In the event that a grievance which has been mediated subsequently is arbitrated, no person serving as a mediator between these parties may serve as the arbitrator. Neither party may at the arbitration hearing refer to statements or settlement proposals made by the other party in connection with the Mediation Conference or any statements made by the Mediator.

(l)  By agreeing to schedule a Mediation Conference, the Company does not acknowledge that the case is properly subject to arbitration and reserves the right to raise issues of arbitrability notwithstanding its agreement to schedule such a conference.

(m)  The compensation and expenses of the mediator and the general administrative expenses of the Mediation Conference shall be borne equally by the parties. The Company shall pay for the grievant and no more than one (1) Union representative for attendance at the Mediation Conference.

(n)  The mediator shall conduct no more than four (4) mediation conferences per day.

# ARTICLE 57
# WORK AND FAMILY

**57.01** **Verizon New York inc. will provide an additional $8.25 million to the Dependent care Reimbursement Fund, with $1.65 million budgeted for each of the years August 3, 2003 - August 7, 2004, August 8, 2004 - August 6, 2005, August 7, 2005 - August 5, 2006, August 6, 2006 - August 4, 2007 and August 4, 2007 and August 5, 2007 - August 2, 2008. the Fund shall be administered through the Verizon New York Inc. Regional work and family committee which shall establish written guidelines for reimbursement. In addition to providing subsidies for employees who incur costs for approved child and/or elder care and for expansion of the Kids in the Workplace Program, the fund may also be used to pay for other Work and Family projects as may be authorized by the Work and Family committee.**

**57.02** NYNEX shall continue full-time Company and Union advisers paid by the Company and charged against monies allocated for Work and Family projects.

**57.03** Neither the Dependent Care Reimbursement Fund nor its administration shall be subject to grievance and arbitration, but nothing herein shall preclude the Union from grieving and arbitrating an employee's suspension or dismissal for cause.

# ARTICLE 58
## GRADUAL RETURN TO WORK FROM CARE OF NEWBORN CHILD LEAVE

Effective June 1, 1994, an employee on a Care of Newborn Child ("CNC") Leave or a Disability Absence Leave as a result of the birth or adoption of a child, shall be permitted to return to work on a reduced schedule known as a Gradual Return to Work ("GRW"). The combination of CNC Leave and/or Disability Absence Leave, and GRW shall not exceed the 12 month period currently in effect for CNC Leave.

GRW shall be implemented as follows:

(a) An employee on GRW shall have the same status (full or part-time) as she or he had before being on leave. Except for (b) below, an employee shall have the same benefits, vacations, holidays, EWDs, and other contractual entitlements which he or she had before the Leave began.

(b) An employee on GRW shall be paid for time worked, and incidental absence and jury duty will be paid only for actual time excused from his or her scheduled work.

(c) The hours assigned to an employee on GRW shall fall within the range of hours that the employee would have been assigned if working a full schedule.

(d) An employee on GRW shall not work Sundays, holidays or overtime.

(e) The assignment of tours for employees on GRW shall not violate the seniority rights of a more senior employee.

# ARTICLE 59
## EQUALIZATION OF OVERTIME PROCEDURES

**GENERAL**

**59.01**

As used herein the term overtime shall mean:

(a) All time worked before or after an employees regular tour;

(b) All time worked within a day or part of a day during which the employee was not scheduled to work and within the employees regular tour of duty; and

(c) All time worked on a holiday, but excluding the holiday allowance; and shall include time worked on Saturdays, Sundays or holidays which are assigned on regular rotational cycles.

The unit for purposes of equalization of overtime shall be the first line supervisors group. However, where more than one such group reports to a common location, two or more such groups shall be combined into one unit for the purposes of equalization of overtime where the job requirements of each group are comparable and where it is mutually agreeable to management and to the Union.

**EQUALIZATION OF OVERTIME**

**59.02**

**Equalization of overtime lists shall be reduced to zero on January 4, 2004. The order of names for sequence of call for overtime assignments immediately following the reduction of the lists to zero shall be the same as the order of names on the lists at the time they were reduced to zero.**

Normal rotational cycles for Saturday, Sunday, or holiday assignments will not be interrupted. Overtime records will be updated weekly and will reflect the overtime worked and excused for the preceding week and cumulatively.

Overtime within each unit will be equalized on at least a quarter annual basis to the best of management's ability to do so. However, the Union recognizes that in assigning overtime management must also consider employee skills, availability of employees, and requirements of the job. The Union also recognizes that under no circumstances will employees be paid for overtime not worked.

There shall be no local agreements or practices that are contrary to or at variance with the terms of this Article.

## OVERTIME CHARGING

### 59.03

(1) All overtime shall be charged in terms of the paid hours including travel time which is paid for on an overtime basis.

(2) An employee who is assigned to work overtime and is excused from the assignment at his own request shall be charged with the number of hours he would have been paid had he worked. These hours shall be determined as follows:

   (a) By the number of hours in an assignment of a specified duration.

   (b) By the number of hours worked by his replacement in the case of an individual assignment of unspecified duration.

   (c) By the average number of hours worked by the group in the case of a group assignment. An employee who is assigned to work on a non-scheduled day and is excused from the assignment at his own request, shall be charged with the number of hours for which he would have been paid had he worked that tour.

(3) In administering Items 1. And 2. Above, the overtime hours worked and excused shall be accumulated for each payroll week and charged to the employee at the end of each payroll week at the

rate these hours would have been paid had they all been worked.

## ADMINISTRATION

### 59.04

(1) A newly hired employee or an employee transferred from another department shall be charged with the average overtime of the unit to which he is assigned when qualified in management's opinion to work overtime assignments.

(2) An employee temporarily transferred from one unit to another in the same occupational classification will assume the average overtime of the unit to which transferred. When he returns he will carry those hours back with him which have been charged to him in excess of the average assumed. These hours will be added to his cumulative total prior to transfer.

(3) An employee temporarily transferred from one occupational classification to a different occupational classification will assume the average overtime of the unit to which transferred. When he returns he will carry those hours back with him which have been charged to him in excess of the average assumed. These hours will be added to his cumulative total prior to transfer.

(4) An employee permanently transferred from one unit to another in the same occupational classification will be charged with the average overtime of the unit to which transferred.

(a) When the Company establishes a new unit for purposes of equalization of overtime, employees initially assigned to such unit shall be reduced to zero overtime hour, and the first sequence of call shall be in order of net credited service.

(5) An employee permanently transferred to a different occupational classification shall be charged with the average overtime of the unit to which he is transferred when qualified in management's opinion to work overtime assignments.

(6) An employee on light duty disability assignment who for medical reasons is not assigned overtime for a continuous period in excess of one month shall be charged with the weekly average overtime of his unit during that portion of his disability assignment which is in excess of one month.

(7) An employee absent from the job for any of the following reasons for a continuous period in excess of one month shall be charged with the weekly average overtime of his group during that portion of his absence which is in excess of one month.

   (a) Leave of absence including leave of absence for military service or military training;

   (b) Sickness disability;

   (c) Accident disability.

(8) An employee temporarily promoted to a management job shall be charged with the weekly average overtime of his unit during the entire period of his absence from his unit on the acting assignment.

(9) An employee absent from the job for any of the following reasons shall not be charged with overtime during such absence:
   (a) Vacation;

   (b) Incidental absence due to personal illness;

   (c) Excused absence, e.g., marriage, jury duty,

death in family, personal business, union business.

(10) An employee who is a member of a military reserve unit and is required to attend a scheduled reserve meeting on an evening or weekend or an annual encampment or cruise or an emergency call to duty will be excused from overtime work during such period and will not be charged with such excused overtime.

(11) An employee absent from the job for any reason other than those described in paragraphs 7, 8, 9 and 10 shall be charged with the weekly average overtime of his unit during his absence.

(12) (a) Each local union may designate one general membership meeting in each quarter of the calendar year for which it desires the cooperation of the Company in excusing employees from overtime assignments in order that employees may attend that meeting. If the local union notifies the Company of the meeting date and time of the general membership meeting so designated at least fifteen (15) calendar days in advance of that meeting , the Company shall not require any employee who wishes to attend that meeting to work overtime which would prevent the employee from attending that meeting.

(b) In addition to the above, after the requirements of the job have been met, management may excuse employees from overtime work to attend other regularly scheduled local union meetings provided that the local union advises the Company in advance of the meeting dates and times. Efforts will be made to excuse officers of the union (including chief stewards and area representatives).

(c) Overtime will not be charged where employees are excused to attend local union meetings under a) and b) above.

(13) Any employee who has elected the exemption from rotational assignments as provided in Article 17.04 shall be charged with the average overtime earned by employees in his unit during the rotational weekend assignments he has elected not to accept.

(14) An Employees with 25 or more years of net credited service shall, if they so desire, be considered, in order of seniority (based on net credited service), to be highest on the sequence of call list for purposes of assignment of overtime.

## AVAILABILITY OF OVERTIME RECORDS

**59.05**      Overtime records shall be posted weekly on Wednesday   on the bulletin board at the normal reporting location for the unit being equalized or shall be made available on Wednesday to forces without bulletin board locations.  These overtime records shall be utilized for overtime assignments in the payroll week immediately following the Wednesday they were posted or otherwise made available.

## ADMINISTRATION OF THE EQUALIZATION OF OVERTIME

**59.06**

(1) The Company shall continue its practice with regards to the assignment of overtime.

(2) The Company shall continue to maintain a "sequence of call" list for the purpose of assigning overtime.

(3) Pay treatment shall not be a factor to be considered by the Company in assigning an employee overtime from the sequence of call list.

## REVIEW OF RECORDS OF OVERTIME EQUALIZATION UNITS

**59.07**    Whenever the difference in hours charged on a sequence of call list between the high and low employee who are generally available for overtime work exceeds 10%, the management employee responsible for administration of the list for the unit involved shall, at the request of the Local Steward, meet with such Steward to review and discuss the matter in a good faith effort to reach a resolution.

Whenever the difference in hours referred to above exceeds 15%, the appropriate district-level supervisor shall, at the request of a designated representative of a local Union, meet with such representative to review and discuss the matter in a good faith effort to reach a resolution.

If the matter cannot be resolved, it shall be referred to the local Union President or his designated representative, and the General Labor Relations Supervisor of the Company or his designated representative, who shall meet to review and discuss the matter that has been referred to them.

If the matter still cannot be resolved, it shall be referred to the Area Director of the Union or his designated representative, and the Assistant Vice President Labor Relations of the Company or his designated representative, who shall meet to review and discuss the matter that has been referred to them.

# ARTICLE 60
## THIRD MEDICAL OPINION

**60.01**　　When there is a difference of opinion between the Company and the Union over the medical condition of an employee which the Union claims will affect the employee's wages or benefits, the Company and the Union will have the employee examined by a physician. The physician must be acceptable to both the Company and the Union, and the expenses of the examination shall be borne by the Company.

　　　　The physician's opinion shall be limited to the "clinical" condition of the employee, which shall be taken into account with respect to the issue in dispute.

**60.02**　　The Company will provide each Local Union with a weekly report of employees who are not being paid for disability absences. Where there is a disagreement between the Company and the employee's doctor regarding the condition of or the ability of an employee to return to work the Union may notify the Company in writing that it wishes to submit the dispute to a third doctor. If the Union's notice is not sent within 21 days after its receipt of the first weekly notice showing that an employee is not being paid for a disability absence this agreement regarding a submission to a third doctor shall not apply to that employee's absence.

　　　　When the Union notifies the Company of its request for a third medical opinion, the County Medical Association shall be requested to designate the third doctor. The selection of, and examination by, the third doctor shall take place within 30 days of the Company's receipt of the Union's written notice. The fee for services shall be shared equally by the Union and the Company.

**60.03**　　The conclusion of the third doctor will be binding on the Company and the Union. It is understood, however, that the Company will determine whether or not it can provide work for the employee within any restrictions that may be imposed consistent with the third doctor's conclusion. If the Company determines that it cannot provide such work for the employee, the employee will receive disability benefits.

**60.04** A copy of the third doctor's opinion shall be furnished to the Union, upon its request and the submission of a release signed by the employee. It is further agreed that the employee's medical records will be furnished to the Union as soon as possible after the Union's request for such records and the submission of a release signed by the employee.

## ARTICLE 61
## DURATION OF AGREEMENT

**61.01** This Agreement shall continue in force and effect until terminated as provided in Section 61.02.

**61.02** **By notifying the other party in writing at least 60 days prior to August 3, 2008, either party may terminate this Agreement at 11:59 p.m. on August 2, 2008.**

**If no such notice of termination is given, this Agreement shall automatically continue in full force and effect after August 2, 2008, for successive renewal periods of one year each, subject to the right of either party to terminate this Agreement at the end of any renewal period by notifying the other party in writing at least 60 calendar days prior to the date of termination, of its intention to terminate this Agreement.**

June 10, 1968

Mr. W. Ricks Littell, Assistant Vice President
New York Telephone Company
140 West Street
New York, New York 10007

Dear Mr. Littell:

Presently under the High Crime Award, any grievances arising out of the implementation of this Award are referred directly to the Area Director's level of the Union and the Assistant Vice President, Personnel Relations, level of the Company.

In the interest of screening out those grievances which can be settled expeditiously at the local level and at the same time keeping the number of grievances coming to our level at a minimum, I recommend that we institute a first step grievance level. Using Local 1101 as an example, this could be at the Division Steward level of the Union meeting with the District Plant Superintendent for the Company. Any grievances not resolved at this level could then be appealed in accordance with Article 7 of the High Crime Award. Note: See below

If you concur, would you so indicate by signing and returning one copy of this letter to me. This agreement could go into effect as of July 1, 1968.

Very truly yours,

M. DON SANCHEZ
Area Director


AGREED:
NEW YORK
TELEPHONE COMPANY

By W. RICKS LITTELL

Dated 6-21-68

Note: this agreement may
be cancelled by either party
on one day's written notice

W. RICKS LITTELL
Assistant Vice President

July 31, 1968

Mr. M. Don Sanchez
Chairman, CWA Bargaining Committee
85 Worth Street
New York, New York 10013

Dear Mr. Sanchez:

This will confirm our understanding regarding employees whose term of employment is less than two years but more than six months with the Company.

Provided the Stipulation of this date is ratified, these employees will be eligible on June 1, 1969, for sickness disability benefits consisting of half pay for 52 weeks beginning with the eighth calendar day of sickness absence. These benefits will be provided under the Company's "Plan for Employees' Pensions, Disability Benefits and Death Benefits." It is understood that the Company will undertake to obtain, through insurance with an insurance carrier, a policy to provide all such employees with supplementary payments of half pay for the first two weeks' of absence due to illness covered by the Plan. In effect, payments for covered absence will be provided at the rate of full pay for two weeks and at the rate of half pay for 50 weeks. The premiums for this insurance of two weeks at half pay will be paid for by all of these employees through payroll allotment with no contributions by the Company.

Employees whose term of employment is less than six months will continue to be eligible for payments of two weeks' full pay and 11 weeks' half pay beginning with the eighth calendar day of sickness absence. These payments are presently provided by an insurance policy which qualifies under the New York State Disability Benefits Law. Payment for the employee's share of the cost of this insurance coverage is deducted from the employee's pay at the rate of one-half of one percent of weekly wages not to exceed thirty cents per week.

Please indicate your concurrence with the foregoing on behalf of the Union by signing and dating the attached carbon copy of this letter.

Very truly yours,

W. RICKS LITTELL
Assistant Vice President

AGREED:
COMMUNICATIONS WORKERS OF AMERICA
By M. DON SANCHEZ
Dated July 31, 1968

RAYMOND E. WILLIAMS
Assistant Vice President

February 17, 1972

Mr. M. Don Sanchez, Area Director
Communications Workers of America
85 Worth Street
New York, New York 10013

Dear Mr. Sanchez:

In the event the Union arranges through an insurance carrier of its choice to make a Group Benefit Plan available to employees in the bargaining unit, the Company will deduct from wages and sickness benefits of any employee upon an order in writing signed by the employee and revocable by him at any time, any payment for the employee's obligation under the Plan in an amount certified to the Company from time to time by the carrier. The Company shall pay such amount to the carrier provided that such Plan and the foregoing deductions are consistent with applicable law.

The Company will make the payroll deductions for only one Union sponsored Plan that covers the entire bargaining unit, and the Union shall make no change in type or classification of the Plan during the entire term of the Collective Bargaining Agreement dated February 17, 1972.

The Company will give to the Union periodically a record of the amounts and the names of the employees from whose wages or sick benefits deductions have been made in accordance with this letter.

Cancellation by employees of the foregoing written authorization for payroll deductions must be in writing and the Company shall notify the Union of the receipt of any such written cancellations.

An employee's written authorization for such deductions shall be cancelled automatically by the Company when the employee is transferred, except on an acting basis, to a position wherein he is no longer covered by the terms of the Collective Bargaining Agreement dated February 17, 1972. The Company will notify the Union of all such permanent transfers.

The Union shall indemnify the Company and hold it harmless from all claims, damages, costs, fees or charges of any kind which may arise in connection with the administration of the Plan, the failure to make deductions or the honoring of payroll deduction authorizations and the transmitting of such deducted amounts.

Very truly Yours,

R. E. WILLIAMS

AGREED:
COMMUNICATIONS WORKERS OF AMERICA
By M. DON SANCHEZ
Dated February 17, 1972

RAYMOND E. WILLIAMS
Assistant Vice President

February 17, 1972

Mr. M. Don Sanchez, Area Director
Communications Workers of America
85 Worth Street
New York, New York 10013

Dear Mr. Sanchez:

This will confirm our understanding that before giving an employee a warning pursuant to the Absence Control Plan, the Company shall notify verbally the steward of the employee involved.  If the employee does not object, the steward may be present when the employee is given the warning.

In addition, the Company agrees that before giving a warning or a suspension prior to discharge under the provisions of this Plan, it shall notify verbally the Union Local.  Unless the employee objects, an official of the Local may be present when such actions are taken.

Please indicate your agreement to the foregoing by signing and returning a copy of this letter to me.

Very truly yours,

R. E. WILLIAMS

AGREED:
COMMUNICATIONS WORKERS OF AMERICA
By M. DON SANCHEZ
Dated February 17, 1972

RAYMOND E. WILLIAMS
Assistant Vice President

September 17, 1973

Mr. M. Don Sanchez, Area Director
Communications Workers of America
85 Worth Street
New York, New York 10013

Dear Mr. Sanchez:

In accordance with our recent discussions concerning transfers for switchmen who do not have the necessary technical qualifications to perform the work in the Area to which they have requested transfer, the following is proposed as a new Letter of Agreement superseding our Letter of Agreement dated April 3, 1970.

The Company agrees to cross train one out of four switchmen, as required, in order to qualify them technically for transfer to a particular Area. One list will be maintained for all qualified and unqualified switchmen. This list will be maintained and transfers administered in accordance with the normal rotational cycle as described in Article 36 of the collective bargaining agreement subject to the following conditions:

1. Using one list, the senior switchmen will be selected in accordance with the normal Area rotational cycle.

2. If the first four senior switchmen to be selected from the Area lists in accordance with the normal rotational cycle are unqualified, the first man in the cycle will be cross trained and transferred. The selection process will then proceed through the Areas in the normal rotational cycle, bypassing senior unqualified switchmen until 3 qualified switchmen are selected. This entails bypassing senior unqualified switchmen in Areas within the normal rotational cycle in order to select qualified switchmen. In selecting for the next cycle of four, the first unqualified switchman previously bypassed will be cross trained. The 3 qualified switchmen required to complete the cycle of four will be selected from the Area lists beginning with the Area following the end of the previous cycle of 4. In effect, the switchman to be cross trained will be the one with the earliest "bypass" date.

3. Under no circumstances will qualified switchmen be bypassed by unqualified ones within the same "From" Area.

4. If there are no senior qualified switchmen on the list to a particular Area, the Company will train one unqualified man every time four are required based on existing vacancies. The remaining 3 vacancies will be filled at the discretion of the receiving Area by either hiring or accepting additional unqualified switchmen in accordance with the normal rotational cycle.

5. The one out of four agreement will be carried over from month to month on a cumulative basis in groups of four. For example, if one switchman is required to be transferred each month to Suffolk because of existing vacancies, an unqualified man will be selected and transferred the first month. In each of the three succeeding months we will select the senior qualified switchman from the list in the normal rotational cycle.

6. The training will be done, after the transfer is made, at the discretion of management in the receiving Area.

7. The Upstate territory is excluded from this Agreement.

8. If a man selected for cross training is sent to switching school and fails to successfully complete the course, he shall be considered not qualified and will be returned to his original location immedi-ately without D.T.A. payments. A replacement will be selected from the same transfer list. The returned switchman shall not be eligible for further cross training for transfer purposes. He will be removed from the transfer list. However, if he submits a new request for transfer to an Area for which he is qualified, he will be placed on the next transfer list issued in October.

   If you concur, please sign the attached copy of this letter and return to me. These arrangements will become effective one month after receipt of your signed letter.

Very truly yours,

R.E. WILLLAMS

AGREED:
COMMUNICATIONS WORKERS OF AMERICA
By M. DON SANCHEZ
Dated Sept. 17, 1973

CAMILLE G. BLAIR
Assistant Vice President

August 11, 1974

Mr. M. Don Sanchez, Area Director
Communications Workers of America
85 Worth Street
New York, New York 10013

Dear Mr. Sanchez:

The plant personnel protection Award by a panel of Arbitrators, James J. McFadden, Chairman, Vincent P. Moravec and Gerald Ryan, Members, dated February 15, 1968, shall be extended to continue in effect for the term of the Collective Bargaining Agreement effective July 18, 1974 between the Company and the Communications Workers of America.

If you are agreeable to this extension, please so indicate by signing and returning a copy of this letter to me.

Very truly yours,

C. G. BLAIR

AGREED:
COMMUNICATIONS WORKERS OF AMERICA
By M. DON SANCHEZ
Dated August 11, 1974

CAMILLE G. BLAIR
Assistant Vice President

August 11, 1974

Mr. M. Don Sanchez, Area Director
Communications Workers of America
85 Worth Street
New York, New York 10013

Dear Mr. Sanchez:

The Company believes that pole and aerial cable work normally should be performed by Company employees. However, when the Company, in accordance with the provisions of Article 13, plans to contract out such work it shall notify, except in emergencies, or when the work is of a hazardous nature, the Union Local fifteen (15) days before contracting out such work in order to afford the Local an opportunity to discuss the matter.

Very truly yours,

C. G. BLAIR

AGREED:
COMMUNICATIONS WORKERS OF AMERICA
By M. DON SANCHEZ
Dated August 13, 1974

BERNARD C. SISSLER
Assistant Vice President

September 19, 1977

Mr. M. Don Sanchez, Area Director
Communications Workers of America
85 Worth Street
New York, New York 10013

Dear Mr. Sanchez:

This is to advise you that whenever an accident on the job occurs and results in absence, the Company will give consideration to not stepping the employee on the Absence Control Program.

Very truly yours,

BERNARD C. SISSLER

BERNARD C. SISSLER
Assistant Vice President

September 19, 1977

Mr. M. Don Sanchez, Area Director
Communications Workers of America
85 Worth Street
New York, New York 10013

Dear Mr. Sanchez:

This is to advise you that if the Company permanently transfers or downgrades an employee to another position within the Company and the employee would be required to commute at least an additional thirty-five (35) road miles to reach his new reporting point from his residence at the time of the transfer or downgrade, then that employee shall receive reasonable moving costs under Sections 8.04 and 14.04(8) of the Collective Bargaining Agreement in accordance with this letter, providing the employee actually changes his permanent residence.

This will advise you further that the following items shall be considered the reasonable moving costs within the meaning of Sections 8.04 and 14.04(8) of the Agreement, and the Company will reimburse employees the reasonable costs for moves resulting from permanent transfers or downgrades to other positions within the Company:

1. Costs incidental to the purchase of a permanent residence, up to a maximum of $2,000.00, limited to attorney's fee, bank service fees, title insurance fee, appraisal fee, mortgage tax, real estate transfer tax, recording fees, survey expense, and inspection fees.

2. One round-trip of employee's spouse to assist in the final selection of the permanent residence into which the employee intends to move, including meals and lodging, for a period not to exceed five (5) days.

3. Transportation and meal expenses for spouse and children on the day of the move en route from the former permanent residence to the new permanent residence where they will live, provided the employee presents receipts for transportation. When the personal automobile is used, receipts need not be presented.

4. Expenses of shipping household goods, including packing and unpacking.

5. Actual miscellaneous expenses up to a maximum of $500.00 for a single employee and $700.00 for a married employee. These expenses shall include such pre-move and post-move expenses as appliance services, cleaning services, piano tuning, drapery hanging, carpet laying, babysitter, etc.

6. Board and lodging treatment under Article 21 of the Agreement for the actual time the employee was required to board and lodge not to exceed thirty (30) days beyond the first thirty (30) days of the permanent transfer or downgrade, if the employee was required, in the judgment of the Company, to board and lodge during the additional thirty (30) days.

The Company's determination of the reasonableness of any moving costs shall be final.

The employee's claim for reimbursement must be made within twelve (12) months of the effective date of the transfer or downgrade.

The terms of this letter shall remain in effect during the term of the Collective Bargaining Agreement effective August 7, 1977.

Very truly yours,

Bernard C. Sissler

Bernard C. Sissler
Assistant Vice President

September 19, 1977

Mr. M. Don Sanchez, Area Director
Communications Workers of America
85 Worth Street
New York. New York 10013

Dear Mr. Sanchez:

This will confirm our understanding with regard to the administration of Article 36 (Interarea Transfer Requests) in Upstate. It is agreed that employee requests for transfer to and within Upstate will be administered on the basis of the Units appropriate to Upstate. These Units are those numbered 10 through 17 in Section 14.03 (1) (c) of the Collective Bargaining Agreement.

Very truly yours,

Bernard C. Sissler

AGREED:
COMMUNICATIONS WORKERS OF AMERICA
By M. DON SANCHEZ

Dated September 20, 1977

Albert M. Freije
Assistant Vice President

August 24, 1983

Mr. Lawrence Mancino
Area Director
Communications Workers of America
80 Pine Street
New York, New York 10005

Dear Mr. Mancino:

This is to inform you of the Company's present intention to change administratively the guidelines for supervisors under the Company's Absence Control Program to reflect the following:

1.   The first step of the Absence Control Program will not be applied to an absence of an employee which occurs after a year without any absences.

2.   The Company will apply a seventh step to the absences of an employee with 25 or more years of net credited service.

Very truly yours,

A.M. Freije

Thomas L Edwards
Assistant Vice President

August 18, 1986

Mr. Ronald E. Woods
Area Director
Communications Workers of America
80 Pine Street
New York, New York 10005

Dear Mr. Woods:

This is to confirm our understanding that notwithstanding the provisions of Article 26 (Classification and Treatment of Part-Time Employees) of the Collective Bar-gaining Agreement between the New York Telephone Company and the NYNEX Service Company and Empire City Subway Company (Limited), and the Union, effective August 10, 1986, regular employees who were on the active payroll of the Company as of December 31, 1980, and who work part-time on or after January 1, 1981 shall thereafter continue, during the current term of employ-ment, to receive payments for the benefits and other items listed in Article 26 (Classification and Treatment of Part-Time Employees) of the Collective Bargaining Agreement, on the same basis as was applicable to a part-time employee on December 31, 1980.

Very truly yours,

T.J. Edwards

AGREED:
COMMUNICATIONS WORKERS OF AMERICA
By Ronald E. Woods
Area Director

Dated: August 18, 1986

Thomas J. Edwards
Assistant Vice President

August 18, 1986

Mr. Ronald E. Woods
Area Director
Communications Workers of America
80 Pine Street, 37th Floor
New York, New York 10005

Dear Mr. Woods:

This is to confirm our understanding with regard to the definition of the term "work location" in the Income Program Plan set forth in Article 42 of the Collective Bargaining Agreement.

Where the Company offers Income Protection payments under Article 42 in connection with a program of layoffs under Section 14.02, the term "work locations" shall be construed to mean the layoff subdivisions and Areas Upstate as defined in Section 14.02(l).

In all other instances where the Company offers Income Protection payments under Article 42, the term "work locations" shall be construed to mean the following units:

1. Rockland County (which for the purpose of this letter agreement shall include Greenwood Lake and Tuxedo);

2. Westchester County (which for the purpose of this letter agreement shall include Greenwich, Connecticut and Putnam County);

3. Kings County-Queens County-Richmond County;

4. New York County-Bronx County-Empire City Subway Company (Limited);

5. Nassau County;

6. Suffolk County;

7. The geographic boundary of Local Union 1120, CWA.

For the purposes of this Letter Agreement the geographic boundary of Unit 7 shall be the same as the geographic boundary of Local 1120 as it exists on the effective date of this Agreement.

For the purposes of this Letter Agreement the geographic boundaries of Units 8 through 33 shall be the same as the geographic boundaries of the respective UTP Unit or combined UTP Units, as the case may be as they exist on the effective date of this Agreement (as shown in the booklet entitled "Upgrade and Transfer Plan-New York Telephone Company," NYT 1-81, attached hereto and made a part hereof).

| Units | | UTP Unit |
|-------|----|----------|
| 8. | 50 | Herkimer, Rome, Utica |
| 9. | 51 | Cobleskill, Samford |
| 10. | 52 | Cooperstown, Oneonta |
| 11. | 53 | Ticonderoga |
| 12. | 54 | Plattsburgh, Saranac Lake, excluding Malone |
| 13. | 56 | and 59 combined: Glen Falls, Saratoga |
| 14. | 57 | and 58 combined: Albany, Amsterdam, Cambridge, Schenectady, Troy |
| 15. | 60 | and 61 combined: Gouveneur, Watertown |
| 16. | 62 | Massena, Ogdensburg, Potsdam, including Malone |
| 17. | 63 | Cortland, Ithaca |
| 18. | 64 | and 66 combined: Geneva, Newark, Sodus |
| 19. | 65 | Hornell |
| 20. | 67 | Syracuse |
| 21. | 68 | Oswego |
| 22. | 69 | Auburn |
| 23. | 70 | Bath |
| 24. | 71 | Binghamton, Endicott, Johnson City, Owego |
| 25. | 72 | Corning, Elmira, Horseheads |
| 26. | 80 | Angola, Boston, Eden, Hamburg, No. Collins, Orchard Park, Springville |
| 27. | 81 | Lockport, Medina |
| 28. | 82 | Niagara Falls |
| 29. | 83 | Cuba, Olean, Salamanca, Wellsville |
| 30. | 84 | Albion, Batavia |
| 31. | 85 | Arcade, East Aurora |
| 32. | 86 | Dunkirk, Gowanda, Silver Creek |
| 33. | 87 | 88 and 89 combined: Alden, Amherst, Buffalo, Checktowaga, De Pew, Grand Island, Kenmore, Lancaster, Tonawanda, West Seneca, Williamsville |

\* The towns and cities listed in each UTP Unit are within the geographic boundaries of each UTP Unit, but they are not necessarily the only towns and cities within each UTP Unit.

This Agreement shall remain in full force and effect for the term of the Collective Bargaining Agreement effective August 10, 1986.

Please indicate your agreement with the above by signing a copy of this letter and returning it to me.

Very truly yours,

T.J. Edward

AGREED:
COMMUNICATIONS WORKERS OF AMERICA
By Ronald E. Woods
Area Director

Dated: August 18, 1986

Thomas J. Edwards
Assistant Vice President

August 18, 1986

Mr. Ronald E. Woods
Area Director
Communications Workers of America
80 Pine Street, 37th Floor
New York, New York 10005

Dear Mr. Woods:

This will confirm our understanding that when a death occurs in an employee's immediate family, the employee shall be given three (3) scheduled working days off with pay beginning with the first scheduled working day on which the employee does not report for duty. The term "employee's" immediate family" shall mean the employee's mother, father, sister, brother, wife, husband, son, daughter, mother-in-law, father-in-law, grandmother, grandfather, granddaughter, grandson, relative who takes the place of a parent, or other relative living in the employee's home at the time of death.

Very truly yours,

T. J. Edwards

AGREED:
COMMUNICATIONS WORKERS OF AMERICA
By Ronald E. Woods
Area Director

Dated: August 18, 1986

ARNOLD J. ECKELMAN
Group Vice President

September 14, 1991

Mr. Michael Ash
Area Director
Communications Workers of America
16 Computer Drive
Albany, New York 12205

Dear Mr. Ash:

The Company and Union agree that it is important that employees be afforded the opportunity to keep current with changes in technology and Operational Support Systems they work with in the performance of their job responsibilities. To that end, the Company may temporarily transfer a succession of employees, each for less than twelve (12) consecutive months, for a cumulative period of more than twelve (12) months, for the purpose of training, familiarization, or updating skills, if it secures the prior consent of the National Union.

Very truly yours,

A. J. ECKELMAN
Group Vice President

AGREED:
COMMUNICATIONS WORKERS OF AMERICA
AFL-CIO
By:        Michael Ash
           Area Director

Dated: 9/14/91

ARNOLD J. ECKELMAN
Group Vice President

September 14, 1991

Mr. Michael Ash
Area Director
Communications Workers of America
16 Computer Drive
Albany, New York 12205

Dear Mr. Ash:

The Company recognizes that the Joint Contracting Committee Meetings held between June 1990 and March 1991 were meaningful, productive and consistent with the spirit of reducing the level of contracting. We therefore reaffirm our commitment to implement all agreements or understandings which resulted from those Joint Contracting Committee discussions.

In addition, the Company agrees to return all splicing work to bargaining unit employees by September 1, 1992. The Company also agrees to conduct a trial within a Manhattan Central Office utilizing New York Telephone Company employees to perform the central office work associated with installing digital pair gain systems (e.g. SLC-96) and associated fiber optic multiplexers for loop systems. The details and associated evaluation of this trial to see if and when this central office work can be returned to bargaining unit employees shall be an initial priority of the Joint Contracting Committee.

It is also the Company's desire to maintain the progress made during these meetings and therefore we agree to continue the Joint Contracting Committee. The ongoing purpose of the Committee shall be to analyze issues re-lated to contracting in all New York Telephone bargaining units brought to it by either the Union or the Company and to seek solutions to the issues or possible alternatives to contracting that are agreeable to both parties. When evaluating or resolving contracting issues brought before it, the Committee shall be guided when possible by the principle of "telephone work for telephone people" and shall consider the following criteria:

(i) The duration of the work or project;

(ii) Whether bargaining unit members have the necessary skills or can be trained within a reasonable period of time to do the work or project;

<ol type="i" start="3">
<li>Whether the Company would be required to incur an extraordinary expense that it would not ordinarily incur to purchase equipment and train employees on that equipment;</li>
</ol>

<ol type="i" start="4">
<li>Whether there was an emergency situation such as a hurricane or blizzard and bargaining unit members working overtime cannot complete the work within a reasonable time.</li>
</ol>

The Committee shall consist of four representatives from the Union and four representatives from the Company, who will be at the General Manager level, and shall have the authority to involve subject matter experts from the areas to be addressed.

The Committee shall meet on regular basis or as otherwise agreed upon by the parties.

Very truly yours,

A. J. ECKELMAN
Group Vice President

AGREED:
COMMUNICATIONS WORKERS OF AMERICA
AFL-CIO
By:      Michael Ash
        Area Director

Dated: 9/14/91

James J. Dowdall
Vice President
Labor Relations

Ms. Elisa Riordan
Assistant to the Vice President
District One
Communications Workers of America
80 Pine Street
New York, NY 10005

April 3, 1994

Dear Ms. Riordan:

This will confirm our agreement regarding the issues that can be arbitrated in connection with the Employee Development Programs provisions of our collective bargaining agreement. As we agreed, the issues that will be subject to arbitration shall be limited to questions of the discipline of or the pay treatment of employees arising out of the administration of the Employee Development Programs.

NYNEX CORPORATION

James J. Dowdall
Vice President
Labor Relations

AGREED:
COMMUNICATIONS WORKERS OF AMERICA
Elisa Riordan
Assistant to the Vice President
District One

James J. Dowdall
Vice President
Labor Relations

Ms. Elisa Riordan
Assistant to the Vice President
District One
Communications Workers of America
80 Pine Street
New York, NY 10005

April 3, 1994

Dear Ms. Riordan:

This will confirm our understanding with respect to day-to-day transfers of employees outside of surplus conditions being dealt with in the Force Adjustment Plan.

Except for transfers under the Force Adjustment Plan Article which are intended to eliminate a declared surplus condition, the Company shall continue to transfer employees in accordance with existing contractual provisions and practices. With respect to permanent involuntary transfers, these existing provisions and practices shall only be employed within an Involuntary Transfer Area or between Involuntary Transfer Areas, as long as no home move as defined in the relocation allowance letter is required.

NYNEX CORPORATION

James J. Dowdall
Vice President
Labor Relations

AGREED:
COMMUNICATIONS WORKERS OF AMERICA
Elisa Riordan
Assistant to the Vice President
District One

James J. Dowdall
Vice President
Labor Relations

Ms. Elisa Riordan
Assistant to the Vice President
District One
Communications Workers of America
80 Pine Street
New York, NY 10005

April 3, 1994

Dear Ms. Riordan:

This will express the Company's intentions with respect to contracting out work. With the new employment security provisions in the collective bargaining agreement, the Company has every incentive to tailor its discretionary use of contracting to balance its obligation to provide jobs for employees with the costs of operation.

Beyond that, in the event that surpluses are caused by an "external event," and before implementation of the last step of the Force Adjustment Plan, the Company will carefully weigh its opportunities to bring back contracted work to provide meaningful jobs for remaining surplus employees outside of the area and/or job title where the work is being done. In considering this option, the Company will evaluate the skill match of the available employees, the need and willingness of employees to relocate, the training and equipment required to do the work, the duration of the requirement, as well as the comparative economics of all options.

The above subjects will be discussed at the contracting subcommittee of the Common Committee.

NYNEX CORPORATION

James J. Dowdall
Vice President
Labor Relations

AGREED:
COMMUNICATIONS WORKERS OF AMERICA
Elisa Riordan
Assistant to the Vice President
District One

James J. Dowdall
Vice President
Labor Relations

Ms. Elisa Riordan
Assistant to the Vice President
District One
Communications Workers of America
80 Pine Street
New York, NY 10005

April 3, 1994

Dear Ms. Riordan:

NYNEX and CWA have carefully reviewed the Company's process re-engineering plan, the demographics of the current work force, and the likely impact of the FAP retirement incentive upon that work force. The parties have concluded that due to the above factors, and barring external events described below, layoffs, forced transfers outside the transfer areas, and loss of compensation shall not occur during the term of this contract extension.

Specifically, the parties agree that there shall be no layoffs, forced transfers outside the transfer areas, or loss of compensation as a result of any Company initiated "process change", which includes process re-engineering initiatives, work place consolidations, office closings, contracting, shifting of bargaining unit work, network upgrades, and other business changes developed to accommodate new technology or to improve productivity. efficiency or methods of operation.

The parties also agree that an "external event" that is viewed as significant and that directly reduces the need for a large number of employees, shall not be considered "process change." An example of an external event might be a state or federal regulatory change that causes the Company to abandon a line of business, an interexchange carrier take back of billings and collections, or the loss of a major telecommunications network contract. An external event of this nature shall be covered by the additional step(s) of the FAP.

NYNEX CORPORATION
James J. Dowdall
Vice President
Labor Relations

AGREED:
COMMUNICATIONS WORKERS OF AMERICA
Elisa Riordan
Assistant to the Vice President
District One

James J. Dowdall
Vice President
Labor Relations

Ms. Elisa Riordan
Assistant to the Vice President
District One
Communications Workers of America
80 Pine Street
New York, NY 10005

April 3,1994

Dear Ms. Riordan:

This is to confirm our agreement that an employee who, as a result of a voluntary or involuntary permanent transfer pursuant to the Force Adjustment Plan, would be required to commute at least an additional thirty-five (35) road miles to reach the new reporting point from his or her residence at the time of the transfer, shall receive a relocation allowance of $8,000, providing the employee actually changes his or her permanent residence within one year of the effective date of the transfer. Such allowance shall be the sole payment to such employees in connection with the relocation of their residence.

NYNEX CORPORATION

James J. Dowdall
Vice President
Labor Relations

AGREED:
COMMUNICATIONS WORKERS OF AMERICA
Elisa Riordan
Assistant to the Vice President
District One

James J. Dowdall
Vice President
Labor Relations

Ms. Elisa Riordan
Assistant to the Vice President
District One
Communications Workers of America
80 Pine Street
New York, NY 10005

April 3, 1994

Dear Ms. Riordan:

This letter confirms the understanding of the parties that should New York Telephone, New England Telephone, Empire City Subway, Telesector Resources Group, NYNEX Information Resources, NYNEX Mobile Communications or the NYNEX Corporation engage in telecommunications work not previously undertaken by that company, that work shall be bargaining unit work covered by the existing collective bargaining agreements if it is the same or equivalent to the telecommunications work currently performed by bargaining unit members in that company as part of their regular duties.

For example, if New York Telephone were permitted by legislation to offer cable television services, the work would include the installation and maintenance of the fiber/coaxial network, the inside wire and converter boxes, and the associated customer representative and accounting work for the CATV services provided.

Nothing in this paragraph affects the parties' (i) existing rights or duties under present contracts, (ii) their legal rights with respect to allegations of management performing bargaining unit work, or (iii) the Company's contractual rights with respect to contracting out work.

For the purposes of this agreement, telecommunications work shall mean the construction, installation, maintenance, marketing and sales of cable television, video, PCN or PCS, wireless or cellular communications, information and interactive media services, and new and traditional voice and data telephone services.

NYNEX CORPORATION

James J. Dowdall
Vice President
Labor Relations

AGREED:
COMMUNICATIONS WORKERS OF AMERICA
Elisa Riordan
Assistant to the Vice President
District One

James J. Dowdall
Vice President
Labor Relations

Ms. Elisa Riordan
Assistant to the Vice President
District One
Communications Workers of America
80 Pine Street
New York, NY 10005

April 3, 1994

Dear Ms. Riordan:

If a surplus is caused by an "external event", as defined in the Job Security letter, and it becomes apparent that the implementation of the procedures in paragraphs 1-8 of the Force Adjustment Article will not eliminate a surplus of Central Office Technicians (COTs) in a given Force Adjustment Area, and New York Telephone Company is performing installation work in that Area with non-bargaining unit employees, then the Company will utilize CWA represented COTs in that Area to perform available equipment installation work but no more than necessary to eliminate that surplus. These positions will be filled by qualified volunteers in order to net credited service.

NYNEX CORPORATION

James J. Dowdall
Vice President
Labor Relations

AGREED:
COMMUNICATIONS WORKERS OF AMERICA
Elisa Riordan
Assistant to the Vice President
District One

James J. Dowdall
Vice President
Labor Relations

Ms. Elisa Riordan
Assistant to the Vice President
District One
Communications Workers of America
80 Pine Street
New York, NY 10005

April 3, 1994

Dear Ms. Riordan:

The Company will reimburse Employees who retire during the term of the current collective bargaining agreement for actual expenses, not to exceed $3000, incurred during the 12 month period after retirement for the following, provided that such expenses are incurred for the purpose of helping prepare the retiree for a new career:

— fees associated with career counselling, skills and interest assessment, résumé preparation and placement agency fees.

— tuition and fees at a college or university.

— tuition and fees at a technical or computer training center.

— tuition and fees at other job training centers.

NYNEX CORPORATION
James J. Dowdall
Vice President
Labor Relations

AGREED:
COMMUNICATIONS WORKERS OF AMERICA
Elisa Riordan
Assistant to the Vice President
District One

J.P. Navarro
Director - Labor Relations

Mr. Michael P. Ash
Area Director - Upstate
Communications Workers of America
3719 Union Road
Union Square Village
Cheektowaga, New York 14225

April 3, 1994

Dear Mr. Ash:

The parties recognize that the combination of craft titles during the 1994 bargaining, together with the anticipated introduction of turf teams, may create difficulties in equalizing overtime opportunities within an overtime group, because of the different skills and qualifications that employees who formerly held different titles bring to the newly created jobs. The parties further recognize that training employees to provide them with skills in other disciplines that they do not now possess will maximize the Company's ability to meet customer requirements for quality service while equalizing overtime. Such efforts may include formal training as well as informal on-the-job training.

When the Company provides formal training, it will, in a majority of cases, select the senior volunteer from the equalization of overtime unit who is qualified for such training, consistent with the needs of the business. Whenever the Company fails to select such senior volunteer, it will notify the Local Union at least one week in advance of the commencement of the training and will provide the reason or reasons for such failure to select. The Training Advisory Board will review issues related to the selection process that are brought to it by either the Company or the Union.

With regard to on-the-job training, the Company may assign, on a voluntary basis, bargaining unit employees to train other employees without additional compensation.

The Company plans to initiate several pilot operations in connection with its introduction of turf teams, and hopes to complete the initial implementation of this concept within approximately two years. Prior to the initiation of any such pilot operations and prior to the initiation of any other turf teams during the initial implementation, local management will meet with representatives of the appropriate Local Union or Unions to discuss issues concerning the initial staffing of such turf teams.

In addition, during the 1994 discussions between the Company and the appropriate Local Unions pursuant to Section B of the Memorandum Agreement on Vacations, the parties will address the impact on vacation schedules of the combination of job titles along with the anticipated introduction of turf teams.

After completion of the turf team pilot operations, and during the period of initial implementation, information regarding local experience with staffing, training, and vacation scheduling may be given to the Common Committee, which may evaluate such local experience for the purpose of sharing successful solutions with management and the Union.

Very truly yours,

J.P. Navarro

AGREED:
COMMUNICATIONS WORKERS OF AMERICA
Michael P. Ash
Area Director - Upstate

J.P. Navarro
Director - Labor Relations

Mr. Michael P. Ash
Area Director - Upstate
Communications Workers of America
3719 Union Road
Union Square Village
Cheektowaga, New York 14225

April 3, 1994

Dear Mr. Ash:

This will confirm our agreement that temporary employees in the occupational classification Escort will not be temporarily promoted to another occupational classification except when the Escort is assigned by management to perform the work of a higher occupational classification while accompanying a Field Technician.

Very truly yours,

J.P. Navarro

AGREED:
COMMUNICATIONS WORKERS OF AMERICA
Michael P. Ash
Area Director - Upstate

John P. Navarro
Executive Director
Labor Relations

Mr. Peter Maher
Area Director
District One
Communications Workers of America
80 Pine Street
New York, New York 10005

August 11, 1998

Dear Mr. Maher:

This will confirm our agreement that NYNEX will provide an additional $3 million to the Dependent Care Reimbursement Fund, with $1.5 million budgeted for each of the years August 9, 1998 - August 8, 1999 and August 9,1999 - August 5, 2000.  In addition to providing subsidies for employees who incur costs for approved child and/or elder care, the Fund may also be used to pay for other Work and Family projects as may be authorized by the Work and Family Committee.

All other provisions of the existing Work and Family contract provisions shall remain applicable.

John P. Navarro
Executive Director
Labor Relations

AGREED:
COMMUNICATIONS WORKERS OF AMERICA
Peter Maher
Area Director
District One

John P. Navarro
Executive Director
Labor Relations

Mr. Peter Maher
Area Director
District One
Communications Workers of America
80 Pine Street
New York, New York 10005

August 11, 1998

Dear Mr. Maher:

This will confirm our agreement to meet, commencing within 60 days after the ratification of this agreement, to consider the development and implementation of a payroll practice under which employees may elect to reduce their current compensation to pay for parking or mass transit costs on a tax-favored basis, as permitted by law. The Company shall have no financial obligation to fund such costs. Instead, the arrangement would be intended to operate on a basis comparable to the dependent care or health care spending accounts. Any such practice must be in full conformity with any requirements under the Internal Revenue Code or applicable Internal Revenue Service or Department of Labor regulations and any applicable state or local requirements relating to payroll practices.

If it is determined that this payroll practice is advantageous both to employees and the Company, the Company shall develop a proposal for approval by the Union setting forth the terms and conditions of the practice and its effective date (which shall allow sufficient time for payroll implementation by the Company).

John P. Navarro
Executive Director
Labor Relations

AGREED:
COMMUNICATIONS WORKERS OF AMERICA
Peter Maher
Area Director
District One

Jeffrey Weiner
Director, Labor Relations


Mr. Carmine Turchi
International Representative
Communications Workers of America
80 Pine Street
New York, New York  10005

August 11, 1998

Dear Mr. Turchi:

Based on discussions between the parties regarding issues and problems associated with the establishment and utilization of the Telecommunications Technical Associate (TTA) occupational classification, the parties will create a TTA Committee, to be comprised of four representatives of each party, including the TTA Directors of both parties.

The Committee will meet on a monthly basis for the purpose of identifying the issues and problems that will be addressed, including the number of positions to be made available and the qualifications for entry into the Next Step Program. Thereafter, the Committee will meet at mutually agreeable times for the purpose of developing joint recommendations to the management of the Company regarding the TTA occupational classification.

The Committee will stay operational as long as it is mutually agreeable.

Very truly yours,

Jeffrey Weiner
Director
Labor Relations


AGREED:
Communications Workers of America
Carmine Turchi
International Representative

Jeffrey Weiner
Director, Labor Relations

Mr. Carmine Turchi
International Representative
Communications Workers of America
80 Pine Street
New York, New York  10005

August 9, 1998

Dear Mr. Turchi:

This will confirm our agreement that during the life of the current contract extension the Company will assign COTs to work in the ESAC, for and at the direction of ESAC management personnel.  The Company will select the COTs for these training tours, which will be for a minimum of eight weeks.  Two COTs will be assigned to the ESAC at any one time.

Very truly yours,

Jeffrey Weiner
Director
Labor Relations

AGREED:
Communications Workers of America

Carmine Turchi
International Representative
Jeffrey Weiner
Director, Labor Relations

Mr. Carmine Turchi
International Representative
Communications Workers of America
80 Pine Street
New York, New York 10005

August 11, 1998

Dear Mr. Turchi:

This will confirm our agreement regarding the assignment of work related to Local Area Networks (LANs).

A. In Network Operations Centers (NOCs), the job duties described below will be performed by bargaining unit employees.

**Tape Backups**
- perform daily log tape backups on 9 Tandem Starserver SSFT Computers

- perform weekly epoch tape backups on 9 Tandem Starserver SSFT Computers

- perform weekly save & tape backups on 2 BNS2000s

- perform weekly save & tape backups on 4 Datakits (1 local, 3 remote)

- keep detailed logs of all backups and send out log backup tapes of all 9 Tandem Starserver Computers to the Disaster Recovery Center weekly (managers will continue to do tape backups of the Primary Work Station (gmmacpws) and the backup home Server (gmmac10)

**Sun Workstations**
- perform routine Sun Workstation Maintenance

- change keyboards and monitors after a workstation has been shut down by a manager

- perform inside moves of Sun Workstations when necessary, and insure LAN

connectivity to the Cabletron Hub in the LAN room (run cables when necessary)

### Datakit

- travel to remote Datakit LAN rooms to insure they are secure and clean and that local Datakit consoles are functioning properly

- inventory spare Datakit hardware in all LAN rooms

- create and keep current lists or databases of all circuits working in all Datakits

- track and refer out any end office circuit troubles given to the Resource Group

- run cables for new circuits

### Video Wall

- perform routine Video Wall maintenance (test projectors, monitors, and touch pads for functionality)

- fix or refer any video or audio troubles on the Video Wall

- maintain the message of the day PC and keep messages current as requested

### Printers

- perform routine printer maintenance

- move printers when directed (host printers, SUN laserjets, PC laserjets)

- fix or refer all printer troubles

### PCs (under the direction of management)

- help install and maintain new PCs as instructed

- load software image and hardware as necessary

- move PCs as needed and insure LAN connectivity

- install PC LAN cabling as required

B.  Outside of NOCs, LAN work that is currently being performed by managers employed in the Network Operations organization, other than work related to system administration, will, over a period of six months from the effective date of this agreement, be assigned to qualified bargaining unit employees who will perform such work for the Network Operations organization. Managers employed in the Information Systems organization will continue to perform LAN work that they are currently performing.

C.  In locations other than NOCs, bargaining unit employees will perform hardware installation (including cabling) and maintenance of PCs, servers, PADs, routers, and terminal servers and preparation of desktop PCs for software seeding.  If any of the above hardware is under warranty, bargaining unit employees will be assigned to the maintenance of such hardware only if an employee who is warranty qualified by the vendor is available to perform the work within a reasonable period of time, and only if the Company receives payment from the vendor sufficient to cover the loaded labor cost to the Company of using a bargaining unit employee.

   This letter of agreement is without prejudice, and neither the letter nor the work performed under it shall be cited as a precedent or otherwise referred to in any proceeding except one to enforce its provisions.

                                        Very truly yours,

                                        Jeffrey Weiner
                                        Director
                                        Labor Relations

AGREED:
Communications Workers of America
Carmine Turchi
International Representative

Jeffrey Weiner
Director, Labor Relations

Mr. Carmine Turchi
International Representative
Communications Workers of America
80 Pine Street
New York, New York  10005

August 9, 1998

Dear Mr. Turchi:

This will confirm our agreement to create a subcommittee of the Common Committee to deal with major technological changes (as defined in Article 52) that are limited in their scope and effect to the Plant bargaining unit.  The subcommittee will be co-chaired by the Managing Director-Labor Relations and the Vice President of District One, or their designees.

If a matter that is presented to and addressed by the Common Committee is thereafter agreed by the parties to be limited in its scope and effect to the Plant bargaining unit, and the parties wish to discuss the matter further, it will be referred to the Plant Subcommittee, which will meet at mutually agreeable times to discuss the matter, with representatives of the particular Local(s) involved being present.

The terms of the last paragraph of Article 52 shall be applicable to matters referred to the Plant Subcommittee, except that the Subcommittee may make recommendations to the Company without referring the matter back to the Common Committee.

The parties further agree that the subcommittee will serve as a forum to which the Union may bring issues regarding situations in which management employees are performing work of a technical nature that the Union believes should be assigned to employees it represents.  It is not the intention of the parties that the subcommittee be used to discuss or resolve allegations of individual instances of management doing bargaining unit work.  Rather, the parties intend that the subcommittee be used to discuss and recommend resolutions of issues relating to areas or types of work being performed by management employees.

Very truly yours,

Jeffrey Weiner
Director, Labor Relations

AGREED:
Communications Workers of America
Carmine Turchi
International Representative

Mr. Christopher Shelton
Assistant to the Vice President
Communications Workers of America
AFL-CIO, District One
80 Pine Street, 37th Floor
New York, NY 10005

Dear Mr. Shelton:

This letter confirms the understanding of the parties that should Verizon ("VZ") - New York, Inc., VZ-New England, Inc., Empire City Subway, Telesector Resources Group, Inc., d/b/a Verizon Services Group, NYNEX Information Resources, or the Verizon Communications Inc. ("Companies") engage in telecommunications work within the former operating area of the seven state former Bell Atlantic North Footprint (NY, MA, NH, VI, ME, RI, CT Byram Greenwich Exchange), not previously undertaken by that company, that work shall be bargaining unit work covered by the existing collective bargaining agreements if it is the same or equivalent to the telecommunications work currently performed by bargaining unit members in that company as part of their regular duties.

For example, if VZ-New York, Inc. were permitted by legislation to offer cable television services, the work would include the installation and maintenance of the fiber/coaxial network, the inside wire and converter boxes, and the associated customer representative and accounting work for the CATV service provided.

Nothing in this paragraph affects the parties' (i) existing rights or duties under present contracts, (ii) their legal rights with respect to allegations of management performing bargaining unit work, or (iii) the Company's contractual rights with respect to contracting out work.

For the purposes of this agreement, telecommunications work shall mean the construction, installation, maintenance, marketing and sales of cable television, video, or information and interactive media services, and new and traditional voice and data telephone services.

> Very truly yours,
> **/s/ Jeffrey Weiner**
> Director, Labor Relations

AGREED:
Communications Workers of America
**/s/ Christopher Shelton**
Assistant to Vice President

Jeffrey Weiner
Director, Labor Relations

Mr. Carmine Turchi
International Representative
Communications Workers of America
80 Pine Street
New York, New York  10005

August 9, 1998

Dear Mr. Turchi:

This will confirm our agreement that for the duration of this contract, the Company will not declare a surplus condition in the Watch Engineer,  Elevator Mechanic or Building Mechanic occupational classification.

The parties also agree that any Building Mechanic who meets the qualifications for Watch Engineer will be promoted to Watch Engineer regardless of whether a vacancy then exists in the Watch Engineer title.  These promotions will not be counted in connection with any Company obligation regarding the filling of vacancies.

It is further agreed that the Company may ask Building Mechanics, on a voluntary basis, first by seniority within the Article 8 Unit and then by seniority from outside the Article 8 Unit, to fill other positions for which they are qualified, and, at the discretion of the Company, they may be placed into these positions before other candidates.  Any placements made under this procedure will be considered as UTP/SPV placements for the purposes of any Company obligation regarding the filling of vacancies.

Very truly yours,

Jeffrey Weiner
Director
Labor Relations

AGREED:
Communications Workers of America
Carmine Turchi
International Representative

# 1994 MEMORANDUM OF UNDERSTANDING

## MANAGEMENT EMPLOYEES PLACED IN THE BARGAINING UNIT

Other than those employees referred to in the Work Reassignment Letter who shall retain their seniority (determined by net credited service) for all purposes, the seniority of a management employee who has been assigned to the bargaining unit shall be determined by net credited service reduced by time spent in management jobs for purposes of vacation selection, tour assignment, UTP, bidding and transfer, for a period of two years, except that in the case of management employees assigned to the Upstate Traffic bargaining unit, their H-V date shall be considered to begin with the first day of their assignment to the bargaining unit. Thereafter, such employee's seniority for these purposes will be determined by net credited service except for H-V dates. Commencing on the date of reassignment, the measurement of such employee's seniority for all other purposes, including pension calculation and force adjustment, shall be net credited service.

# 1998 MEMORANDUM OF UNDERSTANDING

## ADVISORY COMMITTEE ON HEALTH CARE (ACHC)

Motivated by a mutual concern over health care issues, the Company and the Union recognize the following responsibilities:

- examinations and analyses of the major areas of health care costs for Bell Atlantic and its employees;

- considerations of additional cost containment measures, as appropriate;

- examinations of the recommendations and findings of various health care coalitions and other organizations concerned with the quality and cost of health care;

- an exploration of proposed federal and state legislation;

- encourage Health Maintenance Organiza-tions to price their services competitively so as to encourage employee participation;

- an examination of educational programs dealing with life styles and health status and the relationship between the two;

- making recommendations regarding all of the above areas of health care cost containment;

- recommend and develop joint educational programs to help employees make better use of the medical plan and encourage employees to become better consumers of medical services;

- investigate the impact of changing medical patterns of practice to determine areas of the plans that might need to be adjusted and to recommend changes, if appropriate;

The Company and the Union also recognize the following need with respect to the implementation of Managed Care Programs:

- issue an RFP to potential carriers, including general managed care network carriers, specialized mental health/substance abuse managed care firms, and mail order and retail prescription drug firms,

- review proposals, interview carriers, and make a recommendation on the selected carrier(s);

- discuss timing of the network's implementation and roll-out in various geographic sites, including reviewing and providing input on the readiness of sites;

- assist with additional provider recruitment as required;

- assist with employee communications on network implementation and other issues, to aid in the education and training of employees and union representatives on network enrollment, operation and usage;

- create a constructive process for problem resolution on employee claim and network usage issues;

- Identify health promotion and wellness needs, and assist in developing programs to meet employee wellness issues throughout the network if appropriate;

- Identify opportunities to enhance network utilization and effectiveness;

- review ongoing network performance such as provider access, service indicators, quality, responsiveness to employee needs, employee satisfaction issues and surveys.

To address the above needs, the Company and the Union agree to continue the Advisory Committee on Health Care at the regional level. The Advisory Committee shall be a high level committee which will provide oversight and act on approved recommendations.

The Advisory Committee (ACHC) shall have a total of not more than four (4) management representatives from Bell Atlantic and not more than three (3) representatives designated by the CWA including one from the International and one (1) representative designated by the International Brotherhood of Electrical Workers Local 2213 ("IBEW"). The ACHC shall work directly with the Director - Health Benefits and Life Services of Bell Atlantic. As needed, outside experts (e.g. representatives of carriers and third-party administrators) shall attend the Advisory Committee meetings.

The Advisory Committee shall meet from time-to-time but at least four times each year.

The Working Committee shall have a total of not more than two (2) management representa-tives and a total of not more than two (2) representatives appointed by the CWA and one (1) representative appointed by the IBEW. The Working Committee will meet periodically as necessary to resolve issues as delegated by the Advisory Committee.

These Committee (s) shall develop facts and use consensus so that well-informed decisions can be made regarding the matters covered by this provision.

# APPENDIX A

## ROLE OF WORKING COMITTEE ON HEALTH CARE NETWORK IMPLEMENTATION

1.  Solicit proposals from potential carriers, including (1) general managed care carriers, (2) specialized mental health/substance abuse managed care firms, and (3) mail order and retail prescription drug providers.

2.  Review proposals, interview carriers, and provide input and recommendations to the company on the selected carrier(s).

3.  Conduct on-site visits to all finalists.

4.  Discuss timing of the implementation and rollout in various geographic sites, including reviewing and providing input on the readiness of sites.

5.  Assist with employee communications on implementation and other issues, to aid in the education and training of employees and business agents on network enrollment and operation.

6.  Assist in actual implementation. Identify health promotion and wellness needs, and assist in developing programs to meet employee wellness issues.

# APPENDIX B

## ROLE OF THE WORKING COMMITTEE ON HEALTH CARE

1. Create a constructive process for problem resolution on employee claim and network usage issues.

2. Identify opportunities to enhance utilization and effectiveness network providers.

3. Review ongoing network performance such as provider access, service indicators, quality, responsiveness to employee needs, employee satisfaction issues and surveys.

4. Address the process to be utilized in extending until October 31, 1998 the filing of prior year claims that have been filed in an untimely manner, and resolve appeals associated with the issue.

# 2003 MEMORANDUM OF UNDERSTANDING
## CORPORATE PROFIT SHARING

The following Corporate Profit Sharing Plan shall apply during the term of this Agreement:

**Section 1.** Plan Purpose. The Corporate Profit Sharing Plan ("CPS") is designed to encourage and reward employees for their contribution to Company profits

**Section 2.** **Plan Years: The CPS will provide awards for results in calendar years 2003, 2004, 2005, 2006, and 2007, with awards payable in 2004, 2005, 2006, 2007 and 2008.**

**Section 3.** Eligibility.

(a) Eligible Employees. Full-time and part-time regular and temporary employees who are on the payroll for at least 90 days during an applicable Plan Year will be eligible to receive a CPS Distribution to the extent earned and payable. Employees who resign or are discharged for cause prior to December 31 of the Plan Year forfeit their eligibility to receive a CPS Distribution.

(b) Proration for Partial Years. For an employee who is employed more than 90 days, but less than 12 months, of the Plan Year, the employee's CPS Distribution will be prorated by twelfths to correspond to the number of months of participation during the Plan Year. For purposes of proration, a month will be taken into account if the employee is actively participating on the first day of the calendar month.

(c) Proration for Part-Time Employees. CPS Distribution for each eligible part-time employee will be prorated as a percent of the normal workweek for a full-time employee in the same title.

**Section 4.** Time Worked and Leaves of Absence. The following will count as time on the payroll for CPS Distributions:

(a) Absence attributable to approved sickness or accident disability up to accrued FMLA leave.

(b) Departmental leave (up to 30 days).

(c) Time that an employee is eligible to receive pay for Military Leave.

(d) Up to 30 days for Anticipated Disability Leave and Child Care leave combined.

(e) Up to 30 days for any other approved leave.

An employee shall not lose eligibility if, on December 31 of the applicable Plan Year, the employee is absent for one of the reasons stated in (a) through (e) above.

**Section 5.** Separations. An employee who is otherwise eligible for a CPS Distribution will not lose eligibility due to the following separations (so long as the employee has a period of at least 90 days of active participation during the Plan Year):

(a) Retirement

(b) Separation due to force surplus

(c) Transfer (or a quit/hire, with a break not exceeding 30 days) to another company that participates in this Plan or to an affiliated company with a collectively bargained corporate profit sharing plan that is substantially similar to this Plan, and the employee is on the payroll of such company on December 31 of the same year

(d) Death of the employee

(e) Promotion to management, and the employee is on the payroll of the company in which he or she is employed as a manager on December 31 of the same year

An employee who is separated from the active payroll for the above reasons will receive a CPS distribution that shall be prorated as described in Section 3.

## Section 6. CPS Distribution Calculations

(a) **Standard Award:** The "Standard" CPS Distribution shall be as follows:

| Performance Year | Standard CPS Distribution | Year Payable |
|:---:|:---:|:---:|
| 2003 | $500 | 2004 |
| 2004 | $500 | 2005 |
| 2005 | $500 | 2006 |
| 2006 | $500 | 2007 |
| 2007 | $500 | 2008 |

\* \* \*

(b) Performance Percentage. The actual CPS Distribution per eligible employee will be calculated by multiplying the "Standard" CPS Distribution by a "Performance Percentage" for the Plan Year that shall not be less than 0% and not more than 200%. The "Performance Percentage" shall be based on the performance percentage that is applicable to the financially driven component of the short-term annual cash incentive award (the "STIP" award) payable for that performance year to the Chief Executive Officer(s) of Verizon Communications (the "CEO"). The Performance Percentage for this Plan for a given year shall bear the same relationship to 200% as the performance percentage that is awarded to the CEO for financial results in that year bears to the maximum percentage available to the CEO for financial results under the STIP plan. For example, for any performance year in which the performance modifier for the CEO is based on a range from 0% to 200%, then the Performance Percentage under this Plan shall be equal to the performance modifier applicable to the CEO for the same performance year. For any performance year in which the performance modifier for the CEO is based on a range

from 0% to 100%, then the Performance Percentage under this Plan shall be equal to the product of two times the performance modifier applicable to the CEO for the same performance year.

**(c) Notwithstanding paragraphs (a) and (b) above, the minimum distribution for Performance Year 2003 will be $500, the minimum distribution for Performance Year 2004 will be $550, the minimum distribution for Performance Year 2005 will be $600, the minimum distribution for Performance Year 2006 will be $650, and the minimum distribution for Performance Year 2007 will be $700, subject in all cases to prorating under Section 3.**

**Section 7.** Information Requests. The Company agrees to provide to the Union upon request with publicly disclosed information about the STIP compensation of the CEO. With respect to information not publicly disclosed, the Company will only provide the Union with the following:

(a) A copy of the approved STIP achievement scale for the performance year, which sets out the financially driven performance modifiers that would be applicable to various financial results for the year. The unions will treat this information as confidential and proprietary information and will not disclose the information to any person for any purpose other than monitoring the administration of the CPS program.

(b) A report on the outcomes of the factors that affect the financially driven component of the CEO's STIP award for a performance year. This information will be provided as soon as practicable after the end of the performance year.

(c) A summary of the total CPS distribution payments which eligible employees received under the Plan. This information will be provided as soon as practicable following the end of the Plan Year.

**Section 8.** Payment of CPS Distributions. CPS Distributions, when earned, will be paid by separate payroll remittance (EFT or check) not later than March 15th of the year immediately following the Plan Year. For eligible employees who are no longer employed at the time of payment, the Company will be deemed to have satisfied its obligation to pay the CPS award if it sends payment to the eligible recipient's last known address. Each such payment shall be subject to the applicable federal withholding rate for non-recurring payments (currently, a 28% flat rate), and other applicable payroll taxes.

**Section 9.** Benefit-Bearing Treatment of CPS Distribution. When paid, a CPS distribution will be treated as eligible benefit-bearing pay solely for the following purposes:

(a) The CPS distribution will be taken into account for purposes of the Supplemental Monthly Pension calculation under the qualified pension plan.

(b) The CPS distribution shall be treated as eligible benefit-bearing pay which may be contributed to the qualified Savings and Security Plan according to the same contribution percentage (if any) as is in effect for regular wages at the time the CPS distribution is paid (and the same terms and conditions for pre-tax or after-tax treatment, and for qualifying for applicable company matching contributions).

(c) To the extent that an employee is eligible for the one-times-pay death benefit under the qualified pension plan (subject to applicable caps on such death benefit), the last CPS distribution paid to an employee prior to an employee's death shall be taken into account (to the extent it does not cause the death benefit to exceed the applicable cap).

(d) The last CPS distribution paid to an employee prior to an employee's death shall be taken into account under the terms of the group term life insurance plan for active employees.

(e) The CPS distribution may be taken into account for union dues to the extent determined appropriate by the union representing the employee.

CPS distributions will not be included in calculations for any other purposes.

**Section 10.** Grievances and Arbitration. The employee's employing company shall have the discretion to administer this Plan according to its terms. The employing company's interpretations and determinations under this Plan shall be final and binding. The employee's union representative may present grievances relating to matters covered by the Plan but neither the Plan nor its administration shall be subject to arbitration, except that the limited issue of an employee's eligibility to participate in a specific distribution under the Plan shall be arbitrable.

# 1998 MEMORANDUM OF UNDERSTANDING

# JOB TITLES AND DUTIES

The following are new job titles or changes to existing job titles in the agreement between the Companies and the CWA covering the Plant bargaining unit.

I. JOB TITLES AND DUTIES

A. Frame Specialist

This job title combines duties and replaces the job titles of Frame Administrator and Senior Frame Administrator. In addition to the existing duties of the Frame Administrator and Senior Frame Administrator titles, Frame Specialists will be responsible for performing the following duties: SLC card verification and installation; ISDN verification with telephone test sets; digital AML verification and installation; and gas testing in vaults. All employees in the Frame Administrator and Senior Frame Administrator job titles as of the effective date of this agreement will be reclassified to Frame Specialist. The provisions of Section I(A)(1) of the 1994 MOU provision entitled "Job Titles and Duties," dealing with placement of Frame Administrators and Senior Frame Administrators in the title Central Office Technician, shall apply only to Frame Specialists who were Frame Administrators and Senior Frame Administrators on August 8, 1998.

B. Field Coordinator
Construction Equipment Operator

The following job duties will be added to the existing duties of the above two job titles in Empire City Subway Company (Limited): Rodding and roping; placing and removing of air pipe and inner ducts in conduits manually or by power equipment; pulling of 20-250 pair alarm cable in connection with the placing of air pipe.

II. WAGE RATES AND PENSION BANDS

As of the effective date of this agreement, the following shall be the maximum wages and pension bands for the listed job titles:

CRAFT GROUP

| ZONE 1 | TITLE | MAXIMUM WAGE | PENSION BAND |
|--------|-------|--------------|--------------|
| | Frame Specialist | $936.50 | 120 |

CRAFT GROUP (continued)

| ZONE 2 | TITLE | MAXIMUM WAGE | PENSION BAND |
|---|---|---|---|
| | Frame Specialist | $916.50 | 119 |

MISCELLANEOUS GROUP

| ZONE 1 | TITLE | MAXIMUM WAGE | PENSION BAND |
|---|---|---|---|
| | Translation Administrator | $917 | 119 |

Note: The hours of work per tour for this title Downstate shall be increased from 7 hours to 8 hours on the day tour and from 7 to 7 1/2 hours on the night tour.

| ZONE 2 | TITLE | MAXIMUM WAGE | PENSION BAND |
|---|---|---|---|
| | Translation Administrator | $897.50 | 119 |

Note: The hours of work per tour for this title Upstate shall be increased from 7 1/2 hours to 8 hours on the day tour and shall remain at 7 1/2 hours on the night tour.

BUILDING AND SUPPLIES GROUP

| ZONE 1 | TITLE | MAXIMUM WAGE | PENSION BAND |
|---|---|---|---|
| | Watch Engineer | $1,003.00 | 124 |
| | Elevator Mechanic | $1,003.00 | 124 |
| | Building Service Attendant | $539.00 | 106* |
| | Building Servicer | $626.00 | 108* |
| | Building Mechanic | $915.50 | 121* |

Note: Pension bands marked with an asterisk are valid only in connection with a 6+6 offer. In the case of non 6+6 retirements, pension bands in the existing contract apply.

BUILDING AND SUPPLIES GROUP (continued)

| ZONE 2 | TITLE | MAXIMUM WAGE | PENSION BAND |
|--------|-------|--------------|--------------|
| | Watch Engineer | $981.50 | 123 |
| | Elevator Mechanic | $981.50 | 123 |
| | Building Service Attendant | $530.00 | 106* |
| | Building Servicer | $617.50 | 108* |
| | Building Mechanic | $900.00 | 121* |

Note: Pension bands marked with an asterisk are valid only in connection with a 6+6 offer. In the case of non 6+6 retirements, pension bands in the existing contract apply.

EMPIRE CITY SUBWAY

| TITLE | MAXIMUM WAGE | PENSION BAND |
|-------|--------------|--------------|
| Blacksmith | $1,003.00 | 124 |
| Conduit Worker | $800.00 | 114 |
| Construction Equipment Operator | $960.00 | 121 |
| Field Coordinator | $965.00 | 122 |
| Plant Inspector | $815.00 | 115 |
| Senior Conduit Worker | $855.00 | 117 |
| Utility Worker | $890.00 | 118 |

Mr. Christopher Shelton
Area Director, District One
Communications Workers of America
80 Pine Street
New York, New York  10005

Dear Mr. Shelton:

The Company and the Union recognize the importance of maximizing the number of employees on the job.  The parties further recognize that a variety of factors contribute to absence, and that no single approach can effectively address the parties concerns in this area.

In support of their mutual desire to promote good attendance, the Company and the Union will create a Joint Attendance Committee, to be co-chaired by a Manager at the Director level and an International Representative of the Union.  The Committee will explore the factors that contribute to employee absence, and will mutually seek appropriate solutions.  In this connection, the Committee will explore issues relating to employee health and other underlying reasons for absence, work environment, the absence control program, third medical opinions, and others.

The Committee will meet at times and places as mutually agreed, and will issue reports as it deems appropriate.

Very truly yours,

Jeffrey Weiner
Executive Director
Labor Relations

AGREED:
Communications Workers of America
AFL-CIO

Christopher Shelton
Area Director, District One

August 5, 2000

Mr. Richard M. Martini
International Staff Representative
Communications Workers of America
80 Pine Street
New York, New York  10005

Dear Mr. Martini:

This will confirm our agreement regarding the assignment of work related to the installation and repair of PC hardware and software.  This letter of agreement supplements the letter of agreement dated August 11, 1998, which remains in effect.

1.  New PC Installation and Configuration

    (a) LAN Managers will maintain controlled lists of IP addresses, Workstation IDs, Position IDs and phone numbers for the users and request/secure the necessary IDs, shares, directories, PC IP addresses, etc. and provide them to the Integration and Planning Group and directly to the technicians.

    (b) Technicians will perform the initial setup on the user's desktop, unboxing, network printer mapping, connecting the Network Interface Card (NIC) or any similar device on the workstation to the wiring hub or LAN, enter the NT computer name, workstation  IP, DNS, and WINS address into the workstation, reboot the machine and test for network connectivity.

    (c) LAN Managers will perform the necessary software configurations for client-server installations, including domain permissions, shares, mapping to server hard drives, software mapping of client/server based software, etc., and perform testing of their work before turnover to the user.

2. PC Replacement

   (a) User file backup is a shared responsibility. LAN Managers
       will provide all user information (IP address, PC
                   password, etc.) to the technicians.

   (b) Technicians will perform the work described in paragraph
       1(b); LAN Managers will perform the work described in
       paragraph 1(c).

3. Network Printer Installation/Replacement

   (a) Technicians will perform initial printer setup: unboxing,
   NIC installation, IP addressing etc.

   (b) Technicians will perform printer mapping, if required.

4. Non-Network PC Printer/Peripheral Installation/Replacement

   (a) Technicians will perform installation or replacement of
       non-networked printers/peripherals.

   (b) Technician will load software and drivers, if required.

   (c) Technician will perform testing and turnover to user.

5. Software Advisory Committee

   (a) A Company/Union Software Advisory Committee (SAC) will
       be established for the purpose of categorizing software
       applications to distinguish unique or specialized software
       applications (client/server based and/or PC based) from
       standard PC based application software.

   (b) The SAC will be comprised of one Company representative
       from Labor Relations, one Company representative of the
       IS department and two Union representatives.

   (c) The SAC will perform its review of all current software
       applications within 90 days of the date of this agreement.

   (d) If the SAC is unable to agree on the categorization of a

software application, the Union may present a grievance directly at the 3rd Step of the grievance procedure and arbitrate any such grievance that is not adjusted at 3rd step.

(e) Until a software application has been categorized, either by agreement of the SAC or by an arbitrator, it shall be treated as unique or specialized.

6. Software Installations/Upgrades

(a) The Company reserves the right to purchase PCs, printers and peripherals with software or a software image preinstalled.

(b) The Company reserves the right to install mechanized processes that will:

(1) enable images and software to be electronically downloaded from a centralized server directly to the user's workstations;

(2) give end users the capability to perform upgrades of any and all software applications on the end user's computer.

(c) If a corrupted/improper image or corrupted application file is encountered during the work described in paragraphs 1(b) or 1(c), the LAN Manager will determine the appropriate course of action to take. This will include reloading of the image or application file by the technician, or returning the PC, printer or peripheral to the vendor for resolution of the problem.

(d) Manual installations or upgrades of software applications (via disks or downloaded from a network server) will be performed by LAN Managers in the case of a software application categorized as unique or specialized, and by technicians in the case of a software application categorized as standard PC based.

7. Repair

   (a) Hardware repairs will be referred to CTS for resolution.

   (b) Network and software repairs will be referred to EUS for resolution.

   (c) If a dispatch is made in the course of performing the work described in paragraph 7(a) or 7(b), and it becomes necessary to reload corrupted or invalid software applications or corrupted or invalid software application files, the dispatched person will perform the reloading. If the software application has been determined to be unique or specialized, the LAN Manager will determine who will perform the reloading.

8. Support

   (a) LAN Managers will provide Tier 2 support to users. This includes requests for new IDs, password resets, E-LU sessions, printer gens and host applications.

   (b) LAN Managers will provide training and/or guidance to the users on a continual basis.

9. Laptops

   (a) Laptops that are the end users' principal means of interfacing with the Corporate Network will be subject to the terms of this agreement. These includes laptops that utilize docking stations or dial up connections from the end users' office locations.

   (b) Laptops that are used only as mobile telecommuting devices are not subject to this agreement.

10. Qualifications and Productivity

   (a) The parties acknowledge that in order to insure the success of this letter of agreement, technicians assigned to perform the software work described above must be determined by the CTS organization to be fully qualified, and that reasonable productivity standards must be maintained.

(b)    The parties will creatively address issues regarding technician qualifications and productivity in the SAC.

Very truly yours,

Jeffrey Weiner
Executive Director
Labor Relations

AGREED:
Communications Workers of America
AFL-CIO

Richard M. Martini
International Staff Representative

August 5, 2000

Mr. Richard M. Martini
International Staff Representative
Communications Workers of America
80 Pine Street
New York, New York  10005

Dear Mr. Martini:

This will confirm our agreement to establish a joint committee to deal, on an ongoing basis, with issues related to the effective administration of the contractual grievance procedure.  Such issues may include, but are not limited to, the presence of appropriate representatives at certain types of grievances, the enforcement of contractual time limits, and compliance with grievance settlements.

The committee will be chaired by the Company's Executive Director of Labor Relations and the Union's Area Director or their designated representatives, and will meet quarterly at mutually convenient times and locations.

Very truly yours,

Jeffrey Weiner
Executive Director
Labor Relations

AGREED:
Communications Workers of America
AFL-CIO

Richard M. Martini
International Staff Representative

August 5, 2000

Mr. Richard M. Martini
International Staff Representative
Communications Workers of America
80 Pine Street
New York, New York  10005

Dear Mr. Martini:

This will confirm our agreement with regard to the equalization of overtime and the sequence of call list for the purpose of assigning overtime to Storekeepers covered by the Plant Agreement and Head Materiel Attendants and Driver Bs covered by the TRG-NY Agreement.

1.   The unit for purposes of equalization of overtime shall be the first line supervisor's group.

2.   Where management and the Local Union agree, when a single Storekeeper, Head Materiel Attendant, or Driver B is assigned to a work location as a reporting point, all overtime at that work location will be offered first to that Storekeeper, Head Materiel Attendant, or Driver B.

3.   If the overtime offered under paragraph 2, above, is refused, or if additional Storekeepers, Head Materiel Attendants, or Driver Bs are required to work overtime, the sequence of call list shall be used.

Very truly yours,

Jeffrey Weiner
Executive Director
Labor Relations

AGREED:
Communications Workers of America
AFL-CIO

Richard M. Martini
International Staff Representative

August 5, 2000

Mr. Richard M. Martini
International Staff Representative
Communications Workers of America
80 Pine Street
New York, New York  10005

Dear Mr. Martini:

This is to advise you of the Company's intent to engage in a program designed to replace chairs and work stations that are not ergonomically up to date in certain Customer Repair Service Centers (CRSCs).  The Company intends to commit funds to this program.

Commencing during the fourth quarter of 2000, the Company will begin replacing chairs and work stations in the Syracuse CRSC, starting with those judged by the Company, with input from the Union, to be most ergonomically inadequate.  Thereafter, the Company will continue the program in the Brooklyn CRSC and then the Jamaica CRSC.

The Company will complete the program no later than the first quarter of 2002.

Very truly yours,

Jeffrey Weiner
Executive Director
Labor Relations

AGREED:
Communications Workers of America
AFL-CIO


Richard M. Martini
International Staff Representative

August 5, 2000

Mr. Richard M. Martini
International Staff Representative
Communications Workers of America
80 Pine Street
New York, New York 10005

Dear Mr. Martini:

The parties acknowledge their interest in developing a "hiring hall" system for the purpose of having the Union provide the Company with qualified candidates for employment. To that end, the parties will meet, commencing no later than October 1, 2000, in an effort to agree on the terms of such a hiring hall system.

Among the issues to be discussed are the occupational classifications that would be subject to the hiring hall, joint apprenticeship training, the wage rates for employees hired under the program, the degree of the Company's obligation to use the hiring hall as opposed to hiring temporary or regular employees from other sources, and the Company's rights when the hiring hall does not provide sufficient qualified candidates.

If the parties are unable to agree on all the terms of a hiring hall system by April 1, 2001, they will discontinue their discussions of the matter.

Very truly yours,

Jeffrey Weiner
Executive Director
Labor Relations

AGREED:
Communications Workers of America
AFL-CIO

Richard M. Martini
International Staff Representative

August 5, 2000

Mr. Christopher Shelton
Area Director, District One
Communications Workers of America
80 Pine Street
New York, New York 10005

Dear Mr. Shelton:

This will confirm our agreement to create a high level committee to deal with major substantive issues involving the Plant bargaining unit that are of sufficient importance and magnitude to impact the relationship between the parties. The Company representatives on the committee will be the Executive Director of Labor Relations, the New York Regional Presidents, and the Vice President - Network Operations. The Union representatives will be the Downstate Area Director and five Local Union Presidents.

The committee will meet at mutually agreed upon times, at least four times a year, to discuss items on an agreed upon agenda.

Very truly yours,

Jeffrey Weiner
Executive Director
Labor Relations

AGREED:
Communications Workers of America
AFL-CIO
Christopher Shelton
Area Director, District One

August 3, 2003

Mr. Christopher Shelton
Assistant to the Vice President
Communications Workers of America
AFL-CIO, District One
80 Pine Street, 37th Floor
New York, New York  10005

Dear Mr. Shelton:

This will confirm our agreement that the wage rate of any employee whose wage rate has been green circled pursuant to the Force Adjustment Plan will continue to be green circled for the life of this agreement.

Very truly yours,

/s/ Jeffrey Weiner
Executive Director
Labor Relations

AGREED:
Communications Workers of America
AFL-CIO
/s/ Christopher Shelton
Assistant to the Vice President

August 3, 2003

Mr. Christopher Shelton
Assistant to the Vice President
Communications Workers of America
AFL-CIO, District One
80 Pine Street, 37th Floor
New York, New York  10005

Dear Mr. Shelton:

1.  Commencing January 1, 2001, the Company will implement a
    process which   will allow employees to request lateral
    transfers or downgrades between positions in NY/NE
    Companies and Mid-Atlantic Companies.  The process will be
    developed by a Working Committee consisting of four
    representatives of the Company and four representatives of
    the Union.  The Working Committee shall have the authority to
    extend the above commencement date by mutual agreement.

2.  For the purposes of this agreement NY/NE Companies will
    include:

> Verizon New England Inc.
>
> Verizon New York Inc.
>
> Empire City Subway Company (Limited)
>
> Telesector Resources Group, Inc.
>
> Verizon Yellow Pages Company (NY/NE only)

For the purposes of this agreement Mid-Atlantic Companies
will include:

> Verizon Pennsylvania Inc.
>
> Verizon New Jersey Inc.
>
> Verizon Delaware Inc.
>
> Verizon Maryland Inc.
>
> Verizon Virginia Inc.
>
> Verizon Washington, D.C. Inc.

> **Verizon West Virginia Inc.**
>
> **Verizon Services Corp.**

3. This agreement does not apply to requests for upgrades. This agreement does not apply to employee requests for lateral transfers or downgrades within these companies, among the NY/NE Companies, among the Mid-Atlantic Companies, or to any other employee movements covered by other provisions of the collective bargaining agreements, if any. Applicants under this plan will be given consideration for placement before consideration of new hires.

> Very truly yours,
>
> **/s/ Jeffrey Weiner**
> **Executive Director**
> **Labor Relations**

**AGREED:**
**Communications Workers of America**
**AFL-CIO**
**/s/ Christopher Shelton**
**Assistant to the Vice President**

August 5, 2000

Mr. Christopher Shelton
Area Director, District One
Communications Workers of America
80 Pine Street
New York, New York  10005

Dear Mr. Shelton:

This will confirm our agreement that this letter of agreement, setting forth the conditions and procedures regarding participation in the Next Step Program, supersedes the letters of agreement on this subject dated May 24, 1995, September 23, 1999, and September 29, 1999.

Commencing in calendar 2001, classes under the Next Step Program will commence only in the Fall semester.  The Company will make available 250 Next Step Program seats available each year, on the basis of one class per college per year, subject to each college's determination that there are a sufficient number of qualified applicants to enable classes to be conducted.

In order to qualify as a participant in the Next Step Program an employee must have at least 8 years of net credited service and must, as of September 1 of the year of entrance into the Program, be either (a) in the Field Technician (FT) or Central Office Technician (COT) title, or (b) qualified on the UTB-R and Technical Minicourse (TMC).  Prior to acceptance into the Program, all applicants must pass the required qualifying test administered by the colleges participating in the Program.

A.  NTC Employees

The following shall apply to "new to craft" (NTC) employees, i.e., employees who do not have the title of Field Technician or Central Office Technician prior to placement in the Next Step Program:

   1. An NTC applicant who has passed the required qualifying test and who is accepted into the Program will first be assigned the job function of Field Technician or Central Office Technician for a period of approximately six months prior to the commencement of university classes.  It is recognized by both parties to this agreement that due to

**232**

university scheduling procedures, there may be some employees who will experience longer assignment (up to one year) prior to the commencement of university classes.

2. The title upgrade to Telecommunications Technical Associate (TTA), the pay treatment and pension band shall be effective the first day of the week (Sunday) in which the employee starts the assignment. The employee's wage rate shall be adjusted to the maximum weekly wage rate of a FT/COT.

3. During the pre-university assignment, the NTC employee will attend basic technical training courses and will perform regular field work within the title to which assigned.

4. Retreat rights for both the employee and the Company will apply during the pre-university assignment.

5. Upon the conclusion of the pre-university assignment, the NTC employee will be scheduled to commence course work in the degree program.

B. Field Technicians and Central Office Technicians

1. The title upgrade to TTA, the new pay treatment and pension band shall be effective the first day of the week (Sunday) in which the employee is scheduled to begin university classes. The employee's wage rate shall be adjusted to the maximum weekly wage rate of a Field Technician/Central Office Technician.

C. All Next Step Participants

1. Employees enrolled in the Next Step Program shall be provided time off the job with one day's pay per week to attend classes. Attendance at the university shall be treated as a work day under the provisions of the parties' collective bargaining agreement unless modified by the provisions below.

2. All applicable benefit plans and programs currently in effect, as well as Workers Compensation coverage, shall apply to an employee's attendance in the Next Step Program.

3. Upon successful completion of one half of the credits in the Program, the employee's weekly wage rate shall be adjusted upwards. The new wage rate shall be half the difference between the maximum wage for the Field Technician/Central Office Technician and the maximum rate for Telecommunications Technical Associate.

4. Upon completion of the Program the employee's wage rage shall be adjusted to the maximum wage rate for a Telecommunications Technical Associate.

5. In determining whether an employee has successfully completed one half the Program credits or the entire Program, the Company will take into account credits that an employee has earned even though the employee was exempted from taking a certain course because the employee passed a required test.

6. Shifted tour, DTA and Board and Lodging provisions of the collective bargaining agreement shall not apply to an employee's university attendance.

7. No transportation to the university shall be provided by the Company.

8. Employees who take vacation on a scheduled college day shall not be provided additional time off to attend college since the college program is given only on specified dates in each semester. Any course work missed shall be the responsibility of the employee, to be made up on his or her own time. If an employee attends the university classes during a scheduled vacation week, the employee shall be granted another vacation day.

9. If the university expects class attendance on an Article 24 holiday and the employee so attends, the employee shall be granted another day off with pay in that week or in the following three weeks in lieu of the Article 24 holiday.

10. Employees enrolled in the Next Step Program shall not be removed from night tours as a result of their enrollment in the program unless their program participation interferes with their ability to work night tours on the work days when they do not attend classes.

11. The employee shall maintain a Grade Point Average (GPA) of 2.0 to remain in the program. This is a State University of New York requirement. If an employee fails to maintain a GPA of 2.0, he or she shall leave the program and be placed in the Field Technician or Central Office Technician occupational classification, job and pension band, according to his or her current job assignment. There is extensive academic support built into the program to assist the employee in maintaining the GPA of 2.0.

12. TTA personnel shall be integrated into current overtime procedures; however, during the period of cross-training (inside/outside) participants may not be qualified to perform all overtime work or because of specific cross-training obligations may not be available to work overtime.

13. It is the parties' intent with this letter of agreement to treat the employees' university attendance as if it were a normal work day at straight time under the collective bargaining agreement and not to prejudice or provide windfalls for an employee, because of an unintentional or peculiar application of the collective bargaining agreement.

14. TTAs will not be eligible to participate in the SPV process or Article 36, Interarea Transfer Requests, for 36 months from date upgraded to TTA title. TTAs will be included with the classification they are assigned to (COT or FT) for purposes of Article 8 moves within their Article 8 unit.

15. After 36 months in title, TTAs will be eligible to participate in the SPV process, and will be allowed to bid on COT and FT vacancies regardless of their current occupational classification assignment.

16. After 36 months in title, TTAs will be included with the occupational classification assigned to (COT or FT) for the

purpose of Article 8 and Article 36 transfers, subject to all the requirements and conditions in those Articles.

17. If an employee drops out of the Program, the employee shall retreat to his or her previous title, and will be precluded from any SPV consideration for one year from the retreat date. Appeals for re-admission to the Program shall be presented to the Employee Development Board.

18. An employee shall be permitted to take a leave of absence from the Program for cause. Cases shall be reviewed on an individual basis by the co-directors of the Next Step Program.

19. Employees already in the Field Technician or Central Office Technician titles shall usually remain in their current assignment. If a participant is required to move to another assignment within the TTA title during the Next Step Program, it shall be in accordance with the Non-Surplus Transfer Letter. Employees not in the Field Technician or Central Office Technician titles shall be transferred to an assignment within the new title. For those employees whose current work location is in Upstate New York, the employee shall, by seniority, select a work location as offered by the Company in a Plant organization in accordance with the Non-Surplus Transfer Letter. For those employees whose current work location is in Downstate New York (Westchester and South), the employee shall, by seniority, select a work location as offered by the Company in a Plant organization within the UTP area. All employees in the program shall meet the basic qualifications for the job duties assigned.

20. Employees will not be permitted to enter the Next Step Program as TTA participants in or after the Fall semester of 2001 unless they first sign an agreement to reimburse the Company for Next Step tuition costs in the event they voluntarily leave the employment of the Company, other than by retiring with a service pension, within 2 years after completion of the program.

Very truly yours,

Jeffrey Weiner
Executive Director
Labor Relations

AGREED:
Communications Workers of America
AFL-CIO
Christopher Shelton
Area Director, District One

Mr. Christopher Shelton
Assistant to the Vice President
Communications Workers of America
AFL-CIO, District One
80 Pine Street, 37th Floor
New York, New York  10005

Dear Mr. Shelton:

This will confirm our agreement regarding the Company's commitment in connection with new contracting initiatives.

The Company agrees that through December 31, 2007, it will not contract out work that is not being contracted out on the effective date of this agreement.

The parties further agree to continue a Contracting Initiatives Committee, which will be chaired by the Company's Regional Bargaining Agent and the Union's Area Director, each of whom may appoint up to two additional members. The purpose of the Committee is to give the parties the opportunity to conduct open and thorough discussions concerning the Company's intention and rationale regarding the contracting out of bargaining unit work. The Committee will also discuss issues regarding the following exceptions to the restriction on new contracting initiatives: The restriction shall not preclude contracting out work to meet peak load requirements which cannot be covered with overtime or to deal with emergency situations (such as severe weather conditions).

In addition, commencing January 1, 2008, the Company will notify the Union at least six months in advance of any new contracting initiatives. The Contracting Initiatives Committee will then have the opportunity to discuss such new major initiatives.  In these discussions, the goal of the parties will be to balance the needs of customers, the provision of excellent service, and the use of bargaining unit employees to perform bargaining unit work.

/s/ Jeffrey Weiner
Executive Director
Labor Relations

AGREED:
Communications Workers of America
AFL-CIO
/s/ Christopher Shelton
Assistant to the Vice President

Mr. Christopher Shelton
Area Director, District One
Communications Workers of America
80 Pine Street
New York, New York  10005

Dear Mr. Shelton:

Effective no later than March 1, 2001, a new temporary job title entitled "Health Care Coordinator" ("HCC") will be established in each bargaining unit with a wage table equivalent to Wage Table 1 in the Plant agreement and a Pension Band of 124.  The HCCs will be under the direction of the Company's Benefits Delivery Organization.  The Company will establish a total of three HCC positions among the CWA and IBEW, Local 2213 bargaining units, and the Unions may designate the three employees to be HCCs on a temporary basis.  When the employee's temporary assignment ends, the employee will be returned to his or her regular job.

The HCCs must successfully complete a Company training program and demonstrate full understanding of the Company's benefits, including the disability, medical, dental, and vision plans, but not the pension or savings plan.  In order to facilitate the prompt, cooperative resolution of employees' questions and/or problems under the Company's benefit plans, the HCCs will act as liaisons between employees with inquiries or disputes concerning their benefits and the carrier-administrators.

The HCCs will be provided contact names and telephone numbers to use when discussing individual cases with the carrier-administrators; however, the HCCs will not disclose these names or numbers to other employees.  The HCCs will not have authority to vary plan provisions or override decisions of the carrier-administrators on claims or appeals; however, the HCCs may write and present claims and appeals on behalf of employees to ensure complete, impartial presentation of relevant information.  The HCCs may be assigned other duties, such as employee education on plan changes or other issues.

Due to confidentiality requirements, (a) the carrier-administrators will communicate medically sensitive information only to the employee, unless the employee and, if applicable, the patient (or patient's parent or guardian, if patient is a minor) sign release forms prepared by the carrier-

administrators authorizing the carrier-administrators to communicate such medically sensitive information to the HCCs; and (b) the HCCs will not discuss or disclose information on medical issues, questions or disputes to anyone other than the affected employee, carrier-administrators, or the Company Benefits Delivery Organization. The Company's Benefits Delivery Organization will review these confidentiality release forms and, if appropriate, recommend revisions to the carrier-administrators.

The HCCs will report as required to the Company's Benefits Delivery Organization concerning the full scope of their activities, including all interactions with carrier-administrators on claims and appeals.

The provisions of this letter will not be subject to the grievance or arbitration procedures.

Very truly yours,

Jeffrey Weiner
Executive Director
Labor Relations

AGREED:
Communications Workers of America
AFL-CIO


Christopher Shelton
Area Director, District One

Mr. Christopher Shelton
Assistant to the Vice President
Communications Workers of America
80 Pine Street
New York, New York 10005

Dear Mr. Shelton:

This will confirm our agreement during bargaining that the issue of Ergonomics is important to both parties. Accordingly, the parties agree that, within sixty (60) days of the ratification of the 2003 collective bargaining agreement, the National Managers of Inside and Outside Ergonomics, respectively (along with two other Company representatives) will meet with the Union's Director of Health and Safety for District 1 (along with two other local Union representatives) to discuss further collaborative development and implementation of the inside and outside Ergonomics Programs. The parties will also meet to discuss other issues related to Ergonomics.

Very truly yours,

/s/ Edward Simmons
Senior Staff Consultant – Labor Relations

AGREED:
COMMUNICATIONS WORKERS OF AMERICA
/s/ Christopher Shelton
Assistant to the Vice President

August 3, 2003

Mr. Christopher Shelton
Assistant to the Vice President
Communications Workers of America
80 Pine Street
New York, New York 10005

Dear Mr. Shelton:

This will confirm our agreement that effective August 3, 2003, the selection of a third doctor in connection with the first sentence of the second section of the Third Medical Opinion provision of the contract shall be made in accordance with the following:

The third doctor shall be selected by a Medical Vendor that has been jointly selected by the Company and the Union for a trial period of six (6) months. Pending the effective date of such joint selection, the current Medical Vendor shall continue to select the third doctor. If, at the end of the trial period, the parties agree to continue using the jointly selected Medical Vendor, such Vendor shall be engaged for a period to be determined by the parties. If, however, at the end of the trial period, either party objects to the Medical Vendor for objective quality or service reasons, the parties shall agree to (1) the selection of a replacement Medical Vendor through a Request for Proposal ("RFP") process, or (2) another jointly selected Medical Vendor for another six (6) month trial period. Pending the effective date of such agreement, the then current Medical Vendor shall continue to select the third doctor. If the parties agree to another six (6) month trial period, then at the end of that trial period, the parties shall either (1) agree to engage the then current Medical Vendor for a period to be determined by the parties or (2) agree to the selection of a replacement Medical Vendor through an RFP process. Pending the effective date of such agreement, the then current Medical Vendor shall continue to select the third doctor.

Very truly yours,

Jeffrey Weiner
Executive Director
Labor Relations

AGREED:
Communications Workers of America,
   AFL-CIO

By:
Christopher Shelton
Assistant to the Vice President

Mr. Christopher Shelton
Assistant to the Vice President
Communications Workers of America
80 Pine Street
New York, New York 10005

Re: <u>Limited Extension Agreement</u>

Dear Mr. Shelton:

The CWA and the Company agree as follows:

<u>Grievance and Arbitration Extension</u>
If the parties' tentative agreements on new collective bargaining agreements are ratified by the Union's membership, the grievance and arbitration provisions of the parties' expired agreements shall be applied retroactively to the period between August 3, 2003 and the date of ratification.

<u>Union Security Agreement</u>
The parties' agree to extend the Union Security provisions of their respective collective bargaining agreements during the period from expiration of their 2000 agreements until the parties reach new agreements.

The Union hereby agrees to indemnify the Company and hold it harmless from all claims, damages, costs, fees or charges of any kind which may arise out of the honoring by the Company of deduction authorizations in accordance with the provisions of this Limited Extension Agreement, the making up of sums owed the Union in cases of inadvertent failure to timely honor authorizations, and the transmitting of such deductions to the Secretary-Treasurer of the Union.

<u>No Strike – No Lockout</u>
The parties agree that until ratification of, or a vote of the Union's membership rejecting ratification of, the new collective bargaining agreements, the Union agrees on behalf of itself and the employees that it represents, that, in relation to these negotiations, there shall be no strikes, stoppages of work or other job actions of any kind by any employee or employees, or any action by the Union contrary to such obligations. Further, until ratification of, or a vote and failure to ratify, the new collective bargaining agreements by the Union, the Companies agree that they shall not engage in a lockout, except a defensive lockout in response to a material breach of the express promises of the Union set forth herein.

Very truly yours,

Jeffrey Weiner
Executive Director
Labor Relations

AGREED:
Communications Workers of America,
   AFL-CIO

By:
Christopher Shelton
Assistant to the Vice President

Mr. Christopher Shelton
Assistant to the Vice President
Communications Workers of America
80 Pine Street
New York, New York 10005

Dear Mr. Shelton:

This will confirm our agreement to create a TTA Committee for the purpose of providing a forum for discussions between the Company and the Union regarding the Next Step Program. The committee shall be comprised of four representatives of the Union (including the CWA Director - Next Step Program) and four representatives of the Company (including at least one Senior Manager and a member of the Labor Relations staff).

The Committee will evaluate the effectiveness and the benefit to the company of the graduates of the Next Step Program, including how employees in the TTA title can best utilized, both during and after their participation in the degree program. The Committee will also review the Next Step curriculum, analyzing the relevance of the courses to the business, and will make recommendations regarding course additions, deletions, and enhancements.

The Committee will meet at mutually agreed upon times, no less than once per quarter.

Very truly yours,


Jeffrey Weiner
Executive Director
Labor Relations

AGREED:
Communications Workers of America,
   AFL-CIO

By:
Christopher Shelton
Assistant to the Vice President

# CWA LOCALS JURISDICTION

1101 - Manhattan and Bronx

1102 - Staten Island

1103 - Westchester County; Greewich, Connecticut and the portion of Putnam County falling in the Company's downstate area

1104 - Nassau County

1106 - Queens County

1107 - Rockland County; Parts of Orange County, Tuxedo & Greenwood Lake

1108 - Suffolk County

1109 - Borough of Brooklyn

1111 -

| | | | | |
|---|---|---|---|---|
| Binghamton | Owego | Corning | Canisteo | Bath |
| Endicott | Elmira | Painted Post | Watkins Glen | Cortland |

1114 -

| | | | | |
|---|---|---|---|---|
| Lyons | Seneca Falls | Auburn | Weedsport | Sodus |
| Mexico | Waterloo | Palmyra | Geneva | |
| Moravia | Newark | Poplar Ridge | Oswego | |

1115 -

| | | | | |
|---|---|---|---|---|
| Olean | East Aurora | Gowanda | Wellsville | Arcade |
| Falconer | Salamanca | Dunkirk | Hamburg | |

And all areas served by these locations

1117 -

| | | |
|---|---|---|
| Niagara | Lockport | Medina |
| Batavia | Albion | Lewiston |

1118 -

| | | | | |
|---|---|---|---|---|
| Albany | Rensselaer | Colonie | Altamont | Menands |
| Delmar | Chatham | East Berne | Slingerlands | East Greenbush |
| Clifton Park | Jonesville | Schenectady | Amsterdam | Scotia |
| East Glenville | | | | |

(Formerly 1116)

| | | | | |
|---|---|---|---|---|
| Troy | Mechanicville | Hoosick Falls | Waterford | Halfmoon |
| Cambridge | Cohoes | Latham | Watervliet | Valley Falls |
| North Greenbush | Averill Park | Pittstown | Center Brunswick | |

(Formerly 1127)

| | | | | |
|---|---|---|---|---|
| Glens Falls | Warrensburg | Ticonderoga | Port Henry | Schroon Lake |
| Lake George | Ballston Spa | Whitehall | Granville | Hudson Falls |
| Saratoga Springs | Salem | Greenwich | Schuylerville | Argyle |

(Formerly 1129)

| | | | | |
|---|---|---|---|---|
| Plattsburgh | Saranac Lake | Lake Placid | Elizabethtown | Dannemora |
| Tupper Lake | | | | |

1120 -

| | | | | |
|---|---|---|---|---|
| Kingston | Hudson | Catskill | Saugerties | Phoenicia |
| Fleischmanns | Greenville | Hunter | Rosendale | Woodstock |

|        | Windham          | Cairo         | Shokan        | Woodbridge       | Hurleyville    |
|--------|------------------|---------------|---------------|------------------|----------------|
|        | Amenia           | Monticello    | Ellenville    | Liberty          | Jeffersonville |
|        | Callicoon        | White Lake    | Fallsburgh    | Poughkeepsie     | Newburgh       |
|        | Beacon           | Goshen        | Millbrook     | Pawling          | Highland       |
| 1122 - | Buffalo          | Lancaster     | Amherst       | West Seneca      | Williamsville  |
|        | Cheektowaga      | Grand Island  | Clarence      | Clarence Center  | Alden          |
|        | Tonawanda (includes North Tonawanda) | | | | |
| 1123 - | Syracuse         | Phoenix       | Tully         | Bridgeport       |                |
|        | Fayetteville     | LaFayette     | North Syracuse| Baldwinsville    | Liverpool      |
|        | Skaneateles      | Fabius        | Camillus      | Chittenango      | Cicero         |
| 1124 - | Watertown        | Carthage      | Clayton       | Alexandria Bay   |                |
|        | Gouverneur       | Pulaski       | Star Lake     |                  |                |
| 1126 - | Utica            | Oneida        | Rome          | Oneonta          | Hamilton       |
|        | Sherrill         | Whitesboro    | Little Falls  | Herkimer         | Cooperstown    |
|        | New Hartford     | Cobleskill    | Ilion         | Stamford         | Milford        |
|        | Sauquoit         | Canastota     | Cherry Valley | Barneveld        | Clinton        |
|        | Richfield Springs| Dolgeville    | Salisbury     | Osceola          |                |
| 1128 - | Potsdam          | Ogdensburg    | Canton        | Massena          | Malone         |

# 2003

## JANUARY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  |  |  | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 |  |

## FEBRUARY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 |  |

## MARCH

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 |  |  |  |  |  |

## APRIL

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  |  | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 |  |  |  |

## MAY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  |  |  |  | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

## JUNE

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 |  |  |  |  |  |

## JULY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  |  | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 |  |  |

## AUGUST

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  |  |  |  |  | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 |  |  |  |  |  |  |

## SEPTEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 |  |  |  |  |

## OCTOBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  |  |  | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 |  |

## NOVEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 |  |  |  |  |  |  |

## DECEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 |  |  |  |

# 2004

## JANUARY
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

## FEBRUARY
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 |   |   |   |   |   |   |

## MARCH
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 |   |   |   |

## APRIL
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 |   |

## MAY
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   |   |   | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 |   |   |   |   |   |

## JUNE
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 |   |   |   |

## JULY
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

## AUGUST
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 |   |   |   |   |

## SEPTEMBER
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 |   |   |

## OCTOBER
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   |   | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 |   |   |   |   |   |   |

## NOVEMBER
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 |   |   |   |   |

## DECEMBER
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 |   |

# 2005

## JANUARY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   |   |   | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 |   |   |   |   |   |

## FEBRUARY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 |   |   |   |   |   |

## MARCH

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 |   |   |

## APRIL

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   |   | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

## MAY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 |   |   |   |   |

## JUNE

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 |   |   |

## JULY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   |   | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 |   |   |   |   |   |   |

## AUGUST

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 |   |   |   |

## SEPTEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 |   |

## OCTOBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   |   |   | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 |   |   |   |   |   |

## NOVEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 |   |   |   |

## DECEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

# 2006

## JANUARY
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

## JULY
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | | | | | |

## FEBRUARY
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | | | | |

## AUGUST
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

## MARCH
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

## SEPTEMBER
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

## APRIL
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | | | | | | |

## OCTOBER
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

## MAY
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | | | |

## NOVEMBER
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

## JUNE
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | |

## DECEMBER
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

# 2007

## JANUARY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 |  |  |  |

## JULY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 |  |  |  |  |

## FEBRUARY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  |  |  |  | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 |  |  |  |

## AUGUST

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  |  |  | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 |  |

## MARCH

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  |  |  |  | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

## SEPTEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 |  |  |  |  |  |  |

## APRIL

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 |  |  |  |  |  |

## OCTOBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 |  |  |  |

## MAY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  |  | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 |  |  |

## NOVEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  |  |  |  | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 |  |

## JUNE

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  |  |  |  |  | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

## DECEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 |  |  |  |  |  |

# 2008

## JANUARY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 |   |   |

## FEBRUARY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   |   | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 |   |

## MARCH

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   |   |   | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 |   |   |   |   |   |

## APRIL

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 |   |   |   |

## MAY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

## JUNE

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 |   |   |   |   |   |

## JULY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 |   |   |

## AUGUST

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   |   | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 |   |   |   |   |   |   |

## SEPTEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 |   |   |   |   |

## OCTOBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 |   |

## NOVEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   |   |   | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 |   |   |   |   |   |   |

## DECEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 |   |   |   |

# NOTES

# NOTES



**2003 COMMON ISSUES**
**MEMORANDUM OF UNDERSTANDING**

**Between**

**VERIZON NEW YORK INC.**
**EMPIRE CITY SUBWAY COMPANY (LIMITED)**
**VERIZON AVENUE INC.**
**VERIZON ADVANCED DATA, INC.**
**VERIZON CORPORATE SERVICES CORP.**
**VERIZON NEW ENGLAND INC.**
**TELESECTOR RESOURCES GROUP, INC.**

**and**

**COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO**

This Memorandum of Understanding ("MOU") is agreed to by and between the above-named companies (herein the "Company" or "Companies", as context requires) and the Communications Workers of America, AFL-CIO (hereinafter the "Union" or "CWA") with respect to the following CWA-represented bargaining units:

1. CWA Plant (Verizon New York, TRG, ECS, Verizon Avenue, VADI, VCSC)
2. CWA District 1 (TRG)
3. CWA Local 1100 (Downstate Accounting) (Verizon New York, VCSC)
4. CWA Local 1105 (Downstate Commercial) (Verizon New York, VCSC, TRG)
5. CWA Local 1110 (Downstate Traffic) (Verizon New York, VCSC, TRG)
6. CWA Local 1104 (Upstate Traffic) (formerly Local 1112) (Verizon New York)
7. CWA Local 1113 (Upstate Accounting) (Verizon New York, VCSC, TRG)
8. CWA Local 1302 (Central Order Bureau) (Verizon New England)
9. CWA Local 1395 (TRG)
10. CWA Local 1400 (New England Service Centers) (Verizon New England, VCSC, TRG)

It is agreed that the existing labor agreements covering the above-named bargaining units will be terminated effective at 11:59 p.m. on August 2, 2003. New collective bargaining agreements covering the above-named bargaining units will become effective on August 3, 2003,

NY NE CWA

and will remain in effect until 11:59 p.m. on August 2, 2008. Each of the new collective

bargaining agreements shall consist of the provisions of the existing agreements, including the

provisions of the 2000 MOU and the provisions of the 2000 Memorandum of Agreement

("MOA"), as modified by the applicable provisions of this 2003 MOU, the modifications

contained in the 2003 MOA, and by provisions agreed to at local bargaining tables. Provisions

of this 2003 MOU and provisions agreed to at local bargaining tables will be incorporated, by

reference or otherwise, into the appropriate collective bargaining agreements between the parties.

Unless the parties have specified different effective dates in provisions of this 2003 MOU or in

provisions agreed to at local bargaining tables, such provisions will be effective August 3, 2003.

FOR THE COMPANIES

FOR COMMUNICATIONS WORKERS
OF AMERICA, AFL-CIO

JEFFREY WEINER
Executive Director, Labor Relations

CHRISTOPHER SHELTON
Assistant to the Vice President

Dated: _9-4-03_

# TABLE OF CONTENTS

I.     LUMP SUM PAYMENT ................................................................................................... 1

II.    WAGES ........................................................................................................................... 1

III.   COST-OF-LIVING ........................................................................................................ 1

IV.   CORPORATE PROFIT SHARING (CPS) PLAN ......................................................... 3

V.    PENSION BAND INCREASES ..................................................................................... 4

VI.   PENSION LUMP-SUM CASHOUT ............................................................................. 4

VII.  VOLUNTARY TERMINATION BONUS .................................................................... 8

VIII. BENEFITS ..................................................................................................................... 9

IX.   ANNUAL DISCUSSIONS ........................................................................................... 26

X.    JOINT MEDIATION SESSIONS ............................................................................... 26

XI.   JOINT COMMITTEE ON ABSENCE CONTROL ................................................... 26

XII.  JOB SECURITY LETTER .......................................................................................... 27

XIII. COMMUTER ADVANTAGE PROGRAM ................................................................ 27

XIV. SAFETY COMMITTEES ........................................................................................... 28

XV.  SAFETY – ACCIDENT NOTIFICATION ................................................................ 29

XVI. INSIDE AND OUTSIDE ERGONOMICS PROGRAM ............................................ 29

XVII. THIRD MEDICAL OPINION .................................................................................... 29

XVIII. LIMITED EXTENSION AGREEMENT ................................................................... 30

XIX. DURATION ................................................................................................................ 30

ATTACHMENTS - FOLLOWING PAGE 29

## IX.    ANNUAL DISCUSSIONS

The Union and the Company agree that the Company, the CWA, and the IBEW shall meet during the term of this 2003 MOU to discuss wage increases above those set forth in this 2003 MOU, pensions and job security issues. Such discussions will open in April of each year and continue for 30 days. Any agreements that are reached as a result of such discussions shall be reduced to writing. In the event the parties fail to agree on any issues proposed or discussed, the status quo shall remain.

## X.    JOINT MEDIATION SESSIONS

The Union and the Company agree to meet and confer with the Director of the Federal Mediation and Conciliation Service, Peter J. Hurtgen ("Director"), pursuant to the letter to the parties from Director Hurtgen dated August 22, 2003, attached hereto as Attachment 1.

## XI.    JOINT COMMITTEE ON ABSENCE CONTROL

Within 60 days of the effective date of this 2003 MOU, there shall be established a NY Joint Committee, comprised of representatives of the CWA, IBEW Local 2213 and the Verizon-New York companies that are parties to this 2003 MOU, for the purpose of discussing a plan or program for absence reduction for the companies' operations within the operating territory of VZ-NY.

Within 60 days of the effective date of this 2003 MOU, there shall also be established a NE Joint Committee, comprised of representatives of the CWA, IBEW Locals 2222, 2313, 2320, 2321, 2322, 2323, 2324, 2325, 2326, and 2327 (the "NE IBEW Locals") and the Verizon-New England companies that are parties to the 2003 MOU between Verizon-New England companies

and the NE IBEW Locals, for the purpose of discussing a plan or program for absence reduction for those Verizon-New England companies' operations within the operating territory of VZ-NE.

## XII.    JOB SECURITY LETTER

Employees with a NCSD, as defined in Article II of the Verizon Pension Plan for New York and New England Associates, of August 3, 2003 or later ("New Employees") are not covered by the no layoff commitments contained in the Job Security Letter ("JSL") in the local collective bargaining agreements.  For New Employees, paragraphs 8(b) and 10 of the Force Adjustment Plan in the NY Plant contract, and corresponding provisions in the other contracts, may apply regardless of the Company's reason for the surplus declaration. If layoffs occur,  the layoff provisions of the local collective bargaining agreements will apply.

## XIII.    COMMUTER ADVANTAGE PROGRAM

Effective January 1, 2004, the Pre-Tax Public Transportation and Commuting Program shall be eliminated and replaced with the following:

Effective January 1, 2004, and to the extent consistent with, and permitted by, IRS guidelines, the Company shall provide a Commuter Advantage Program (CAP) to Verizon employees, allowing them to set aside pre-tax dollars from their paychecks into CAP accounts to pay for eligible commuting expenses.

Two CAP accounts will be available: a Transportation Reimbursement Account; and, a Parking Reimbursement Account.  The Transportation Reimbursement Account will allow employees to set aside pre-tax dollars to cover certain, eligible mass transit or vanpooling commuter vehicle transportation expenses associated with travel to and from work.  The Parking Reimbursement Account will allow employees to set aside pre-tax dollars to cover certain

**Jackie Latham**
Executive Director
Labor Relations

MAR 2 4 2006



1095 Avenue of the Americas, Room 1327
New York, NY 10036

Phone 212 395-8040
Fax 212 395-0723

March 22, 2006

**VIA E-MAIL AND REGULAR MAIL**
Mr. Dennis Trainor
Assistant to the Vice President
Communications Workers of America
AFL-CIO, District One
80 Pine Street, 37th Floor
New York, NY 10005

Re: Modification to Absence Control Plan

Dear Mr. Trainor:

As you know, the absence rate at Verizon New York Inc. ("the Company" or "VNY") among associates is unacceptable by any reasonable standards. Although the Company and the union have discussed this issue many times, particularly at our Joint Committee on Absence Control (JCAC), the JCAC has been unable to develop any concrete approach to reducing absenteeism. Although we hope we can continue to explore with the union various means of reducing absenteeism at VNY, the Company believes it must take some immediate steps to address this issue. Accordingly, the Company is planning to modify its existing Absence Control Plan ("ACP") effective May 1, 2006.

The ACP will remain essentially the same in that it will continue to use a progressive disciplinary approach with employees; however, it will be modified as described below to impress upon employees precisely how serious their absence problem is and that it must be corrected. In particular, the modifications to the ACP are as follows:

1. An employee will only be placed on the ACP after he/she has had (a) an absence of 3 days or more; or (b) the employee has a second incident of absence (regardless of length of time) within 6 months of the initial absence.

2. Once on the ACP, the employee will remain on each step for 6 months (instead of 3 months) unless he/she exhibits a pattern of poor attendance.

3. An employee who has exhibited a pattern of poor attendance will remain on his/her respective step for 12 months (instead of 6 months).

4. The number of steps in the ACP will be changed from 6 to 5. The new steps with the appropriate discipline are as follows:

    a.  Step 1    -    First Discussion

    b.  Step 2    -    Second Discussion

    c.  Step 3    -    Warning with Short (5 day) Suspension

    d.  Step 4    -    Final Warning with longer (10 day) Suspension

    e.  Step 5    -    Termination

5. Step 5 medical review is eliminated.

6. Repeat of 5th Step for long service employees eliminated.

7. With respect to employees who are already on the ACP, they would be transitioned to the revised ACP as follows:

| Current Step Existing ACP | Transition Step – Revised ACP | Revised ACP with next Absence |
|---|---|---|
| Step 1 | Step 1 | Step 2 |
| Step 2 | Step 2 | Step 3 with short suspension |
| Step 3 | Step 2 | Step 3 with short suspension |
| Step 4 | Step 4 with no suspension | Step 5 termination |
| Step 5 | Step 4 with no suspension | Step 5 termination |

    8. For any employee who is transitioned to a step on the revised ACP, the Company will apply the new step duration (i.e. 6 months, unless poor pattern of attendance rules apply in which case it will be 12 months). However, VNY will credit any time that the employee had on a step under the existing ACP to the time under the revised ACP. For example, an employee placed on Step 2 of the existing ACP on 3/1/06 would have remained, under the existing ACP, on the step until 6/1/06. With the implementation of the revised ACP, that employee will be transitioned on 5/1/06 to Step 2 of the revised ACP which has a six month retrogression for each step, which

normally would have kept that employee at that step until 11/1/06. However, since he/she has been on Step 2 for March and April under the existing ACP, that time will be applied to the six months and the employee can retrogress after four months (i.e. 9/1/06) assuming no additional absences.

The Company is planning to notify employees of the changes beginning on April 24, 2006 so they can better understand the changes before the intended May 1, 2006 implementation.

If you have any questions, please feel free to contact me. I can be reached on (212) 395-8040.

Sincerely,

Jackie Latham



# Verizon New York Inc.
# Absence Control Plan

## 1.0 Company Attendance Policy

**1.1** The telecommunications industry has undergone tremendous changes since Verizon New York Inc. ("the Company") first started its operations -- from the services that it offers its customers, to the fierce competition it faces. Through it all, the Company continues to hold a unique position in the communities it serves in that it is the primary source for telecommunication services 24 hours per day, to police and fire departments, the military, hospitals, etc. in emergency situations. Because of this public trust, we must provide outstanding customer service and be ready to meet the demands of all types of service, day and night. In order to meet this obligation, the Company needs everyone on duty every day on which s/he is scheduled to work. Our company is only as strong as its employees' commitment. All employees, therefore, are expected to strive for perfect attendance by:

- Maintaining reasonable health standards
- Taking intelligent precautions against illness
- Making every effort to live and work safely
- Not permitting minor indispositions or inconveniences to keep them away from the job

**1.2** Good attendance is, therefore, an essential job requirement, and excessive absence seriously impedes Verizon's ability to remain competitive and provide the outstanding service that our customers expect and deserve. In addition, employees are expected to report to work with regularity in return for the compensation they receive. The Company's Absence Control Plan (ACP), which covers all regular full-time, regular part-time and temporary associates who are located in NY and are represented by either the CWA or IBEW, is designed to help employees maintain good attendance. The ACP does this by alerting employees to their poor attendance in order for them to modify their behavior. Failure to maintain good attendance will result in progressive discipline including suspension without pay and/or termination from the payroll as outlined in the ACP. Progressive discipline helps the employee understand the seriousness of the problem and take appropriate action to correct it. As detailed below, the ACP, which consists of five steps, does this by placing an employee with an attendance problem on a step of the ACP, but allows them to come off of the ACP (i.e. retrogress) by demonstrating good attendance. Employees will be stepped on the ACP only for chargeable absences as defined by the ACP. The details of the various steps and retrogression process are set forth below in sections 2 and 3.

The ACP describes the Company's policy regarding progressive discipline for employees who fail to maintain satisfactory attendance. Employees are cautioned, however, that under the Code of Conduct, misrepresenting one's health status or other reasons for absence continues to constitute independent grounds for disciplinary action, up to and including termination, regardless of an employee's overall attendance record.

## 1.3 Definitions

**Incident:**  Any occurrence of a chargeable absence. An incident is recorded without regard to the amount of time missed.

**Chargeable Absence:** Any absence of any duration, paid or unpaid, which is recorded and charged against an employee's record for the purpose of determining attendance performance (e.g. non-FMLA covered sickness and disability absences; absence due to transportation difficulties; unexcused time without pay; etc.).

**Non-Chargeable Absences:** Any absence, paid or unpaid, which is recorded but not charged against an employee's record for the purpose of determining attendance performance (e.g. jury duty; military duty; FMLA certified absence; death in immediate family; excused time without pay).

**Perfect Attendance:** Is any rolling 12 month period during which an employee - - who is not already on the ACP - - has not had a chargeable absence. If such employee has a period of perfect attendance, s/he will not be placed on Step 1 of the ACP for his/her next chargeable absence (regardless of the length of the absence). However, such absence is chargeable and any subsequent chargeable absence (regardless of the length of the absence) that occurs within six (6) months of this absence will result in the employee being placed on Step 1 the ACP. (For example, an employee who is not on the ACP and whose last chargeable absence ended on September 30, 2005 was next absent from November 20, 2006 through November 22, 2006. Because the employee had over 12 rolling months without a chargeable absence (i.e. perfect attendance) this three-day absence that began on November 20th would not result in the employee being placed on step 1 on November 23, 2006. It would, however, count as a chargeable absence for which the employee could be stepped if the employee had another chargeable absence within the next six months.)

## 2.0 Steps of the Absence Control Plan (ACP):

1st Step – First Discussion
2nd Step – Second Discussion
3rd Step – Warning / Suspension (suspension without pay – 5 days)
4th Step – Final Warning / Suspension (suspension without pay – 10 days)
5th Step – Termination

## IMPORTANT POINTS THAT APPLY TO ALL STEPS:

If an employee filed the appropriate form for an absence to be considered under the FMLA and a final determination of the request has not been received from the ARC Department (FMLA Administration), any action under the ACP will be delayed until a determination is received. The employee will be notified of whether the request was certified or not and of any action under the ACP.

The target date (end date of step) will be extended for any full days of an approved Leave of Absence (for example, FMLA, Educational). *This does not apply to Military Leave of Absence.*

The period that an employee is on a step begins on the calendar day following the last day of absence.

The period that an employee is on a step as referenced below in Sections 2.1 through 2.5 is 6 months. However, the steps may be increased to 12 months in the circumstances described below in Section 3.1A and 3.1B

The supervisor may decide that a consultation with VZLife / EAP would be helpful in assisting the employee to take remedial steps.

### 2.1 Step 1 – First Discussion:

An employee will be placed on Step 1 when,
(a) The employee has a chargeable absence of 3 or more consecutive scheduled work days; or
(b) Within 6 months from the calendar day following the last day of chargeable absence, the employee has a second incident of chargeable absence (regardless of the length of time of the absence).

Once on the ACP, the employee will remain on Step 1 for 6 months. If no chargeable absence occurs during this period, the employee will retrogress off of the ACP. If the employee has another chargeable absence (regardless of the length of time of the absence) within this period, he/she will progress to the next step.

> **Note: If an employee, who is not on the ACP, satisfies the criteria of Perfect Attendance, s/he will not be placed on Step 1 for their initial absence (See Sec. 1.3 "Perfect Attendance").**

## 2.2 Step 2—Second Discussion:

> **An employee will be placed on Step 2 if within 6 months from the calendar day that the employee was placed on Step 1, the employee has another chargeable absence (regardless of the length of time of the absence).**
>
> **Once on this step, the employee will remain on Step 2 for 6 months. If no chargeable absence occurs during this period, the employee will retrogress to Step 1 of the ACP. If the employee has another chargeable absence (regardless of the length of time of the absence) within this period, he/she will progress to the next step.**

## 2.3 Step 3—Warning / Suspension (suspension without pay – 5 days):

> **An employee will be placed on Step 3 if within 6 months from the calendar day that the employee was placed on Step 2, the employee has another chargeable absence (regardless of the length of time of the absence).**
>
> **Once on this step, the employee will remain on Step 3 for 6 months. If no chargeable absence occurs during this period, the employee will retrogress to Step 2 of the ACP. If the employee has another chargeable absence (regardless of the length of time of the absence) within this period, he/she will progress to the next step.**

<u>IMPORTANT POINT:</u>

An employee on Step 3 is now considered unsatisfactory in the category of Attendance and is therefore ineligible for positions under the SPV process.

At the time the warning/suspension is announced, a Union representative may be present if the employee so requests.

If an employee is on Step 3 or Step 4 at the end of a calendar year, the attendance rating and overall rating of the annual appraisal will be "Does Not Meet Requirements" (DN).

### 2.4 Step 4—Final Warning / Suspension (suspension without pay – 10 days):

An employee will be placed on Step 4 if within 6 months from the calendar day that the employee was placed on Step 3, the employee has another chargeable absence (regardless of the length of time of the absence).

Once on this step, the employee will remain on Step 4 for 6 months. If no chargeable absence occurs during this period, the employee will retrogress to Step 3 of the ACP. If the employee has another chargeable absence (regardless of the length of time of the absence) within this period, he/she will progress to the next step.

IMPORTANT POINT:

At the time the warning/suspension is announced, a Union representative may be present if the employee so requests.

### 2.5 Step 5—Termination from the Payroll:

An employee will be placed on Step 5 and terminated if within 6 months from the calendar day that the employee was placed on Step 4, the employee has another chargeable absence (regardless of the length of time of the absence).

At the time the termination is announced, a union representative may be present if the employee so requests.

## 3.0 Retrogression:

An employee who has an absence that places him/her on any step of the ACP can retrogress from that step to a lower step (or off the plan entirely if on step 1) and eventually come off of the ACP after s/he has demonstrated a period of improved attendance. This is called retrogression. In most circumstances, the period to retrogress from one step to a lower step is six (6) months without a chargeable absence. As described in Section 3.1, the duration at any step may be increased to 12 months if a poor attendance pattern and/or subject to disabilities warrants such treatment.

Example:  If an employee who is not on the ACP had a 3-day absence which ended on November 29, 2006 he/she would be placed on Step 1 of the ACP from November 30, 2006 through May 30, 2007. If the employee does not have another chargeable absence within that six month period, he/she will retrogress off of the ACP the day after the six months on Step 1 (May 31, 2007). An employee on Step 2 can come off of the ACP entirely in 12 months if no further chargeable absences

occur from the time that the employee was placed on Step 2 (i.e. six months to come off Step 2, and then another six months to come off Step 1). The same format is followed for retrogression from any step, unless the period on a step is affected by circumstances described in Section 3.1A and 3.1B.

## 3.1 Exceptions to Normal Stepping and Retrogression Procedures:
The ACP allows supervisors some discretion when applying the stepping and retrogression procedures. Some of those areas include:

### 3.1A – Poor Attendance Patterns
For employees who have certain absence patterns, the ACP includes exceptions to the normal time periods for stepping and retrogression. The ACP requires that a review be given to address an employee's individual pattern of absence when for example:
   - It appears that an employee may be timing absences to circumvent the time elements of the ACP (e.g. there is a pattern of absence occurring within the six months following retrogression to an earlier step).
   - An employee has demonstrated a pattern of multiple day absences (e.g. third occasion of three days or greater of chargeable absence within an 18 month period).
   - Pattern of No Report or Monday and Friday absences.

In a situation where any of the above poor attendance patterns is evident to the supervisor, the retrogression period should be extended from six (6) months to twelve (12) months. Delayed retrogression is a rehabilitative stepping action that will be taken whenever any of the above patterns of poor attendance becomes apparent.

### 3.1B – Subject to Disabilities
If an employee has two disability absences (each defined as an absence of eight or more consecutive calendar days) within a 24 month period, the employee is deemed "subject to disability absences," for which the ACP includes exceptions to the normal time periods for stepping. As a result of a second disability absence within 24 months, the retrogression period will be extended to 12 months. If during that 12 month period the employee does not have any further absence, the employee retrogresses to the next lower numbered step. However, the employee must remain on that next lower step for an additional 12 months as well. Each subsequent retrogression period will then be for six (6) months, assuming no further chargeable absences occur during this period.

Example #1: Employee not on the ACP has 2 chargeable disability absences (eight (8) absence days or more) within a 24 month period (no other absences): December 4 – December 29, 2006 and August 6 – August 24, 2007. The December 2006 absence places the employee on Step 1 for 6 months as of December 30, 2006, s/he will retrogress off Step 1 on July 1, 2007 to Step 0 (i.e. s/he will come off of the ACP). The August 2007 disability absence, however, places the employee back on Step 1 as of August 25, 2007 and because it is his/her second disability absence, s/he remains on Step 1 for 12 months. The employee will retrogress off Step1 on August 26, 2008 if s/he has no chargeable absence during this period.

Example #2: Employee not on the ACP has 1 chargeable incidental absence; and 2 chargeable disability absences within 24 month period: Incidental absence, December 6 – December 8, 2006 (3 days), Disability absences March 5 – March 23, 2007 and September 4 – September 28, 2007.

The December 6 – 8, 2006 absence places the employee on Step 1 for 6 months as of December 9, 2006, with an expected retrogression date to be June 10, 2007. Because of the March 2007 disability absence, the employee is placed on Step 2 for 6 months as of March 24, 2007; with an expected Step 2 retrogression date of September 25, 2007.

The September 4 – 28, 2007 disability absence places the employee on Step 3 as of September 29, 2007 for 12 months because it is his/her 2nd disability within 24 months. Therefore, the employee will retrogress off Step 3 on September 30, 2008. The employee will then retrogress off Step 2 after another 12 months which will be September 30, 2009. The employee will then retrogress off Step 1 after 6 months which would be March 30, 2010, assuming no further chargeable absences occur during this period.

### 3.1C – Very Short Service
The ACP allows for omission or acceleration of steps in the case of a very short term employee (generally less than one year of service) as long as Step 1 – First Discussion and Step 4 – Final Warning/Suspension (10 days suspension) is not omitted. Retrogression for these employees is the same as all other employees; that is, one step at a time.

### 3.1D – On-the-Job Accidents
In those cases where the On-the-Job accident appears separate from a pattern of absence, consideration may be given to not stepping the employee on the ACP for the initial period of absence. However, any subsequent absences for the same on the job accident will result in stepping the employee under the ACP.

### 4.0 Proof of Personal Illness for Incidental Absence
The ACP does not restrict the Company's right to request proof of illness in the form of a doctor's note or other documentation. For example, a supervisor may use discretion in particular absence situations where poor attendance patterns are evident or circumstances raise questions that the absence may not be caused by an illness. Failure on the part of the employee to submit requested satisfactory proof of personal illness may result in denial of pay for the days in question.

Modified: 11/05/06

Jackie Latham
Executive Director
Labor Relations

May 19, 2006



1095 Avenue of the Americas, Room 132
New York, NY 10036

Phone 212 395-8040
Fax 212 395-0723

Mr. Dennis Trainor
Assistant to the Vice President
Communications Workers of America
AFL-CIO, District One
80 Pine Street, 37th Floor
New York, NY 10005

Re: Addressing Absence Problem

Dear Mr. Trainor:

In response to recent notice from Verizon New York Inc. ("VNY" or the "Company") to the Communications Workers of America, AFL-CIO ("CWA") and the International Brotherhood of Electrical Workers, Local 2213 ("IBEW")(collectively "the Unions") with respect to its plans to modify its Absence Control Plan ("ACP"), the Unions have stated (and hereby affirm) that at this time they do not seek to bargain with the Company over the proposed changes. The Unions assert that they believe that the changes violate some or all of the collective bargaining agreements despite the Company's position to the contrary.

The Unions have proposed that the Company postpone the implementation of those modifications in order to permit the parties to explore other measures as alternatives to the Company's proposed changes to the ACP in order to address the Company's absence problems, which may obviate the need to modify the ACP. In order to explore such alternatives, the Company and the Unions agree as follows:

1. The Company and the Union will reconvene the New York Joint Committee on Absence Control ("NY JCAC") no later than June 9, 2006 to discuss and review absence data and information related to the issues that contributed to the Company's decision to modify its ACP. This discussion and review will be concluded on or before July 7, 2006, at which time the Unions will inform the Company in writing as to whether the Unions wish to engage in bargaining over issues other than the ACP that may have an impact on reducing the number and/or cost of absences to the Company ("non-ACP Issues"). Because such non-ACP issues may affect the ACP, the Unions may, at their discretion, also request bargaining over the ACP Issues.

2. In the event the Unions inform the Company that they do not wish to bargain with the Company over non-ACP Issues, the Unions agree that they will not

subsequently request to bargain over the proposed changes to the ACP that the Company outlined in its March 22, 2006 letter to the Unions (the "ACP Issues") or the non-ACP Issues. If the Company implements those proposed changes to the ACP, the Unions will not claim in any forum that they were not given an opportunity to bargain over the ACP Issues. However, nothing herein is intended to prevent the Unions from making any other claim that the Company's implementation of the ACP was improper nor is the Company precluded in any way from disputing any such claim.

3.  In the event that the Unions inform the Company that they wish to bargain with the Company over non-ACP Issues, or over both non-ACP Issues and ACP Issues, the Company will postpone implementing the modified ACP pending the outcome of the bargaining with the Unions and the parties will commence such bargaining as described below in paragraphs 3 (a) – (b).

    a.  Bargaining will commence on or before August 7, 2006 and will be limited to 45 days.

    b.  Bargaining may include any absence related issues, including the ACP if the Unions or the Company so request, that either party believes might help to reduce the number and/or cost of incidental absences including provisions of the parties' collective bargaining agreements. However, either party may, in its discretion, decline to discuss changes to provisions of existing collective bargaining agreements, or other agreements between the parties. To the extent that any change to existing provisions of the parties' collective bargaining agreements, letters, memoranda or other agreement between the parties can, as a matter of law, be modified only by mutual consent of the parties, then such mutual consent will be required to effectuate any such change.

4.  If the bargaining that takes place under paragraph 3 results in an agreement, the Company will not implement the changes to the ACP as outlined in its March 22, 2006 letter to the Unions and the Company and the Unions agree that neither party will make any proposals during 2008 bargaining related to absence. Further, the Company agrees not to propose other unilateral changes to the ACP prior to or during 2008 bargaining.

5.  If the bargaining that takes place under paragraph 3 does not result in an agreement, the Unions agree that they will not subsequently request to bargain over the ACP Issues or the non-ACP Issues, and if the Company then implements its proposed changes to the ACP, the Unions will not claim in any forum that they were not given an opportunity to bargain over the ACP Issues. However, nothing herein is intended to prevent the Unions from making any other claim that the Company's implementation of the ACP was improper nor is the Company precluded in any way from disputing any such claim. Lastly, neither the Company

nor the Unions will have been deemed to have waived any of their respective rights to make whatever lawful proposals they deem appropriate related to absence or any other topics during 2008 bargaining.

6. Any deadlines set forth in this agreement may be extended, but only upon the mutual agreement of the parties.

Please indicate your agreement by signing in the space provided below and returning one of the originals to me.

Sincerely,

Jackie Latham
Executive Director,
Labor Relations

AGREED: _Dennis G. Trainor_ Date _5/19/06_
Dennis G. Trainor, Assistant to the Vice President
Communications Workers of America